**Appeal No. 24-1007**

IN THE

# United States Court of Appeals

FOR THE FOURTH CIRCUIT

►►◄◄

―――――――――――

ADVANFORT COMPANY

*Plaintiff-Appellant,*

v.

ZAMIL OFFSHORE SERVICES COMPANY and SAUDI PORTS AUTHORITY.

*Defendants-Appellees.*

―――――――――――

On Appeal From The United States District Court
For The Eastern District of Virginia

―――――――――――

## JOINT APPENDIX

―――――――――――

Clara Brillembourg
FOLEY HOAG LLP
1717 K Street N.W.
Washington, D.C. 20006
Tel. (202) 261-7334

Andrew B. Loewenstein
Roseanna K. Loring
Matthew F. Casassa
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel. (617) 832-1000

Peter A. Sullivan
FOLEY HOAG LLP
1301 Ave. of the Americas
New York, NY 10019
Tel. (212) 812-0310

Stephen Robin
FOLEY HOAG LLP
4643 S. Ulster Street
Denver, CO 80237
Tel. (720) 782-5084

*(signature blocks continue on the following page)*

Benjamin L. Hatch
MᴄGᴜɪʀᴇWᴏᴏᴅꜱ LLP
101 West Main Street
Norfolk, VA 23510
Tel. (757) 640-3700

*Attorneys for Plaintiff-Appellant AdvanFort Company*

Richmond T. Moore
John S. Williams
Nicholas A. Maricic
Janae N. Staicer
Wɪʟʟɪᴀᴍꜱ & Cᴏɴɴᴏʟʟʏ LLP
680 Maine Avenue SW
Washington, D.C. 20024
Tel. (202) 434-5000

*Attorneys for Defendant-Appellee Zamil Offshore Services Company*

# TABLE OF CONTENTS

District Court Docket Sheet.........................................................J.A.001

Dkt. No. 1 Complaint ...............................................................J.A.007

    Dkt. No. 1-1 Exhibit A.......................................................J.A.043

    Dkt. No. 1-2 Civil Cover Sheet ........................................J.A.047

Dkt. No. 23 Motion to Dismiss Plaintiff's Complaint.................J.A.049

    Dkt. No. 23-1 Proposed Order...........................................J.A.051

Dkt. No. 24 Memorandum in Support re 23 Motion to Dismiss  J.A.052

    Dkt. No. 24-1 Affidavit Declaration of Hussam Salah I.
    Al Hejailan...................................................................J.A.085

    Dkt. No. 24-2 Exhibit A....................................................J.A.099

    Dkt. No. 24-3 Exhibit B....................................................J.A.114

    Dkt. No. 24-4 Exhibit C....................................................J.A.124

    Dkt. No. 24-5 Exhibit D ...................................................J.A.130

    Dkt. No. 24-6 Affidavit Declaration of Anoop
    Kurikkalakath................................................................J.A.136

Dkt. No. 34 Memorandum in Opposition re 23 Motion to
Dismiss .................................................................................J.A.139

Dkt. No. 35 Declaration of Peter A. Sullivan re 34 Memorandum in
Opposition ............................................................................J.A.179

    Dkt. No. 35-1 Exhibit A....................................................J.A.181

    Dkt. No. 35-2 Exhibit B....................................................J.A.185

    Dkt. No. 35-3 Exhibit C....................................................J.A.195

    Dkt. No. 35-4 Exhibit D (excerpt) ....................................J.A.202

    Dkt. No. 35-5 Exhibit E....................................................J.A.207

Dkt. No. 35-6 Exhibit F .......................................................J.A.216

Dkt. No. 35-7 Exhibit G .....................................................J.A.221

Dkt. No. 36 Declaration of Ahmed Farajallah re 34 Memorandum in Opposition.......................................................................J.A.227

Dkt. No. 37 Declaration of Abdullah Alaoudh re 34 Memorandum in Opposition.......................................................................J.A.229

Dkt. No. 37-8 Exhibit H .....................................................J.A.249

Dkt. No. 37-9 Exhibit I.......................................................J.A.255

Dkt. No. 37-10 Exhibit J .....................................................J.A.259

Dkt. No. 37-11 Exhibit K.....................................................J.A.263

Dkt. No. 37-25 Exhibit Y.....................................................J.A.270

Dkt. No. 38 Motion for Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss ............J.A.273

Dkt. No. 38-1 Proposed Order.............................................J.A.276

Dkt. No. 39 Memorandum in Support re 38 Motion for Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss ...................................................J.A.278

Dkt. No. 41 Brief in Support re 23 Motion to Dismiss ................J.A.293

Dkt. No. 41-1 Supplemental Declaration of Anoop Kurikkalakath.................................................................J.A.318

Dkt. No. 41-2 Supplemental Declaration of Hussam Salah I. Al Hejailan............................................................J.A.321

Dkt. No. 42 Response in Opposition re 38 Motion for Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss........................................................J.A.328

Dkt. No. 43 Reply to Response in Opposition re 38 Motion for Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss ...........................................................J.A.337

Dkt. No. 46 Request for Entry of Default as to Defendant Saudi Ports Authority ..................................................................... J.A.350

Dkt. No. 46-1 Affidavit of Benjamin L. Hatch.................... J.A.354

Dkt. No. 47 Clerk's Entry of Default as to Defendant Saudi Ports Authority ................................................................... J.A.356

Dkt. No. 55 Transcript of Motions Hearing on December 1, 2023 ........................................................ J.A.357

Dkt. No. 49 Memorandum Opinion re 23 Motion to Dismiss...... J.A.363

Dkt. No. 50 Order Granting 23 Motion to Dismiss and Denying 38 Motion for Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss ................................ J.A.379

Dkt. No. 51 Judgment ................................................................ J.A.380

Dkt. No. 52 Notice of Appeal........................................................ J.A.381

APPEAL,CLOSED,JURY

# U.S. District Court
## Eastern District of Virginia – (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:23–cv–00906–LMB–IDD

| | |
|---|---|
| AdvanFort Company v. Zamil Offshore Services Company et al | Date Filed: 07/12/2023 |
| Assigned to: District Judge Leonie M. Brinkema | Date Terminated: 12/01/2023 |
| Referred to: Magistrate Judge Ivan D. Davis | Jury Demand: Plaintiff |
| Demand: $75,000 | Nature of Suit: 290 Real Property: Other |
| Case in other court: 4th Circuit, 24–01007 | Jurisdiction: Diversity |
| Cause: 28:1332 Diversity–Conversion | |

**Plaintiff**

**AdvanFort Company**      represented by    **Andrew Barak Loewenstein**
Foley Hoag LLP (MA–NA)
155 Seaport Blvd
Boston, MA 02210
**NA**
617–832–1000
Fax: 617–832–7000
Email: aloewens@foleyhoag.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clara Elena Brillembourg**
Foley Hoag LLP (DC–NA)
1717 K Street, NW
Washington, DC 20006
**NA**
202–223–1200
Fax: 202–785–6687
Email: cbrillembourg@foleyhoag.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peter Albert Sullivan**
Foley Hoag LLP (NY–NA)
1301 Avenue of the Americas
25th Floor
New York, NY 10019
**NA**
212–812–0400
Fax: 212–812–0399
Email: psullivan@foleyhoag.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roseanna Koenig Loring**
Foley Hoag LLP (MA–NA)
155 Seaport Blvd
Boston, MA 02210
**NA**
617–832–1000
Fax: 617–832–7000
Email: rloring@foleyhoag.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Lucas Hatch**
McGuireWoods LLP (Norfolk)
101 W Main St
Suite 9000
Norfolk, VA 23510–1655

757–640–3947
Email: bhatch@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Zamil Offshore Services Company**            represented by  **Amy Beth McKinlay**
Williams & Connolly LLP (DC)
725 12th St NW
Washington, DC 20005
202–434–5000
Fax: 202–434–5029
Email: amckinlay@wc.com
*ATTORNEY TO BE NOTICED*

**John Williams**
Williams & Connolly LLP (DC–NA)
680 Maine Ave SW
Washington, DC 20024
*** NA ***
202–434–5646
Fax: 202–434–5029
Email: jwilliams@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richmond Turner Moore**
Williams & Connolly LLP (DC–NA)
680 Maine Ave SW
Washington, DC 20024
*** NA ***
202–434–5688
Fax: 202–434–5029
Email: rtmoore@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Saudi Ports Authority**
*a foreign sovereign State*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/12/2023 | 1 | Complaint ( Filing fee $ 402, receipt number AVAEDC–9023088.), filed by AdvanFort Company. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet)(Hatch, Benjamin) (Entered: 07/12/2023) |
| 07/12/2023 | 2 | Proposed Summons *Zamil Offshore Services Company* by AdvanFort Company. (Hatch, Benjamin) (Entered: 07/12/2023) |
| 07/12/2023 | 3 | Proposed Summons *Saudi Ports Authority* by AdvanFort Company. (Hatch, Benjamin) (Entered: 07/12/2023) |
| 07/12/2023 | 4 | Financial Interest Disclosure Statement (Local Rule 7.1) by AdvanFort Company. (Hatch, Benjamin) (Entered: 07/12/2023) |
| 07/12/2023 | 5 | Citizenship Disclosure Form (Local Rule 7.1) by AdvanFort Company. (Hatch, Benjamin) (Entered: 07/12/2023) |
| 07/12/2023 | 6 | Motion to appear Pro Hac Vice by Clara Elena Brillembourg and Certification of Local Counsel Benjamin L. Hatch Filing fee $ 75, receipt number AVAEDC–9023153. by AdvanFort Company. (Hatch, Benjamin) (Entered: 07/12/2023) |

| | | |
|---|---|---|
| 07/12/2023 | 7 | Motion to appear Pro Hac Vice by Peter Albert Sullivan and Certification of Local Counsel Benjamin L. Hatch Filing fee $ 75, receipt number AVAEDC−9023171. by AdvanFort Company. (Hatch, Benjamin) (Entered: 07/12/2023) |
| 07/12/2023 | | Initial Case Assignment to District Judge Leonie M. Brinkema and Magistrate Judge Ivan D. Davis. (swil) (Entered: 07/13/2023) |
| 07/13/2023 | 8 | Summons Issued as to Saudi Ports Authority, Zamil Offshore Services Company, NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed or Summons Returned Unexecuted. (Attachments: # 1 Summons Notice)(swil) (Entered: 07/13/2023) |
| 07/13/2023 | 9 | ORDER granting 6 Motion for Pro hac vice Appointed Clara Elena Brillembourg for AdvanFort Company (swil) (Entered: 07/13/2023) |
| 07/13/2023 | 10 | ORDER granting 7 Motion for Pro hac vice Appointed Peter Albert Sullivan for AdvanFort Company. Signed by District Judge Leonie M. Brinkema on 7/13/2023. (swil) (Entered: 07/13/2023) |
| 07/20/2023 | 11 | Motion to appear Pro Hac Vice by Andrew Barak Loewenstein and Certification of Local Counsel Benjamin L. Hatch Filing fee $ 75, receipt number AVAEDC−9035927. by AdvanFort Company. (Hatch, Benjamin) (Entered: 07/20/2023) |
| 07/24/2023 | 12 | ORDER granting 11 Motion for Pro hac vice Appointed Andrew Barak Loewenstein for AdvanFort Company. Signed by District Judge Leonie M. Brinkema on 7/24/2023. (swil) (Entered: 07/24/2023) |
| 08/30/2023 | 13 | WAIVER OF SERVICE Returned Executed by AdvanFort Company. Zamil Offshore Services Company waiver sent on 7/31/2023, answer due 10/30/2023. (Hatch, Benjamin) (Entered: 08/30/2023) |
| 09/12/2023 | 14 | AFFIDAVIT *Requesting Foreign Mailing* by AdvanFort Company. (Hatch, Benjamin) (Entered: 09/12/2023) |
| 09/29/2023 | 15 | Motion to appear Pro Hac Vice by John Williams and Certification of Local Counsel Amy B. McKinlay Filing fee $ 75, receipt number AVAEDC−9149249. by Zamil Offshore Services Company. (McKinlay, Amy) (Entered: 09/29/2023) |
| 09/29/2023 | 16 | Motion to appear Pro Hac Vice by Richmond Moore and Certification of Local Counsel Amy B. McKinlay Filing fee $ 75, receipt number AVAEDC−9149275. by Zamil Offshore Services Company. (McKinlay, Amy) (Entered: 09/29/2023) |
| 09/29/2023 | 17 | ORDER denying 15 Motion for Pro hac vice. Signed by District Judge Leonie M. Brinkema on 9/29/2023. (swil) (Entered: 09/29/2023) |
| 09/29/2023 | 18 | ORDER denying 16 Motion for Pro hac vice. Signed by District Judge Leonie M. Brinkema on 9/29/2023. (swil) (Entered: 09/29/2023) |
| 09/29/2023 | 19 | Amended Motion to appear Pro Hac Vice by John Williams and Certification of Local Counsel Amy B. McKinlay by Zamil Offshore Services Company. (McKinlay, Amy) (Entered: 09/29/2023) |
| 09/29/2023 | 20 | Amended Motion to appear Pro Hac Vice by Richmond Moore and Certification of Local Counsel Amy B. McKinlay by Zamil Offshore Services Company. (McKinlay, Amy) (Entered: 09/29/2023) |
| 09/29/2023 | 21 | Amended Motion to appear Pro Hac Vice by John Williams and Certification of Local Counsel Amy B. McKinlay by Zamil Offshore Services Company. (McKinlay, Amy) (Entered: 09/29/2023) |
| 09/29/2023 | 22 | Corporate Disclosure Statement by Zamil Offshore Services Company. (McKinlay, Amy) (Entered: 09/29/2023) |

| 09/29/2023 | 23 | MOTION to Dismiss *PLAINTIFFS COMPLAINT* by Zamil Offshore Services Company. (Attachments: # 1 Proposed Order Proposed Order)(McKinlay, Amy) (Entered: 09/29/2023) |
| 09/29/2023 | 24 | Memorandum in Support re 23 MOTION to Dismiss *PLAINTIFFS COMPLAINT* filed by Zamil Offshore Services Company. (Attachments: # 1 Affidavit Declaration of Hussam Salah I. Al Hejailan, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Affidavit Declaration of Anoop Kurikkalakath)(McKinlay, Amy) (Entered: 09/29/2023) |
| 09/29/2023 | 25 | ORDER granting 20 Motion for Pro hac vice Appointed Richmond Turner Moore for Zamil Offshore Services Company. Signed by District Judge Leonie M. Brinkema on 9/29/2023. (swil) (Entered: 10/02/2023) |
| 09/30/2023 |  | Notice of Correction: The filing user has been notified to file a Notice of Hearing or a Waiver of Oral Argument in re 23 MOTION to Dismiss PLAINTIFFS COMPLAINT. (jlan) (Entered: 09/30/2023) |
| 10/02/2023 | 26 | ORDER granting 21 Motion for Pro hac vice Appointed John Williams for Zamil Offshore Services Company. Signed by District Judge Leonie M. Brinkema on 9/29/2023. (swil) (Entered: 10/02/2023) |
| 10/02/2023 | 27 | MOTION for Extension *of Time to Respond to Motion to Dismiss (Unopposed)* by AdvanFort Company. (Attachments: # 1 Proposed Order)(Hatch, Benjamin) (Entered: 10/02/2023) |
| 10/02/2023 | 28 | ORDER granting 27 MOTION for Extension *of Time to Respond to Motion to Dismiss (Unopposed)*; and it is further ORDERED that Plaintiff shall file any response to the Motion to Dismiss on or before October 30, 2023. Signed by District Judge Leonie M. Brinkema on 10/2/2023. (Dest) (Entered: 10/02/2023) |
| 10/18/2023 | 30 | MOTION for Extension *Time to Reply to Response to Motion to Dismiss (Unappossed)* by Zamil Offshore Services Company. (Attachments: # 1 Proposed Order Proposed Order)(McKinlay, Amy) (Entered: 10/18/2023) |
| 10/18/2023 | 31 | Notice of Hearing Date *12/01/2023* re 23 MOTION to Dismiss *PLAINTIFFS COMPLAINT* (McKinlay, Amy) (Entered: 10/18/2023) |
| 10/19/2023 |  | Set Deadline as to 23 MOTION to Dismiss PLAINTIFFS COMPLAINT. Motion Hearing set for 12/1/2023 at 10:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (wgar, ) (Entered: 10/19/2023) |
| 10/19/2023 | 32 | ORDERED that the Motion is GRANTED. Defendant's reply memorandum shall be filed by November 10, 2023 in re 30 Motion for Extension of Time to File. Signed by District Judge Leonie M. Brinkema on 10/19/2023. (swil) (Entered: 10/19/2023) |
| 10/20/2023 | 33 | SUMMONS Returned Executed by AdvanFort Company Saudi Ports Authority served on 9/19/2023, answer due 10/10/2023 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Hatch, Benjamin) (Entered: 10/20/2023) |
| 10/30/2023 | 34 | Memorandum in Opposition re 23 MOTION to Dismiss *PLAINTIFFS COMPLAINT* filed by AdvanFort Company. (Hatch, Benjamin) (Entered: 10/30/2023) |
| 10/30/2023 | 35 | Declaration re 34 Memorandum in Opposition *of Peter A. Sullivan* by AdvanFort Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Hatch, Benjamin) (Entered: 10/30/2023) |
| 10/31/2023 | 36 | Declaration re 34 Memorandum in Opposition *of Ahmed Farajallah* by AdvanFort Company. (Hatch, Benjamin) (Entered: 10/31/2023) |
| 10/31/2023 | 37 | Declaration re 34 Memorandum in Opposition *of Abdullah Alaoudh* by AdvanFort Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL, # 39 Exhibit MM, # 40 Exhibit NN, # 41 Exhibit OO, |

| | | |
|---|---|---|
| | | # 42 Exhibit PP, # 43 Exhibit QQ, # 44 Exhibit RR, # 45 Exhibit SS, # 46 Exhibit TT, # 47 Exhibit UU, # 48 Exhibit VV, # 49 Exhibit WW)(Hatch, Benjamin) (Entered: 10/31/2023) |
| 10/31/2023 | 38 | MOTION for Discovery *(Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss of Defendant Zamil Offshore Service Company)* by AdvanFort Company. (Attachments: # 1 Exhibit A – Proposed Order)(Hatch, Benjamin) (Entered: 10/31/2023) |
| 10/31/2023 | 39 | Memorandum in Support re 38 MOTION for Discovery *(Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss of Defendant Zamil Offshore Service Company)* filed by AdvanFort Company. (Hatch, Benjamin) (Entered: 10/31/2023) |
| 11/01/2023 | | Notice of Correction re 38 MOTION for Discovery *(Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss of Defendant Zamil Offshore Service Company)*. The filing user has been notified to file a Notice of Hearing or a Notice of Waiver of Oral Argument. (swil) (Entered: 11/01/2023) |
| 11/02/2023 | 40 | Notice of Hearing Date set for December 1, 2023 re 38 MOTION for Discovery *(Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss of Defendant Zamil Offshore Service Company)* (Hatch, Benjamin) (Entered: 11/02/2023) |
| 11/03/2023 | | Set Deadline as to 38 MOTION for Discovery (Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss of Defendant Zamil Offshore Service Company). Motion Hearing set for 12/1/2023 at 10:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (wgar, ) (Entered: 11/03/2023) |
| 11/10/2023 | 41 | Brief in Support to 23 MOTION to Dismiss *PLAINTIFFS COMPLAINT* filed by Zamil Offshore Services Company. (Attachments: # 1 Supplement Supplemental Declaration of Anoop Kurikkalakath, # 2 Supplement Supplemental Declaration of Hussam Salah I. Al Hejailan)(McKinlay, Amy) (Entered: 11/10/2023) |
| 11/10/2023 | 42 | RESPONSE in Opposition re 38 MOTION for Discovery *(Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss of Defendant Zamil Offshore Service Company)* filed by Zamil Offshore Services Company. (McKinlay, Amy) (Entered: 11/10/2023) |
| 11/16/2023 | 43 | REPLY to Response to Motion re 38 MOTION for Discovery *(Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss of Defendant Zamil Offshore Service Company)* filed by AdvanFort Company. (Hatch, Benjamin) (Entered: 11/16/2023) |
| 11/29/2023 | 44 | Motion to appear Pro Hac Vice by Roseanna Koenig Loring and Certification of Local Counsel Benjamin L. Hatch Filing fee $ 75, receipt number AVAEDC–9239916. by AdvanFort Company. (Hatch, Benjamin) (Entered: 11/29/2023) |
| 11/29/2023 | 45 | ORDER granting 44 Motion for Pro hac vice Appointed Roseanna Koenig Loring for AdvanFort Company. Signed by District Judge Leonie M. Brinkema on 11/29/2023. (swil) (Entered: 11/30/2023) |
| 11/30/2023 | 46 | Request for Entry of Default as to *Defendant Saudi Ports Authority* by AdvanFort Company. (Attachments: # 1 Affidavit of Benjamin L. Hatch)(Hatch, Benjamin) (Entered: 11/30/2023) |
| 12/01/2023 | 47 | Clerk's ENTRY OF DEFAULT as to Saudi Ports Authority (swil) (Entered: 12/01/2023) |
| 12/01/2023 | 48 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema: Motion Hearing held on 12/1/2023. Appearances of Counsel for Plaintiff and Counsel for Defendant. RE: 23 MOTION to Dismiss *PLAINTIFFS COMPLAINT* filed by Zamil Offshore Services Company – GRANTED – ORDER/OPINION TO FOLLOW. RE: 38 MOTION for Discovery *(Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss of Defendant Zamil Offshore Service Company)* filed by AdvanFort Company – DENIED – ORDER/OPINION TO |

| | | FOLLOW.<br>Court Reporter: S. Austin (pmil, ) (Entered: 12/01/2023) |
|---|---|---|
| 12/01/2023 | 49 | MEMORANDUM OPINION RE: Deft Zamil Offshore Service Company's 23 Motion to Dismiss. Signed by District Judge Leonie M. Brinkema on 12/01/23. (pmil, ) (Entered: 12/01/2023) |
| 12/01/2023 | 50 | ORDER, for the reasons stated in open Court and for the reasons stated in the accompanying Memorandum Opinion, Deft Zamil Offshore Services Company's 23 Motion to Dismiss is **GRANTED** and pltf AdvanFort Company's 38 Motion for Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay the Motion to Dismiss is **DENIED**.<br>Pltf's Complaint be and is **DISMISSED WITHOUT PREJUDICE** (see Order for details). Signed by District Judge Leonie M. Brinkema on 12/01/23. (pmil, ) Modified on 12/1/2023 to add text (pmil, ). (Entered: 12/01/2023) |
| 12/01/2023 | 51 | JUDGMENT is hereby entered in favor of the Defendants, Zamil Offshore Services Company and Saudi Ports Authority and against the Plaintiff, Advanfort Company (Entered by Clerk on 12/01/23 pursuant to FRCP 58). (pmil, ) (Entered: 12/01/2023) |
| 12/01/2023 | | (Court only) ***Civil Case Terminated. (pmil) (pmil, ) (Entered: 12/01/2023) |
| 12/26/2023 | 52 | NOTICE OF APPEAL as to 51 Clerk's Judgment by AdvanFort Company. Filing fee $ 605, receipt number AVAEDC−9282391. (Hatch, Benjamin) (Entered: 12/26/2023) |
| 12/26/2023 | 53 | Transmission of Notice of Appeal to US Court of Appeals re 52 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (wgar, ) (Entered: 12/28/2023) |
| 01/02/2024 | 54 | USCA Case Number 24−1007, case manager Jeffrey S. Neal 4th Circuit for 52 Notice of Appeal filed by AdvanFort Company. (swil) (Entered: 01/03/2024) |
| 01/05/2024 | 55 | TRANSCRIPT of motions hearing for date of 12−1−23, before Judge Leonie M. Brinkema, re 52 Notice of Appeal Court Reporter/Transcriber Stephanie Austin, Telephone number 571−298−1649. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/5/2024. Redacted Transcript Deadline set for 3/6/2024. Release of Transcript Restriction set for 4/4/2024.(Austin, Stephanie) (Entered: 01/05/2024)** |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>Alexandria Division</u>

| | |
|---|---|
| ADVANFORT COMPANY,<br>                              Plaintiff,<br><br>      vs.<br><br>ZAMIL OFFSHORE SERVICES COMPANY<br>and SAUDI PORTS AUTHORITY, a foreign<br>sovereign State,<br>                              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO. 1:23-cv-906

**JURY TRIAL DEMANDED**

## **COMPLAINT**

### **Nature of the Action**

1.      Plaintiff AdvanFort Company ("AdvanFort") is a Virginia-based company that deploys armed security vessels to protect oil tankers and other vulnerable ships against piracy in some of the world's most volatile seas.  This action arises out of unlawful acts by Defendant Zamil Offshore Services Company ("Zamil Offshore") and Defendant Saudi Ports Authority ("Ports Authority") (together "Jeddah Shipyard" or the "Shipyard") undertaken in connection with the commercial operation of the shipyard in Jeddah, Saudi Arabia that ruined one of AdvanFort's highly specialized maritime security vessels: the *M/V Seaman Guard Virginia* ("*Seaman Guard Virginia*").  Put simply, the *Seaman Guard Virginia* entered the shipyard as a valuable, high-performance vessel in order to undergo routine maintenance and minor repairs.  But, due to the malfeasance and negligence of the Shipyard, the vessel is now scrap.

2.      Specifically, and as detailed below, Zamil Offshore – through acts undertaken in the United States, including Virginia – attracted AdvanFort to engage Jeddah Shipyard to carry

out routine maintenance and minor repairs on the *Seaman Guard Virginia* while on a hiatus from conducting anti-piracy operations in the Red Sea.

3.      However, despite the public portrayal of Jeddah Shipyard as a competent and reliable ship-repair facility, AdvanFort found itself in a nightmare: a shipyard in disarray with an unstable power supply, sinking dock, striking workers, and a practice of disregarding minimal safety standards.

4.      Jeddah Shipyard's extraordinary degree of mismanagement included failing to remove combustible materials from the *Seaman Guard Virginia* before carrying out welding and other hot work, causing a portion of the vessel to catch fire.  And, because Jeddah Shipyard failed to post a fire watch, the fire was allowed to burn long after it should have been put out.

5.      The fire, however, was only the beginning of the story.  It was followed by Jeddah Shipyard's refusal to complete its contractually obligated repair work on the vessel – including work unaffected by the fire.  Indeed, rather than take responsibility for causing the blaze and failing to extinguish it, Zamil Offshore sought to use its influence within the Saudi government to reassign blame to AdvanFort by, *inter alia*, providing false information to investigators and otherwise attempting to influence their investigation.

6.      When AdvanFort sought to vindicate its rights in the Saudi court system, Jeddah Shipyard offered to settle the dispute contingent on Zamil Offshore arranging a bribe to the relevant governmental authorities.  And, when AdvanFort refused, Zamil Offshore perverted the judicial process, which resulted in a Saudi judicial award *against* AdvanFort.

7.      When AdvanFort finally gained access to the *Seaman Guard Virginia*, it discovered that Jeddah Shipyard had stripped the vessel – or permitted it to be stripped – of everything of value, leaving it an exposed shell incapable of navigation.

## Parties

8.      AdvanFort is a company organized under the laws of Washington, D.C., with a principal place of business in Fairfax County, Virginia.  AdvanFort is a multi-mission maritime security company that protects maritime assets through the deployment of armed security vessels.

9.      Upon information and belief, Zamil Offshore is a closed stock company organized under the laws of Saudi Arabia.  Zamil Offshore holds itself out as a maritime support company.

10.     Zamil Offshore is an affiliate of Zamil Group Holding ("Zamil Group"), one of the largest company groups in Saudi Arabia.  Zamil Group is owned and controlled by the Zamil family, one of Saudi Arabia's richest and most powerful families.  The Zamil family enjoys an extremely close relationship with the all-powerful Saudi Royal Family and Saudi Government.

11.     The Zamil family's connections and influence in Saudi Arabia, including with the Saudi Royal Family and Saudi Government, is indicated by the fact that the Chairman of Zamil Group, Abdul Rahman Al-Zamil, accompanied Saudi King Salman bin Abdulaziz Al Saud and Saudi Crown Prince Mohammed Bin Salman as part of a formal delegation of the U.S.-Saudi Business Council, aimed at expanding U.S. business in Saudi Arabia.  Zamil Group's Chairman can be seen in the photograph, reproduced below, seated in close proximity to the King and Crown Prince at a meeting of the U.S.-Saudi Business Council in Vienna, Virginia.

3



Individuals circled in the image from left to right: the Chairman of the Zamil Group; Saudi Crown Prince Mohammed Bin Salaman; and Saudi King Salman bin Abdulaziz Al Saud, at a meeting at the U.S.-Saudi Arabia Business Council in Vienna, Virginia.

12.    The Ports Authority is a government authority of the Kingdom of Saudi Arabia, a foreign state. The Ports Authority qualifies as a foreign state within the meaning of 28 U.S.C. § 1603(a). According to the Ports Authority's website, it "is a government authority which . . . oversees [Saudi Arabia's] national ports system."

13.    During all relevant times, Zamil Offshore and the Ports Authority jointly operated Jeddah Shipyard as a commercial enterprise.

**Jurisdiction and Venue**

14.    The Court has subject matter jurisdiction over the claims asserted herein against Zamil Offshore pursuant to 28 U.S.C. § 1332(a) because AdvanFort is a citizen of Washington, D.C. and Virginia, Zamil Offshore is a citizen of a foreign state, and the amount in controversy exceeds $75,000.

15.     The Court has personal jurisdiction over Zamil Offshore because it availed itself of the laws of the Commonwealth of Virginia and the United States pursuant to Va. Code Ann. § 8.01-328.1(A)(1), (3)-(4); (B) and the Fourteenth Amendment of the U.S. Constitution.

16.     The Court has subject matter jurisdiction under 28 U.S.C. § 1330(a) over the claims asserted herein against the Ports Authority because it is not immune from suit under the third clause of 28 U.S.C. § 1605(a)(2).  The claims asserted against the Ports Authority are based upon acts that occurred outside the territory of the United States, in Saudi Arabia, including the Ports Authority's malfeasance in wrongfully retaining and stripping the *Seaman Guard Virginia* of all valuable items, including those necessary for its operation, and/or permitting such retaining and stripping to occur.  The Ports Authority undertook these acts and omissions in connection with a commercial activity of a foreign State, specifically its supervision and joint commercial operation of Jeddah Shipyard.  Those acts caused a direct effect in the United States: to wit, AdvanFort was prevented from performing its contractual obligation to return the *Seaman Guard Virginia* to the Port of Baltimore, Maryland in the same or as good structure, state, condition, and class as that in which the vessel had been delivered to AdvanFort.

17.     The Court has personal jurisdiction over the Ports Authority pursuant to 28 U.S.C. § 1330(b) because there is subject matter jurisdiction under 28 U.S.C. § 1330(a) and service will be effectuated in accordance with 28 U.S.C. § 1608(a).

18.     Venue is proper in this division and district pursuant to 28 U.S.C. §§ 1391(b); 28 U.S.C. § 1391(f) and Local Rule 3(B)-(C).  A substantial part of the events or omissions giving rise to the claims occurred in this division and district and Zamil Offshore is subject to the Court's personal jurisdiction with respect to this action in this district.

## **Facts**

A.    <u>The M/V Seaman Guard Virginia</u>

19.    The *Seaman Guard Virginia* was designed and built for the British Royal Air Force Marine Navy Branch as a long-range support craft.  The vessel was later transferred to the British Royal Navy after it proved ideally suited for service as a patrol boat.  Under the name *Her Majesty's Ship Redpole*, the vessel served in the waters of Northern Ireland.

20.    To enhance its ability to serve security-related functions, the Royal Navy added additional features to the vessel, including an enclosed wheelhouse, extended bridge wings, and a bullet-proof bridge.

21.    In or about late 2011, Seaman Guard Inc. ("Seaman Guard") acquired the *Seaman Guard Virginia* to serve as an anti-piracy armed vessel.  Seaman Guard retained the vessel's military features, including its bullet-proof bridge, hardened super-structure, gray naval paint, and battle equipment.  The vessel's appearance as a warship enhanced its ability to deter piracy during security operations.  The following image shows the vessel's state before arriving at the shipyard.



J.A.012

22.     Seaman Guard made additional improvements to the *Seaman Guard Virginia* that increased its range and ability to provide security services in rough seas.  Such services included housing and transporting security personnel and armaments for deployment on vessels vulnerable to attacks of piracy.

23.     On or about May 21, 2012, AdvanFort entered into a charter agreement with Seaman Guard to charter the *Seaman Guard Virginia* for a period of 36 months, at a rate of US $5,000 per day.  Under the charter agreement, AdvanFort had an option to extend the charter period for an additional 12 months.  The charter agreement automatically extended the charter period if AdvanFort did not return the *Seaman Guard Virginia*.

24.     The charter agreement obligated AdvanFort to return the *Seaman Guard Virginia* to Seaman Guard at the Port of Baltimore, Maryland in the same or as good structure, state, condition, and class as that in which the vessel was delivered to AdvanFort.

B.      AdvanFort's Operations In The Red Sea

25.     In or around June 2012, AdvanFort took delivery of the *Seaman Guard Virginia* at the Port of Baltimore.  Upon delivery, AdvanFort hired an experienced team to manage the vessel's anti-piracy operations.  AdvanFort also refitted the vessel for upcoming operations.

26.     Piracy and other maritime threats present a serious risk to shipping in the southern portion of the Red Sea, which, due to its connection to the Suez Canal, serves as one of the world's most vital and busiest shipping routes.  The insurance industry has long designated parts of the Red Sea a "High Risk Area" for piracy.  While the risk of piracy in other areas has decreased over the years, it has remained a grave threat to vessels traversing the southern part of the Red Sea.

27.     In view of these threats, insurance companies require that armed security teams be deployed aboard covered commercial vessels local port rules and regulations that prohibit the presence of armaments in port or territorial waters complicate the operations of commercial fleets

traversing the Red Sea's High Risk Area because the fleets are required by their insurers to have onboard the very armaments they are prohibited from possessing in port or territorial waters. To comply with these rules and regulations, commercial vessels retain the services of anti-piracy companies like AdvanFort whose security vessels act as floating armories, allowing armaments to be securely housed while commercial vessels are in areas that prohibit armaments. AdvanFort was one of the first companies to offer this service and found immediate success due to significant demand and its ability to provide superior logistical support and coverage.

28.     In or about 2012, AdvanFort directed the *Seaman Guard Virginia* to depart the Port of Baltimore for the Red Sea to meet the area's increasing demand for anti-piracy security services. Upon arrival in the Red Sea, the *Seaman Guard Virginia* performed anti-piracy services pursuant to contracts that AdvanFort entered into with commercial fleets.

29.     The *Seaman Guard Virginia* was one of three security vessels that AdvanFort used in its operations across the High Risk Area. The *Seaman Guard Virginia*'s positioning vis-à-vis AdvanFort's other security vessels allowed AdvanFort to offer unparalleled service to its clients: full coverage across the High Risk Area which extends from the southern portion of the Red Sea, along the Somali coast, and at times, extending all the way to the coast of India. In the years since AdvanFort took delivery of the *Seaman Guard Virginia*, the increased risk of piracy created significant demand for the *Seaman Guard Virginia*'s armed security services.

C.     Zamil Offshore's and the Ports Authority's Joint Operation of Jeddah Shipyard

30.     The Ports Authority owns the Jeddah Islamic Port. The Jeddah Islamic Port contains a shipyard.

31.     Upon information and belief, in or around 2013, the Ports Authority entered into an agreement to partner with Zamil Offshore to jointly commercially operate Jeddah Shipyard for a period of ten years.

32.    Upon information and belief, the Ports Authority supervises and oversees all commercial operations of Jeddah Shipyard.

33.    Upon information and belief, Zamil Offshore and the Ports Authority share revenues earned from the commercial operation of Jeddah Shipyard.

34.    Jeddah Shipyard issues commercial quotes and invoices in connection with the performance of its services on letterhead bearing the corporate logos of both Zamil Offshore and the Ports Authority.  Importantly, Arabic is read from right to left indicating the importance of the Ports Authority's logo. An extract of an example of such a quote, issued to AdvanFort, is reproduced and annotated below.



35.    Upon information and belief, as part of its joint commercial operation of Jeddah Shipyard, the Ports Authority at all relevant times monitored and controlled entry to and exit from Jeddah Shipyard.

36.    Upon information and belief, as part of its joint commercial operation of Jeddah Shipyard, the Ports Authority at all relevant times permitted only approved individuals with the required security clearance and identification to enter Jeddah Shipyard.

37.     Upon information and belief, as part of its joint commercial operation of Jeddah Shipyard, the Ports Authority controlled the exit of individuals and the removal of items from Jeddah Shipyard.

38.     In the alternative, upon information and belief, Zamil Offshore operated Jeddah Shipyard as an agent of the Ports Authority.  The Ports Authority retained the right to control the commercial operation of Jeddah Shipyard.  The Ports Authority also retained oversight and supervision of Jeddah Shipyard's commercial operations and controlled ingress and egress to the Jeddah Shipyard.

D.      <u>AdvanFort Seeks the Services of Jeddah Shipyard</u>

39.     In 2013, after over a year of carrying out anti-piracy operations in the Red Sea, AdvanFort sought the services of a shipyard to perform routine maintenance and to carry out minor repairs on the *Seaman Guard Virginia*.

1.      *Zamil Offshore's Solicitation of U.S. Business*

40.     Zamil Offshore solicits business for Jeddah Shipyard in the Commonwealth of Virginia.

41.     The American Bureau of Shipping (the "Bureau") is a maritime classification society that provides classification services for marine and offshore assets.  It is a recognized agent of the U.S. government "in matters related to classification," and U.S. law requires that the U.S. government appoint representation on the executive committee of the Bureau.  *See* 46 U.S.C. § 3316.

42.     To make itself attractive to businesses in the United States, including Virginia, Zamil Offshore has sought out the classification and association of the American Bureau of Shipping, which Zamil Offshore has publicly promoted.

43.     Zamil Offshore's executives are members of the American Bureau of Shipping. For example, in 2017, an American Bureau of Shipping publication listed the following Zamil Offshore executives as active members of the Bureau: Zamil A. Al-Zamil, Hassan Khalil Ibrahim, and Sufyan Zamil.  The publication described each such executive as being affiliated with "Zamil Offshore Services Company."

44.     As part of Zamil Offshore's efforts to obtain business in the United States, including Virginia, Zamil Offshore advertises that it meets American Bureau of Shipping standards.

45.     In or about 2011, Zamil Offshore sought and obtained the American Bureau of Shipping Certificate of Conformance evaluation for its Ship Building and Ship Repairs Division.

46.     On or about October 5, 2011, as part of its efforts to obtain business from the United States, including Virginia, Zamil Offshore published on its website that its ship repair division had been awarded that standard by the American Bureau of Shipping.  A copy of the certificate of conformance, as it appeared on Zamil Offshore's website, is reproduced below.



11

J.A.017

47.     Zamil Offshore continues to advertise that it meets American Bureau of Shipping safety standards.  As recently as July 2023, Zamil Offshore's website advertised that Zamil Offshore meets the rules and standards promulgated by the American Bureau of Shipping.

48.     The home page of Zamil Offshore's website – which, on information and belief, is hosted in Ashburn, Virginia and Scottsdale, Arizona – prominently features the insignia of the American Bureau of Shipping.

49.     When the *Seaman Guard Virginia* arrived at the Jeddah Shipyard, Zamil Offshore's representatives provided business cards to the *Seaman Guard Virginia*'s crew that displayed the American Bureau of Shipping insignia.

50.     Zamil Offshore advertises its marine services in publications distributed in the United States, including Virginia.  For example, the *Baltic Exchange* is a publication that targets the marine services industry.  It is distributed in the United States, including Virginia.  The Autumn 2011 edition of the *Baltic Exchange* included an advertisement by Zamil Offshore.  The advertisement touted Zamil Offshore as the "Leading Integrated Marine Service Providers to the Offshore Industry."  Among the services offered by Zamil Offshore in the advertisement were "Shipbuilders and Ship and Rig Repairers" and "Engineering and Construction Services."  A copy of the advertisement is reproduced below.

J.A.018



51.     Zamil Offshore published similar advertisements in the *Baltic Exchange* in the summer and spring of 2011.

52.     Zamil Offshore, on information and belief, published advertisements and/or paid for case studies to appear in other publications that are distributed in the United States, including Virginia, such as: *Maritime Executive Magazine*, *Seatrade Maritime News*, *TradeWinds*, and *Offshore Journal*.

53.     Zamil Offshore's further efforts to obtain business from the United States, including Virginia, have included attending energy-sector conferences for servicing companies that rely on the maritime industry to transport hydrocarbons.

54.     For example, Zamil Offshore has regularly participated in the Offshore Technology Conference, held annually in Houston, Texas. Zamil Offshore participated in the conference in 2012 and published on its website that over 90,000 people attended the event.

55.     The Vienna, Virginia-based U.S.-Saudi Business Council seeks to develop business between the United States, including Virginia, and Saudi Arabia. Zamil Group promotes affiliated companies, including Zamil Offshore, in the United States, including Virginia, through its executives' membership in the Council and service on its Board.

56.     In or about April 2019, for example, the U.S.-Saudi Business Council boasted that Zamil Offshore signed a joint venture agreement with the American company McDermott International, Inc.

57.     Zamil Offshore's efforts to solicit U.S.-based business have been successful and it counts numerous U.S.-based businesses among its clients.

2.      *Zamil Offshore Attracts AdvanFort to Jeddah Shipyard*

58.     AdvanFort personnel, while in Virginia, learned of Zamil Offshore by seeing Zamil Offshore's advertisement in *The Baltic Exchange* and reading about the company in the *Maritime Executive Magazine*.

59.     Zamil Offshore's U.S. affiliations and certifications, as well as its contract to jointly commercially operate Jeddah Shipyard, led AdvanFort to believe – incorrectly, as it turned out – that Jeddah Shipyard was a competent and reliable shipyard.

60.     AdvanFort communicated with Jeddah Shipyard from Virginia using email hosted on a Virginia-based server and through telephone lines and/or cell phones located in Virginia.

61.     Jeddah Shipyard knew it was dealing with an American company based in Virginia.

62.     Correspondence from AdvanFort, on the one hand, to Jeddah Shipyard, on the other, included a signature block listing AdvanFort's address in Virginia.

63.     On or about July 18, 2013, AdvanFort provided to Jeddah Shipyard a list of work items that AdvanFort contemplated having done by Jeddah Shipyard.

64.     On or about July 25, 2013, Jeddah Shipyard provided to AdvanFort a "Price List and Dock Tariff."

65.     Jeddah Shipyard requested that AdvanFort deliver the *Seaman Guard Virginia* to the shipyard on September 12, 2013.  Jeddah Shipyard represented that it would: (a) complete the requested maintenance work and repairs by September 25, 2013; and (b) redeliver the vessel to AdvanFort by that date.

66.     In its dealings with Jeddah Shipyard, AdvanFort liaised with the Ports Authority's General Manager and Zamil Offshore's General Manager.

E.      <u>AdvanFort's Catastrophic Experience at Jeddah Shipyard</u>

67.     AdvanFort delivered the *Seaman Guard Virginia* to Jeddah Shipyard on or about September 12, 2013.  However, upon arrival, Jeddah Shipyard informed AdvanFort that the vessel could not enter the Shipyard because an electrical outage caused by unstable power supply had sunk one of Jeddah Shipyard's floating dry docks.

68.     On or about September 17, 2013, after the *Seaman Guard Virginia* had been waiting to enter the shipyard for five days, Jeddah Shipyard transmitted an email to AdvanFort requiring an advance payment in the amount of US$20,000 to secure dry dock space beginning on October 4, 2013 – more than two weeks after Jeddah Shipyard had initially represented the work would be completed.  In the same email, Jeddah Shipyard estimated a new completion date of October 13, 2013.

69.     On or about September 23, 2013, Jeddah Shipyard transmitted to AdvanFort a quotation on "Jeddah Shipyard" letterhead that included the corporate logos of Zamil Offshore and the Ports Authority, a copy of which is included herewith as Exhibit A (the "September 23, 2013 quotation").   Subsequent communications from Jeddah Shipyard were likewise written on letterhead bearing the Ports Authority's and Zamil Offshore's corporate logos.

70.     In the September 23, 2013 quotation, Jeddah Shipyard offered to perform basic maintenance services, including: hull cleaning; hull inspection; anchor and chain inspection and cleaning; seawater valves overhauling; and pipes and steel renewal.  The September 23, 2013 quotation offered to perform these services for the amount of US$46,550.  It stated that the "[t]ime frame for [the] above defined works [would be] 12 days in normal stable conditions."

71.     The same day that AdvanFort received the September 23, 2013 quotation, AdvanFort wired US$20,000 to Zamil Offshore, acting on behalf of Jeddah Shipyard, from its Bank of America account in Virginia to an account at the Saudi Hollandi Bank.

72.     Shortly after wiring these funds and while still awaiting entry to Jeddah Shipyard's dry dock to start the repairs, AdvanFort learned that Jeddah Shipyard workers had gone on strike due to substandard living and working conditions.  As a result, only a limited number of workers remained working at Jeddah Shipyard and those that remained were busy repairing the sunken dock, causing further delays to the repair of the *Seaman Guard Virginia*.

73.     The Jeddah Shipyard missed the second agreed-upon dry dock date as well as the second delivery date.  While waiting, AdvanFort repeatedly requested that the *Seaman Guard Virginia* be allowed to dry dock.

74.     On or about October 19, 2013 – more than a month after the *Seaman Guard Virginia* arrived – Jeddah Shipyard finally permitted the vessel to enter its dry dock.  AdvanFort delivered the vessel to Jeddah Shipyard in good condition.  At the time of delivery, the *Seaman Guard Virginia* required only routine maintenance and minor repairs.

J.A.022

*1.    The Fire on the Seaman Guard Virginia*

75.    In or around October 2013**,** Jeddah Shipyard proposed that electrical work be performed on the *Seaman Guard Virginia*.

76.     On or about October 21, 2013, Jeddah Shipyard provided AdvanFort with an additional works estimate in the amount of approximately US$56,841.00.  The estimate covered, among other electrical work: an item for "two alternator (STB, Port) complete overhauling – dismantle all parts, change bearing, clean and varnish for windingsand (sic) collecting all parts"; an item for "[c]hange all current and voltage readers and full inspection for synchronize system"; and an item for "[r]emove old fixes and install new ones and fabricate some plates and handle to light movement."

77.    On or about the same day, AdvanFort approved the proposed electrical work on the condition that the work not cause further postponement of the redelivery date.

78.    On or about the same day, Jeddah Shipyard began the electrical work and installed temporary electrical systems on the *Seaman Guard Virginia*, using extension cords and a portable service panel to connect the vessel to the same unstable power supply that had caused the floating dry dock to sink.

79.    Shortly thereafter, on October 27, 2013, a fire broke out on the vessel below deck on the port side of the *Seaman Guard Virginia*.

80.    Earlier that day, Jeddah Shipyard's permit authority had issued a hot work permit that authorized welding and the removal of a plate on the forward port side of the *Seaman Guard Virginia*, directly above where the fire later broke out.  The hot work permit mandated that a fire watch be posted and that before any hot work began, the worksite be adequately prepared, including by inspecting the area to insure it was safe to do hot work.

81.     As a safety precaution, it is standard industry practice that, prior to the commencement of hot work at a port, the fire department be notified and provided with a copy of the hot work permit.

82.     As a further safety precaution, it is standard industry practice that, prior to the commencement of hot work, the area be inspected and combustible materials removed.

83.     Although industry standards and the Jeddah Shipyard hot work permit's own terms required Jeddah Shipyard to ensure that the worksite be adequately prepared for hot work – including, *inter alia*, by checking the vicinity of the welding to protect against fire hazards – Jeddah Shipyard failed to check and remove combustible materials from the hot work area.

84.     On information and belief, because of the failures by Jeddah Shipyard to check for and remove combustible material prior to performing hot work, the work taking place on the deck ignited combustible materials underneath the deck.

85.     Industry standards and the hot work permit also required that Jeddah Shipyard post a fire watch prior to commencing the hot work.  However, in contravention of these standards, Jeddah Shipyard failed to do so, allowing the fire to burn unchecked.  The fire was only extinguished after burning for approximately four hours and causing significant damage.

> 2.     *Jeddah Shipyard's Refusal to Take Responsibility And Obtaining of False Reports*

86.     Notwithstanding having caused the fire and having failed to extinguish it in a timely manner, Jeddah Shipyard refused to take responsibility for its wrongdoing.  Instead, Jeddah Shipyard sought to evade responsibility through improper means.

87.     Just hours after the fire, the Saudi Government issued a report purporting to determine the cause of the fire.  The six-line handwritten report was signed by representatives from

the Border Guard,[1] a branch of the Saudi military responsible for monitoring maritime areas, and the Civil Defense, a governmental agency charged with the safety and protection of the public. Both the Border Guard and the Civil Defense are arms of the Saudi Government and organs of the Saudi Ministry of Interior.

88.     The six-line report summarily concluded that the fire was caused by an electrical short circuit in the living room.  The report did not consider the root cause of the supposed electrical short circuit, nor did it consider that the supposed short circuit could have been caused by the hot work that Jeddah Shipyard had been conducting on the vessel that day.

89.     Nearly two months after the fire, on or about December 15, 2013, the Director of Saudi Arabia's Maritime Administration released a report that attributed the cause of the fire to AdvanFort and the vessel's electrical system.  The report contained supposed findings that were demonstrably false, including that the hot work on the port side (the same side as the fire) had been completed before the fire occurred on October 27, 2013, and that the hot work on the day of the fire was on the opposite side of the fire (the starboard side), even though governmental investigators possessed the hot work permit, which expressly stated that the hot work occurred on October 27, 2013 and on the forward port side of the vessel.

90.     On information and belief, Jeddah Shipyard influenced both reports by improper means.

---

[1] Zamil Offshore touts its close relationship with the Border Guard.  Nelson Mackie, Head of Business Development and Marketing for Zamil Offshore's Shipyard Division, boasted that Zamil Offshore is "very active with the Royal Saudi Navy Force and Border Guard" and that Zamil Offshore actively seeks out relationships with governmental bodies.

91.    Prior to issuing the reports, investigators from the entities responsible for their issuance interviewed the captain of the *Seaman Guard Virginia*, Yurii Fedorenko.

92.    Mr. Fedorenko provided the investigators with extensive evidence of Jeddah Shipyard's fault.  Among other things, Mr. Fedorenko showed the investigators the hot work permit documenting the port-side hot work; informed the investigators that no fire watch was posted and that combustible materials had not been removed; and showed the investigators the areas of the vessel where the hot work occurred and the related fire damage.  Mr. Fedorenko also told the investigators that the vessel's electrical systems had been removed and that Jeddah Shipyard's electrical work was ongoing at the time of the fire.

93.    The investigators witnessed Jeddah Shipyard's temporary extension cords supplying power to the *Seaman Guard Virginia*.  The investigators also witnessed tools, electrical equipment, and a portable electrical service panel on the vessel.  The investigators even commented that Jeddah Shipyard had been carrying out a considerable amount of electrical work and repairs at the time of the fire.

94.    During their interview of Mr. Fedorenko, the investigators acknowledged Jeddah Shipyard's negligence and agreed that the hot work and failures by Jeddah Shipyard caused the fire damage.

95.    The investigators took witness statements from Jeddah Shipyard employees who, on information and belief, provided the investigators with false statements.  Zamil Offshore's Engineer/project manager falsely told the investigators that the welding had occurred on the port side of the vessel and had been completed on October 23, 2013.  Zamil Offshore's Director of Safety falsely told the investigators that the hot work on the port side had been completed on October 23, 2013.  However, the contemporaneous hot work permit shows that both of these

statements were false: hot work was ongoing on the port side of the vessel on the day of the fire, October 27, 2013, the same side where the fire started.

96.     AdvanFort carried out its own investigation into the fire.  The investigation, based on physical evidence at the scene of the fire, concluded that a spark from the welding had caused insulation in the space between the outer shell of the vessel and interior joinder wall to ignite.  The investigation further concluded that the lack of a fire watch and the failure to remove flammable materials before commencing hot work contributed to the fire damage.  On or about November 1, 2013, AdvanFort provided this report to the Ports Authority.

97.     Corruption is common in Saudi Arabia.  In 2013, the U.S. Department of State's Report on Human Rights Practices in Saudi Arabia reported that while Saudi law criminalizes corruption, the law is not implemented effectively and violations are infrequently prosecuted.  The report concluded that Saudi officials engage in corrupt practices with impunity.

3.     *Jeddah Shipyard Begins Making Demands*

98.     Immediately after the fire, Jeddah Shipyard began exerting pressure on AdvanFort to try to compel AdvanFort to abandon its claims against Jeddah Shipyard.

99.     On or about October 28, 2013, the day following the fire, AdvanFort received notice that Jeddah Shipyard intended to undock the vessel mid-repair, leaving it vulnerable to water damage.  When AdvanFort wrote to Jeddah Shipyard demanding that Jeddah Shipyard not undock the vessel, Jeddah Shipyard responded by requesting that AdvanFort sign a statement of responsibility for the fire.  AdvanFort understood Jeddah Shipyard to be threatening to undock and thus damage the vessel unless AdvanFort signed the statement of responsibility for the fire.

100.    AdvanFort refused.  While Jeddah Shipyard demurred on its threat to undock the vessel, AdvanFort's refusal prompted Jeddah Shipyard to cease carrying out the work it had contracted to perform on the vessel.

101.    AdvanFort made repeated requests that Jeddah Shipyard resume work on the vessel. In one such instance, AdvanFort requested that Jeddah Shipyard work on the non-fire damaged parts of the vessel while the investigation was ongoing.  However, Jeddah Shipyard refused all such requests.

102.    With the *Seaman Guard Virginia*, because of the fire, now in need of additional repairs beyond those that Jeddah Shipyard had been contracted to perform but had failed to carry out, AdvanFort was unable to perform contractual commitments or secure additional contracts.

103.    To mitigate further losses, AdvanFort made an additional attempt to resolve the matter with Jeddah Shipyard.  On or about December 26, 2013, AdvanFort wrote to Zamil Offshore seeking prompt repair of the *Seaman Guard Virginia*'s fire-related damage.

104.    On or about January 25, 2014, however, Zamil Offshore wrote to AdvanFort denying responsibility for the fire; accusing AdvanFort of causing the delay in the regular maintenance and scheduled repair by falsely claiming that AdvanFort had neglected to furnish spare parts; and, most egregiously, demanding payment from AdvanFort for purported damage suffered by Jeddah Shipyard as a result of the fire that Jeddah Shipyard had itself caused.

### 4.    *Zamil Offshore Corrupts the Saudi Legal Process*

105.    On or about April 14, 2014, AdvanFort commenced an action against Zamil Offshore in Saudi Arabia in the Third Commercial Circuit of the Jeddah Board of Grievances (the "Saudi court") for damages caused by the fire.  AdvanFort sought an order requiring the repair of its vessel and damages for lost profits in the amount of US$825,986 per month.

106.    In a further attempt to pressure AdvanFort, Zamil Offshore filed a countersuit. Among other things, the countersuit falsely claimed that the fire was somehow AdvanFort's fault and falsely asserted that any delay in repairing the vessel was attributable to AdvanFort's own supposed delay in furnishing spare parts.  While the countersuit claimed approximately

US$147,523 in berthing fees and US$717,800 in repair costs, Zamil Offshore later claimed in legal filings that the berthing fees amounted to millions of dollars in damages.

107.    While the suit was pending, Jeddah Shipyard continued sending AdvanFort invoices and making financial demands.  On January 13, 2014, Jeddah Shipyard, in a letter written on the letterhead of the Ports Authority and Zamil Offshore, sent to AdvanFort in Virginia such demand in the form of an invoice demanding payment in excess of US$100,000 as a purported advance payment for work.[2]

108.    On or about December 8, 2014, Zamil Offshore, through its legal representative, offered to settle the dispute by wiring 10 million Saudi Riyals (approximately US$2.7 million) to AdvanFort.  Under the terms of the offer, however, AdvanFort had to: (a) agree that the fire was an "Act of God"; and (b) "pay the guys" in order to have the Saudi Government's report revised so as to change the cause of the fire, on the basis of which Zamil Offshore would make a claim to its insurer.

109.    AdvanFort understood the putative settlement offer to mean that Zamil Offshore would arrange a bribe to the relevant Saudi authorities, who, in exchange for the payment, would amend their report regarding the cause of the fire.  AdvanFort further understood that, under the proposal, Zamil Offshore's insurer would bear the cost of the fire such that Zamil Offshore would be able to recoup the amount that it would pay to AdvanFort.

110.    AdvanFort refused the offer and continued to pursue recourse in the Saudi court.

---

[2] The Ports Authority and Zamil Offshore addressed the invoice to AdvanFort's Virginia address and requested that AdvanFort wire the demanded amount to the same Saudi Hollandi Bank account in Saudi Arabia as AdvanFort's US$20,000 deposit.

111.    Subsequently, a representative of the Ports Authority, Jamal Anani, proposed that AdvanFort settle its lawsuit with Zamil Offshore by Zamil Offshore bearing a portion of the value of the vessel's repair.  AdvanFort again refused.

112.    Meanwhile, Zamil Offshore sought to taint the legal process.  While the legal action was ongoing, Mr. Fedorenko stayed in the shipyard.  During Mr. Fedorenko's stay, Jeddah Shipyard pressured Mr. Fedorenko to change this testimony, offering him payment to do so.

113.    Prior to Mr. Fedorenko's testimony in the lawsuit, a Zamil Offshore representative approached Mr. Fedorenko and asked him to attend a meeting with Zamil Offshore representatives, including Jamal Anani, this time acting as Zamil Offshore's legal representative.

114.    At the meeting, Zamil Offshore inquired about the testimony that Mr. Fedorenko would give in the Saudi court proceedings.  When Mr. Fedorenko described the testimony that he intended to provide, the Zamil Offshore representatives appeared displeased.

115.    Mr. Anani spoke with Mr. Fedorenko separately.  During their exchange, Mr. Anani demanded that Mr. Fedorenko give different testimony and offered payment if Mr. Fedorenko agreed to testify in a manner favorable to Zamil Offshore.

116.    Mr. Anani told Mr. Fedorenko that he would face dire consequences if Mr. Fedorenko refused to testify in a manner that benefited Zamil Offshore.  In that meeting, Mr. Anani warned Mr. Fedorenko that the Zamil family was very powerful.  Mr. Fedorenko understood this to be a threat.

117.    In the Saudi court proceedings, Zamil Offshore argued that any delay by Zamil Offshore in repairing the *Seaman Guard Virginia* was attributable to AdvanFort because AdvanFort had allegedly failed to supply certain spare parts.

118.    AdvanFort had, in fact, delivered the spare parts to the shipyard. AdvanFort intended to refute Zamil Offshore's argument by presenting the testimony of AdvanFort's subcontractor, Zaid Almashhoor, who was prepared to testify that he had delivered the spare parts to the shipyard.

119.    Shortly before he was scheduled to testify, Mr. Almashhoor stopped returning AdvanFort's telephone calls. When AdvanFort eventually reached Mr. Almashhoor from a new telephone number, Mr. Almashhoorr indicated that he was afraid to testify because of the harm he feared by testifying against the interests of the powerful Zamil family, stating "[t]his is not America." As a result, Mr. Almashhoor did not appear before the Saudi court to testify against Zamil Offshore.

120.    When AdvanFort sought to prove delivery of the parts through documentary evidence, it was thwarted by the Ports Authority which, despite controlling ingress and egress to the shipyard and requiring detailed documentary evidence of any delivery, claimed that there were no documents recording the deliveries.

121.    At a hearing that took place on or about June 16, 2014, the Saudi court stated that it would appoint a marine expert in light of the technical issues raised by the case. However, the Saudi court subsequently reversed course. Instead, in or around April 2017, the Saudi court, without appointing a marine expert, issued a judgment dismissing AdvanFort's claims. Additionally, the Saudi court awarded Zamil Offshore US$40,000 in damages and confirmed Zamil Offshore's right to unspecified berthing fees, which Zamil Offshore had stated in court filings amounted to over US$5 million, the equivalent of over 50 years of berthing fees based on Jeddah Shipyard's published rates.

122.    In so ruling, the Saudi court relied on the fire reports that, based on false statements provided by Zamil Offshore, had erroneously attributed the cause of the fire to the *Seaman Guard Virginia's* own electrical system, ignoring evidence that Jeddah Shipyard controlled the power supply on the vessel at the time of the fire and failing to acknowledge Jeddah Shipyard's negligence in welding without proper safety precautions.

123.    AdvanFort understood that, in order to obtain possession of its vessel, AdvanFort had to pay to Zamil Offshore millions of dollars to satisfy the judgment that had resulted from the perverted judicial process.

F.    Jeddah Shipyard's Stripping of the *Seaman Guard Virginia*

124.    On or about June 29, 2022, Zamil Offshore, through U.S. counsel, informed AdvanFort in Virginia that unless AdvanFort contacted Mr. Allastair Bisset, Zamil Offshore's General Manager, regarding its plans to remove the *Seaman Guard Virginia* within 90 days of that letter, Zamil Offshore itself would take "appropriate steps" to remove the *Seaman Guard Virginia* including disposing of the vessel.

125.    On or about July 23, 2022, AdvanFort, from Virginia, wrote to Mr. Bisset, informing Zamil Offshore that AdvanFort would be in contact to arrange for a salvage team to evaluate the *Seaman Guard Virginia.*

126.    On or about July 28, 2022, Mr. Bisset wrote to AdvanFort in Virginia, requesting information about the marine expert who would inspect the *Seaman Guard Virginia* on AdvanFort's behalf.  Thereafter, Mr. Bisset communicated with AdvanFort in Virginia to arrange for AdvanFort's marine expert to inspect the *Seaman Guard Virginia.*

127.    On or about September 4, 2022, AdvanFort's marine expert inspected the *Seaman Guard Virginia*.  What the marine expert found was beyond all expectation: the *Seaman Guard Virginia* had been stripped bare and rendered inoperable.

128.    *Seaman Guard Virginia* was open to the elements, with engine space hatches removed, a watertight door broken off, and multiple windows broken or left open.  Debris was strewn throughout the vessel.  The *Seaman Guard Virginia* was utterly unseaworthy and a personal safety hazard for the marine expert.

129.    The photograph reproduced below shows the completely deteriorated state of the vessel's                                                                                     hull.



130.    The photograph reproduced below shows the state of the upper bridge. Large holes are visible where equipment and instrumentation have been removed.



131.    As shown in the following photograph, the vessel's engines had been removed from the engine room, which was laid bare, leaving a torn-up space.



132.     The inspection revealed for the first time that Jeddah Shipyard had undertaken no meaningful efforts to preserve or protect the *Seaman Guard Virginia* or associated equipment.  The vessel was severely corroded.  Jeddah Shipyard employees informed the marine expert that the vessel had been removed from the water due to fears that it would sink and become a hazard to local navigation.

133.     The inspection confirmed that the *Seaman Guard Virginia* was not seaworthy and significant work would be required before the vessel even could be safely towed out of the shipyard.  Moreover, the *Seaman Guard Virginia* was stripped of all items of value.  Everything from a binoculars set to entire engines had been removed.  The removed items included, among other things: a Zodiac brand fast speed boat, TVs, air conditioners, fire pumps, cooling pumps, VHF radio stations, diesel generators, a crane, a washing machine, paint, life vests, emergency generators, steering equipment, anchors, medical supplies, coolers, two main engine telegraphs, and much more.

134.     On information and belief, removing these items from the *Seaman Guard Virginia* required hundreds of man hours and many days.

135.     On information and belief, Jeddah Shipyard stripped the vessel of all its valuable parts, materials, and instruments, including those needed to operate, such as the engines, in 2022, before Zamil Offshore permitted AdvanFort's marine expert to access the vessel.

136.     During the inspection, AdvanFort's marine expert observed that the fire damage remained visible and confirmed that the fire had been confined to the lower deck mess room, with the most extensive fire damage located in the ceiling directly below visible indications of hot work on the deck above the area.

137.    Jeddah Shipyard's manager, Karim Barakat, told AdvanFort's marine expert that the engines had been removed and disassembled earlier in 2022, prior to the vessel's removal from the water.  When the marine expert asked to inspect the engines, he was informed that they were unavailable.  The marine expert understood this to mean that the engines were no longer in the shipyard.  A Jeddah Shipyard employee later claimed that "they" had the engines, which could be reconstructed.

138.    On information and belief, Jeddah Shipyard wrongly, and without right, assumed ownership of the engines, along with all the other stripped parts, materials, and instruments.

139.    The Ports Authority, which controls ingress and egress to the Shipyard, facilitated the removal of these items by allowing the removal.  The Shipyard is a controlled facility with a secured access point.  No individual or items can enter the Shipyard without the approval of the Ports Authority.  No individual or items can leave the port without inspection, which includes verifying records documenting ownership.  Moreover, the process of removing large, heavy objects would or should have been observed by Jeddah Shipyard guards and employees monitoring and otherwise observing activities in the Shipyard.

140.    Jeddah Shipyard stripped *Seaman Guard Virginia* of valuable materials, instruments and parts needed for operation, such as its engines, knowing that it had no right to do so and in conscious disregard to AdvanFort's rights and interests in the *Seaman Guard Virginia*.

141.    At all relevant times, Jeddah Shipyard knew that AdvanFort was the rightful operator of the *Seaman Guard Virginia* and nevertheless took the parts, materials, and instruments for its own.

142.    These acts and omissions caused injuries to AdvanFort inside the Commonwealth of Virginia and prevented AdvanFort from conducting its business and from using the *Seaman*

*Guard Virginia* to perform contracts. Without the *Seaman Guard Virginia* AdvanFort cannot provide anti-piracy services in High Risk Area the way it once could. Though AdvanFort tried to address its fleet limitations through logistical operations, those logistical operations could not make up for the strategic importance of the *Seaman Guard Virginia*. Consequently, AdvanFort lost market share to competitors.

143.    Despite AdvanFort's efforts, the loss of the *Seaman Guard Virginia* proved insurmountable and as a result AdvanFort has suffered, and continues to suffer, tens of millions of dollars worth of damage due to the loss of the vessel, including but not limited to the loss of value of the vessel and lost profits from not having the vessel available for service.

### COUNT I: CONVERSION
*Conversion Against All Defendants*

144.    AdvanFort realleges and incorporates herein the preceding paragraphs as if fully set forth herein.

145.    Jeddah Shipyard lacked any right to assume authority over and/or to convert the *Seaman Guard Virginia*, its materials, instruments, engines, and parts.

146.    Jeddah Shipyard nevertheless assumed authority over the *Seaman Guard Virginia* and its materials, instruments, engines and parts by preventing AdvanFort's use of the vessel and stripping the *Seaman Guard Virginia* of its materials, instruments, engines, and parts for its own use and enjoyment.

147.    AdvanFort was denied use and rights to the *Seaman Guard Virginia*. Since Jeddah Shipyard has now stripped the vessel of any valuable materials, instruments, engines, and parts, AdvanFort is denied use of those materials, instruments, engines and parts.

J.A.037

148.     Jeddah Shipyard's assumption of authority over the *Seaman Guard Virginia*, its materials, instruments, engines, and parts deprived AdvanFort of its immediate possessory rights and was in conscious disregard of AdvanFort's rights.

149.     AdvanFort has had at all times immediate right to possession and authority over the *Seaman Guard Virginia* and its materials, instruments, engines, and parts.

150.     As a result of Jeddah Shipyard's assumption of authority over the *Seaman Guard Virginia*, and its materials, instruments, engines, and parts, AdvanFort suffered damages that were foreseeable to Jeddah Shipyard to be proven at trial, including lost profits.

## COUNT II: BREACH OF A BAILMENT – TORT
### *Against All Defendants*

151.     AdvanFort realleges and incorporates herein the preceding paragraphs as if fully set forth herein.

152.     AdvanFort delivered the *Seaman Guard Virginia* to Jeddah Shipyard, entrusting the Shipyard with the *Seaman Guard Virginia* for the purpose of undertaking routine maintenance and minor repairs to the *Seaman Guard Virginia*.  Jeddah Shipyard accepted delivery.

153.     Under Jeddah Shipyard's control, the *Seaman Guard Virginia* was destroyed and rendered useless and valueless which was proximately caused by the negligence of Jeddah Shipyard.  Jeddah Shipyard failed to maintain and exercise reasonable care of the vessel, causing it to be exposed to the elements for an extended period of time, damaging and destroying the vessel, and looting or allowing the vessel to be looted.

154.     As a result of Jeddah Shipyard's breach of the bailment, AdvanFort has suffered damages, including lost profits.

## COUNT III: BREACH OF A BAILMENT – CONTRACT
### *Against All Defendants*

155.    AdvanFort realleges and incorporates herein the preceding paragraphs as if fully set forth herein.

156.    AdvanFort delivered the *Seaman Guard Virginia* to Jeddah Shipyard, entrusting Jeddah Shipyard with the vessel for the purpose of undertaking routine maintenance and minor repairs.  Jeddah Shipyard accepted delivery.

157.    Jeddah Shipyard failed to redeliver the *Seaman Guard Virginia* as contracted and instead only allowed AdvanFort to access the vessel when it had been stripped of all value, exposed to the elements, and left for scrap.

158.    Jeddah Shipyard's actions resulted in the destruction of the vessel, and proximately and actually caused AdvanFort damages, including lost profits.

## COUNT IV: NEGLIGENCE
### *Against All Defendants*

159.    AdvanFort realleges and incorporates herein the preceding paragraphs as if fully set forth herein.

160.    Jeddah Shipyard had a duty to maintain the vessel in a workman-like manner consistent with industry standards.

161.    Jeddah Shipyard breached this duty by storing the *Seaman Guard Virginia* without protection from the elements or security from theft.

162.    This breach caused the destruction and unseaworthiness of the *Seaman Guard Virginia*, rendering it scrap.

163.    AdvanFort suffered damages as a proximate and actual result of this breach, including losing not only its valuable vessel, the *Seaman Guard Virginia*, but also any and all of

the vessel's valuable materials, instruments, engines, and parts and causing further damages, including lost profits.

**COUNT V: GROSS NEGLIGENCE**
*Against All Defendants*

164.    AdvanFort realleges and incorporates herein the preceding paragraphs as if fully set forth herein.

165.    Jeddah Shipyard had a duty to maintain the vessel in a workman-like manner consistent with industry standards.

166.    Jeddah Shipyard breached this duty by storing the *Seaman Guard Virginia* without protection from the elements or security from theft.

167.    Jeddah Shipyard showed an utter disregard to caution amounting to a complete neglect of safety to the *Seaman Guard Virginia* by exposing the vessel to the elements for extended periods of time and leaving it unprotected from theft.

168.    This breach caused the destruction and unseaworthiness of the *Seaman Guard Virginia*, rendering it scrap.

169.    AdvanFort suffered damages as a proximate and actual result of this breach, including losing not only its valuable vessel the *Seaman Guard Virginia*, but also any and all of the vessel's valuable materials, instruments, engines, and parts and causing further damages, including lost profits.

**REQUEST FOR RELIEF**

Wherefore, Plaintiff AdvanFort respectfully requests that this Court grant the following relief:

A.    Enter judgment in favor of Plaintiff on each of its claims;

34

B.      Award actual, compensatory, consequential, including loss profits, and punitive damages for the unlawful acts and practices alleged herein, in an amount to be determined at trial;

C.      Order the Defendants to disgorge all monies and profits wrongfully obtained by Defendants as a result of the unlawful acts and practices alleged herein;

D.      Award Plaintiff costs reasonably incurred in this action together with reasonable attorneys' fees incurred herein; and

E.      Any other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

Dated:  7/12/2023                    AdvanFort Company

                                     By its Attorneys,

                                     */s/ Benjamin L. Hatch*
                                     Benjamin L. Hatch (VSB No. 70116)
                                     MCGUIREWOODS LLP
                                     World Trade Center
                                     101 West Main Street, Suite 9000
                                     Norfolk, Virginia 23510-1655
                                     Telephone: (757) 640-3727
                                     Facsimile: (757) 640-3947
                                     E-mail: bhatch@mcguirewoods.com

                                     Emily Erb Kelley (VSB No. 96252)
                                     MCGUIREWOODS LLP
                                     888 16th Street N.W.
                                     Suite 500
                                     Black Lives Matter Plaza
                                     Washington, DC 20006
                                     Telephone: (202) 857-1708
                                     Facsimile: (202) 828-2988
                                     E-mail: ekelley@mcguirewoods.com

                                     Clara Brillembourg *(pro hac vice forthcoming)*
                                     Foley Hoag LLP
                                     1717 K Street N.W.

Washington D.C., 020006
Telephone: (202) 261-7334
E-mail: CBrillembourg@foleyhoag.com

Andrew Loewenstein *(pro hac vice forthcoming)*
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone: (614) 832-3015
E-mail: ALoewens@foleyhoag.com

Peter Sullivan *(pro hac vice forthcoming)*
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 010019
Telephone: (212) 812-0310
E-mail: psullivan@foleyhoag.com

*Counsel for AdvanFort Company*

# EXHIBIT A



# J E D D A H   S H I P Y A R D



## M/V SEAMAN GUARD VIRGINIA
## INITAL QUOTATION

| | |
|---|---|
| **Project Name** | **M/V SEAMAN GUARD VIRGINIA** |
| **Owner** | |
| **Contract No** | |
| **Issue Date** | **23.09.2013** |

| WO No | Description | Unit | Qty. Amt | Rate USD $ | Cancel US $ | Total US $ |
|---|---|---|---|---|---|---|
| **1** | **Dry-Docking:** | | | | | |
| **1.1** | **Preparation of block arrangement** | | | | | |
| 1.1.1 | L. O. A. = 33.00 MTRS, BREADTH = 8  MTRS<br>Note:<br>Any special block arrangement, will be extra charge | /LS | 1 | | | **$1,690.00** |
| | | | | | | |
| **1.2** | **Docking/Undocking Including Divers assistance** | /LS | | | | **$2,535.00** |
| | | | | | | |
| **1.3** | **Dock rent** | | | | | |
| 1.3.1 | Lay Days In Dock Or Part There Of. | /Day | 12 | 845 | | **$10,140.00** |
| | | | | | | |
| **1.4** | **Jetty warfage rent from 17.09.2013** | /Day | 20 | 281 | | **$5,620.00** |
| | | | | | | |
| **1.5** | **Mooring of vessel** | /Time | 2 | 250 | | **$500.00** |
| | Unmooring of vessel | /Time | 2 | 250 | | **$500.00** |
| | | | | | | |
| **1.6** | **Pilotage** | | | | | |
| | (Dock, Jetty And Return) | /Time | 2 | 645 | | **$1,290.00** |
| **1.7** | **Tug assistance during docking and undocking:** | | | **At cost + 20% or be arrangeed by owner with agent** | | |
| **2** | **General Service:** | | | | | |
| **2.1** | **Shore power connection:** | | | | | |
| 2.1.1 | Connection & disconnection | /Line/Time | 2 | 110 | | **$220.00** |
| 2.1.2 | Provide shore power supply<br>(150 Kw 60 Hz 440 V 250 A) | /Kwh | 1 | 0.55 | | |
| | | | | | | |
| **2.2** | **Fire line provision:** | | | | | |
| 2.2.1 | Maintain fire line under pressure (compulsory) | /Day/Line | 12 | 57 | | **$684.00** |
| 2.2.2 | Connection & disconnection | /Day/Line | 2 | 100 | | **$200.00** |
| 2.2.3 | Fire watch man (24 hours)(compulsory) | /Day | 12 | 249 | | **$2,988.00** |
| | | | | | | |
| **2.3** | **Gas free inspection** | | | | | |
| 2.3.1 | Initial inspection | LS | | | | **$270.00** |
| 2.3.2 | Subsequent inspection | /Certificate | 11 | 117 | | **$1,287.00** |
| | | | | | | |
| **2.4** | **Supply Fresh Water** | /Ton | 1 | 18 | | |

Jeddah Shipyard Zamil Offshore, P.O. Box 17742, Jeddah 21494, Saudi Arabia
Tel: +966 2 627 2784 - Fax: +966 2 627 7777 Ext.78369 / + 966 2 627 2789 (Direct)

J.A.044



# J E D D A H   S H I P Y A R D



| 2.5 | Garbage removal | /Box | 5 | 110 | | $550.00 |
|---|---|---|---|---|---|---|
| | | | | | | |
| 2.6 | Gangway | /Time | 2 | 145 | | $290.00 |
| 2.7 | **Crane Services** (Per One Hour Or Part There Of) **Note:** The Crane Capacity Up To 7 Tons, If Required More Will Be Hired And The Cost To Be Advised. | /Hr. | 5 | 85 | | $425.00 |
| | | | | | | |
| 2.8 | **Dock Cleaning before undocking** | LS | | | | $550.00 |
| 2.9 | **Sewage line** | | | | | |
| 2.9.1 | Connection and disconnection of line | /Line/Time | 1 | 171 | | $171.00 |
| | | | | | | |
| **3** | **Surface Preparation:** | | | | | |
| **3.1** | **Hull Cleaning & Painting: ( Assum. Area 500 m2 )** | | | | | |
| 3.1.1 | High pressure jet wash | /M2 | 500 | 1 | | 500.00 |
| 3.1.2 | Hard scraping | /M2 | 500 | 3 | | 1,500.00 |
| 3.1.3 | Sand blasting S.A 2.5 for hull | /M2 | 500 | 12 | | 6,000.00 |
| 3.1.4 | Full Painting **3 Coat** "Paints Owner Supply" | /M2 | 1500 | 1 | | 1,500.00 |
| 3.1.5 | Wash down with fresh water | /M2 | 1700 | 0.9 | | $1,530.00 |
| | | | | | | |
| **4** | **HULL Markings:** | | | | | |
| 4.1 | Repaint Ship's Name And Port Of Registry, Draft Marks And Plimsol Marks. "Paints Owner Supply" | /LS | | | | 550.00 |
| | | | | | | |
| **5** | **Tire Fenders** | | | | | |
| 5.1 | Supply and fixed the tire fender with new galvanized chain and shackle. ( size up to 20" DIM.) | /Each | 10 | 186 | | $1,860.00 |
| | | | | | | |
| **6** | **THICKNESS GUAGING:** | | | | | |
| 6.1 | Carry out thickness gauging on the hull | /Point | 300 | 4.5 | | $1,350.00 |
| | | | | | | |
| **7** | **ANCHOR AND CHAIN INSPECTION:** | /LS | | | | $1,850.00 |
| 7.1 | Range anchor and chain & Re-bording | | | | | |
| 7.2 | High pressure wash, clean anchor and chain | | | | | |
| 7.3 | Calibrate anchor chain and submit report | | | | | |
| 7.4 | Sand blast and apply one coat of "Paints Owner Supply" | | | | | |
| | | | | | | |

J.A.045



# J E D D A H   S H I P Y A R D



| 7 | **SEA WATER VALVES OVERHAULING.** | | | | | |
|---|---|---|---|---|---|---|
| | Take out all the sea suction and overboard valves flange to flange, transport to workshop, dismantled, valve housing to sand blast, apply one coat of yard supply paint, overhaul, lapped, pressure test, assemble back with new gland packing, transport onboard, fix in place using yard supply nuts, bolts and packing | | | **As Per Attached (1)** | | |
| | | | | | | |
| 8 | **VARIOUS SEA WATER PIPES FOR RENEWAL :** | | | | | |
| | Remove pipe lines, transport to workshop, fabricate using yard supply pipe, sand sweep, apply one coat of yard supply paint, transport to on board, fix in place using yard supply nuts, bolts and packing | | | **As Per Attached (2)** | | |
| | | | | | | |
| 20 | **STEEL RENEWAL. (If required)** | | | **As Per Attached (3)** | | |
| | | | | | | |
| | **Estimated initial Amount Payable (USD)** | | | | | **$46,550.00** |

**Terms and condition for steel and painting works:**
- Any safety additional precautions related by type of the job will be charged extra and affecting in time schedule.
- Our quotation covers the defined works only and excludes subsequent repairs of additional work and/or hidden extra jobs.
- Any access works not specified in our quotation, but necessary will be extra charged.
- System coating for painted area will be up on approved painting procedure from owner side. area calculeted as per submited scope of work only and will be charge as per actual.
- Time frame for above defined works 12 days in normal stable condition.

**Project Estimator**
Engr. Hany Ashmawy

**Commercial Manager (A)**
Engr. Mohamed A. Al-Attar

Jeddah Shipyard Zamil Offshore, P.O. Box 17742, Jeddah 21494, Saudi Arabia
Tel: +966 2 627 2784 - Fax: +966 2 627 7777 Ext.78369 / + 966 2 627 2789 (Direct)

J.A.046

JS 44 (Rev. 04/21) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

ADVANFORT COMPANY

**DEFENDANTS**

ZAMIL OFFSHORE SERVICES COMPANY and SAUDI PORTS AUTHORITY

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Saudi Arabia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Benjamin L. Hatch, McGuireWoods LLP
World Trade Center, 101 West Main Street, Suite 9000, Norfolk, VA 23510
757-640-3727

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☒ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☒ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☒ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)
Brief description of cause:
Breach of Bailment

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $ Excess of $75,000
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   Jul 12, 2023
SIGNATURE OF ATTORNEY OF RECORD   /s/ Benjamin L. Hatch

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

/IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| ADVANFORT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-906 |
| | ) | |
| ZAMIL OFFSHORE SERVICES | ) | |
| COMPANY and SAUDI PORTS | ) | |
| AUTHORITY, a foreign sovereign | ) | |
| State, | ) | |
| | ) | |
| Defendants. | ) | |

**ZAMIL OFFSHORE SERVICES COMPANY'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Defendant Zamil Offshore Services Company ("Zamil Offshore") hereby moves this Court

to dismiss Plaintiff AdvanFort Company's ("AdvanFort") Complaint, Dkt. No. 1, pursuant to the

doctrine of *forum non conveniens* and, in the alternative, under Federal Rule of Civil Procedure

12(b)(2) for lack of personal jurisdiction. The Motion is based on the authorities cited in the

accompanying memorandum of law and the declarations of Mr. Hussam Salah I. Al Hejailan and

Mr. Anoop Kurikkalakath. A proposed order is attached.

Dated: September 29, 2023                    Respectfully submitted,

                                              */s/ Amy McKinlay*
                                             Richmond T. Moore (*Pro Hac Vice pending*)
                                             John S. Williams (*Pro Hac Vice pending*)
                                             Amy McKinlay (VSB No. 89394)
                                             WILLIAMS & CONNOLLY LLP
                                             680 Maine Avenue S.W.
                                             Washington, DC  20024
                                             Telephone: (202) 434-5000
                                             Fax: (202) 434-5029
                                             amckinlay@wc.com

                                             *Counsel for Defendant Zamil Offshore Services
                                             Company*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September, 2023, I will electronically file the foregoing with the clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Benjamin L. Hatch
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3947
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Clara E. Brillembourg
Foley Hoag LLP
1717 K Street N.W.
Washington D.C., 20006
Telephone: (202) 223-1200
E-mail: CBrillembourg@foleyhoag.com

Andrew B. Loewenstein
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
E-mail: ALoewens@foleyhoag.com

Peter A. Sullivan
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 812-0400
E-mail: psullivan@foleyhoag.com

/s/ Amy McKinlay
Amy McKinlay (VSB No. 89394)
WILLIAMS & CONNOLLY LLP

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| ADVANFORT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-906 |
| | ) | |
| ZAMIL OFFSHORE SERVICES | ) | |
| COMPANY and SAUDI PORTS | ) | |
| AUTHORITY, a foreign sovereign | ) | |
| State, | ) | |
| | ) | |
| Defendants. | ) | |

**[PROPOSED] ORDER GRANTING ZAMIL OFFSHORE SERVICES COMPANY'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Having reviewed Defendant Zamil Offshore Services Company's Motion to Dismiss
Plaintiff AdvanFort's Complaint, along with the accompanying materials, IT IS HEREBY
ORDERED that the Motion to Dismiss is GRANTED. The Complaint (Dkt. No. 1) is
DISMISSED without prejudice.

SO ORDERED.

Dated:

_____
THE HON. LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | | |
|---|---|---|
| ADVANFORT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-906 |
| | ) | |
| ZAMIL OFFSHORE SERVICES | ) | |
| COMPANY and SAUDI PORTS | ) | |
| AUTHORITY, a foreign sovereign | ) | |
| State, | ) | |
| | ) | |
| Defendants. | ) | |

**ZAMIL OFFSHORE SERVICES COMPANY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Richmond T. Moore (*Pro Hac Vice pending*)
John S. Williams (*Pro Hac Vice pending*)
Amy McKinlay (VSB No. 89394)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC  20024
Telephone: (202) 434-5000
Fax: (202) 434-5029
amckinlay@wc.com

*Counsel for Defendant Zamil Offshore Services Company*

## TABLE OF CONTENTS

Page

ZAMIL OFFSHORE SERVICES COMPANY'S MEMORANDUM OF LAW ..........................1

STATEMENT OF FACTS ............................................................................................2

ARGUMENT ...............................................................................................................6

I.      The Action Should Be Dismissed Based on *Forum Non Conveniens*...............................6

      A.      Saudi Courts Are Available.....................................................................7

      B.      Saudi Courts Are Adequate. ....................................................................7

      C.      The Private Interests All Favor the Saudi Forum. ................................10

      D.      The Public Interests All Favor the Saudi Forum. .................................13

II.     The Court Lacks Personal Jurisdiction Over Zamil Offshore.........................................15

      A.      There Is No General Jurisdiction Over Zamil Offshore......................16

      B.      There Is No Specific Jurisdiction Over Zamil Offshore. ....................17

            1.      Most of AdvanFort's jurisdictional allegations have nothing to do with AdvanFort's claims........................................................17

            2.      Zamil Offshore did not purposefully avail itself of the privilege of doing business in the State of Virginia. ...................................18

            3.      Exercising personal jurisdiction in this case would be constitutionally unreasonable..............................................24

CONCLUSION..........................................................................................................27

i

## <u>TABLE OF AUTHORITIES</u>

Page

### CASES

*AdvanFort Co. v. Cartner*, 2015 WL 12516240 (E.D. Va. Oct. 30, 2015) ................................. 13

*AdvanFort Co. v. Maritime Executive, LLC*, 2015 WL 4603090 (E.D. Va. July 28, 2015) ........ 13

*Ahmed v. Boeing Co.*, 720 F.2d 224 (1st Cir. 1983) ..................................................... 9

*Al-Salamah Arabian Agencies Co. v. Reece*, 673 F. Supp. 748 (M.D.N.C. 1987) ...................... 10

*Alayan v. Permanent Mission of Saudi Arabia to the United Nations*,
   2021 WL 1964078 (S.D.N.Y. May 17, 2021) ....................................................... 9

*Asahi Metal Industries Co. v. Superior Court*, 480 U.S. 102 (1987) ........................................ 26

*BNSF Railway Co. v. Tyrrell*, 581 U.S. 402 (2017) ......................................................... 16

*Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017) ........................................ 16

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ................................................... 20

*Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*,
   334 F.3d 390 (4th Cir. 2003) ..................................................................... 20, 24

*CFA Institute v. Institute of Chartered Financial Analysts of India*,
   551 F.3d 285 (4th Cir. 2009) ......................................................................... 24

*Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*,
   569 F.3d 189 (4th Cir. 2009) .............................................................. 7, 8, 12, 15

*Conflict Kinetics, Inc. v. Goldfus*, 577 F. Supp. 3d 459 (E.D. Va. 2021) ........................... *passim*

*Conopco, Inc. v. Rebel Smuggling, LLC*, 2021 WL 5909831 (E.D. Va. Dec. 14, 2021) ............. 25

*Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273 (4th Cir. 2009) .................... *passim*

*Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446 (9th Cir. 1990) ..................... 13

*D & S Consulting, Inc. v. Kingdom of Saudi Arabia*, 961 F.3d 1209 (D.C. Cir. 2020) ............... 14

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ........................................................... 16

*DeSantis v. Hafner Creations, Inc.*, 949 F. Supp. 419 (E.D. Va. 1996) ..................................... 19

*DiFederico v. Marriott International, Inc.*, 714 F.3d 796 (4th Cir. 2013) .................................. 12

ii

Page

Cases—continued:

*dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 136 (4th Cir. 2023) .................... 6, 16, 17, 18

*Dynamic Industries, Inc. v. Metlife - American International Grp. - Arab National Bank Coop. Ins. Co.*, 2021 WL 6052700 (E.D. La. Dec. 21, 2021). ............................................ 15

*Dynamic Industries, Inc. v. Walaa Coop. Ins. Co.*, 2023 WL 2474220 (5th Cir. Mar. 13, 2023) ........................................................................ 15

*Ellicott Machine Corp. v. John Holland Party Ltd.*, 995 F.2d 474 (4th Cir. 1993) .............. *passim*

*Equitable Trust Co. v. Bratwursthaus Management Corp.*, 514 F.2d 565 (4th Cir. 1975) .......... 14

*Fireclean LLC v. Tuohy*, 2016 WL 4414845 (E.D. Va. June 14, 2016) .................................... 24

*Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285 (5th Cir. 1989) ................................ 9, 10

*Goldrick v. D.M. Picton Co.*, 56 F.R.D. 639 (E.D. Va. 1971) ................................................ 20

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011) ................................ 16

*Grizzard v. LG Chem Ltd.*, 641 F. Supp. 3d 282 (E.D. Va. 2022) ......................................... 20

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ................................................................... 10

*In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488 (2d Cir. 2002) ................................................................................ 8

*In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp. 1141 (D.D.C. 1982) .................................................................... 10, 11, 12, 14

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) .................................................. 16

*Jeha v. Arabian American Oil Co.*, 751 F. Supp. 122 (S.D. Tex. 1990), *aff'd sub nom.* ................ 9

*Jeha v. Arabian American Oil*, 936 F.2d 569 (5th Cir. 1991) ................................................. 9

*Kamel v. Hill-Rom Co.*, 108 F.3d 799 (7th Cir. 1997) ........................................................... 9

*Mattiaccio v. Cantu Apiaries of Florida, LLC*, 2022 WL 1597826 (E.D. Va. May 19, 2022) ................................................................ 23, 25

*Nichols v. G.D. Searle & Co.*, 991 F.2d 1195 (4th Cir. 1993) ................................................. 17

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) ............................................................. *passim*

iii

Page

Cases—continued:

*Quillen v. International Playtex, Inc.*, 789 F.2d 1041 (4th Cir. 1986)...........................................14

*Reid-Walen v. Hansen*, 933 F.2d 1390 (8th Cir. 1991).................................................................13

*Saudi v. Northrop Grumman Corp.*, 427 F.3d 271 (4th Cir. 2005) ................................. 17, 18, 20

*Shandong Reltex Leihua Co. v. Ison Int'l LLC*,
    2023 WL 5662563 (E.D. Va. Aug. 31, 2023).......................................................................15

*Shields v. Mi Ryung Constr. Co.*, 508 F. Supp. 891 (S.D.N.Y. 1981) ................................... 10, 12

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007) .............................6, 7

*Tang v. Synutra Int'l, Inc.*, 656 F.3d 242 (4th Cir. 2011) ....................................................*passim*

*Tire Engineering & Distribution, LLC v. Shandong Linglong Rubber Co.*,
    682 F.3d 292 (4th Cir. 2012) ................................................................................. 23, 24, 25

*UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344 (4th Cir. 2020) ...................................... 15, 17

*Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553 (4th Cir. 2014) ....................................22

*Weisner v. FLIR Systems, Inc.*, 2019 WL 4962594 (E.D.N.C. Oct. 7, 2019) ..............................22

*Yacht Basin Provision Co. v. Bates*, 610 F. Supp. 3d 800 (E.D.N.C. 2022).......................... 18, 19

iv

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| ADVANFORT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-906 |
| | ) | |
| ZAMIL OFFSHORE SERVICES | ) | |
| COMPANY and SAUDI PORTS | ) | |
| AUTHORITY, a foreign sovereign | ) | |
| State, | ) | |
| | ) | |
| Defendants. | ) | |

**ZAMIL OFFSHORE SERVICES COMPANY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

If this case belongs anywhere, it is Saudi Arabia.  Plaintiff AdvanFort Co. brought a ship

to Saudi Arabia for repairs, and that is where the ship remains—in a shipyard in Jeddah.  All the

evidence is in Saudi Arabia.  The witnesses and most of the documents are in Saudi Arabia.  The

Defendant, Zamil Offshore, is in Saudi Arabia.  And Saudi law will govern this dispute.

Moreover, this case arises out of a dispute that has *already been litigated in Saudi Arabia*.

Most of the factual allegations in the Complaint relate to a fire on the ship that occurred in October

2013—ten years ago.  In 2017, six years ago, a Saudi court rejected AdvanFort's claims against

Zamil Offshore for damage from the 2013 fire, and a Saudi appellate court affirmed the decision.

At least from that point, if not earlier, AdvanFort made no effort to recover or use the ship.  Now,

in an attempt to plead around the *res judicata* effects of the Saudi judgment, AdvanFort alleges

claims based on purported *new* damage to the ship since the 2013 fire.  The notion that Zamil

Offshore is liable for damages and lost profits for a ship that AdvanFort abandoned in the Red Sea is frivolous. The Court need not address the merits of these allegations, however, because the Complaint should be dismissed for two reasons.

*First*, the Court should dismiss the Complaint based on *forum non conveniens*. All the relevant events occurred in Saudi Arabia. All the relevant evidence and witnesses (other than AdvanFort) are in Saudi Arabia. All the relevant public and private interest factors favor Saudi Arabia. The Saudi courts, which are already familiar with the facts that underlie this dispute, are available, adequate, and a more convenient forum to adjudicate AdvanFort's claims.

*Second,* the Court should dismiss the Complaint for lack of personal jurisdiction. Zamil Offshore is a Saudi company that operated a local shipyard in Jeddah, Saudi Arabia. It has no U.S. offices, no U.S.-based employees, and has never repaired a ship in the United States. AdvanFort contacted Zamil Offshore in Saudi Arabia to perform repair work in Saudi Arabia. Zamil Offshore communicated with AdvanFort from Saudi Arabia. At no point did Zamil Offshore purposefully avail itself of the privilege of doing business in the State of Virginia. Accordingly, if this Court declines to dismiss this action for *forum non conveniens*, it should dismiss this action for lack of personal jurisdiction over Zamil Offshore.

## STATEMENT OF FACTS[1]

1. *The Parties.* From 2013 to 2023, Zamil Offshore operated a local shipyard in Jeddah, Saudi Arabia. Compl. ¶ 31. The shipyard offered standard maritime construction and repair services. Compl. ¶¶ 1, 9. Zamil Offshore maintained a website, and over the years occasionally advertised its services to companies operating ships in and around Jeddah. Compl. ¶¶ 46-48, 50-

---

[1] The facts stated herein are as alleged in the Complaint, except as otherwise noted.

52.  The Complaint does not allege that Zamil Offshore has any U.S. offices, any U.S.-based employees, or has ever built or serviced any ship in the United States.

AdvanFort is a "multi-mission maritime security company" headquartered in Fairfax County, Virginia.  Compl. ¶ 8.[2]  It is in the business of chartering used military ships, arming them, and deploying them to piracy hotspots around the world.  Compl. ¶¶ 8, 19-23, 27.  One such ship was the *Seaman Guard Virginia*, which AdvanFort chartered in 2012 and deployed to the Red Sea.  Compl. ¶¶ 23, 27-28.

2.  *The 2013 Fire*.  In July 2013, AdvanFort contacted Zamil Offshore in Jeddah, Saudi Arabia and requested a quote for a list of repairs it wanted performed on the *Seaman Guard Virginia*.  Compl. ¶¶ 39, 63.  Both parties understood that the repair work requested by AdvanFort was to be performed at the Jeddah shipyard.  Compl. ¶ 63.  Zamil Offshore responded with a quote, AdvanFort made an advanced payment, and work began on the *Seaman Guard Virginia* on October 19, 2013.  Compl. ¶¶ 64-65, 68-71, 74.

On October 27, 2013, as the *Seaman Guard Virginia* was undergoing repairs in the Jeddah shipyard, a fire broke out.  Compl. ¶ 79.  Local officials investigated and determined that the fire was caused by an electrical short circuit in the *Seaman Guard Virginia*'s living room.  Compl. ¶¶ 88-89.  AdvanFort took issue with the local officials' conclusion and maintains that the fire was instead caused by the repair crew.  Compl. ¶ 96.  At that point, repair work on the *Seaman Guard Virginia* ceased as the parties disputed responsibility for the fire.  Compl. ¶¶ 104-05.

---

[2] On March 5, 2013, AdvanFort pleaded guilty to the felony of aiding and abetting the making of a false statement in connection with acquiring firearms.  *United States v. AdvanFort Co.*, No. 13-cr-00053, Dkt. Nos. 6-7 (E.D. Va. Mar. 5, 2013) (Plea Agreement and Statement of Facts).  It agreed to forfeit 27 firearms, pay an $180,000 fine, and serve two years of probation.  *Id.* Dkt. Nos. 9, 17 (E.D. Va. Mar. 5, Sept. 5, 2013).

3

3.  *The Matter Is Fully Litigated in Saudi Arabia.*  In 2014, AdvanFort filed suit against Zamil Offshore in the Third Commercial Circuit of the Jeddah Board of Grievances.  Compl. ¶ 105; Al Hejailan Decl. Ex. A.  AdvanFort alleged Zamil Offshore was responsible for the 2013 fire aboard the *Seaman Guard Virginia* and sought more than $39,000,000 in lost profits and an order requiring Zamil Offshore to repair the ship.  Compl. ¶ 105; Al Hejailan Decl. Ex. A, at 3.  Zamil Offshore initiated a separate suit for $147,523 for repair fees and $2,267,000 for berthing fees and related expenses.  Al Hejailan Decl. Ex. B, at 2.[3]

For the next three years, the Saudi court held hearings, and both parties presented witnesses, submitted evidence, and made arguments.  Compl. ¶ 121; Al Hejailan Decl. Exs. A-B.  In 2017, the Third Commercial Circuit of the Jeddah Board of Grievances issued mixed rulings.  It dismissed AdvanFort's original claims against Zamil Offshore and, in Zamil's suit against AdvanFort, found that Zamil Offshore was only entitled to $40,000 of the $147,523 it sought in repair fees.  Compl. ¶ 121; Al Hejailan Decl. Exs. A-B.  It also held that Zamil Offshore was entitled to unspecified berthing fees.  Compl. ¶ 121; Al Hejailan Decl. Ex. B, at 4.  AdvanFort appealed, and the Administrative Court of Appeal in Mecca affirmed both of the lower court's decisions in the summer of 2017.  Al Hejailan Decl. Exs. C-D.

4.  *AdvanFort Abandons the Seaman Guard Virginia.*  Rather than respect the decision of the Saudi courts or negotiate with Zamil Offshore to remove the vessel from the Jeddah shipyard, AdvanFort abandoned the *Seaman Guard Virginia*.[4]  The Complaint does not allege facts showing

---

[3] The Complaint alleges Zamil Offshore sought $147,523 for berthing fees and $717,800 in repair costs, Compl. ¶ 106, but the Saudi judgment shows Zamil Offshore sought the amounts described above.  Al Hejailan Decl. Ex. B, at 2.  Nothing turns on the difference, but the memorandum uses the figures reflected in the judgment.

[4] AdvanFort does not allege that it made any previous efforts to recover or move the ship until after it was contacted in June 2022—more than five years after the Saudi Administrative Court of

4

that AdvanFort made *any* attempt to retrieve its ship or gave any indication to Zamil Offshore that it ever intended to. Unsurprisingly, during the intervening years, the *Seaman Guard Virginia* experienced natural corrosion from exposure to salt water and extreme temperatures. *See* Compl. ¶ 129. In early 2022, to prevent the *Seaman Guard Virginia* from becoming an environmental and safety hazard, Zamil Offshore removed it from the water and into a storage yard. Compl. ¶132. To facilitate doing so, Zamil Offshore removed the engines and other heavy components from the ship. *See* Compl. ¶¶ 129-133, 135, 137.

In June 2022, with the end of Zamil Offshore's lease of the Jeddah shipyard quickly approaching, Zamil Offshore informed AdvanFort that it would need to dispose of the *Seaman Guard Virginia* if AdvanFort did not remove it. Compl. ¶¶ 31, 124. Facing the threat of disposal, AdvanFort finally sent a representative to inspect the boat in September 2022. Compl. ¶ 127. Despite knowing that the ship had needed further repairs since 2013, and was floating in one of the saltiest bodies of water on earth for nearly a decade, AdvanFort now claims it was surprised to find a corroded, inoperable vessel. Again, however, AdvanFort did nothing. In July 2023, ten months after its representative inspected the ship in 2022 (and years after both the fire and AdvanFort's losing its court case in Saudi Arabia about the fire), AdvanFort filed the instant action in this Court.

5. *AdvanFort's New Allegations.* Recognizing that *res judicata* prohibits it from relitigating the 2013 fire, AdvanFort alleges it has been "denied use" of the *Seaman Guard Virginia* since the fire because of the deterioration of the boat's condition. Compl. ¶¶ 144-169. It alleges common-law claims for conversion, breach of bailment, negligence, and gross negligence, all

---

Appeal affirmed the lower court's dismissal of AdvanFort's claims. Compl. ¶¶ 121, 124; Al Hejailan Decl. Ex. C.

J.A.061

premised on the theory that Zamil Offshore had a duty to maintain the ship while AdvanFort did and said nothing about reacquiring the vessel. Compl. ¶¶ 144-169. AdvanFort alleges it has suffered "tens of millions of dollars worth of damage due to the loss of the vessel, including but not limited to the loss of value of the vessel and lost profits from not having the vessel available for service." Compl. ¶ 143.

These new allegations raise a host of unanswered questions.[5] As explained below, however, this Court need not address the merits of AdvanFort's claims because the appropriate forum for this action is in Saudi Arabia.

## ARGUMENT

**I.    The Action Should Be Dismissed Based on *Forum Non Conveniens*.**

A case should be dismissed on the basis of *forum non conveniens* when an alternative forum is (i) available; (ii) adequate; and (iii) more convenient in light of the public and private interests involved. *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 136 (4th Cir. 2023) (quoting *Tang v. Synutra Int'l, Inc.*, 656 F.3d 242, 248 (4th Cir. 2011)). A Court may dismiss based on *forum non conveniens* before considering subject-matter and personal jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007). This case is a textbook example of *forum non conveniens*.

---

[5] The Complaint does not attempt to explain why AdvanFort abandoned such an allegedly valuable vessel for so many years. Nor does it explain how AdvanFort can suffer "loss of value of [a] vessel" it does not own. *See* Compl. ¶¶ 23, 143. Nor does the Complaint explain why AdvanFort's alleged damages were caused by post-fire events, rather than the 2013 fire, which has already been litigated. *See* Compl. ¶ 102 (AdvanFort alleging it has been "unable to perform contractual commitments or secure additional contracts" as far back as October 2013). Nor does the Complaint explain how AdvanFort could be entitled to "tens of millions of dollars" in lost profits after it abandoned the vessel in Saudi Arabia and made no attempt to recover it. Compl. ¶ 143.

A.      **Saudi Courts Are Available.**

"Availability will ordinarily be satisfied when the defendant is amenable to process in the other jurisdiction." *Tang*, 656 F.3d at 249 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981)) (internal quotation marks omitted).  Zamil Offshore, a Saudi Arabian company, is subject to suit in Saudi Arabia.  Kurikkalakath Decl. ¶ 5.  AdvanFort cannot claim otherwise; it initiated litigation against Zamil Offshore in Saudi Arabia.  *See Sinochem Int'l*, 549 U.S. at 435 (parallel proceeding abroad against same defendant evidence that foreign forum is available); *Conflict Kinetics, Inc. v. Goldfus*, 577 F. Supp. 3d 459, 463 (E.D. Va. 2021) ("The fact that [plaintiff] has initiated related litigation in [a foreign forum] suggests that [the forum's] courts are available to litigate further claims relating to [plaintiff's] dispute with defendants.").

B.      **Saudi Courts Are Adequate.**

"A foreign forum is adequate when (1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." *Tang*, 656 F.3d at 249 (internal quotation and citation omitted).

*First*, as the prior litigation confirms, Zamil Offshore is within the jurisdiction of the Saudi courts.  Moreover, the Saudi Ports Authority has not appeared in this matter, but it also is a Saudi Arabian entity within the jurisdiction of the Saudi courts and is not entitled to sovereign immunity. Al Hejailan Decl. ¶ 4.1.4.

*Second*, AdvanFort will not be deprived of remedies in Saudi Arabia.  A forum is inadequate when it does not permit litigation of the subject matter in dispute.  *Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*, 569 F.3d 189, 205 (4th Cir. 2009).  Or, in certain "rare circumstances," the forum is inadequate when the remedy offered by the other forum is "clearly unsatisfactory."  *Piper Aircraft Co.*, 454 U.S. at 254 n.22.  Neither concern is warranted

7

here.  As described in more detail by Mr. Hussam Salah I. Al Hejailan, an attorney with nearly three decades' experience and education in the Saudi legal system, AdvanFort will be able to pursue the claims alleged in the Complaint in Saudi Arabia.  *See* Al Hejailan Decl. ¶ 4.1.2. Specifically, AdvanFort can allege claims based on the duty of care owed by a shipyard to a vessel owner under the general Shari'a law principle of "la dular wala Dirar" which means "there should be neither harming nor reciprocating harm."  *Id.*  As applied to this case, AdvanFort can argue that Zamil Offshore breached a duty of care owed under the terms of a contract, or in the absence of a specific contract, under Islamic tort law's general duty to "act reasonably and with reasonable care to avoid causing harm."  *Id.*  If AdvanFort proves a breach of duty, harm, and causation, it may be entitled to "diya," or compensation.  *Id.*  Such a claim—based on an alleged failure by Zamil Offshore to adequately care for the *Seaman Guard Virginia* while docked in the Jeddah shipyard— clearly covers the "subject matter of the dispute" and offers the potential pecuniary remedy AdvanFort seeks.  *See Compania Naviera Joanna*, 569 F.3d at 205 (quoting *Piper Aircraft Co.*, 454 U.S. at 254 n.22).[6]

*Third*, AdvanFort has not established that it will be treated unfairly by the Saudi courts.  In 2014, AdvanFort hired Saudi counsel and chose to litigate the 2013 fire in Saudi Arabia.  This "demonstrate[d] some amount of belief" by AdvanFort that Saudi courts were "capable of adjudicating this dispute fairly."  *Conflict Kinetics*, 577 F. Supp. 3d. at 465.  Now, AdvanFort seeks a new forum and casts aspersions on the Saudi courts.  *See, e.g.*, Compl.  ¶¶ 97, 121.  But American courts are rightly "reluctant to find foreign courts 'corrupt' or 'biased[,]'"—and in the process pass formal judgment on another nation's legal system—based on a litigant's anecdotes. *In re Arb. between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d

---

[6] The statute of limitations has not run on this matter in Saudi Arabia.  Al Hejailan Decl. ¶ 4.1.3.

488, 499 (2d Cir. 2002). In this Circuit, "[c]ourts have uniformly held that anecdotal evidence of corruption and delay provides an insufficient basis for concluding that a foreign court is an inadequate forum." *Conflict Kinetics*, 577 F. Supp. 3d at 464-65 (internal quotation marks, brackets, and citation omitted).

That is all AdvanFort offers here. Indeed, its allegations point in the opposite direction. AdvanFort tries to indict the entire Saudi government with sweeping generalizations. *See* Compl. ¶ 97 ("Corruption is common in Saudi Arabia . . . . Saudi officials engage in corrupt practices with impunity."). But AdvanFort acknowledges that the purportedly biased Saudi court awarded Zamil Offshore only $40,000 in repair fees—less than a third of the $147,523 Zamil Offshore sought. Al Hejailan Decl. Ex. B, at 4; *see* Compl. ¶¶ 106, 121. A court's administrative decision to change course and not "appoint a marine expert in light of the technical issues raised by th[is] case," Compl. ¶ 121, hardly indicates that a court would "deprive[] [AdvanFort] of all remedies or treat [ ] [it] unfairly." *Tang*, 656 F.3d at 249 (citation omitted). AdvanFort's allegations ring particularly hollow given that Zamil Offshore was denied more than 70% of its asserted damages for repair costs.

American courts routinely find Saudi courts to be adequate fora and dismiss cases to Saudi Arabia on the basis of *forum non conveniens*. *See, e.g.*, *Kamel v. Hill-Rom Co.*, 108 F.3d 799, 803 (7th Cir. 1997) (affirming trial court's dismissal on the basis of *forum non conveniens*, including its finding that Saudi Arabia was an adequate forum); *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 290-91 (5th Cir. 1989) (same); *Ahmed v. Boeing Co.*, 720 F.2d 224, 226 (1st Cir. 1983) (Breyer, J.) (same); *Alayan v. Permanent Mission of Saudi Arabia to the United Nations*, 2021 WL 1964078, at *2 (S.D.N.Y. May 17, 2021) (finding Saudi Arabia an adequate forum); *Jeha v. Arabian Am. Oil Co.*, 751 F. Supp. 122, 126 (S.D. Tex. 1990), *aff'd sub nom. Jeha v.*

*Arabian Am. Oil*, 936 F.2d 569 (5th Cir. 1991) (same); *In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp. 1141, 1146 (D.D.C. 1982) (same); *Shields v. Mi Ryung Constr. Co.*, 508 F. Supp. 891, 897 (S.D.N.Y. 1981) (same); *cf. Al-Salamah Arabian Agencies Co. v. Reece*, 673 F. Supp. 748, 751 (M.D.N.C. 1987) (relying on *forum non conveniens* cases and finding Saudi Arabia not inconvenient for arbitration).

The calculus does not change when the claim being brought is against a government-controlled entity, such as the Saudi Ports Authority. *See, e.g.*, *Forsythe*, 885 F.2d at 290-91 (affirming finding that Saudi Arabia was an adequate forum even though defendant was a corporation wholly owned by the Saudi government); *see also* Al Hejailan Decl. ¶ 4.1.1 (describing other successful suits against Saudi government authorities or interests in Saudi Arabia). Indeed, courts have applied *forum non conveniens* even when a plaintiff accuses the Saudi royal family of wrongdoing—which AdvanFort does not. *See Shields*, 508 F. Supp. at 896 ("The Court notes that Saudi Arabia has established a specific tribunal for litigation of claims against the Government. This indicates that the Saudi royal family is not as sensitive to criticism as plaintiff claims.") (internal citation omitted).

## C.    The Private Interests All Favor the Saudi Forum.

In weighing the private interests, pertinent factors include: (i) the relative ease of access to sources of proof, (ii) the availability of compulsory process to obtain the testimony of unwilling witnesses, (iii) the cost of obtaining testimony from willing witnesses, (iv) the possibility of viewing the premises, and (v) "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Tang*, 656 F.3d at 249 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)); *Piper Aircraft Co.*, 454 U.S. at 241 n.6. Each of these factors weighs heavily in favor of Saudi Arabia.

It is indisputable that "[a] large proportion of the relevant evidence" in this case is in Saudi Arabia. *Piper Aircraft Co.*, 454 U.S. at 258. "This is so because the majority of the actionable conduct alleged in the complaint occurred in [Saudi Arabia], not the United States." *Conflict Kinetics*, 577 F. Supp. 3d at 465. The most important physical evidence is the ship, the engines, and the other allegedly damaged or missing components that serve as the basis for AdvanFort's claims. All this evidence is in Jeddah. Compl. ¶ 137. Further, AdvanFort alleges the physical damage to the ship was caused by the negligence of Zamil Offshore's employees and its lack of security at the Jeddah shipyard. Compl. ¶¶ 153, 161, 167. Evidence regarding the security at the Jeddah shipyard is in Jeddah. The relative ease of access to this evidence in Saudi Arabia versus Virginia "plainly favor[s the] foreign forum[.]" *In re Disaster at Riyadh Airport*, 540 F. Supp. at 1147 (evidence regarding alleged negligent maintenance of aircraft at Riyadh airport). In such circumstances, "the private interests strongly favor dismissal on *forum non conveniens* grounds." *Conflict Kinetics*, 577 F. Supp. 3d at 465.

The key witnesses are also in Saudi Arabia. Since AdvanFort was not in Saudi Arabia when the allegedly new damage to the *Seaman Guard Virginia* took place, the parties will need to rely on testimony from Zamil Offshore and Saudi Ports Authority employees. For example, the Complaint references discussions between AdvanFort's marine expert and Jeddah Shipyard's manager, Karim Barakat, about the removal of the *Seaman Guard Virginia*'s engines. Compl. ¶ 137. The parties will also need to present testimony about the security at the shipyard, whether any looting was witnessed, when and why certain items were removed from the ship before raising it out of the water, where those items were stored, and the condition of the ship when it was lifted out of the water in 2022.

11

"[S]ignificant costs would be involved in transporting and accommodating [the] willing witnesses . . . from Saudi Arabia[.]"  *In re Disaster at Riyadh Airport*, 540 F. Supp. at 1148.  "[T]he costs to defendants of transporting willing witnesses will be much higher than plaintiff's costs in travelling to Saudi Arabia."  *Shields*, 508 F. Supp. at 894.  And given that this dispute involves events spread over ten years at a shipyard—including allegations that Zamil Offshore "allow[ed] the vessel to be looted" by third parties, Compl. ¶ 153—there is every reason to believe that litigation of the case will involve third-party witnesses who are not under either party's control.  Kurikkalakath Decl. ¶ 8; *see Piper Aircraft Co.*, 454 U.S. at 258-59 (noting lack of need to identify particular witnesses not available, especially if difficult to identify without "extensive investigation").  An American federal court will lack authority to compel the attendance at trial of any unwilling Saudi witnesses—a factor that favors the Saudi forum.  *See Tang*, 656 F.3d at 252; *In re Disaster at Riyadh Airport*, 540 F. Supp. at 1148; *Shields*, 508 F. Supp. at 894.

Given that the dispute is centered in Saudi Arabia, most of the relevant documents, including the papers submitted to the Saudi courts, will be in Arabic.  Kurikkalakath Decl. ¶ 8.  And the witnesses in Saudi Arabia will also speak Arabic, at least principally.  *Id.*  Accordingly, litigation in the Eastern District of Virginia "will require costly translators," another factor favoring dismissal.  *Tang*, 656 F.3d at 252 (need for translators weighs in favor of dismissal); *Compania Naviera Joanna*, 569 F.3d at 201 (same).

AdvanFort's choice of forum is entitled to little deference.  To be sure, a U.S. resident's decision to bring suit in its home forum is often afforded "heightened deference."  *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 803 (4th Cir. 2013).  But no such deference is warranted here, because an international company "doing business abroad . . . should expect to litigate in foreign courts."  *Id.* at 807.  "When an American corporation doing extensive foreign business brings an

12

action for injury occurring in a foreign country, many courts have partially discounted the plaintiff's United States citizenship." *Reid-Walen v. Hansen*, 933 F.2d 1390, 1395 (8th Cir. 1991); *see Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1450 (9th Cir. 1990) (similar). This reflects that a state's "interest in adjudicating [an] action insofar as it seeks to ensure the economic health of its citizens and the fair resolution of their disputes . . . . diminishes . . . as [the state's] citizens *seek their fortune away from home*[.]" *Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 479 (4th Cir. 1993) (emphasis added). That diminishment is "particularly" pronounced when domestic corporations "compete for a slice of foreign pie . . . intended primarily for foreign consumption." *Id.*

AdvanFort not only expected to litigate in the foreign fora where it does business; it pursued litigation in the appropriate forum until it lost that litigation. AdvanFort is a maritime security company in the business of deploying ships to serve as anti-piracy escorts around the world. *See* Compl. ¶¶ 8, 29 (describing the "full coverage" it offers its clients from the Somali Coast, to the southern portion of the Red Sea, to the coast of India); *AdvanFort Co. v. Mar. Exec., LLC*, 2015 WL 4603090, at *1 (E.D. Va. July 28, 2015) (litigation involving one of AdvanFort's ships taken by Indian Coast Guard off the coast of India); *AdvanFort Co. v. Cartner*, 2015 WL 12516240, at *2 (E.D. Va. Oct. 30, 2015) (AdvanFort describing having more than 400 contracts with global shipping companies from 2011-2015). This dispute involves one of those ships. It is not unfair to hold AdvanFort to litigating in the forum to which it sent its ship.

### D.    The Public Interests All Favor the Saudi Forum.

Public interest factors further tip the balance in favor of Saudi Arabia. The public's interests in a *forum non conveniens* motion include:

> [1] the administrative difficulties flowing from court congestion; [2] the local interest in having localized controversies decided at home; [3] the interest in having the trial of a diversity case in a forum that

is at home with the law that must govern the action; [4] the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and [5] the unfairness of burdening citizens in an unrelated forum with jury duty.

*Tang*, 656 F.3d at 249 (quoting *Piper Aircraft Co.*, 454 U.S. at 241 n.6) (internal quotation marks omitted). All of these factors weigh in favor of litigation in Saudi Arabia, not Virginia.

*First*, the State of Virginia's interests in this case are minimal. This is a case about a ship in Saudi Arabia that was allegedly damaged by a Saudi company, with Saudi employees, in a shipyard in Saudi Arabia. As the D.C. Circuit has recognized, the Saudi court that previously heard this case (and would again), the Board of Grievances, "seemingly would have a significant interest in hearing a dispute about a contract performed in Saudi Arabia" by a Saudi company. *D & S Consulting, Inc. v. Kingdom of Saudi Arabia*, 961 F.3d 1209, 1214 (D.C. Cir. 2020). On the other hand, there is "little local interest" in a case involving an alleged tort from performance of a contract overseas. *Conflict Kinetics*, 577 F. Supp. 3d at 465; *see Ellicott Mach.*, 995 F.2d at 479. In situations like this, where the "controversy's contacts with the United States pale in comparison to the controversy's foreign contacts," "jury duty ought not to be imposed upon the people of the United States nor should United States courts be clogged" with such cases. *In re Disaster at Riyadh Airport*, 540 F. Supp. at 1152.

*Second*, *forum non conveniens* dismissal would be appropriate given that this Court would be tasked with applying Saudi law. A federal court sitting in Virginia and exercising diversity jurisdiction applies Virginia's choice-of-law rules. *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986). Under Virginia's *lex loci delicti* rule for tort claims, the court applies the law of the place where "the last event necessary to make an act liable for an alleged tort takes place." *Id.* (citation omitted). For contract claims, questions arising from the performance of a contract are governed by the law of the place of performance. *Equitable Tr. Co. v. Bratwursthaus*

14

J.A.070

*Mgmt. Corp.*, 514 F.2d 565, 567 (4th Cir. 1975); *Shandong Reltex Leihua Co. v. Ison Int'l LLC*, 2023 WL 5662563, at *2 n.1 (E.D. Va. Aug. 31, 2023). Under both rules, the outcome is the same: both the place of performance and place where the last alleged tortious action took place is Jeddah, Saudi Arabia. Thus, Saudi law will apply, and this court would be forced to expend resources sorting through unfamiliar issues arising under an unfamiliar body of law and then explaining those issues to a jury. *Compania Naviera Joanna*, 569 F.3d at 201 (holding that applying foreign law "administratively tax[es] the court system"). Like each of the other public interest factors in this case, "the need to apply foreign law point[s] towards dismissal." *Piper Aircraft Co.*, 454 U.S. at 260; *see, e.g.*, *Tang*, 656 F.3d at 252; *Compania Naviera Joanna*, 569 F.3d at 201; *Dynamic Indus., Inc. v. Metlife - Am. Int'l Grp. - Arab Nat'l Bank Coop. Ins. Co.*, 2021 WL 6052700, at *9 (E.D. La. Dec. 21, 2021), *aff'd in part, rev'd in part sub nom. Dynamic Indus., Inc. v. Walaa Coop. Ins. Co.*, 2023 WL 2474220 (5th Cir. Mar. 13, 2023) ("Saudi Arabia is much more familiar with its own law then a court in the United States would be, and consequently, this factor militates in favor of dismissal.").

At bottom, "the central focus of the *forum non conveniens* inquiry is convenience[.]" *Piper Aircraft Co.*, 454 U.S. at 249. Every element of the inquiry shows that Saudi Arabia is a more convenient forum than the United States, as AdvanFort's own prior litigation choice demonstrates. The Court should dismiss the Complaint on the basis of *forum non conveniens*.

## II.    The Court Lacks Personal Jurisdiction Over Zamil Offshore.

A federal court has personal jurisdiction over a non-resident defendant if (i) the forum state's long-arm statute authorizes personal jurisdiction and (ii) personal jurisdiction comports with due process. *See UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350-51 (4th Cir. 2020). In Virginia, however, "the statutory inquiry merges with the constitutional inquiry" because Virginia's long-arm statute authorizes personal jurisdiction "to the extent permissible" under the

15

Due Process Clause. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir.

2009). The plaintiff bears the burden of establishing personal jurisdiction over the defendant.

*dmarcian*, 60 F.4th at 131.

Constitutional due process requires a defendant to have sufficient "'minimum contacts'"

with the forum so that the exercise of jurisdiction "does not offend traditional notions of fair play

and substantial justice." *Consulting Eng'rs*, 561 F.3d at 277 (quoting *Int'l Shoe Co. v. Washington*,

326 U.S. 310, 316 (1945)). Within those parameters, the Court must determine whether general or

specific personal jurisdiction exists. *See, e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

Neither form of personal jurisdiction exists here.

### A.     There Is No General Jurisdiction Over Zamil Offshore.

General jurisdiction allows a party to be sued for anything in the forum state, regardless of

the connection between the acts complained of and the forum state. *E.g.*, *Bristol-Myers Squibb

Co. v. Superior Ct.*, 582 U.S. 255, 262 (2017). Accordingly, general jurisdiction "requires

affiliations 'so continuous and systematic' as to render [the company] essentially at home in the

forum State." *Daimler AG*, 571 U.S. at 159 n.11 (quoting *Goodyear Dunlop Tires Operations,

S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Outside the "exceptional case," a company is subject

to general jurisdiction only in (i) the state of its incorporation and (ii) the state in which its principal

place of business is located. *E.g.*, *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413-14 (2017).

This is not the exceptional case, and there is no general jurisdiction. Neither of the two

traditional bases for establishing general jurisdiction are present here. *BNSF*, 581 U.S. at 413.

AdvanFort does not allege that Zamil Offshore is incorporated or has its principal place of business

in Virginia. Zamil Offshore is a foreign company organized under the laws of Saudi Arabia.

Compl. ¶ 9; Kurikkalakath Decl. ¶ 3. Further, AdvanFort makes no allegation that Zamil Offshore

has offices in Virginia, employees in Virginia, or even has ever previously conducted business in

Virginia.  *See, e.g.*, *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005) ("Surely evidence of a single, short-term contractual relationship does not rise to the level of 'continuous and systematic' contact."); *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir. 1993) (noting that "advertising and solicitation activities alone do not constitute the 'minimum contacts' required for general jurisdiction" and finding that a single, one-time contract in the state was insufficient for general jurisdiction).

### B.     There Is No Specific Jurisdiction Over Zamil Offshore.

The Fourth Circuit has established a three-prong test for specific jurisdiction: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *dmarcian*, 60 F.4th at 133 (quoting *UMG Recordings,* 963 F.3d at 352).  The plaintiff must carry their burden on all three.  *Consulting Eng'rs*, 561 F.3d at 281 n.9 (no need to analyze other prongs if plaintiff fails to satisfy one).  AdvanFort's allegations cannot.

### 1.     Most of AdvanFort's jurisdictional allegations have nothing to do with AdvanFort's claims.

Turning to the second prong first quickly clarifies the jurisdictional picture.  To establish specific jurisdiction, AdvanFort's claims must arise out of Zamil Offshore's activities directed at Virginia.  *See dmarcian*, 60 F.4th at 133.  Here, the only alleged activities that have any nexus with AdvanFort's claims are (i) AdvanFort's allegation that it learned of Zamil Offshore by seeing an advertisement in *The Baltic Exchange* and reading about it in the *Maritime Executive Magazine*, Compl. ¶ 58, and (ii) the communications with AdvanFort about the work on the *Seaman Guard Virginia*.  The remainder of Zamil Offshore's alleged contacts with the State of Virginia and even the United States are entirely unconnected to AdvanFort's claims and are thus irrelevant to the

specific jurisdiction analysis. *See Saudi*, 427 F.3d at 276 (rejecting contention that foreign shipyard's activities in Texas could serve as basis for specific jurisdiction because plaintiff's claims involved shipyard's allegedly negligent repair of ship in Singapore and did not have "anything to do with" shipyard's activities in Texas); *Yacht Basin Provision Co. v. Bates*, 610 F. Supp. 3d 800, 820 (E.D.N.C. 2022) (defendants' prior visits to state for unrelated reasons were "not related to plaintiff's claims and thus cannot serve as a basis for specific jurisdiction").

For example, AdvanFort alleges that Zamil Offshore utilized a web server in Virginia, Compl. ¶¶ 46, 48, but does not allege that it viewed Zamil Offshore's website before it engaged Zamil Offshore to repair its boat in 2013. Similarly, AdvanFort cites Zamil Offshore's attendance at a conference in Texas, Compl. ¶ 54, a joint venture agreement with McDermott International, Inc., Compl. ¶ 56, and a corporate affiliate's involvement with the U.S.-Saudi Business Council, Compl. ¶ 55; but it does not allege that any of these activities relate in any way to the alleged damage on the *Seaman Guard Virginia*. They are all apropos of nothing.

## 2.     Zamil Offshore did not purposefully avail itself of the privilege of doing business in the State of Virginia.

The purposeful availment prong is flexible, and a nonexclusive list of factors guides the inquiry in this Circuit:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*dmarcian*, 60 F.4th at 133. The allegations in the Complaint fall well short of establishing that

18

Zamil Offshore purposefully availed itself of the privilege of doing business in the State of Virginia.

Six of the eight factors can be immediately dismissed.  There is no allegation in the Complaint that Zamil Offshore (i) maintains agents or offices in Virginia, (ii) maintains property in Virginia, (iii) deliberately engaged in significant or long-term business activities in Virginia, (iv) signed a contract with AdvanFort containing a choice-of-law clause specifying Virginia as the applicable law, (v) made in-person contact with AdvanFort in Virginia, or (vi) was required by a contract at issue to perform services in Virginia.

Instead, AdvanFort bases its assertion of personal jurisdiction on claims that Zamil Offshore reached into Virginia to do business and communicated with AdvanFort about the *Seaman Guard Virginia* (factors 3 and 8).  Considered separately or together, however, these alleged contacts are insufficient to find that Zamil Offshore purposefully availed itself of doing business in the State of Virginia.

### a.    *Zamil Offshore's solicitations do not establish jurisdiction.*

AdvanFort alleges Zamil Offshore solicited business in Virginia through its advertisements in certain trade publications, including *The Baltic Exchange* and *Maritime Executive Magazine*. Compl. ¶¶ 40-47, 50-52, 58.  But placing advertisements in national and international trade magazines that happened to have subscribers in Virginia is not enough to establish purposeful availment.  *See, e.g.*, *Yacht Basin*, 610 F. Supp. 3d at 817 (four to five advertisements placed in two print magazines over course of two years, in addition to 51 radio advertisements, insufficient "to constitute the required significant activities in the state"); *DeSantis v. Hafner Creations, Inc.*, 949 F. Supp. 419, 426 (E.D. Va. 1996) (placement of advertisement that ran "two or three" times in national publication distributed in Virginia insufficient to establish personal jurisdiction in Virginia).  Nor does membership in a "maritime classification society," Compl. ¶ 41, evince a

19

concerted effort to target Virginians.

AdvanFort's other solicitation-related allegations are irrelevant, because they are unrelated to their claims, but would also be insufficient. Zamil Offshore's representations on its website cannot confer specific personal jurisdiction here because the Complaint does not allege that AdvanFort viewed Zamil Offshore's website before engaging it in 2013. Regardless, however, the website would not be a basis for personal jurisdiction over Zamil Offshore because it was not directed specifically at Virginia. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 399 (4th Cir. 2003) (If a defendant's website "merely makes information available, the site cannot render him subject to specific personal jurisdiction in a foreign court."); *Grizzard v. LG Chem Ltd.*, 641 F. Supp. 3d 282, 290 (E.D. Va. 2022) ("[T]he fact that Defendant operates a global business and website . . . fall[s] short of proving that Defendant purposefully availed itself of the privilege of conducting activities in Virginia.").

It is equally irrelevant that Zamil Group, a corporate affiliate of Zamil Offshore, "promotes" Zamil Offshore in the United States by way of the affiliate company's executives' service on the board of the U.S.-Saudi Business Council, based in Virginia. Compl. ¶ 55. This "unilateral activity of another party," Zamil Offshore's affiliate, is the type of "random, fortuitous, [and] attenuated contact" with a state that the Supreme Court has held is insufficient to find purposeful availment. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 486 (1985) (citations omitted). In any event, it also fails at the outset because courts in this Circuit respect the corporate form for purposes of personal jurisdiction, and the actions of one corporation are not attributable to another, absent unusual conditions. *See Saudi*, 427 F.3d at 276 ("[I]t is generally the case that the contacts of a corporate subsidiary cannot impute jurisdiction to its parent entity."); *Goldrick v. D.M. Picton Co.*, 56 F.R.D. 639, 641 (E.D. Va. 1971) (finding "no justification for disregarding

20

the separate existence of the parent corporation and the subsidiary corporation" and rejecting plaintiff's attempt to attribute actions of parent to subsidiary for purposes establishing personal jurisdiction over the subsidiary in Virginia).

### b.      *Zamil Offshore's communications with AdvanFort are not a basis for jurisdiction.*

The alleged communications between AdvanFort and Zamil Offshore are also insufficient. The Complaint alleges no in-person meetings between Zamil Offshore and AdvanFort in Virginia, and there is no allegation that any services were performed in Virginia. Instead, AdvanFort describes its initial solicitation of Zamil Offshore's services in July 2013, Compl. ¶ 63, and the approximately dozen emails, letters, and telephone calls between AdvanFort in Virginia and Zamil Offshore in Saudi Arabia regarding the repair of the *Seaman Guard Virginia* spread between 2013 and 2022. *See* Compl. ¶¶ 60, 63-64, 67-69, 75-77, 99-101, 103-04, 107-08, 110, 124-126. It also describes a wire transfer from AdvanFort's bank account in Virginia to Zamil Offshore's bank account in Saudi Arabia. Compl. ¶ 71.

These contacts fall well short of purposeful availment under Fourth Circuit precedent. In *Consulting Engineers Corp. v. Geometric Limited*, the Fourth Circuit considered whether two foreign entities, one from Colorado and one from India, had purposefully availed themselves of the State of Virginia. 561 F.3d at 273. During contract negotiations, the Virginia plaintiff had four telephone conversations and exchanged twenty-four emails with the Colorado defendant. *Id.* at 279. The Colorado defendant had no offices or employees in Virginia, no ongoing business in Virginia, and no in-person contact with the plaintiff in Virginia. *Id.* at 279-80. It negotiated the contract from Colorado, and all work contemplated under the contract was to be performed in India. *Id.* As to the Indian defendant, it exchanged four brief emails, various drafts of their agreement, and had several telephone calls with the Virginia plaintiff. *Id.* at 281. The court held

that both defendants' contacts with Virginia were too attenuated to support specific jurisdiction. *Id.* at 282.

This case is on all fours with *Consulting Engineers*. Like the defendants in that case, Zamil Offshore has no Virginia offices, employees, or ongoing business activities in Virginia. Zamil Offshore never visited Virginia in connection with the transaction at issue, and there is no dispute that under the Parties' agreement, all performance was to take place in Saudi Arabia. The four telephone conversations and twenty-four emails exchanged between the Virginia plaintiff and the Colorado defendant in *Consulting Engineers*, *id.* at 279, is *more* than the dozen or so communications described in the Complaint, Compl. ¶¶ 60, 63-64, 67-69, 75-77, 103-04, 107-08, 110, 124-126. The fact that a wire transfer was made from Virginia to Saudi Arabia does not change the analysis. *See Weisner v. FLIR Sys., Inc.*, 2019 WL 4962594, at *4 (E.D.N.C. Oct. 7, 2019) (citing *Consulting Engineers* and explaining that wire transfer from defendant employer in Saudi Arabia to bank in North Carolina carried little significance because it was merely a function of plaintiff's residence in North Carolina, and had "little, if anything, to do with the relationship between the parties").

If anything, this is an easier case than *Consulting Engineers*. There, the Colorado defendant had affirmatively reached out to the Virginia plaintiff and initiated the business relationship. 561 F.3d at 280. As the Fourth Circuit has explained, "the fact that a defendant 'initiated contact' with the plaintiff" can "significantly impact[] the outcome of a personal jurisdiction analysis[.]" *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 562 (4th Cir. 2014). As to the Indian defendant, it had agreed to a contract with a Virginia choice-of-law provision. *Consulting Eng'rs*, 561 F.3d at 281. The court noted that "while significant," such a provision could be outweighed by other factors—and subsequently held that it was. *Id.* Neither

22

of those facts are alleged here: it is undisputed that *AdvanFort initiated contact* with Zamil Offshore in July 2013, Compl. ¶¶ 39, 63, and there is no allegation that there is a Virginia choice-of-law provision.

This case is also materially indistinguishable from *Ellicott Machine*, 995 F.2d 474, which "involve[d] a private corporation from a foreign country whose only contacts with a United States corporation and the [U.S.] forum resulted from a single, short-term contract performed abroad," *id.* at 478-79. The Fourth Circuit found the Australian defendant's contacts with the U.S. forum—in that case, Maryland—to be "insubstantial" because (i) performance took place abroad, (ii) the parties did not have a "longstanding business relationship," (iii) the contract was for a one-time project expected to last only four months, (iv) the contract did not contemplate a "long-term relationship" or any future work, and (v) it lacked of a choice-of-law provision. *Id.* Indeed, the Fourth Circuit reached that conclusion despite worse facts than those presented in AdvanFort's Complaint. Like *Consulting Engineers*, *Ellicott Machine* involved a foreign defendant that "purposefully initiated the business relationship between the parties" by faxing a request to bid on the project to the Maryland company's Baltimore headquarters. *Id.* at 476, 478.

*Ellicott Machine*, like *Consulting Engineers*, strongly counsels dismissal here. *See Mattiaccio v. Cantu Apiaries of Fla., LLC*, 2022 WL 1597826, at *6 (E.D. Va. May 19, 2022) (quoting both cases, and finding no purposeful availment when (i) alleged breach of contract occurred outside Virginia; (ii) contract contemplated performance outside Virginia, (iii) defendant held no offices in Virginia, never travelled to Virginia, and held no property in Virginia). Both decisions reflect Fourth Circuit law that "purposeful availment [i]s lacking in cases in which the locus of the parties' interaction was overwhelmingly abroad." *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 302 (4th Cir. 2012); *see Ellicott Mach.*, 995 F.2d

J.A.079

at 480 (dismissing for lack of personal jurisdiction and noting the "overwhelming Australian focus of the [parties'] contract"). For the reasons described above, this is exactly such a case. The "locus" of this case is undoubtedly in Saudi Arabia. *See Tire Eng'g*, 682 F.3d at 302.

### c.    Zamil Offshore's servers are not a basis for jurisdiction.

Finally, AdvanFort alleges, "on information and belief," that Zamil Offshore's website and email was hosted on servers located in Virginia. Compl. ¶¶ 48, 60. However, it is settled law that that this is not sufficient to establish purposeful availment to Virginia. As the Fourth Circuit has explained, the level of contact between an out-of-state defendant and a web server located within a forum is "de minimis." *Carefirst*, 334 F.3d at 402. It would be "unreasonable" for a foreign company to expect that, merely by utilizing servers owned by a Virginia-based company, it would be haled into court in Virginia. *Id.* This is especially true where—as here—there is no allegation that Zamil Offshore even knew its website and email were hosted by a Virginia-based service provider. Since the physical location of a server where information is posted to the internet is "often a matter of happenstance" unbeknownst to the user, "[i]t would eviscerate traditional notions of due process to exercise personal jurisdiction over a defendant based on such a contact with the forum state." *Fireclean LLC v. Tuohy*, 2016 WL 4414845, at *6 (E.D. Va. June 14, 2016).

### 3.    Exercising personal jurisdiction in this case would be constitutionally unreasonable.

An exercise of jurisdiction is constitutionally unreasonable when forcing the defendant to litigate in a forum would be "so gravely difficult and inconvenient" as to place the defendant at a "severe disadvantage in comparison to his opponent." *Tire Eng'g*, 682 F.3d at 303 (quoting *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 296 (4th Cir. 2009)). The interests of the forum state, the burden on the defendant, AdvanFort's interest in obtaining relief, the interstate judicial system's interest in efficient resolution of controversies, and the shared interest

of the several States in furthering fundamental substantive social policies are the relevant considerations. *Ellicott Mach.*, 995 F.2d at 479.

As a threshold matter, because AdvanFort cannot satisfy the first two requirements for personal jurisdiction, it would be constitutionally unreasonable to exercise personal jurisdiction in this case. *See Consulting Eng'rs*, 561 F.3d at 279 ("If the plaintiff satisfies prongs one and two, prong three comes into play."); *Conopco, Inc. v. Rebel Smuggling, LLC*, 2021 WL 5909831, at *5 (E.D. Va. Dec. 14, 2021) ("Considering the inability of Defendant to satisfy the first two prongs, the Court concludes that i[t] would be constitutionally unreasonable to exercise personal jurisdiction in this case.").

For the reasons discussed above, the interests of Virginia in resolving this dispute are minimal. This is a case about a ship that caught fire a decade ago in Saudi Arabia, while being worked on by a Saudi company, with Saudi employees, in a shipyard in Saudi Arabia. This case will be decided under Saudi law, and will involve the scope and application of judgments made by the Saudi courts. It is not a case where "Virginia law [will] inform[] some of the claims." *See Tire Eng'g*, 682 F.3d at 303. The State of Virginia has little interest in applying Saudi law to events and disputes in Saudi Arabia that are already familiar to the Saudi courts. *See Mattiaccio*, 2022 WL 1597826, at *7 ("While Virginia maintains a substantial interest in adjudicating local business disputes, a cause of action outside the forum involving one contract between a Virginia resident and entirely foreign defendants does not indicate a strong state interest."). True, AdvanFort is a Virginia company, but it decided to conduct business off the coast of Saudi Arabia, and then sought repairs of the ship in Saudi Arabia. Virginia's "interest in adjudicating [an] action insofar as it seeks to ensure the economic health of its citizens and the fair resolution of their disputes . . . . diminishes . . . as [the state's] citizens seek their fortune away from home—

25

particularly when they compete for a slice of foreign pie . . . intended primarily for foreign consumption." *Ellicott Mach.*, 995 F.2d at 479.

Here, the "burden on the defendant" weighs against exercising personal jurisdiction, and "with particular force in actions against foreign national defendants." *Id*. Zamil Offshore is located in Saudi Arabia. Transporting witnesses, obtaining translators, and the difficulties associated with litigating a dispute half a world away from where the events took place would substantially increase litigation costs for Zamil Offshore. *See id.* The Supreme Court has cautioned that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field" because of potential negative implications for foreign relations. *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 115 (1987) (citation omitted). International comity, it explained, is "best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State." *Id.* That concern is squarely implicated here. Virginia's interests are minimal, and as with the foreign company in *Ellicott Machine*, "the issues here implicate fundamental substantive social policies affecting international trade, business, and sovereignty concerns." 995 F.2d at 480. "The involvement of these policies weighs against the reasonableness of jurisdiction in [Virginia]." *Id.*

Thus, AdvanFort cannot meet its burden to show that the exercise of personal jurisdiction over Zamil Offshore would be proper.

**CONCLUSION**

For the foregoing reasons, AdvanFort's Complaint should be dismissed.

Dated: September 29, 2023          Respectfully submitted,

                                   */s/ Amy McKinlay*
                                   _____
                                   Richmond T. Moore (*Pro Hac Vice pending*)
                                   John S. Williams (*Pro Hac Vice pending*)
                                   Amy McKinlay (VSB No. 89394)
                                   WILLIAMS & CONNOLLY LLP
                                   680 Maine Avenue S.W.
                                   Washington, DC 20024
                                   Telephone: (202) 434-5000
                                   Fax: (202) 434-5029
                                   amckinlay@wc.com

                                   *Counsel for Defendant Zamil Offshore Services Company*

27

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September, 2023, I will electronically file the foregoing with the clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Benjamin L. Hatch
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3947
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Clara E. Brillembourg
Foley Hoag LLP
1717 K Street N.W.
Washington D.C., 20006
Telephone: (202) 223-1200
E-mail: CBrillembourg@foleyhoag.com

Andrew B. Loewenstein
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
E-mail: ALoewens@foleyhoag.com

Peter A. Sullivan
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 812-0400
E-mail: psullivan@foleyhoag.com

         */s/ Amy McKinlay*

         Amy McKinlay (VSB No. 89394)
         WILLIAMS & CONNOLLY LLP

# Declaration of Hussam Salah I. Al Hejailan

# The Law Firm of Salah Al-Hejailan since 1968 (L.L.C.)

**In association with** 🦅 **Freshfields Bruckhaus Deringer**

Head Office - Riyadh
P.O. Box 1454, Riyadh 11431 CR 1010328482
Tel.: 011-4792200  Fax: 011-4791717
Email: Lfshriyadh@hejailanlaw.com
Website: www.hejailanlaw.com
Kingdom of Saudi Arabia

Our ref.: LFSH/Zamil

Date: 29 September 2023G

Dear Sirs

**Civil Action No. 1:23-cv-906**
**AdvanFort Company vs. Zamil Offshore Services Co. and Saudi Ports Authority**

| | |
|---|---|
| **Expert Opinion of:** | Hussam Salah I. Al Hejailan |
| **Specialist field:** | Administrative and Commercial Litigation under Saudi Law |
| **On behalf of the Defendant:** | Zamil Offshore Services Co. (the Defendant) |
| **Prepared for:** | United States District Court for the Eastern District of Virginia |
| **Subject Matter:** | Expert Opinion on the law of the Kingdom of Saudi Arabia |

1      **Instructions**

I have been instructed by Williams & Connolly, LLP, counsel for Zamil Offshore Services Co., to provide an expert opinion (the "**Opinion**") about the Saudi legal system and certain issues in connection with AdvanFort's claim listed in paragraph 3 of this Opinion.

2      **Expert's experience**

2.1    **The writer**

2.1.1   I am Hussam Salah I. Al Hejailan.

2.1.2   As a Partner of The Law Firm of Salah Al Hejailan LLC, I have been practicing as a Saudi lawyer under license no. 23170 (Exp: April 8, 2027) for 28 years, specializing in litigation, Commercial and Administrative Law.  I have handled a number of cases in the Saudi Courts in relation to Commercial & Administrative disputes, represented local and international companies, and have appeared before the Saudi First Instance Court, Court of Appeal, and the High Court in the Saudi judicial system.  I have also provided legal advice on Saudi civil procedure laws and general Saudi law in a number of litigations.

JEDDAH:  P.O. Box 15141  Jeddah 21444  Tel.: 012-6985888  Fax: 012-6821277  Email: Lfshjeddah@hejailanlaw.com
KHOBAR:  P.O. Box 405  Khobar 31952  Tel.: 013-8687266  Fax: 013-8687255  Email: Lfshalkhobar@hejailanlaw.com
(The Law Firm of Salah Al-Hejailan L.L.C. has replaced the Law Firm of Salah Al-Hejailan)

J.A.086

# The Law Firm of Salah Al-Hejailan *since 1968 (L.L.C.)*

**In association with**  **Freshfields Bruckhaus Deringer**

---

2.1.3    Full details of my qualifications and experience entitling me to give an expert opinion evidence are in Appendix 1 (CV).

2.2    **Summary background of the case**

The Plaintiff (AdvanFort) has brought a claim in the United States District Court for the Eastern District of Virginia against the Defendants (Zamil Offshore & Saudi Ports Authority), as the owner of a vessel that was placed for maintenance at the Defendant's shipyard in Jeddah, Saudi Arabia in 2013, claiming that the Defendants did not take appropriate duty of care during their custody of the vessel, and therefore, claiming against all Defendants for conversion, breach of bailment under tort and contract, and for negligence and gross negligence.

AdvanFort and Zamil Offshore were previously involved in litigation in Saudi Arabia.  My understanding of the prior litigation, based on a review of the filings, is as follows:

In February 2014, AdvanFort filed a claim against Zamil Offshore in the Third Commercial Department Circuit of the Jeddah Administrative Court of the Board of Grievances in Jeddah, Saudi Arabia under case number (2033/2/1435).  AdvanFort alleged it suffered losses due to a fire on the Seaman Guard Virginia while it was docked in the Jeddah shipyard and that Zamil Offshore was responsible for the fire. Zamil Offshore then filed a claim against AdvanFort in the Third Commercial Circuit of the Board of Grievances at Jeddah, Saudi Arabia under case number (4656/2/1436).  Zamil Offshore alleged it was owed monies for the repairs it performed on the Seaman Guard Virginia as well as berthing fees and other damages.  Over the next three years, the court held multiple hearings, received submissions from both parties, and heard testimony from AdvanFort's witnesses.

In February 2017, in a written decision, which is attached hereto, the first instance court (case number (2033/2/1435) filed by AdvanFort) found AdvanFort's witnesses not credible. It held that Zamil Offshore was not responsible for the fire on AdvanFort's ship. It then dismissed AdvanFort's claims against Zamil Offshore. An appeal was filed by AdvanFort that was dismissed by the appellate court and affirmed the lower court decision (case number (3347/2/1438)).

In addition to the above-mentioned appeal, in April 2017, AdvanFort also filed an appeal to the first commercial circuit in the administrative court of appeal in Mecca against the judgment (case number (4656/2/1436) issued in favor of Zamil Offshore. In May 2017, the appellate court rejected the appeal and affirmed the lower court decision (case number (3549/2/1438)).

I have been asked to provide my opinion under Saudi Law on whether:

I.    the Plaintiff can pursue in Saudi Courts claims similar to those filed before the United States District Court for the Eastern District of Virginia, specifically

# The Law Firm of Salah Al-Hejailan *since 1968 (L.L.C.)*

**In association with** ⊕ **Freshfields Bruckhaus Deringer**

conversion, breach of bailment under tort and contract, negligence, and gross negligence;

II.     the Defendants (Zamil Offshore & Saudi Ports Authority) enjoy sovereign immunity in Saudi Arabia; and

III.    there are any statute of limitations under Saudi law that would prevent the Plaintiff from filing a cause of action on any of the above claims in the Saudi Courts; and

IV.    whether there is a relief under Saudi Law to file new claims or to re-open a claim after a final judgment is rendered by the Saudi Courts.

3      **The issues to be addressed**

This Opinion will address the following legal issues:

3.1.1    Brief description of the Saudi legal system and the Saudi Judicial Court System.

3.1.2    Does Saudi Law address the same legal principles filed by the Plaintiff in the United States Courts, on conversion, breach of bailment tort and contract, negligence, and gross negligence?

3.1.3    What are the statutes of limitations for commercial, civil, and administrative claims in Saudi Arabia?

3.1.4    Do commercial entities and government institutions enjoy sovereign immunity in Saudi Arabia?

3.1.5    If a final judgment is issued by the Saudi Courts, is there any legal relief for a party to reopen the same case under Saudi Law, and is there any opportunity to file a new claim in relation to a final judgment already issued?

4      **My opinion**

4.1.1    **Brief description of the Saudi legal system and the Saudi Judicial Court System.**

In Saudi Arabia, the word "law" is understood to refer to Islamic Shari'a law. The primary objective of Islamic law is to clarify the obligations and duties of individuals according to the teachings of Islam.  The laws of Saudi Arabia are considered valid only to the extent that they conform to Islamic law.  Shari'a law principles addresses all commercial, civil and administrative issues under Saudi law, and apply equally to all sectors of the law on the same principles.

The traditional sources of Shari'a law in Saudi Arabia have been divided into two parts: primary independent sources of law, namely the *Qur'an* and *Sunna*, which all laws shall strictly adhere to and secondary sources of law, namely *Ijtehad, Ijma' and Qiyas*.

3

J.A.088

# The Law Firm of Salah Al-Hejailan *since 1968 (L.L.C.)*

**In association with** ⊛ Freshfields Bruckhaus Deringer

---

The **Qur'an** is the primary and supreme source of Islamic law and the **Sunna** is the collections and teachings, and reports acts of Prophet Mohammed that were recorded and later authenticated by his followers.

The secondary sources of law, are: **Ijtehad** (a process to carefully apply Shari'a principles to new legal issues to come up in society), **Ijma'** (a framework of moral principles and code of conduct and requires majority approval) and **Qiyas** (a logical reasoning by analogy, to resolve any social and legal problems). These secondary sources are approved interpretation of the true meaning of Shari'a law, which are widely practiced today and have been organized through Saudi legislation in the enactment of the Saudi Council of Senior Scholars which acts through the Permanent Committee for Scholarly Research and Ifta. This Council was organized in terms of formation by the Royal Order No. (A/137), and Royal Order No. (A/88), and Royal Order No. (A/72).

In addition to the primary sources of Islamic law, the Saudi legal system also creates legislation that primarily addresses administrative, commercial and civil regulations, created with the intention of accommodating modern social changes in Saudi communities that must concur with Islamic teachings (*Shari'a*). Legislators are expected to strike a balance between the Shari'a teachings and modern-day legislations. In brief, these legislations take the form of *Royal Decrees, Royal Orders and Ministerial Resolutions* that are passed as Saudi laws. There are also policies and decisions issued by *Ministers* that also take a regulatory form, but they can be challenged.

For the purpose of this Opinion, we will focus on legislations that are issued as Royal Decrees, which go through a process of approvals starting from the Shoura Council to the Council of Ministers, and are finally approved by the Crown (Royal Diwan), where a Royal Decree number is given to the legislation and is considered supreme under Saudi law. To give examples of some of these legislations, which will be part of this Opinion: (i) the Law of Civil Procedures (issued under the Royal Decree No. (M/1) November 25, 2013); (ii) Law of the Judiciary (issued under the Royal Decree No. (M/78) October 1, 2007); (iii) Basic Law of Governance (issued under the Royal Decree No. (A/90) March 2, 1992) which is the Constitution of the Kingdom of Saudi Arabia; (iv) Law of Procedure before the Board of Grievances (issued under the Royal Decree No. (M/3) November 25, 2013); (v) Law of Commercial Courts (issued under the Royal Decree No. (M/93) April 8, 2020); and (vi) Commercial Maritime Law (issued under the Royal Decree No. (M/33) December 12, 2018).

The Saudi judicial system is mainly divided into three categories: (i) Shari'a courts, (ii) specialized courts such as the Commercial Court, Criminal Court, Administrative Court, Labor Court, and (iii) specialized committees (examples

**The Law Firm of Salah Al-Hejailan** *since 1968 (L.L.C.)*

In association with 🏛 **Freshfields Bruckhaus Deringer**

of this are tax committees and custom committees). All of these jurisdictions generally operate in accordance with Shari'a law principles.

Except for some specialized committees, the Shari'a Courts and the aforesaid specialized courts have a similar structure. They have three levels: first instance court, Court of Appeal, and finally the High Supreme Court. The main legal framework regulating all the court systems are the Law of Civil Procedures (issued under the Royal Decree No. (M/1) November 25, 2013), the Commercial Courts Law that regulates the commercial courts (issued under the Royal Decree No. (M/93) April 8, 2020), and Law of Procedure before the Board of Grievances that regulates all administrative courts (issued under the Royal Decree No. (M/3) November 25, 2013). There is also a newly enacted law, called Civil Code Law (issued under the Royal Decree No. (M/191), dated 18 Jun 2023), which is not in effect yet, that will regulate all civil matters also before the Shari'a court.

As for the Judicial System in Saudi Arabia, it must be noted that it is independent and autonomous from any other authority.

As stated in Article 1 of the Law of the Judiciary (issued under the Royal Decree No. (M/78) dated October 1, 2007) "*Judges shall be independent and, in the administration of justice, they shall be subject to no authority other than the provisions of Shari'a and applicable laws. No one may interfere with the judiciary*". Moreover, it is also stated in the Basic Law of Governance (issued under the Royal Decree No. (A/90) March 2, 1992) which is the Constitution of the Kingdom of Saudi Arabia, under Article 46, that: "*The Judiciary shall be an independent authority. There shall be no power over judges in their judicial function other than the power of Shari'a*".

As a general principle, under Saudi law, any party who has any commercial, civil or administrative interest or any other legal rights will be able to protect its interests and rights before a competent Saudi court subject to the Saudi law and procedures applicable to the relevant process.

Please note that, in accordance with the Saudi Constitution (issued under Royal Decree (A/9) dated March 2, 1992), Article 47 states that: "*The right of litigation shall be guaranteed equally to citizens and residents in the Kingdom. The law shall set forth the procedures required therefor*". Moreover, in the Law of Civil Procedure (issued under Royal Decree No. (M/1) dated November 25, 2013), Article 3 states that: "*(1) No claim or defense shall be accepted unless submitted by a person with a legitimate interest. Potential interest shall be sufficient if the claim is intended as a precaution to avoid imminent damage or to establish a right the evidence for which may not be available at the time it is contested; and (2) the court shall reject any lawsuit proven to be frivolous or malicious, and it may punish the person filing such a lawsuit*".

# The Law Firm of Salah Al-Hejailan since 1968 (L.L.C.)

**In association with** 🏛 Freshfields Bruckhaus Deringer

---

Please note that there are a number of lawsuits that have been successfully pursued by claimants on different grounds against a governmental authority or a governmental interest.

One example is the Case No: 1388 for the year 1442H, corresponding to 2021G –First Instance 14th Administrative Court, and Case No: 1786 for the year 1442H, corresponding to 2021G – Administrative Appeal Court.

In that case a major foreign port operator had claimed that the Ports Authority in Dammam, Saudi Arabia, has issued an administrative decision restricting the removal of the port operator's equipment from the premises of the Port in Dammam to be sold to a third party on the basis that they have not paid an outstanding amount due to the Port Authorities.  A Judgment was issued by the First Instance Court lifting the restriction on the port operator allowing them to move their equipment outside the premises of the Ports Authority in Dammam on the basis that the port operator issued an unconditional guarantee to the Port Authority that secures any outstanding debt or other dues to the Ports Authority. Moreover, the risk that the port operator may miss an opportunity to sell their equipment to a third party may give rise to liability that the Ports Authority is misusing their authority against the port operator.  This judgment has also been reaffirmed by the Court of Appeal.

Another case is Case No: K/2/2984 for the year 1435H, corresponding to 2014G – First Instance Administrative Court and Case No: S/2/2821 for the year 1437H, corresponding to 2016G – Administrative Appeal Court.

In this case the claim was brought by a Saudi citizen against the Municipality of Jeddah for not performing their duty of care to ensure the proper safety by paving and constructing proper roads. The claimant was awarded damages by the Court of First Instance and reaffirmed by the Court of Appeal that the Municipality of Jeddah had a duty of care to ensure the safety of roads to motorists and pedestrians.

Another case is one that my Firm was involved in.  My Firm has assisted Al Khaliji Commercial Bank P.Q.S.C., a Qatari registered commercial bank, in the enforcement of its Qatari court judgment in the bankruptcy process of Ahmad Hamad Algosaibi and Brothers ("AHAB").  This case arose during the embargo against Qatar, and therefore during a disruption of diplomatic relations between the Kingdom of Saudi Arabia and Qatar. Even so, the bank's claim was accepted by the court for the purposes of the financial restructuring procedure (the "FRP") initiated by AHAB without any comment or discrimination based on the claimant being a Qatari entity and/or seeking to enforce a claim based on a Qatari court judgment.  The bank was able to retain Saudi counsel, and was treated equally and in the same manner as all other claimants both before the

# The Law Firm of Salah Al-Hejailan *since 1968 (L.L.C.)*

**In association with** 🦅 **Freshfields Bruckhaus Deringer**

Joint Directorate of the Enforcement Court and, subsequently, before the Commercial Court in the FRP process.

**4.1.2**     **Does Saudi Law address the same legal principles filed by the Plaintiff in the United States Courts, on conversion, breach of bailment tort and contract, negligence, and gross-negligence?**

Under Saudi law, the legal principles referred to in the Plaintiff's claims in the US courts, are legal principles that are addressed in Shari'a law and Saudi legislation, and, therefore, similar claims seeking similar forms of relief may be filed by a plaintiff. All the claims are generally addressed (also through comparable principles) under Shari'a law while some of them are specifically addressed under Saudi law.

The general principle of Shari'a Tort is the principle of "*la dular wala Dirar*" which means "*there should be neither harming nor reciprocating harm*", under this principle, the duty of care that a shipyard has towards a vessel under its care in a contract shall be firstly assessed by referring to the terms and conditions of the contract entered into by and between the shipyard owner and the vessel owner. If any contractual obligations are breached, the innocent damaged party can protect its rights by seeking remedy from the Saudi Commercial Court. In the absence of specific terms and conditions in the contract, the obligations of duty of care arise under the Principles of Shari'a Tort. The meaning of duty of care in Islamic Tort Law is that individuals owe others an obligation to act reasonably and with reasonable care to avoid causing harm (*Dharar*) or damage to others. Failure to perform this duty may lead to compensation (*Diya*). The general rule for establishing negligence under Saudi law is to demonstrate (i) a breach of obligation, followed by harm (*Dharar*) and (ii) the chain of causation between the breach and the harm. If both of these conditions are established, then, an innocent party can claim compensation (*Diya*).

It is also important to mention that there is a new Saudi Law that has been enacted, addressing civil issues, the Civil Code Law (issued under the Royal Decree No. (M/191), dated 18 Jun 2023), that has not yet been implemented. This new legislation codifies the principles of tort law under Saudi law. This law can be applied retroactively in certain conditions, as stated in Article 5 of the Royal Decree pursuant to which the law was issued, which states that: "*The provisions of the Civil Code Law shall apply to all cases before such time prior to its entry into force, save for the following:*

*1. Where there exists a statutory provision or judicial principle pertaining to the case that is contrary to the provisions of this Law and it is upheld by one of the parties.*

*2. Where the provision pertains to the extinctive prescription effective prior to the entry into force of this Law.*"

7



# The Law Firm of Salah Al-Hejailan *since 1968 (L.L.C.)*

**In association with** **Freshfields Bruckhaus Deringer**

---

<u>Conversion</u>

As per the Conversion claim, which we understand under US law as the wrongful exercise of authority over another's goods, depriving the person of their possession, the most comparable principle is the aforesaid mentioned general Shari'a law principle known as "*la dular wala Dirar*", the meaning of this legal principle in Shari'a Law is "*there should be neither harming nor reciprocating harm*".  This principle, which is widely used in contract and tort in Shari'a law, protects against any harm to a person or property.  The meaning of Conversion in Shari'a law would be "**Taahsouff**" which means "*the state of being highhanded and/or the cruel and arbitrary use of authority or a tyrannical act*".  Under Shari'a law, if it is proven that in any commercial, civil or administrative law transaction someone has abused their authority and has negatively affected others in doing so is subject to liability to compensate the relevant damage and, in some circumstances, it may be also liable of criminal punishment.  Please note that also Saudi law has enacted legislations to protect its rights against "*Taahsouff*" behaviours.

Under Saudi Administrative Law, any abuse of power by any government body or government official will be subjected to administrative punishment and financial liability if they are accused of committing *Taahsouff* by the administrative court under the Law of Procedure before the Board of Grievance (issued under Royal Decree No. (M/3), dated November 25, 2013).  Moreover, the new Civil Law Code (issued by Royal Decree No. (M/191) dated June 18, 2023), although not yet implemented, provides under Articles 28 and 29 rights to remedies for anyone who commits *Taahsouff*.

<u>Breach of Bailment in Tort and Contract and Negligence and Gross Negligence</u>

Breach of Bailment in Tort and Negligence and Gross Negligence (with certain degree), under Saudi law, will follow under the general principles of Islamic Tort.  Please note that also, Breach of Bailment in Contract, in the absence of breach of obligations expressly provided in the contract will follow under the principles of Islamic Tort.

Similarly to Conversion, these claims are viewed to be treated under the aforesaid Shari'a law principle of "la dular wala Dirar", "there should be neither harming nor reciprocating harm".

Gross negligence may follow under tort or may be considered a sort of criminal act depending on the facts, grade of negligence and type of damages.  Whether the gross negligence follows under one of the two aforesaid categories is to be assessed on a case-by-case basis and it is upon the discretion of the judge.

*The Law Firm of Salah Al-Hejailan since 1968 (L.L.C.)*

**In association with** 🌐 **Freshfields Bruckhaus Deringer**

---

As mentioned above, upon the entry into effect of the new Civil Code, which codifies the principles of the Islamic Tort in Saudi law, the Plaintiff may exercise further action under Saudi law in relation to these claims.

**4.1.3**   **What are the statutes of limitations for commercial, civil and administrative claims in Saudi Arabia?**

Under Saudi law, the Shari'a law has historically prohibited placing any statutes of limitation on any rights or claims, but legislators in Saudi Arabia have recently tried to strike a balance between setting limitations on claims on commercial and administrative claims only, but not on civil claims. Please note that, new Civil Code provides also for limitations on civil claims but, as mentioned before, it has not been enacted yet.

Article 24 of the Law of Commercial Courts (issued under the Royal Decree No. (M/93) dated April 8, 2020) provides a statute of limitations for filing a commercial claim of five years. Please note that before the Law of Commercial Courts was enacted there was no statute of limitation for commercial claims under Shari'a law principles. Therefore, under Article 24 of the Law of Commercial Courts all claims based on events occurring before April 2020 must be brought before 13 February 2025, or five years under the Hijri calendar after the April 2020 passage of Article 24.

Although not relevant to AdvanFort's claims against Zamil Offshore, administrative claims have a statute of 10 years, unless the defendant confirms the claim, or the court exercises its rights to accept the claim after the 10 years have lapsed, as stated in Article 8 subsection 6, and Article 13, of the Board of Grievance Procedural law.

**4.1.4**   **Do commercial entities and government institutions enjoy sovereign immunity in Saudi Arabia?**

Under Saudi law, there is no sovereign immunity granted to ministers, government employees, commercial public or private entities, or citizens. Sovereign immunity is usually only limited at different levels to diplomatic and some high-ranking state officials (like the King, the Crown Prince, and the Prime Minister). Therefore, neither Zamil Offshore Services Co. nor the Saudi Ports Authority may claim sovereign immunity.

Please note that the Law of Procedure before the Board of Grievance and the Administrative courts has historically been placed to review any claims filed against government officials or government departments that can be heard before the administrative courts. In addition, the law of Trial of Ministers, as

*The Law Firm of Salah Al-Hejailan* since 1968 (L.L.C.)

**In association with** ⊕ **Freshfields Bruckhaus Deringer**

---

stated in Article 1 that: ministers and council of ministers will be held accountable for any illegal or inappropriate conduct.

In conclusion, commercial entities and government institutions do not enjoy sovereign immunity in Saudi Arabia.

4.1.5 **If a final judgment is issued by the Saudi Courts, is there any legal relief for a party to re-open the same case again under Saudi Law? And is there any opportunity to file a new claim in relation to a final judgment already issued?**

Yes, there is a relief offered by the Saudi judicial legal system for a party to re-open the same case again. Any final judgment, issued in Saudi Arabia from any courts, either commercial, administrative or civil, can be re-opened by filing a judicial review claim subject to fulfilling the requirements stated in the Civil Procedure Law (issued under the Royal Decree No. (M/1) November 25, 2013), under Article 200, which states as follows:

1. *Any litigant may petition for reconsideration of final judgments in the following circumstances:*

   a) *If the judgment was based on documents that were subsequently found to be forged or based on a testimony that was subsequently ruled perjurious by the competent authority;*
   b) *If the petitioner, after the judgment was rendered, obtained conclusive documents for the case that he was unable to produce before the rendering of the judgment;*
   c) *If an act of fraud was committed by the adverse party which would have a bearing on the judgment;*
   d) *If the judgment awards what the litigants did not ask for or more than what they asked for;*
   e) *If the wording of the judgment was contradictory;*
   f) *If the judgment was in absentia;*
   g) *If the judgment was rendered against a person not properly represented in the case.*

2. *Anyone who was bound by the judgment and was neither joined nor did he intervene in the case may petition for reconsideration of final judgments.*

Moreover, there are opportunities to file new claims with new demands on the same subject on a claim that has already been reviewed by the courts, if these new claims have never been reviewed by the court and considered to be different from the original claims. Such review is upon the discretion of the court.

# *The Law Firm of Salah Al-Hejailan* since 1968 (L.L.C.)

**In association with**  **Freshfields Bruckhaus Deringer**

**5**        **Conclusion**

I.      The Judicial System in Saudi Arabia it is independent and autonomous, in the administration of justice and no other authority shall have power over the judges in their judicial function other than the power of Sharia.

Under Saudi law claims or defences are accepted if they are submitted by a person with a legitimate interest.  Potential interest shall be sufficient if the claim is intended as a precaution to avoid imminent damage or to establish a right the evidence for which may not be available at the time it is contested.

II.     Under Saudi law, the legal principles referred to in the Plaintiff's claims in the US courts, are legal principles that are addressed in Shari'a law and Saudi legislation, and therefore, a claim on this basis may be filed by a plaintiff.   As per the duty of care, there is a general principle of Shari'a Tort "*la dular wala Dirar*" which means "*there should be neither harming nor reciprocating harm*". Under this principle, the duty of care that a shipyard owner has towards a vessel owner under its care in a contract shall be firstly assessed by referring to the terms and conditions of such contract. In the absence of any specific terms and conditions in the contract, the obligations of duty of care arise under the Principles of Shari'a Tort. The meaning of duty of care in Islamic Tort Law is that individuals owe others an obligation to act reasonably and with reasonable care to avoid causing harm (Dharar) or damage to others. Failure to perform this duty may lead to compensation (Diya). The general rule for establishing negligence under Saudi law is to demonstrate (i) a breach of obligation, followed by harm (Dharar) and (ii) the chain of causation between the breach and the harm. If both of these conditions are established, then, an innocent party can claim compensation (Diya).

III.    There is not currently a statute of limitation for civil claim. However, the new Civil Code provides for a statute of limitation applicable to civil claim but, as mentioned before, it has not been enacted yet.

Differently, there are statutes of limitations for filing a commercial claim and administrative claims.

Article 24 of the Law of Commercial Courts (issued under the Royal Decree No. (M/93) dated April 8, 2020) provides a statute of limitations for filing a commercial claim of five years.  Since before the enactment of the Law of Commercial Courts there was no statute of limitation for commercial claims under Shari'a law principle, under Article 24 of the Law of Commercial Courts all claims based on events occurring before April 2020 must be brought before 13 February 2025, or five years under the Hijri calendar after the April 2020 passage of Article 24.

The statute of limitation for filing an administrative claim is 10 years, unless the defendant confirms the claim, or the court exercises its rights to accept the claim

# The Law Firm of Salah Al-Hejailan *since 1968 (L.L.C.)*

**In association with**  Freshfields Bruckhaus Deringer

after the 10 years have lapsed, as stated in Article 8 subsection 6, and Article 13, of the Board of Grievance Procedural law.

IV.   Commercial entities and government institutions do not enjoy sovereign immunity in Saudi Arabia. Therefore, neither the Zamil Offshore Services Co. nor the Saudi Ports Authority may claim sovereign immunity.

V.   Any final judgment, issued in Saudi Arabia from any courts, either commercial, administrative or civil, can be re-opened by filing a judicial review claim subject to fulfilling the requirements stated in the Civil Procedure Law (issued under the Royal Decree No. (M/1) November 25, 2013), under Article 200.  Moreover, a final judgment may be reopened, if there are new claims that have never been reviewed by the court and considered to be different from the original claims.  Such review is discretionary to the court.

6    **Statement of truth**

I confirm that I have made clear which facts and matters referred to in this expert opinion are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer. I declare under penalty of perjury under the laws of the United States of America that the foregoing truly and correctly reflects my opinions and conclusions regarding the questions posed before me within the scope of this report.

Signed

The Law Firm of Salah Al-Hejailan LLC
in association with
Freshfields Bruckhaus Deringer LLP

12

J.A.097

# *The Law Firm of Salah Al-Hejailan* *since 1968 (L.L.C.)*

**In association with** ⬡ **Freshfields Bruckhaus Deringer**

---

**Appendix 1**
**Curriculum Vitae**

## HUSSAM AL-HEJAILAN

**Telephone:** +966 11 479 2200

**Facsimile:** +966 11 479 1717

**E-mail:** Lfshriyadh@hejailanlaw.com
        hh@hejailanlaw.com

**Nationality:** Saudi

Hussam Salah Al Hejailan is working in the Riyadh office of LFSH as managing partner and head of the firm's litigation section. In that capacity, he has acquired excellent expertise in the field of litigation management, experience and pre-eminent knowledge. Based on this experience in different kind of legal areas including but not limited to employment law, corporate, finance and governmental issues, he advises the international section of LFSH in its work of contract drafting and legal consultancy services. Hussam also works in the field of state legislative and regulatory legal matters as well as law firm coordination and management. He has also international commercial transaction experience, with an emphasis on corporate and project finance, international joint ventures and distribution agreements and other commercial law issues.  He has over the years, worked on the following:

1. He was head of the LFSH legal team that advised the Saudi Arabian General Investment Authority, Economic Cities Agency for two years on the regulatory framework for Economic Cities in the Kingdom of Saudi Arabia;
2. assisted in a study related to Saudi Arabian economic and business development conducted by the International Monetary Fund;
3. worked on several high commercial and governmental litigation matters; and
4. attended several conferences in relation to arbitration, insurance, office management, family companies and investment forums.

**Publications:**

Hussam is also author of a number of publications:

- Examination of the Subject Matter relating to Commercial Agencies and the Legal Problems Likely to Arise Therefrom (2000)
- Saudi Arabia (2000-2001)
- Responsibility of Board Members and the Directors of Joint Stock Companies (March 2003)
- Anti-Money Laundering Law Sets Standards for Commercial and Financial Transactions (2004)
- The requirements for Future Contracts of Foreign Companies with Government Authorities in the Kingdom
- Amendments to the Law of Legal Practice and Reinforcing the Judicial System
- The Law of Judicial Costs and Free Litigation
- The New Law of Evidence and Paradigm Shift in the Judicial Field
- An article on cyber security
- A study on the new Saudi Law of Arbitration
- A study on profit and non-profit companies
- A study on the new Saudi Bankruptcy Law
- An article on the one-man company
- An Essay on the Future of the Foreign Companies' Contracting with Government Agencies of the Kingdom

**PRACTICES / INDUSTRIES**

Corporate and Litigation

**AREAS OF FOCUS**

Litigation
Corporate

**EDUCATION**

LL.B. Law, King Saud University, Riyadh (1996)

Georgetown University Law Centre, Foundation of American Law and Legal Education (1997)

Master of Law (LL.M), University of Virginia School of Law (1999)

**MEMBERSHIPS**

Managing Director, The Law Firm of Salah Al Hejailan LLC

Member of the International Court of Arbitration (2021)

Deputy Chairman, ICC Saudi Arabia (2017)

Member in the Lawyers Committee at the Chamber of Commerce & Industry, two terms (2005-2012)

Board member, Aon Saudi Arabia

Board member, Arla Foods

**BAR ADMISSIONS**

Admitted to legal practice by the Ministry of Commerce & Industry, Riyadh Saudi Arabia (1995)

Admitted to legal practice after the promulgation of the new regulation concerning legal practice as approved by the Ministry of Justice, Riyadh, Saudi Arabia (2003)

Admitted to Who's Who International Society (2003)

Member of the Saudi Bar Association under membership no. 91669

**COURT ADMISSIONS**

Saudi Arabia

**LANGUAGES**

Arabic
English

13
J.A.098

# Exhibit A



**Samia A. Attar Translation Office**
**LOFTA CERTIFIED TRANSLATION**
**(Head Office - Takhassusi St.)**
**License No. (735) C.C. 285298**
**VAT No : 3007313642 00003**

مكتب سامية عبدالرحمن عطارللترجمة
لـفـتـه لـلـتـرجـمـة المـعـتـمـدة
( المكتب الرئيسي – شارع التخصصي )
ترخيص (٧٣٥ ) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

| CERTIFICATION | شـهــادة |
|---|---|
| We hereby certify, under our responsibility, the accuracy of the translation of the enclosed documents from Arabic Language into English Language as per the enclosed text submitted to us and without any liability on us for the content of the translated text. | بهـذا نصـادق وعلـى مسـئوليتنا علـى صحة ترجمـة المسـتندات المرفقـة مـن اللغـة العربيـة إلـي اللغـة الانجليزيـة حسب النص الـوارد إلينا والمرفق طيـه دون أدنى مسئولية عن محتويات النص المترجم. |
| In witness whereof we affix hereunder the signature and stamp of Samia A. Attar Translation Office (Lofta) to attest & confirm the accuracy of the translation | وإشـهادا علـى ذلـك فقـد قمنـا بتثبيـت توقيعنا وختم مكتب سامية عبدالرحمن عطار (لفته) الرسمي على هذه الوثيقة للمصادقة على صحة ودقة الترجمة. |
| **Samia A. Attar Translation Office (Lofta)** Certified Translators Head Office – Riyadh | مكتب سامية عبدالرحمن عطار للترجمة (لفته) مترجمون معتمدون المكتب الرئيسي – الرياض |



الـريـاض – شـارع الـتـخـصـصـي – هـاتـف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com

1

J.A.100



**Samia A. Attar Translation Office**

**LOFTA CERTIFIED TRANSLATION**
**(Head Office - Takhassusi St.)**

License No. (735) C.C. 285298
VAT No : 3007313642 00003

مكتب سامية عبدالرحمن عطارللترجمة
لـفـتـه لـلتـرجـمـة المعـتـمـدة
( المكتب الرئيسي – شارع التخصصي )

ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

Kingdom of Saudi Arabia

Board of Grievances (083)

The Judgment in the Lawsuit No. 2033/2/ق of 1435 AH

Filed by/ AdvanFort (American Company)

Against Zamil Offshore Services Company

Praise Be To Allah, and Peace Be Upon Messenger of Allah and His Family and Companions:

In the hearing held on Wednesday, corresponding to 18/5/1438 AH, at the Third Commercial Department of the Administrative Court in Jeddah, comprised of:

The Judge/ Saadi Bin Mohsen Al Zahrani – President

The Judge/ Dr. Majed Bin Mohammed Al Saleemi – Member

The Judge/ Faisal Bin Saleh Al Enezi – Member

And in the presence of Khalid Bin Abdurrahman Al Obeid – Secretary

For reviewing this lawsuit referred to the Department on 6/4/1435 AH.

((Facts))



The facts of this lawsuit are summed up in that the Plaintiff has submitted a statement of claim to Jeddah Administrative Court against the Defendant, in which it stated that it suffered losses as a result of a fire in one of its ships by reason of the Defendant's fault. The Plaintiff requests to obligate the Defendant to pay it a sum of USD (825.986) equaling

**Samia A. Attar Translation Office**
**LOFTA CERTIFIED TRANSLATION**
(Head Office - Takhassusi St.)
License No. (735) C.C. 285298
VAT No : 3007313642 00003



مكتب سامية عبدالرحمن عطارللترجمة
لـفـتـه لـلـتـرجـمـة المعتمدة
( المكتب الرئيسي - شارع التخصصي )
ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

to SAR (3,097.4478) against the losses and the lost profit for each month, thus the total amount claimed since the date of fire to 14/6/1435 is SAR (18,58.4000). After that, it revised its requests in the final memo dated 14/5/1435 by obligating the Defendant to repair the ship Virginia urgently and hand it over to the Plaintiff together with the safety and adequacy certificate and to pay a sum of USD (39,168.120) thirty nine million one hundred sixty eight thousand one hundred and twenty US Dollar as against the liquidated damages resulting from the ship cessation and nonperformance of the contractual obligations and obligate it to pay the attorney fees. Having referred the lawsuit to this Department, the Court determined the hearing dated 18/8/1435 AH for reviewing the lawsuit, wherein both the Plaintiff and the Defendant were represented by an attorney for each. The representative of the Plaintiff's attorney stated that the attorney could not attend the hearing of this day, and requested a grace period for submitting a memo stating the Plaintiff's capacity in this lawsuit and its relationship with the ship and submitting the maintenance contract with the Defendant. Then, the Defendant's representative submitted his letter of authorization but the Department requested him to submit a legal power of attorney. The Plaintiff's representative expressed his readiness to provide the Defendant with what he will submit before at least three weeks of the next hearing. In the hearing dated 27/11/1435 AH, the Plaintiff's attorney submitted one page memo attached with two exhibits, the ship chartering contract along with the translation and the accident report along with the translation. The Defendant's attorney received a copy thereof, then submitted a six pages memo attached with a collection of documents in which he mentioned that he indicated thereto in his memo. The Plaintiff's attorney received a copy thereof. Both parties have been given a grace period for reply. The Department requested the Defendant's attorney to correct his capacity or submit the memorandum of association

الـريـاض – شـارع الـتخصصي – هـاتـف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com

3

J.A.102



of the Defendant Company in order to verify his capacity and also requested from him to submit the original documents of translation attached with his memo.

In the hearing dated 16/2/1436 AH, both parties have been given a grace period for conciliation.

In the hearing dated 13/4/1436 AH, the Department reviewed the memo dated 23/3/1436 AH submitted by the Plaintiff's attorney in which he requested to hear the testimony of the shipmaster. Further, the Department reviewed the memo dated 7/4/1436 AH submitted by the Plaintiff's attorney in which he requested to communicate with Ministry of Foreign Affairs for issuing a visa to the witness in this lawsuit. Then, the Plaintiff's attorney submitted a four pages memo enclosed with photocopies of documents and the Defendant's attorney received a copy thereof, in which he stated that he requests to obligate the Defendant to promptly repair the ship, subject matter of the lawsuit, and obligate the Defendant to pay a sum of USD 20350581 as a compensation against the damages caused to the ship and nonperformance of its contractual obligations with the third parties by reason of the Defendant's act and obligate the Defendant to pay the attorney fees. Having presented the same to the Defendant's attorney, he requested a grace period for reply.

In the hearing dated 10/5/1436 AH, the Defendant's attorney submitted an eight pages memo enclosed with some documents, the Plaintiff's attorney received a copy thereof and requested a grace period for reply thereto.

In the hearing dated 24/6/1436 AH, the witness the shipmaster submitted his written testimony of two pages dated 12 April 2015 AD in English. The Department deposited a copy thereof with the lawsuit's file and requested from the attendant translator to refer to

4

الــريــاض – شــارع الـتخصصي ² هــاتـف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com

J.A.103



**Samia A. Attar Translation Office**
**LOFTA CERTIFIED TRANSLATION**
**(Head Office - Takhassusi St.)**
License No. (735) C.C. 285298
VAT No : 3007313642 00003

مكتب سامية عبدالرحمن عطارللترجمة
لــفــتـــه  لـلـتــرجـــمـــة  الـمـعـتـمـدة
( المكتب الرئيسي – شارع التخصصي )
ترخيص (٧٣٥ ) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

the Department for taking a copy of the testimony and submitting it along with its Arabic translation, then the Plaintiff's attorney asked the first witness whether there have been welding works at time of the fire and from where the fire got started, so the translator translated the question of the Plaintiff's attorney to the witness, he mentioned that the cause of fire was a spark emitted from the welding works fallen on the insulation, then the fire broken out. He added that, in such case and as a preventive measure, the insulation must be removed before carrying out the welding. Then, the Plaintiff's attorney asked the first witness: were there any firefighters provided by the Defendant Company, he mentioned that there were no firefighters. Then, the Plaintiff's attorney asked the first witness: was the fire put out by the sea water and who put it out, he stated that the civil defense was that who put the fire out through the sea water, he added that it is logical to use the sea water for putting out the fire, the fire extinguishers may only be used in case of the flames, the thing which was absent. After that, the second witness who stated that he was a sailor in the ship, subject matter of the lawsuit, submitted his written testimony in one page dated 13/4/2015 AD, the Department delivered a copy thereof to the translator together with a copy of the shipmaster's testimony for translating and submitting them to the Department, then the Plaintiff's attorney requested a postponement of the lawsuit for stating the points of citation from the witnesses' testimony, and the Defendant requested a grace period for commenting on the witnesses' testimony.

In the hearing dated 13/8/1436 AH, the Plaintiff's attorney stated that he had no addition in regard to the testimony. The Defendant's attorney submitted a two page memo in which he mentioned his notes to the witness's testimony. The Plaintiff's attorney received a copy thereof and requested a grace period for replying thereto and submitting the details of damages and the evidences therefor.

الـريــاض – شـارع الـتـخصصي ٌ هـاتـف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
**Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com**

**Samia A. Attar Translation Office**
**LOFTA CERTIFIED TRANSLATION**
**(Head Office - Takhassusi St.)**
License No. (735) C.C. 285298
VAT No : 3007313642 00003



مكتب سامية عبدالرحمن عطار للترجمة
لــفــتــه لـلـتـرجـمـة الـمـعـتـمـدة
( المكتب الرئيسي – شارع التخصصي )
ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

In the hearing dated 8/11/1436 AH, the Plaintiff's attorney submitted a two pages memo, in which he mentioned his notes to the witness's testimony and added some comments on the Defendant's reply and assured his previous requests. The Defendant's attorney received a copy of what has been submitted and requested a grace period for reviewing. The Plaintiff's attorney also requested a further grace period for limiting the damages and translating the documents.

In the hearing dated 26/1/1437 AH, the Plaintiff's attorney submitted a memo enclosed with a large collection of documents along with their translation, it is noted that they were not indexed and not indicated clearly in the memo, so the Department sent them back to him and requested from him to submit them in a proper manner and state the point of citation in every exhibit of the memo, further, it requested from him to submit his power of attorney for the company and he showed his readiness for that. The Defendant's attorney submitted a five pages memo enclosed with five documents, it is noted that one of them was not translated, so the Department requested from him to submit a translation therefor and sent them back to him and requested from him to submit them in a proper manner and state the point of citation in every exhibit, and he showed his readiness for that. The Department requested from both parties to re-submit the memos within ten days of its date and submit a copy thereof to the other party.

In the hearing dated 17/3/1437 AH, the Plaintiff's attorney stated that he has already submitted the memo that was re-submitted to him in the previous hearing after indexing the enclosed documents as requested. The Defendant's attorney confirmed that he has received a copy of this memo from the Department and submitted four pages reply memo enclosed with some documents, and the Plaintiff's attorney received a copy thereof and reviewed it and requested a grace period for reply thereto.

الــريــاض – شــارع الـتـخـصـصـي ٥ هـاتـف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
**Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com**

**Samia A. Attar Translation Office**
**LOFTA CERTIFIED TRANSLATION**
(Head Office - Takhassusi St.)
License No. (735) C.C. 285298
VAT No : 3007313642 00003



مكتب سامية عبدالرحمن عطار للترجمة
لـفـتـه لـلـتـرجـمـة الـمـعـتـمـدة
( المكتب الرئيسي – شارع التخصصي )
ترخيص ( ٧٣٥ ) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

In the hearing dated 14/5/1437 AH, the Plaintiff's attorney submitted a four pages memo enclosed with a collection of documents, in which he assured his requests, and the Defendant's attorney received a copy thereof and requested a grace period for reply thereto, then the Department asked the Plaintiff's attorney about the reason of not giving back the parts which his principal received, he answered that the parts mentioned by the Defendant's attorney have been received before the fire for the purpose of repairing them, they have been repaired by the Plaintiff under invoices, however, as a result of the fire, the Plaintiff ceased delivery thereof to the Defendant and stipulated that it must repair the damages and deteriorations caused by the fire before giving back the aforesaid parts. The Defendant's attorney commented that the Defendant has already adhered, under the conciliation minutes, to repair the deteriorations resulted from the fire broken out in the wood, furniture and cables got damaged in the living room, but this was not the cause under which the ship was still ineffective during this long period, and the Defendant is still adhering to this matter and reserving its right to claim compensation against the damages resulted from the delay in giving back the parts, including the damages represented in reservation of the quay in the lawsuit No. 4656 filed against AdvanFort Company.

In the hearing dated 12/7/1437 AH, the Defendant's attorney submitted a four pages memo and some documents - the same documents already submitted in the last hearing, the Plaintiff's attorney received a copy thereof and reviewed it and requested a grace period for reply thereto.

In the hearing dated 20/10/1437 AH, the Department indicates that it has addressed Jeddah Islamic Port for inquiring about some documents requested by the Plaintiff's attorney in his letter deposited in the lawsuit's file, then the Plaintiff's attorney submitted a four pages memo, the Defendant's attorney received a copy thereof, then the Plaintiff's

الـريـاض – شـارع الـتخصصي ⁵ هـاتـف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com
J.A.106

Samia A. Attar Translation Office
LOFTA CERTIFIED TRANSLATION
(Head Office - Takhassusi St.)
License No. (735) C.C. 285298
VAT No : 3007313642 00003



مكتب سامية عبدالرحمن عطارللترجمة
لـفـتـه لـلـتـرجـمـة المعـتـمـدة
( المكتب الرئيسي – شارع التخصصي )
ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

attorney stated that he requests to hear the testimony of the driver Zaeed Mashhour who received the spare parts from his principal in order to deliver them to the Defendant, so the Department allowed him to call for the witness.

In the hearing dated 25/12/1437 AH, it was noted that the Plaintiff was not represented in the hearing, the Department indicates that it has received the letter No. 15/42/24105 dated 4/11/1437 AH from the general manager of Jeddah Port, in which he stated that the requested statement of spare parts is unavailable with the Port, then the Defendant's attorney requested to nonsuit the lawsuit.

In the hearing dated 21/2/1438 AH, the attorneys of both parties to the lawsuit have been appeared. The Department asked the Plaintiff's attorney about his evidence the witness Zaeed Mashhour, is it that who received the spare parts, he answered that it was impossible to call for him in the hearing, and he has no evidences but those he submitted in the lawsuit, so the Department said to him that he has the right to request the Defendant's oath in receipt of the spare parts, but he rejected to ask for its oath, then the parties decided that the documents submitted are sufficient for the lawsuit. In the hearing dated 12/4/1438 AH, the lawsuit has been reserved for study. In the hearing dated 18/5/1438 AH, the hearing has been closed for deliberation on the grounds of the parties' sufficiency.

### Reasons

Whereas, the financial claim requested by the Plaintiff has been arisen from the Defendant's repair of the Plaintiff's ship, so this dispute is fallen within the Article No. (443), Paragraph (a) of the Commercial Court Law issued by virtue of the Royal Order No. 32 dated 15/3/1350 AH which states that the Commercial Courts shall have the jurisdiction to examine the disputes including those issues and disputes occur between the

الـريـاض – شـارع الـتخصصي ٧ هـاتـف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com

8



**Samia A. Attar Translation Office**
**LOFTA CERTIFIED TRANSLATION**
**(Head Office - Takhassusi St.)**
License No. (735) C.C. 285298
VAT No : 3007313642 00003

مكتب سامية عبدالرحمن عطارللترجمة
لـفــتـه للـتـرجـمـة المـعـتـمـدة
( المكتب الرئيسي - شارع التخصصي )
ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

dealers resulting from commercial matters, therefore, the Commercial Departments of the Board of Grievances shall have the jurisdiction to examine the lawsuit. In addition, the Department shall have the place of jurisdiction in conformity with the Decision No. (128) of 1432 AH issued by the Board of Grievances' President. Whereas, the Plaintiff requests to obligate the Defendant to pay the losses resulting from the fire occurred to the ship owned by the Plaintiff, considering that the ship was under custody of the Defendant at the time of breaking out the fire, however, the presence of the ship under custody of the Defendant at the time of breaking out the fire is not sufficient to obligate it to bear the losses, what makes it liable for that is the cause of damage attributable to the Defendant, the liability is conditioned by that and the burden of proof therefor falls on the plaintiff. The examiner of the subject matter of the lawsuit, and the government authority that put out the fire is the General Directorate of Civil Defense, Border Guards and Industrial Security in Jeddah Islamic Port, confirmed that the fire in the ship has been arisen from an electrical contact, thus, the Defendant is not blamed because the fire is attributable to the ship itself. Whereas, the government competent authority is deemed an expert in the lawsuit, so its conclusion shall be reliable therein. The testimony of the two witnesses which the Plaintiff deemed it an evidence for it, is worth nothing in front of what has been concluded by the examining authorities, whereas, the two witnesses are among of the ship's workers, so their testimony is unacceptable, in addition, the Defendant's negligence to call for the firefighters contrary to the contract terms is invalid because what important is the damage caused not spread out, and the challenge to the result concluded by the government authorities is blank, and even if it is argumentatively accepted, then it lacks the evidence supported by a report or an expert's opinion, and the liability is discharged

9

الـريـاض – شــارع الـتـخصصي △ هـاتـف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
**Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com**

Samia A. Attar Translation Office
LOFTA CERTIFIED TRANSLATION
(Head Office - Takhassusi St.)
License No. (735) C.C. 285298
VAT No : 3007313642 00003



مكتب سامية عبدالرحمن عطارللترجمة
لـفــتــه لـلـتــرجــمــة المـعـتـمـدة
( المكتب الرئيسي – شارع التخصصي )
ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

principally and owed incidentally, and the occupancy of something is not sufficient to deem the party liable for the damage, thus, the Department issues its judgment according thereto.

**For These Reasons the Department Ruled:**

To dismiss the lawsuit.

Peace Be Upon Our Prophet Mohammad and His Family and Companions.

Secretary/ Khalid Bin Abdurrahman Al Obeid (signed)

Member/ Faisal Bin Saleh Al Enezi (signed)

Member/ Dr. Majed Bin Mohammed Al Saleemi (signed)

Head of Department/ Saadi Bin Mohsen Al Zahrani (signed)

(sealed)



الــريــاض – شــارع الــتــخـصـصـي – هــاتــف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com

بسم الله الرحمن الرحيم

المملكة العربية السعودية

ديوان المظالم (٠٨٣)

الحكم في القضية رقم ٢٠٢٣/٢/٢/ق/١٤٣٥هـ

المقامة من / شركة أدفان فورت (شركة أمريكية)

ضد / شركة الزامل للخدمات البحرية

الحمد لله، والصلاة والسلام على رسول الله، وعلى آله وصحبه ومن والاه، وبعد:

ففي يوم الاربعاء الموافق ١٤٣٨/٥/١٨هـ عقدت الدائرة التجارية الثالثة بالمحكمة الإدارية بجدة جلستها والمشكلة من:

| القاضي/ | سعدي بـن محسن الزهراني | رئيساً |
| القاضي/ | د. ماجد بن محمـد السليمي | عضواً |
| القاضي/ | فيصل بن صــالح العنـزي | عضواً |

وبحضور خالد بن عبدالرحمن العبيد أميناً للسر، وذلك للنظر في هذه القضية المحالة للدائرة في ١٤٣٥/٤/٦هـ.

(( الواقعات ))

تتلخص واقعات هذه الدعوى في أن المدعية تقدمت إلى المحكمة الإدارية بجدة بلائحة دعوى ضد المدعى عليها تتضمن حصول خسائر للمدعية نتيجة حريق في سفينة عائدة لما بسبب خطأ المدعى عليها ، وتطلب إلزام المدعى عليها بمبلغ (٩٨٦, ٨٢٥) دولار أمريكي أي ما يعادل (٢,٠٩٧,٤٤٧٨) ريالاً سعودياً على أساس الخسارة وتفويت الفرص لكل شهر ليكون إجمالي المبلغ المطالب به منذ تاريخ الحريق وحتى تاريخ ١٤٣٥/٦/١٤ هو (١٨,٥٨,٤,٠٠٠) ريالاً سعودياً ، - عدلت بعد ذلك في المذكرة الختامية المؤرخة بتاريخ ١٤٣٧/٥/١٤ إلى طلب إلزام المدعى عليها بإصلاح السفينة فيرجينيا بصفة مستعجلة ، وتسليمها للمدعية مرفقة بشهادة السلامة والصلاحية ، وإلزام المدعى عليها بدفع مبلغ (٣٩,١٦٨,١٢٠) تسعة وثلاثين مليون ومائة وثمانية وستين ألف ومائة وعشرين دولار أمريكي قيمة العطل والضرر المترتب على تعطل وتضرر السفينة عن العمل وعدم تنفيذ الالتزامات التعاقدية ، وكذلك إلزامها بدفع أتعاب المحاماة - ، وبعد إحالتها لهذه الدائرة حددت تاريخ ١٤٣٥/٨/١٨هـ موعداً لنظرها ، وفي الموعد المحدد حضر من يمثل المدعية والمدعى عليها ، وقد ذكر الحاضر عن وكيل المدعية بان الوكيل لم يستطع الحضور لجلسة اليوم واستمهل لتقديم مذكرة موضحة لصفة المدعية في هذه الدعوى وعلاقتها بالسفينة ، وتقديم عقد الصيانة ، مع المدعى عليها ، ثم قدم الحاضر عن المدعى عليها خطاب تفويضه وأفهمته الدائرة بان الصفة تكون بموجب وكالة شرعية، واستعد الحاضر عن المدعى عليها بتزويد المدعى عليها بما سيقدمه قبل الجلسة المقبلة بثلاثة أسابيع على الأقل .

وفي جلسة ١٤٣٥/١١/٢٧هـ قدم المدعي وكالة مذكرة من صفحة واحدة أرفق بها مستندين عبارة عن قد إيجار السفينة مع ترجمته ، وتقرير الحادث مع ترجمته، تسلم المدعى عليه وكالة نسخة منها ، ثم قدم مذكرة من ٦ صفحات أرفق بها مجموعة من المستندات ذكر أنه أشار إليها في مذكرته تسلم المدعى عليه وكالة نسخة منه ، واستمهل الطرفان للجواب ، وأفهمت الدائرة المدعى عليه وكالة بتصحيح صفته أو تقديم عقد تأسيس الشركة المدعى عليها للتحقق من صفته ، كما أفهمته بتقديم أصول الترجمات المرفقة بمذكرته .

وفي جلسة ١٤٣٦/٢/١٦هـ استمهل الطرفان لبحث الصلح .

وفي جلسة ١٤٣٦/٤/١٣هـ اطلعت الدائرة على المذكرة المقدمة من المدعي وكالة والمؤرخة في ١٤٣٦/٣/٢٣هـ والمتضمنة طلب سماع شهادة قبطان السفينة ، كما اطلعت الدائرة على المذكرة المقدمة من المدعي وكالة والمؤرخة في ١٤٣٦/٤/٧هـ، والمتضمنة طلب الكتابة لوزارة الخارجية فيما يخص طلب إصدار تأشيرة للشاهد في هذه القضية ، ثم قدم المدعي وكالة مذكرة من أربع صفحات أرفق بها صور عدد من المستندات، وزود المدعى عليه وكالة بنسخة منها ، وذكر أن حاصلها طلب إلزام المدعى عليها بصفة مستعجلة بإصلاح السفينة محل

J.A.110



المملكة العربية السعودية

ديوان المظالم (٠٨٣)

صفحة ٢ من ٤

الدعوى، وإلزام المدعى عليها بدفع مبلغ قدره ٢٠٣٥٠٥٨١دولار أمريكي، قيمة العطل والضرر المترتب على تعطل وتضرر السفينة، وعدم تنفيذها التزاماتها التعاقدية مع الغير بسبب يرجع لفعل المدعى عليها، إضافة إلى إلزام المدعى عليها بأتعاب المحاماة، وبعرض ذلك على المدعى عليه وكالة طلب إمهاله للجواب.

وفي جلسة ١٤٢٦/٥/١٠هـ قدم المدعى عليه وكالة مذكرة من ثمان صفحات أرفق بها عدداً من المستندات تسلم المدعي وكالة نسخة منها وطلب مهله للجواب عليها.

وفي جلسة ١٤٢٦/٦/٢٤ قدم الشاهد كابتن السفينة محل الدعوى شهادته مكتوبة على صفحتين مؤرخة في ١٢ أبريل ٢٠١٥م، باللغة الإنجليزية، أودعت الدائرة نسخة منها بملف الدعوى وأفهمت المترجم الحاضر بمراجعة الدائرة لأخذ نسخة من الشهادة وتقديمها مترجمة للغة العربية، ثم سأل المدعي وكالة الشاهد الأول هل كانت هناك أعمال صيانة لحام وقت الحريق، ومن أين بدأ الحريق، فترجم المترجم سؤال المدعي وكالة للشاهد وذكر بأن جوابه بأن سبب الحريق كان بسبب شرارة متطايرة من أعمال اللحام وقعت على مادة عازلة ثم انتشر الحريق، وأضاف بأنه كإجراء وقائي كان يجب بأن تزال المادة العازلة قبل إجراء اللحام، ثم سأل المدعي وكالة الشاهد الأول هل كان هناك رجل إطفاء موفر من قبل الشركة المدعى عليها، فذكر بأنه لم يكن هناك أي رجل إطفاء، ثم سأل المدعي وكالة الشاهد الأول هل تم إطفاء الحريق من مياه البحر ومن قام بإطفاء الحريق، فذكر بأن من قام بإطفاء الحريق هم الدفاع المدني وتم ذلك عن طريق مياه البحر، ثم أضاف أن المنطقي أن يتم استخدام مياه البحر في إطفاء الحريق، وأنه لا يتم استخدام طفايات الحريق إلا في حال وجود لهب، وذلك لم يكن موجوداً، ثم قدم الشاهد الثاني والذي ذكر بأنه بحار في السفينة محل الدعوى شهادته مكتوبة في صفحة واحدة ومؤرخة في ٢٠١٥/٤/١٢م، فزودت الدائرة المترجم بنسخة منها، ونسخة من شهادة كابتن السفينة لبيان وجه الاستشهاد من شهادة الشهود، كما طلب المدعي وكالة تأجيل نظر الدعوى لبيان وجه الاستشهاد من شهادة الشهود، كما طلب المدعى عليه إمهاله للتعليق على شهادة الشهود.

وفي جلسة ١٤٢٦/٨/١٣هـ ذكر المدعي وكالة أنه لا إضافة لديه بخصوص الشهادة، ثم قدم المدعى عليه وكالة مذكرة من صفحتين أورد فيها ملاحظته على شهادة الشاهد، زود المدعي وكالة بنسخة منها فاستمهل للرد عليها، ولتقديم تفصيل بالأضرار والبينات المثبتة لها.

وفي جلسة ١٤٢٦/١١/٨هـ قدم المدعي وكالة مذكرة من صفحتين أورد فيها ملاحظته على شهادة الشاهد، وأضاف بعض التعقيب على رد المدعي عليها، وأكد على طلباته السابقة، تسلم المدعى عليه وكالة نسخة مما قدم واستمهل للاطلاع عليها، كما استمهل المدعي وكالة مهله لحصر الأضرار وترجمة مستنداتها.

وفي جلسة ١٤٢٧/١/٢٦هـ قدم المدعي وكالة مذكرة مرفق بها مجموعة كبيرة من المستندات مع ترجمتها، وتبين أنها غير مفهرسه وغير مشار إليها بوضوح في المذكرة، فأعادتها إليه الدائرة وطلبت منه تقديمها بالطريقة الصحيحة مع توضيح وجه الاستشهاد في كل مرفق من المرفقات في المذكرة، كما طلبت منه تقديم وكالته عن الشركة فاستمهل بذلك، ثم قدم المدعى عليه وكالة من خمس صفحات أرفق بها خمسة مستندات، تبين أن أحدها غير مترجم فأفهمته الدائرة بتقديم ترجمة لها، فأعادتها إليه الدائرة وطلبت منه تقديمها بالطريقة الصحيحة مع توضيح وجه الاستشهاد عن كل مرفق، فاستمهل بذلك، وأفهمت الدائرة الطرفين بإعادة تقديم المذكرات خلال عشرة أيام من تاريخه وتسليم الطرف الآخر نسخة منها.

وفي جلسة ١٤٢٧/٢/١٧هـ أفاد المدعي وكالة بأنه سبق تقديم المذكرة التي أعيدت له في الجلسة السابقة بعد فهرسة المستندات المرفقة كما طلب منه، كما أكد المدعى عليه وكالة بأنه استلم نسخة من هذه المذكرة من الدائرة، وقدم جوابا عليها مذكرة من ٤ صفحات أرفق بها عدداً من المستندات، تسلم المدعي وكالة نسخة منها، وباطلاعه عليها استمهل للرد.

وفي جلسة ١٤٢٧/٥/١٤هـ قدم وكيل المدعي مذكرة مكونة من أربع صفحات أرفق بها مجموعة من المستندات أكد فيها على طلباته تسلم المدعى عليه وكالة نسخة منها واستمهل للرد ثم سألت الدائرة المدعي وكالة عن

12

J.A.111



المملكة العربية السعودية

ديوان المظالم (٠٨٣)

سبب عدم إعادة القطع التي تسلمتها موكلته فأجاب بأن القطع التي ذكرها وكيل المدعى عليها تم استلامها قبل الحريق وذلك بغرض إصلاحها وقد تم إصلاحها بمعرفة المدعية بموجب فواتير ثم توقفت المدعية في تسليمها للمدعى عليها واشترطت أن يتم إصلاح الأضرار والتلفيات الحاصلة بسبب الحريق قبل إعادة القطع المشار إليها فعقب المدعى عليه وكالة بأن المدعى عليها سبق أن التزمت على سبيل الصلح بإصلاح التلفيات الناتجة عن الحريق في الأخشاب والأثاث والكيبل المتضررة بالحريق في غرفة الإعاشة غير أن ذلك ليس هو العائق في بقاء الزورق متعطلاً خلال هذه الفترة الطويلة ولا تزال المدعى عليها ملتزمة في هذا الأمر مع احتفاظها بطلب الأضرار الناتجة عن التأخر في إعادة القطع والتي منها الأضرار المتمثلة في حجز الرصيف وذلك في الدعوى المقامة ضد شركة أدفان فورت برقم ٤٦٥٦ .

وفي جلسة ١٤٢٧/٧/١٢هـ قدم المدعى عليه وكالة مذكرة من أربع ورقات وبعضاً من المستندات ، لم تخرج عن المستندات السابقة التي قدمها في الجلسة الماضية ، تسلم المدعي وكالة نسخة منها ، وباطلاعه عليها استمهل للرد . وفي جلسة ١٤٢٧/١٠/٢٠هـ تشير الدائرة إلى أنه تمت الكتابة إلى ميناء جدة الإسلامي للاستفسار عن بعض المستندات التي طلبها المدعي وكالة في خطابه المودع بملف القضية ، ثم قدم المدعي وكالة مذكرة من ٤ صفحات، تسلم المدعى عليه وكالة نسخة منها ، ثم ذكر المدعي وكالة أنه يطلب سماع شهادة السائق زيد مشهور الذي تسلم قطع الغيار من موكلته لإيصالها إلى المدعى عليه، فأذنت له الدائرة بإحضار الشاهد .

وفي جلسة ١٤٢٧/١٢/٢٥هـ تبين عدم حضور من يمثل المدعية، وتشير الدائرة إلى ورود خطاب مدير عام ميناء جدة برقم ٤٢/٢/١٥ بتاريخ ١٤٣٧/١١/٤هـ، والذي يفيد فيه بأن الكشف المطلوب الخاص بقطع الغيار غير متوفر لدى الميناء ، ثم طلب المدعى عليه وكالة شطب القضية .

وفي جلسة ١٤٣٨/٢/٢١هـ حضر وكيل وكيل الدعوى، وبسؤال الدائرة وكيل المدعى عن بينته الشاهد زيد مشهور، هو السائق الذي تسلم قطع الغيار، فأجاب: بأنه تعذر حضوره في الجلسة، وأن ليس لديهم بينه سوى ما قدمه، فأفهمته الدائرة بأن له يمين المدعى عليها في استلام قطع الغيار ، إلا أنه رفض أن تدلي بيمينها ، ثم قرر الطرفان اكتفائهم . وفي جلسة ١٤٣٨/٤/١٢هـ حجزت القضية للدراسة . وفي جلسة ١٤٣٨/٥/١٨هـ وبناء على اكتفاء الأطراف رفعت الجلسة للمداولة.

الأسباب

ولما كانت المطالبة المالية التي تطالب بها المدعية نشأت عن قيام المدعى عليها بإصلاح سفينة للمدعية فإن هذه المنازعة تندرج تحت المادة رقم ( ٤٤٣) فقرة (أ) من نظام المحكمة التجارية الصادر بالأمر الملكي رقم ٣٢ في ١٣٥٠/٢/١٥هـ ، والتي نصت على أن من ضمن المنازعات التي تختص المحاكم التجارية بنظرها ما يحدث بين التجار من مشاكل ومنازعات متولدة عن أمور تجارية : لذا فإن الدوائر التجارية بديوان المظالم تكون مختصة بنظر الدعوى ، كما أن الدائرة مختصة مكانياً وفقاً لقرار رئيس ديوان المظالم رقم (١٢٨) لعام ١٤٣٢هـ،ولما كانت غاية ما تطلبه المدعية تضمين المدعى عليها ما ترتب على الحريق في السفينة التي تعود للمدعية ، على أن السفينة كانت وقت نشوء الحريق تحت تصرف المدعى عليها لإصلاحها ، إلا أن وجود السفينة تحت تصرف المدعى عليها وقت الحريق غير كاف لتكليفها بمسؤولية عنه ، إذ أن ما يستوجب ذلك ينشأ من وجود الضرر من المدعى عليها وقيام الخطأ منها ، فالمسؤولية مشروطة بذلك ، وعلى المدعي عبء إثبات ذلك ، وبما أن المعاين لمحل الدعوى المعالج لها من جهات الاختصاص الحكومي ، وهي المديرية العامة للدفاع المدني ، وسلاح الحدود ، والأمن الصناعي بميناء جدة الإسلامي ، قد اتفقت على أن الحريق في السفينة نشأ عن التماس كهربائي ، مما يدل معه تخلف حصول السبب من المدعى عليها بل من أمر متعلق بالسفينة ذاتها ، ومتى ما استبان ما انتهت إليه الجهات الحكومية المختصة والتي تعد الخبيرة بما عاينته أخذ بقولها ، وأما ما شهد به الشاهدان من شهادة اعتبرتها المدعية بينة لها فهي بينة لا تقوى في رد ما

٢٨٥٢٩٨
ترخيص رقم





المملكة العربية السعودية
ديوان المظالم (٠٨٣)

صفحة ١ من ١

خلصت إليه الجهات المعاينة ، إذ أن الشاهدين من العاملين بالسفينة ، فلا تؤمن رغبتهما أو رهبتهما ، كما أن تراخي المدعى عليها في حضور رجل إطفاء من عندها بما يخالف مقتضى العقد غير مؤثر إذ المدار على نشوء الضرر لا انتشاره ، وأما القدح في نتيجة ما توصلت إليه الجهات الحكومية فهو مرسل ، ولو سلم لكل أحد الطعن بلا بينة تقبل ما استقام الأخذ بتقرير ولا قول خبير ، وعليه يبقى أصل البراءة للذمة فلا تشغل بوارد لا يقوى على نقل الأصل ، ووضع اليد لا يكتفى به في اعتباره مسؤولاً عن الضرر ، مما تنتهي معه الدائرة إلى حكمها .

وليهذه الأسباب حكمت الدائرة: برفض الدعوى ، وصلى الله على نبينا محمد وعلى آله وصحبه وسلم

رئيس الدائرة          عضو          عضو          أمين سر
سعدي بن محسن الزهراني     د. ماجد بن محمد السليمي     فيصل بن كريم الغنزي     خالد بن عبدالرحمن العبيد





# Exhibit B



Samia A. Attar Translation Office
LOFTA CERTIFIED TRANSLATION
(Head Office - Takhassusi St.)
License No. (735) C.C. 285298
VAT No : 3007313642 00003

مكتب سامية عبدالرحمن عطار للترجمة
لـفـتـه لـلـتـرجـمـة الـمـعـتـمـدة
( المكتب الرئيسي – شارع التخصصي )
ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

| CERTIFICATION | شــــهـــــادة |
|---|---|
| We hereby certify, under our responsibility, the accuracy of the translation of the enclosed documents from Arabic Language into English Language as per the enclosed text submitted to us and without any liability on us for the content of the translated text. | بـهـذا نـصـادق وعـلـى مسئـولـيـتـنا عـلـى صـحـة تـرجـمـة المـسـتـنـدات المـرفـقـة مـن اللـغـة العـربـيـة إلـى اللـغـة الانجلـيـزيـة حـسـب النـص الـوارد إلينا والمرفـق طـيـه دون أدنى مسئولية عن محتويات النـص المترجم. |
| In witness whereof we affix hereunder the signature and stamp of Samia A. Attar Translation Office (Lofta) to attest & confirm the accuracy of the translation | وإشـهـادا عـلـى ذلـك فـقـد قمـنا بتثبـيـت توقيعنا وختم مكتب سامية عبدالرحمن عطار (لفته) الرسمي على هذه الوثيقة للمصادقة على صحة ودقة الترجمة. |
| **Samia A. Attar Translation Office (Lofta)** Certified Translators Head Office – Riyadh | **مكتب سامية عبدالرحمن عطار للترجمة (لفته)** مترجمون معتمدون المكتب الرئيسي – الرياض |

Samia A. Attar Translation Office
LOFTA CERTIFIED TRANSLATION
(Head Office - Takhassusi St.)
License No. (735) C.C. 285298
VAT No : 3007313642 00003



مكتب سامية عبدالرحمن عطارللترجمة
لـفـتـه لـلـتـرجـمـة المـعـتـمـدة
( المكتب الرئيسي – شارع التخصصي )
ترخيص (٧٣٥ ) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

Saudi Arabia

Board of Grievances

Jeddah Administrative Court

(83/ 8/ 202)

## Judgement in case No. 4656/2/4656/ 2/Q/1436H

## Filed by Al Zamil Marine Services, Commercial Register 2051003290

## VS / AdvanFort, a US Company

Praise be to Allah. and may peace and blessings be upon the Messenger of Allah and His family and companions. Having said that:

On Wednesday, 18/5/1438 AH, the Third Commercial Department of the Administrative Court of Jeddah (thereof referred to as the Department) held a session attended by:

Judge / Saadi bin Mohsen Al-Zahrani, as Chairman,

Judge Dr. Majed bin Mohammed Al-Sulaimi, as Member,

Judge Faisal bin Saleh bin Nayef Al-Anzi, as Member,

With the attendance of Khalid Abdul Rahman Al Obaid, as secretarial assistant, to consider this case referred to the Department on 26/06/1436 AH.

### FACTS

In a sum up, the plaintiff's attorney/Jamal Anani has filed a lawsuit that includes a request to compel the defendant to fulfil the following steps: 1- To pay the repair costs of the ship owned by the defendant, named Virginia, at $127,523. 2- To compensate the plaintiff with an amount of SAR 20,437,500 for the occupation of the dock, the crew room services, and labour wages for the duration of the ship's docking at the anchorage owned by the plaintiff. 3- To pay the bailout to the plaintiff, in exchange for the plaintiff's saving of the defendant through extinguishing the fire that spread through its equipment. 4- To pay the attorney's fees.

By referring the case to the Department, and at the hearing of 13/8/1436 AH, the plaintiff's attorney confirmed the statement of his case, and when the defendant was asked about their answer, they asked for a delay to respond.

At the session of 8/11/1436 AH when asking the defendant for their answer, they submitted a two-page memorandum requesting the suspension of the case until the completion of the case filed by AdvanFort vs. Zamil Company on the basis of article 85 of the law of Procedure, and article 87 thereof, and when the matter was presented to the plaintiff's attorney, they asked for delay to review the memo, stating that they request the two cases to be joined. At the session of 26/1/1427 AH, the plaintiff's attorney presented a five-page memorandum confirming that his client had carried out some repairs to the ship owned by the defendant,

الـريــاض – شـارع الـتـخـصـصـي – هــاتـف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com



**Samia A. Attar Translation Office**
**LOFTA CERTIFIED TRANSLATION**
**(Head Office - Takhassusi St.)**
License No. (735) C.C. 285298
VAT No : 3007313642 00003

مكتب سامية عبدالرحمن عطار للترجمة
لـفـتـه لـلـتـرجـمـة الـمـعـتـمـدة
( المكتب الرئيسي - شارع التخصصي )
ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

but that the defendant did not commit to bringing the spare parts required from them, adding that his client is willing to complete the repair if the defendant brought the spare parts. The plaintiff's attorney also confirmed that the fire on the ship was due to an electric contact, and not because of welding work. The plaintiff's note was concluded by requesting that the defendant be obliged to fulfil the following: 1- Pay the fees of the repairs made by the plaintiff's client in the amount of $147.523 dollars. 2- Pay $2.267,000 for the ship's occupation of the dock, services, and crew room. 3- Pay the bailout amount as estimated by the court. 4- Pay the attorney fees. The defendant's attorney was provided with a copy of the memo, and after reviewing it he demanded a delay to reply to it.

At the session of 17/3/1437 AH, and by requesting a reply from the defendant's attorney in response to the memorandum submitted by the plaintiff's attorney, the defendant stated that he had no answer at this hearing. The Department then requested the plaintiff's attorney to provide evidence on the repairs, and submit the two invoices whose value is requested by him along with the contract between the two parties. The plaintiff declared his readiness to submit the above. The Department also requested the defendant's attorney to specify the spare parts delivered to the plaintiff to repair the ship, and to provide evidence for the delivery of such parts.

At the session of 14/5/1437 AH, the plaintiff's attorney presented a three-page memorandum with which he attached some documents, stating that it contained what the Department had requested at the previous hearing. The Department then requested the defendant's attorney to answer the Department's question to him at the previous session regarding specifying the spare parts delivered to the plaintiff. The defendant responded by saying that his client did not deliver the spare parts to the plaintiff's company. The defendant then received a copy of the plaintiff's memo, to which he requested a delay in order to review it and respond to it.

At the session of 12/7/1437 AH, the defendant's attorney submitted a two-page memorandum, attaching it with a number of documents, and when asked about what was stated in his memo to the effect that all the spare parts were delivered to Zamil Company – whereas he acknowledged at the previous hearing that the spare parts were not delivered, the defendant stated that after consulting his client on that point, the latter pointed out that the spare parts were delivered, but he noted that he had no evidence for that except the witness who had delivered them in person, or if the Jeddah Islamic Port could be addressed to verify the delivery of the spare parts to the port. The Department clarified to him that he is obliged to provide evidence of the delivery of the spare parts to the port and then to the Zamil Company, stressing that this evidence must be provided either by his client, or by the port. The Department also made it clear to him that he must bring the mentioned witness to the court. Afterwards, the plaintiff's attorney received a copy of the submitted memo, and he asked for delay to review it and respond to it. The Department then asked the plaintiff's attorney if he has evidence of the claimed value of repair other than the documents submitted during the previous session, and the plaintiff stated that he does not have any further evidence other than what he had already submitted. The Department then asked the defendant on the repair cost approved by his client up till the date on which the fire occurred. The defendant replied that his client approves an amount of $60.000 as repair fees by Zamil up till the fire incident on 27/10/2013, adding that his client paid $20.000 of that amount, which leaves $40.000 overdue

**2 |** P a g e ٤٨٢٩٨٢٥ / ٤٨٢٧٨٥٤ : هـاتـف – الـريـاض – شـارع الـتـخـصـصـي
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com
J.A.117



**Samia A. Attar Translation Office**

**LOFTA CERTIFIED TRANSLATION**
**(Head Office - Takhassusi St.)**

License No. (735) C.C. 285298
VAT No : 3007313642 00003

مكتب سامية عبدالرحمن عطارللترجمة
لـفـتـه لـلـتـرجـمـة المعـتـمـدة
( المكتب الرئيسي - شارع التخصصي )

ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

remaining. In response, the plaintiff's attorney noted that his client admits receiving an amount of $20.000, pointing out, however, that the total sum of repair fees is different from what was stated by the defendant's attorney, stating that the accurate amount of repair fees is $147.523. In response, the Department clarified to the plaintiff that the defendant swore to his client that the amount never exceeds $60.000, to which the plaintiff replied saying that he rejects the vow made by the defendant.

At the session of 20/10/1437 AH, the plaintiff's attorney submitted a three-page memorandum, which in its essence did not provide any new information to what had been already submitted. A copy of that memo was submitted to the defendant's attorney, who asked for a delay to review it.

At the session of 25/12/1437 AH, no representative of the defendant was present, and the plaintiff's attorney requested a delay to submit a memorandum.

At the session of 21/2/1438 AH, the Department stated that it received a three-page memorandum from the plaintiff's attorney which in its essence did not provide any new information to what had been already submitted. Afterwards, the plaintiff's attorney decided to limit his claim to the repair value of the ship in an amount of (147.523) US Dollar. He also demanded a ruling in favour of his client's right to compensation for the occupation of the dock, stating that he decided to confine his demands to the above. Likewise, the defendant's attorney decided to confine his demands to what he has already submitted. At the session of 12/4/1438 AH, the Department decided to postpone the session due to the need for deliberation. Later on, at the session of 18/5/1438 AH, the Department decided to adjourn the session for further deliberation.

### Causes

Since the dispute between the plaintiff and the defendant arises from the plaintiff's repair of a ship owned by the defendant, this dispute is therefore covered by Article 443, Paragraph (a) of the Commercial Court's law, stipulating that the cases which fall under the jurisdiction of commercial courts include any disagreements and disputes that emerge between traders during their commercial dealings. Accordingly, the Commercial Chamber is competent to rule in this case. Furthermore, since the plaintiff's attorney has limited his claim to the demand for the repair value of the ship to be $147.523, in addition to a ruling issued in favour of his client's right to compensation for the occupation of the dock, and since the defendant's attorney admitted that the amount due to the plaintiff as ship repair costs is $60.000, and that his client has already paid $20.000 of that amount, leaving $40.000 overdue to the plaintiff, and since the plaintiff's attorney has admitted that his client had received the amount of $20.000, meanwhile arguing that the accurate amount due to his client is $147.525, and since he did not provide a related evidence to his latter claim, and the Department clarified to him that his client is only entitled to the vow made by the defendant, and since the defendant swore that the amount due to the plaintiff never exceeds $60.000 – a vow that was rejected by the plaintiff, then the Department has ruled in favour of the plaintiff's right to receive the remaining amount, which is $40.000 and to reject the plaintiff's demand for any additional amounts. Regarding the plaintiff's demand for a court ruling in favour of approving its right to a compensation for occupying the dock by the ship owned by the defendant, it has been

**Samia A. Attar Translation Office**
**LOFTA CERTIFIED TRANSLATION**
**(Head Office - Takhassusi St.)**
License No. (735) C.C. 285298
VAT No : 3007313642 00003

مكتب سامية عبدالرحمن عطارللترجمة
لـفـتـه لـلتـرجـمـة المعتمدة
( المكتب الرئيسي – شارع التخصصي )
ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣



established that a fire occurred onboard the ship on 22/12/1434 AH, which corresponds to 27/10/2013, and that the plaintiff did not cause the fire in any way, and that the fire was rather caused by an electric contact, as was documented in the official joint log book dated 22/12/1434 AH and signed by both the border guard deputy and the civil defence deputy, and as indicated in the report dated 22/12/1434 AH and signed by the director of maritime management; hence it must be stated that leaving the ship attached to the dock caused a disadvantage in that it deprived the plaintiff from utilizing the dock, in line with the saying by Prophet Muhammad (PBUH): "Cause no harm and no foul," and in line with the public interest rule which states that "harm must be erased," the Department hereby declares its approval of the right of the plaintiff to compensation for the occupation of the dock.

#### For the aforementioned reasons the Department has ruled the following:

**First:** To oblige AdvanFort, a US company, address: 1875 E St Nw Floor 5, Washington, DC 20006 - to pay to Zamil Marine Services, commercial register 2051003290, an amount of US$40,000 (forty thousand US Dollars), and to reject the demand by the plaintiff to any additional amounts.

**Second:** To approve of Zamil Marine Services Company's right to compensation for the occupation of its dock by Sea Guard Virginia ship, which is owned by the AdvanFort Company, and may God's prayers and blessings be upon our Prophet Muhammad, his family and his companions.

| Secretatial Assistant | Member | Member | Head of Department |
|---|---|---|---|
| Khaled Al-Obaid | Faisal bin Saleh Al-Anzi | Dr. Majed bin Mohammed Al-Sulaimi | Saadi bin Mohsen Al-Zahrani |



J.A.119



المملكة العربية السعودية
ديوان المظالم
**المحكمة الإدارية بجدة**
(٢٠٢/٨/٨٣)

الحكم في القضية رقم ٤٦٥٦/٢/ق/١٤٣٦هـ

المقامة من / شركة الزامل للخدمات البحرية سجل تجاري ٢٠٥١٠٠٣٢٩٠

ضد / شركة أدفان فورت شركة أمريكية

الحمد لله، والصلاة والسلام على رسول الله، وعلى آله وصحبه ومن والاه، وبعد:

ففي يوم الأربعاء الموافق ١٤٣٨/٥/١٨ عقدت الدائرة التجارية الثالثة بالمحكمة الإدارية بجدة جلستها والمشكلة من:

| القاضي/ | سعدي بـن محسن الزهراني | رئيساً |
| القاضي/ | د. ماجد بن محمـد السليمي | عضواً |
| القاضي/ | فيصل بن صالح بن نايف العنزي | عضواً |

وبحضـور خالـد بـن عبـد الـرحمن العبيد أمينـاً للسـر ، وذلـك للنظـر في هـذه القضيـة المحالـة للـدائرة في ١٤٣٦/٠٦/٢٦هـ.

**الوقائع**

تتلخص في أن المدعي وكالة / جمال عناني تقدم بلائحة دعوى تتضمن طلب إلـزام المدعى عليها بـأجور إصلاح الزورق العائد إليها واسمه فرجينيا بمبلغ قدره ١٢٧.٥٢٣ دولار ، وإلزامها بتعويض المدعية بمبلغ ٢٠.٤٢٧.٥٠٠ريالاً مقابل حجز الرصيف وخدمات حجرة الطاقم وأجور العمالة مدة رسو الـزورق في الرصيف العائد للمدعية ، وإلزام المدعى عليها بمكافأة الإنقاذ للشركة المدعى عليها ، مقابل إنقاذ المدعية للشركة المدعى عليها من الهلاك وإطفاء الحريق الحاصل بمعداتها وإلزام المدعى عليها بأتعاب المحاماة.

وبإحالة القضية للدائرة ، وفي جلسة ١٤٣٦/٨/١٣هـ أكد المدعي وكالة على ما جاء بلائحة دعواه ، وبسؤال المدعى عليه وكالة عن الجواب استمهل للرد.

وفي جلسة ١٤٣٦/١١/٨ وبسؤال المدعى عليه عن الجواب قدم مذكرة من صفحتين طلب فيها وقف السير في الدعوى لحين الانتهاء من القضية المقامة من شركة أدفان فورت ضد شركة الزامل استناداً إلى المادة ٨٥ من نظام المرافعات والمادة ٨٧ منه ، وبعرض ذلك على المدعي وكالة استمهل للاطلاع عليها ، وذكر أنه يطالب بضم القضيتين.

وفي جلسة ١٤٣٧/١/٢٦هـ قدم المدعي وكالة مذكرة من خمسة صفحات أكد فيها على أن موكلته قامت بعمل بعض الإصلاحات على السفينة العائدة للمدعى عليها إلا أن المدعى عليها لم تلتزم بإحضار قطع الغيار المطلوبة منها ، وأن موكلته على استعداد بإتمام الإصلاح في حال أحضرت المدعى عليها قطع الغيار ،كما أكد على أن الحريق كان بسبب ماس كهربائي وليس بسبب أعمال اللحام ، وختم مذكرته بطلب إلزام المدعى عليها بدفع أجرة الإصلاحات التي قامت بها موكلته وقدرها ١٤٧.٥٢٣ دولار ،وإلزامها بدفع مبلغ ٢.٢٦٧.٠٠٠ دولار مقابل حجز السفينة للرصيف والخدمات وحجرة الطاقم ، بالإضافة إلى مكافأة الإنقاذ حسب ما تقدره المحكمة وأتعاب المحاماة. وزود المدعى عليه وكالة بنسخة منها وباطلاعه عليها طلب إمهاله للجواب عليها .

وفي جلسة ١٤٣٧/٣/١٧هـ وبطلب الجواب من المدعى عليه وكالة على المذكرة المقدمة من المدعي وكالة أفاد بأنه ليس لديه جواب في هـذه الجلسة ، ثم طلبت الـدائرة مـن المدعي وكالة تقديم البينـة على الاصـلاحات وتقديم الفاتورتين التي يطالب بقيمتها والعقد بين الطرفين فاستعد بتقديمها ، كما طلبت الدائرة مـن المدعى عليه وكالة تحديد قطع الغيار التي سلمت للشركة المدعية لإصلاح السفينة ، وتقديم ما يثبت تسليم هذه القطع .

وفي جلسة ١٤٣٧/٥/١٤هـ قدم المدعي وكالة مذكرة من ثلاث صفحات أرفق بها بعض المستندات وأفاد بأنها تتضمن ما طلبته الدائرة في الجلسة السابقة ، ثم طلبت الدائرة من المدعى عليه وكالة الجواب عن سؤال الغيار له في الجلسة السابقة عن تحديد قطع الغيار التي سلمت للشركة المدعية فأفاد بأن موكلته لم تسلم قطع الغيار للشركة المدعية . ثم تسلم المدعي وكالة نسخة من مذكرة المدعى وكالة وطلب مهلة للاطلاع والرد عليها .



الصفحة ٢ من ٣



المَملَكةُ العَرَبِيَّةُ السّعودِيّةُ

دِيوَانُ المَظَالِمِ

المحكمة الإدارية بجدة

(٢٠٢/٨/٨٣)

وفي جلسة ١٤٣٧/٧/١٢هـ قدم المدعى عليه وكالة مذكرة من صفحتين أرفق بها عدد من المستندات، وبسؤاله عما ورد في مذكرته من أنه تم تسليم جميع قطع الغيار لشركة الزامل، في حين أنه أقر في الجلسة السابقة بعدم تسليم قطع الغيار، أفاد بأنه بعد الرجوع لموكلته أفادت بأنه تم تسليم قطع الغيار إلا أنه ليس لديه بينة على ذلك إلا الشاهد الذي قام بتوصيلها أو أن تتم مخاطبة ميناء جدة الإسلامي للتحقق من دخول قطع الغيار إلى الميناء، فأفهمته الدائرة بأن عليه تقديم ما يثبت إدخال قطع الغيار إلى الميناء وتسليمها إلى الزامل سواء من قبل موكلته أو من قبل الميناء، كما أفهمت الدائرة بإحضار الشاهد، وتسلم المدعي وكالة نسخة من المذكرة المقدمة، وطلب إمهاله للاطلاع والرد عليها، ثم سألته الدائرة هل لديه بينة على ما يدعيه من قيمة الإصلاح غير المستندات المقدمة بالجلسة السابقة، فأفاد بأنه ليس لديه غير ما قدم، ثم سألت الدائرة المدعى عليه وكالة كم أجرة الإصلاح التي تقر بها موكلته حتى تاريخ حدوث الحريق، فأفاد بأن موكلته تقر بمبلغ ٦٠.٠٠٠دولار كأجرة إصلاح من شركة الزامل حتى تاريخ الحريق في ٢٠١٣/١٠/٢٧م ودفعت موكلته من هذا المبلغ ٢٠.٠٠٠دولار وتبقى مبلغ ٤٠.٠٠٠دولار، فعقب المدعي وكالة بأن موكلته تقر باستلام مبلغ ٢٠.٠٠٠دولار إلا أن إجمالي أجرة الإصلاح ليس كما ذكر المدعى عليه وكالة وأن المبلغ الصحيح هو ١٤٧.٥٢٣دولار، فأفهمته الدائرة بأن لموكلته يمين المدعى عليها على نفي ما زاد عن مبلغ ٦٠.٠٠٠دولار، فقرر أنه لا يقبل يمين المدعى عليها .

وفي جلسة ١٤٣٧/١٠/٢٠هـ قدم المدعى عليه وكالة مذكرة من ثلاث صفحات لم تخرج في مجملها عما سبق تقديمه تسلم المدعى عليه وكالة نسخة منها واستمهل للاطلاع عليها .

وفي جلسة ١٤٣٧/١٢/٢٥هـ تبين عدم حضور من يمثل المدعى عليها، وطلب المدعي وكالة إمهاله لتقديم مذكرة .

وفي جلسة ١٤٣٨/٢/٢١هـ تشير الدائرة بأنه وردها مذكرة من ثلاث صفحات من المدعي وكالة لم تخرج عما سبق تقديمه، ثم قرر المدعي وكالة فيه بهذه الجلسة أنه يحصر دعواه في المطالبة بقيمة إصلاح السفينة بمبلغ ١٤٧.٥٢٣ دولار، بالإضافة إلى الحكم بثبوت حق موكلته في التعويض عن حجز الرصيف وقرر أنه يكتفي بذلك، كما قرر المدعى عليه وكالة الاكتفاء بما سبق تقديمه .

وفي جلسة ١٤٣٨/٤/١٢هـ قررت الدائرة تأجيل الجلسة نظراً لحاجة القضية لمزيد من الدراسة ، وفي جلسة ١٤٣٨/٥/١٨هـ وبناء على اكتفاء الأطراف قررت الدائرة رفع الجلسة للمداولة .

**الأسباب**

وبما أن المنازعة القائمة بين المدعية والمدعى عليها ناشئة عن قيام المدعية بإصلاح سفينة للمدعى عليها لذلك فإن هذه المنازعة تندرج تحت نص نص المادة ٤٤٣ فقرة (أ) من نظام المحكمة التجارية والتي نصت على أن من ضمن المنازعات التي تختص المحاكم التجارية بنظرها ما يحدث بين التجار من مشاكل ومنازعات متولدة عن أمور تجارية ؛ وبناءً عليه فإن الدائرة التجارية مختصة بنظر هذه القضية.

وبما أن المدعي وكالة حصر دعواه في المطالبة بقيمة إصلاح السفينة بمبلغ ١٤٧.٥٢٣ دولار ، بالإضافة إلى الحكم بثبوت حق موكلته في التعويض عن حجز الرصيف ، وبما أن المدعى عليه وكالة أقر بأن المبلغ المستحق للمدعية من قيمة إصلاح السفينة قدره ستون ألف دولار وأن موكلته سددت مبلغ عشرين ألف دولار وتبقى للمدعية مبلغ أربعين ألف دولار ، وبما أن المدعي وكالة أقر بأن موكلته استلمت مبلغ عشرين ألف دولار إلا أنه أفاد بأن أصل المبلغ المستحق للمدعية مبلغ ١٤٧.٥٢٣دولار ، وبما أنه لم يقدم بينة موصلة على ما يدعيه فقد أفهمته الدائرة بأنه ليس لموكلته إلا يمين المدعى عليها على نفي ما زاد عن المبلغ الذي تقر به وقدره ستون ألف دولار فقرر عدم قبول اليمين،مما تنتهي معه الدائرة إلى الحكم للمدعية بالمبلغ المتبقي وقدره أربعون ألف دولار ورفض مطالبتها فيما زاد عن ذلك، وأما عن مطالبة المدعية بالحكم لها بثبوت الحق في التعويض عن حجز الرصيف من قبل السفينة العائدة للمدعى عليها فإن الثابت من أن السفينة تعرضت لحريق بتاريخ ١٤٣٤/١٢/٢٢هـ الموافق ٢٠١٣/١٠/٢٧م ولم يكن للمدعية سبب في الحريق بل كان بسبب ماس كهربائي هذا ما مدون في المحضر المشترك المؤرخ في ١٤٣٤/١٢/٢٢هـ والموقع من مندوب حرس الحدود ومندوب الدفاع المدني وكذلك التقرير المؤرخ في ١٤٣٤/١٢/٢٢هـ الموقع من مدير الإدارة البحرية ، وبناء عليه فإن بقاء السفينة في الرصيف فإن ضرر بين في حجز الرصيف وعدم

USCA4 Appeal: 24-1007    Doc: 17    Filed: 03/27/2024    Pg: 127 of 389
Case 1:23-cv-00906-LMB-IDD    Document 24-3    Filed 09/29/23    Page 9 of 10 PageID# 148





المملكة العربية السعودية

ديوان المظالم

المحكمة الإدارية بجدة

(٢٠٢/٨/٨٣)

تمكن المدعية من الاستفادة منه ، ولقوله عليه الصلاة والسلام ( لا ضرر ولا ضرار ) وبناء على قاعدة ( الضرر يزال ) فإن الدائرة تنتهي إلى ثبوت الحق للمدعية في التعويض عن حجز الرصيف .

**ولهذه الأسباب حكمت الدائرة** بما يلي :

أولاً : إلزام شركة أدفان فورت ـ شركة أمريكية عنوانها ١٨٧٥ شارع آي الطابق الخامس ٢٠٠٠٦ واشنطن دي سي ـ بأن تدفع لشركة الزامل للخدمات البحرية سجل تجاري ٢٠٥١٠٠٣٢٩٠ مبلغا قدره ٤٠.٠٠٠ دولارا أمريكيا أربعون ألف دولارا أمريكيا ، ورفض طلبها فيما زاد عن هذا المبلغ .

ثانياً : ثبوت حق شركة الزامل للخدمات البحرية في التعويض عن حجز الرصيف من قبل اللنش سيمان جارد فرجينيا التابع لشركة أدفان فورت ، وصلى الله على نبينا محمد وعلى آله وصحبه وسلم.

| رئيس الدائرة | عضو | عضو | أمين سر |
|---|---|---|---|
| سعدي بن محسن الزهراني | د. ماجد بن محمد السليمي | فيصل بن صالح الغامدي | خالد المهيد |



صك رقم ٣٦٩٠٤٦١٤٤



المملكة العربية السعودية
وزارة العدل

| | |
|---|---|
| رقم الصفحة : ١ | المُحكمة التجارية بجدة |
| تاريخ الصك : ١٤٣٨/١٢/٠١ | دائرة الاستئناف الأولى |

الحمد لله والصلاة والسلام على رسول الله أما بعد:

فلدى دائرة الاستئناف الأول وبناء على القضية رقم ٣٦٨٢٤٦٥٦ وتاريخ ١٤٣٦/٠٦/٢٦ هـ

أطراف القضية

| الاسم | نوع الهوية | رقم الهوية | الجنسية | صفته بالقضية |
|---|---|---|---|---|
| شركة الزامل للخدمات البحرية | | ٤٠٣٠٢٥٢٣٤٥ | | المدعي |
| شركة ادفان فورت | | | | مدعى عليه |

الصيغة التنفيذية

يطلب من جميع الوزارات والأجهزة الحكومية الأخرى العمل على تنفيذ هذا الحكم بجميع الوسائل النظامية المتبعة ولو أدى إلى استعمال القوة الجبرية عن طريق الشرطة

سعود احمد عبدالعزيز بخاري



|  |  |  |  |
|---|---|---|---|
| عضو الدائرة | عضو الدائرة | عضو الدائرة | عضو الدائرة |
| عبدالوهاب بن محمد المنصوري | ابراهيم بن صالح السحيباني | عبدالوهاب بن محمد المنصوري | ابراهيم بن صالح السحيباني |



J.A.123

# Exhibit C



**Samia A. Attar Translation Office**
**LOFTA CERTIFIED TRANSLATION**
**(Head Office - Takhassusi St.)**
License No. (735) C.C. 285298
VAT No : 3007313642 00003

مكتب سامية عبدالرحمن عطارللترجمة
لـفـتـه لـلـتـرجـمـة المعتمـدة
( المكتب الرئيسي - شارع التخصصي )
ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

| CERTIFICATION | شــهــادة |
|---|---|
| We hereby certify, under our responsibility, the accuracy of the translation of the enclosed documents from Arabic Language into English Language as per the enclosed text submitted to us and without any liability on us for the content of the translated text. | بهذا نصادق وعلى مسئوليتنا على صحة ترجمة المستندات المرفقة من اللغة العربية إلى اللغة الانجليزية حسب النص الوارد إلينا والمرفق طيه دون أدنى مسئولية عن محتويات النص المترجم. |
| In witness whereof we affix hereunder the signature and stamp of Samia A. Attar Translation Office (Lofta) to attest & confirm the accuracy of the translation | وإشهادا على ذلك فقد قمنا بتثبيت توقيعنا وختم مكتب سامية عبدالرحمن عطار (لفته) الرسمي على هذه الوثيقة للمصادقة على صحة ودقة الترجمة. |
| **Samia A. Attar Translation Office (Lofta)** Certified Translators Head Office – Riyadh | مكتب سامية عبدالرحمن عطار للترجمة (لفته) مترجمون معتمدون المكتب الرئيسي – الرياض |



الرياض - شارع التخصصي - هاتف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com

1

J.A.125

Samia A. Attar Translation Office
**LOFTA CERTIFIED TRANSLATION**
(Head Office - Takhassusi St.)
License No. (735) C.C. 285298
VAT No : 3007313642 00003

مكتب سامية عبدالرحمن عطارللترجمة
لـفـتــه لـلـتـرجــمـة المعـتـمـدة
( المكتب الرئيسي - شارع التخصصي )
ترخيص(٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣



Kingdom of Saudi Arabia
Board of Grievances
Administrative Court of Appeal – Mecca District
(83/7/200)

**The First Commercial Department**
**The Judgment in the Lawsuit No. 3347/2/A of 1438 AH**
**Filed by/ AdvanFort (American Company)**
**Against Zamil Offshore Services Company**

**For which the Judgment in the Lawsuit No. 2033/2/J of 1435 AH has been issued**
**by the Third Commercial Department of Jeddah Administrative Court**

Praise Be To Allah, and Peace Be Upon Our Prophet Mohammad and His Family and Companions

In the hearing held on Tuesday, corresponding to 13/8/1438 AH, at the First Commercial Department of the Administrative Court of Appeal in Mecca District, comprised of:

Appeal Head of Department/ Abdul Wahab Bin Mohammed Al Mansouri – President

Appeal Judge/ Mohammed Bin Bakhet Al Medrea – Member

Appeal Judge/ Obeid Bin Awadh Al Omari – Member

And in the presence of/ Abdullah Bin Saleh Al Maoled – Secretary

For reviewing the above-mentioned lawsuit referred to the Department on 7/7/1438 AH.

<u>**Appeal Department**</u>

Having perused and studied the lawsuit papers and the judgment delivered therein and the objection thereto, whereas, the facts of this lawsuit have been surrounded by the judgment, subject matter of the above-mentioned appeal, therefore, the Department refers thereto in order to avoid repetition, in which the Department adjudged to dismiss the lawsuit.

Whereas, this Department has perused the lawsuit papers and the judgment delivered therein and the objection thereto and found that the objection has been submitted within the legally prescribed period, so, it shall be acceptable procedurally.

2

الـريـاض – شــارع الـتخصصي – هــاتــف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com



Samia A. Attar Translation Office

**LOFTA CERTIFIED TRANSLATION**
(Head Office - Takhassusi St.)

License No. (735) C.C. 285298
VAT No : 3007313642 00003

مكتب سامية عبدالرحمن عطار للترجمة
لـفـتـه لـلـتـرجـمـة المعـتمـدة
( المكتب الرئيسي - شارع التخصصي )

ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

For merits, this Department, and having reviewed the objection to the judgment, did not see any remarks necessitating the cassation, so, the Department concludes to uphold it forced to its reasons.

**For These Reasons**

**The Appeal Department adjudged:**

To accept the objection procedurally and dismiss it on its merits and uphold the judgment delivered by the Third Commercial Department of Jeddah Administrative Court in the Lawsuit No. 2035/2/ق of 1435 AH stating to dismiss the lawsuit.

Peace Be Upon Our Prophet Mohammad and His Family and Companions.


Secretary/ Abdullah Bin Saleh Al Maoled (signed)

Member/ Obeid Bin Awadh Al Omari (signed)

Member/ Mohammed Bin Bakhet Al Medrea (signed)

Head of Department/ Abdul Wahab Bin Mohammed Al Mansouri (signed)

(sealed)



الـريـاض - شـارع الـتـخصصي - هـاتـف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com




بسم الله الرحمن الرحيم

المملكة العربية السعودية
ديوان المظالم

محكمة الاستئناف الإدارية بمنطقة مكة المكرمة
(٢٠٠/٧/٨٣)

الدائرة التجارية الأولى (م)

الحكم في القضية رقم ٣٣٤٧ /٢/س لعام ١٤٣٨هـ
المقامة من/ شركة ادفان فورت امريكية
ضد / شركة الزامل للخدمات البحرية
والصادر بشأنها الحكم في القضية رقم ٢.٣ط/٢/ق لعام ١٤٣٥هـ
عن الدائرة التجارية الثالثة بالمحكمة الإدارية بجدة

———————

الحمد لله رب العالمين، والصلاة والسلام على نبيّنا محمدٍ وعلى آله وصحبه أجمعين. وبعد:

ففي يـــوم الثلاثاء الموافق ١٣ / ٨ /١٤٣٨هـ انعقدت الدائرة التجارية الأولى بمحكمة الاستئناف الإدارية بمنطقة مكة المكرمة بتشكيلها المكون من:

| | | |
|---|---|---|
| رئيــس اسـتـئـنــــــاف | عبدالوهاب بن محمد المنصوري | رئيساً |
| قـاضـي اسـتـئـنــــــاف | محمــد بن بخيــت المـدرع | عضواً |
| قـاضـي اسـتـئـنــــــاف | عبيــد بن عـوض الـعـمـري | عضواً |
| بـــــــحـضـــــــور | عبدالله بن صالح المولد | أميناً للسر |

وذلك للنظر في القضية المذكورة أعلاه والمحالة إلى الدائرة بتاريخ ١٤٣٨/٧/٧هـ .

<u>دائرة الاستئناف</u>

بعد الاطلاع ودراسة أوراق القضية والحكم الصادر فيها والاعتراض المقدم عليه ، وحيث أن وقائع هذه القضية قد أوردها الحكم محل الاستئناف المشار إليه أعلاه ، فإن الدائرة تحيل إليه منعاً للتكرار والذي قضت فيه الدائرة برفض الدعوى.

وحيث اطلعت هذه الدائرة على أوراق القضية والحكم الصادر فيها والاعتراض المقدم عليه فاستبان لها أن الاعتراض قد قدم خلال الأجل المحدد نظاماً ومن ثم فهو مقبول شكلاً.

أما من حيث الموضوع فإنه لم يظهر لهذه الدائرة من خلال الاعتراض على الحكم ملاحظات توجب النقض وتنتهي الدائرة إلى تأييده محمولاً على أسبابه.

صفحة ١ من ٢

4

سلطان العميري

J.A.128







المملكة العربية السعودية
ديوان المظالم

محكمة الاستئناف الإدارية بمنطقة مكة المكرمة

(٢٠٠/٧/٨٣)

## لذلك حكمت دائرة الاستئناف

بقبول الاعتراض شـكلاً، ورفضـه موضــوعاً، وتأييد حكم الدائرة التجارية الثالثة بالمحكمة الإدارية بجدة في القضية رقم ٢/٢.٠٣٥/ق لعام ١٤٣٥هـ القاضي برفض الدعوى. وصلى الله وسلم على نبينا محمد وآله وصحبه أجمعين.

| رئيس الدائرة | عضو الدائرة | عضو الدائرة | عضو الدائرة | أمين السر |
|---|---|---|---|---|
| عبدالوهاب بن محمد المنصوري | محمد بن بخيت المدرع | عبيد بن عوض العمري | عبدالله بن صالح المولد | |





سلطان العميري

# Exhibit D

Samia A. Attar Translation Office
LOFTA CERTIFIED TRANSLATION
(Head Office - Takhassusi St.)
License No. (735) C.C. 285298
VAT No : 3007313642 00003



مكتب سامية عبدالرحمن عطارللترجمة
لـفـتـه لـلـتـرجـمـة الـمـعـتـمـدة
( المكتب الرئيسي - شارع التخصصي )

ترخيص ( ٧٣٥ ) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

| CERTIFICATION | شـــهـــادة |
|---|---|
| We hereby certify, under our responsibility, the accuracy of the translation of the enclosed documents from Arabic Language into English Language as per the enclosed text submitted to us and without any liability on us for the content of the translated text. | بهذا نصادق وعلى مسئوليتنا على صحة ترجمة المستندات المرفقة من اللغة العربية إلى اللغة الانجليزية حسب النص الوارد إلينا والمرفق طيه دون أدنى مسئولية عن محتويات النص المترجم. |
| In witness whereof we affix hereunder the signature and stamp of Samia A. Attar Translation Office (Lofta) to attest & confirm the accuracy of the translation | وإشهادا على ذلك فقد قمنا بتثبيت توقيعنا وختم مكتب سامية عبدالرحمن عطار (لفته) الرسمي على هذه الوثيقة للمصادقة على صحة ودقة الترجمة. |
| **Samia A. Attar Translation Office (Lofta)** Certified Translators Head Office – Riyadh | مكتب سامية عبدالرحمن عطار للترجمة (لفته) مترجمون معتمدون المكتب الرئيسي – الرياض |

1



**Samia A. Attar Translation Office**
**LOFTA CERTIFIED TRANSLATION**
**(Head Office - Takhassusi St.)**
License No. (735) C.C. 285298
VAT No : 3007313642 00003

مكتب سامية عبدالرحمن عطارللترجمة
لـفـتــه لـلتــرجـمــة الـمـعـتـمـدة
( المكتب الرئيسي – شارع التخصصي )
ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

Kingdom of Saudi Arabia
Board of Grievances
Administrative Court of Appeal – Mecca District
(83/7/200)

The First Commercial Department
The Judgment in the Lawsuit No. 3549/2/A of 1438 AH
Filed by/ Zamil Offshore Services Company
Against /AdvanFort (American Company)

For which the Judgment in the Lawsuit No. 4656/2/J of 1436 AH has been issued
by the Third Commercial Department of Jeddah Administrative Court

Praise Be To Allah, and Peace Be Upon Our Prophet Mohammad and His Family and Companions

In the hearing held on Tuesday, corresponding to 16/11/1438 AH, at the First Commercial Department of the Administrative Court of Appeal in Mecca District, comprised of:

Appeal Head of Department/ Abdul Wahab Bin Mohammed Al Mansouri – President

Appeal Judge/ Abdullah Bin Abdulrahim AL Zahrani – Member

Appeal Judge/ Ebrahim Bin Saleh Alsehaibani – Member

And in the presence of/ Sultan Bin Sefr Al Omairi – Secretary

For reviewing the above-mentioned lawsuit referred to the Department on 20/7/1438 AH.

### Appeal Department

Having perused and studied the lawsuit papers and the judgment delivered therein and the objection thereto, whereas, the facts of this lawsuit have been surrounded by the judgment, subject matter of the above-mentioned appeal, therefore, the Department refers thereto in order to avoid repetition, in which the Department adjudged to:

**First:** To oblige AdvanFort, a US company, address: 1875 E St Nw Floor 5, Washington, DC 20006 - to pay to Zamil Marine Services, commercial register 2051003290, an amount of US$40,000 (forty thousand US Dollars), and to reject the demand by the plaintiff to any additional amounts.

الرياض - شارع التخصصي – هـاتـف : ٤٨٢٧٨٥٤ / ٤٨٢٩٨٢٥
Riyadh - Takhassusi St. - Tel.: 4827854 / 4829825 - Email: Lofta3@yahoo.com

J.A.132

**Samia A. Attar Translation Office**
**LOFTA CERTIFIED TRANSLATION**
**(Head Office - Takhassusi St.)**
License No. (735) C.C. 285298
VAT No : 3007313642 00003



مكتب سامية عبدالرحمن عطارللترجمة
لـفـتـه لـلـتـرجـمـة الـمـعـتـمـدة
( المكتب الرئيسي – شارع التخصصي )

ترخيص (٧٣٥) رقم العضوية ٢٨٥٢٩٨
رقم الضريبي : ٣٠٠٧٣١٣٦٤٢٠٠٠٠٣

**Second:** To approve of Zamil Marine Services Company's right to compensation for the occupation of its dock by Sea Guard Virginia ship, which is owned by the AdvanFort Company, and may God's prayers and blessings be upon our Prophet Muhammad, his family and his companions.

Whereas, this Department has perused the lawsuit papers and the judgment delivered therein and the objection thereto and found that the objection has been submitted within the legally prescribed period, so, it shall be acceptable procedurally.

In terms of the subject matter, no observations appeared to this chamber through the objection to the ruling that would require a reversal, and the chamber ended up supporting it based on its reasons.

<u>The Appeals Chamber therefore ruled</u>

By accepting the objection in form and rejecting it in substance, and upholding the ruling of the Third Commercial Circuit of the Administrative Court in Jeddah in Case No. 4656/2/J of 1436 AH which ruled as follows:

<u>First:</u> To oblige AdvanFort, a US company, address: 1875 E St Nw Floor 5, Washington, DC 20006 - to pay to Zamil Marine Services, commercial register 2051003290, an amount of US$40,000 (forty thousand US Dollars), and to reject the demand by the plaintiff to any additional amounts.

<u>Second:</u> To approve of Zamil Marine Services Company's right to compensation for the occupation of its dock by Sea Guard Virginia ship, which is owned by the AdvanFort Company, and may God's prayers and blessings be upon our Prophet Muhammad, his family and his companions.

*Peace Be Upon Our Prophet Mohammad and His Family and Companions.*

| Head of Department | Member | Member | Secretatial Assistant |
|---|---|---|---|
| (Signature) | (Signature) | (Signature) | (Signature) |





بسم الله الرحمن الرحيم

المملكة العربية السعودية
ديوان المظالم
محكمة الاستئناف الإدارية بمنطقة مكة المكرمة
(٢٠٠/٧/٨٣)

الدائرة التجارية الأولى(١)

الحكـــــم في القضـــــية رقـــــم ٣٥٤٩ /٢/س لعــــام ١٤٣٨هـ
المقامــــــــة مــــــن/ شركـــــة الزامـــــل للخدمات البحريـــــة
ضــد /شركـــة أدفـــان فــــورت (شركـــة أمريكيـــة)
والصـــادر بشـــأنها الحكـــم في القضية رقـــم ٤٦٥٦/٢/ق لعـــام ١٤٣٦هـ
عـــن الدائـــرة التجاريـــة الثالثـــة بالمحكمـــة الإداريـــة بجـــدة

الحمد لله رب العالمين، والصلاة والسلام على نبيِّنا محمد وعلى آله وصحبه أجمعين، وبعد:

ففي يـوم الثلاثـاء الموافق ١٦ / ١١ /١٤٣٨هـ انعقدت الدائـرة التجاريـة الاولى بمحكمـة الاستئناف الإدارية بمنطقة مكة المكرمة بتشكيلها المكون من:

| | | |
|---|---|---|
| رئيـــس استئنــــاف | عبدالوهاب بـن محمد المنصوري | رئيســـاً |
| قـــاضي استئنـــاف | عبدالله بـن عبدالرحيم الزهراني | عضواً |
| قـــاضي استئنـــاف | إبراهيم بـن صالح السحيباني | عضواً |
| بحضـــــور | سلطان بـن سفر العميري | أميناً للسر |

وذلك للنظر في القضية المذكورة أعلاه والمحالة إلى الدائرة بتاريخ ١٤٣٨/٧/٢٠هـ .

**دائرة الاستئناف**

بعد الاطلاع ودراسة أوراق القضية والحكم الصادر فيها والاعتراض المقدم عليه ، وحيث أن وقائع هذه القضية قد أوردها الحكم محل الاستئناف المشار إليه أعلاه ، فإن الدائرة تحيل إليه منعاً للتكرار والذي قضت فيه الدائرة بما يلي: أولاً/ إلزام شركة أدفان فورت (شركة أمريكية عنوانها ١٨٧٥ شارع أي الطابق الخامس ٢٠٠٦ واشنطن دي سي) بأن تدفع لشركة الزامل للخدمات البحرية ، سجل تجاري رقم (٢٠٥١٠٣٢٩٠) مبلغاً قدره ٤٠,٠٠٠ دولاراً أمريكياً ، أربعون ألف دولاراً أمريكياً ورفض طلبها فيما زاد عن هذا المبلغ .





المملكة العربية السعودية

ديوان المظالم

محكمة الاستئناف الإدارية بمنطقة مكة المكرمة

(٢٠٠/٧/٨٣)

ثانياً/ ثبوت حق شركة الزامل للخدمات البحرية في التعويض عن حجز الصيف من قبل اللنش سيمان جارد فرجينيا التابع لشركة أدفان فورت .

وحيث اطلعت هذه الدائرة على أوراق القضية والحكم الصادر فيها والاعتراض المقدم عليه فاستبان لها أن الاعتراض قد قدم خلال الأجل المحدد نظاماً ومن ثم فهو مقبول شكلاً.

أما من حيث الموضوع فإنه لم يظهر لهذه الدائرة من خلال الاعتراض على الحكم ملاحظات توجب النقض وتنتهي الدائرة إلى تأييده محمولاً على أسبابه

### لذلك حكمت دائرة الاستئناف

بقبول الاعتراض شكلاً، ورفضه موضوعاً، وتأييد حكم الدائرة التجارية الثالثة بالمحكمة الإدارية بجدة في القضية رقم ٤٦٥٦/٢/ق لعام ١٤٣٦هـ القاضي بما يلي : أولاً/ إلزام شركة أدفان فورت (شركة أمريكية عنوانها ١٨٧٥ شارع أي الطابق الخامس ٢٠٠٦ واشنطن دي سي) بأن تدفع لشركة الزامل للخدمات البحرية ، سجل تجاري رقم (٢٠٥١٠٠٣٢٩٠) مبلغاً قدره ٤٠,٠٠٠ دولاراً أمريكياً ، أربعون ألف دولاراً أمريكياً، ورفض طلبها فيما زاد عن هذا المبلغ .

ثانياً/ ثبوت حق شركة الزامل للخدمات البحرية في التعويض عن حجز الصيف من قبل اللنش سيمان جارد فرجينيا التابع لشركة أدفان فورت .

وصلى الله وسلم على نبينا محمد وآله وصحبه أجمعين.

| أمين السر | عضو الدائرة | عضو الدائرة | رئيس الدائرة |
|---|---|---|---|
| سلطان بن سفر العميري | إبراهيم بن صالح السحيباني | عبدالله بن عبدالرحيم الزهراني | عبدالوهاب بن محمد المنصوري |



سلطان العميري

صفحة ٢ من ٢

# Declaration of Anoop Kurikkalakath

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| ADVANFORT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-906 |
| | ) | |
| ZAMIL OFFSHORE SERVICES | ) | |
| COMPANY and SAUDI PORTS | ) | |
| AUTHORITY, a foreign sovereign | ) | |
| State, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ANOOP KURIKKALAKATH

I, Anoop Kurikkalakath, Senior Legal Counsel at Zamil Offshore Services Company ("Zamil Offshore"), assert the following:

1. I have personal knowledge of the facts set forth in this Declaration.

2. I am Senior Legal Counsel at Zamil Offshore. In my role, I have authority to make legally binding decisions on behalf of Zamil Offshore for purposes of this litigation, or speak for those who do.

**A. Zamil Offshore's Operations**

3. Zamil Offshore is based in Saudi Arabia. Zamil Offshore has no offices or employees in the United States.

4. Zamil Offshore has never repaired a ship in the United States.

**B. Zamil Offshore is Subject to the Saudi Legal System.**

5. Zamil Offshore is subject to suit in Saudi Arabia. Zamil Offshore is not afforded any special immunity from lawsuits, and it defends itself from all claims.

6. Zamil Offshore has not ever failed to satisfy a final judgment issued by a Saudi court.

7. If AdvanFort Company ("AdvanFort") commences litigation arising out of the general circumstances and claims asserted in the Complaint in an appropriate Saudi court, Zamil Offshore will accept service in Saudi Arabia, and will accept an appropriate Saudi court's exercise of jurisdiction, as it did when AdvanFort filed suit against Zamil Offshore in Saudi Arabia in 2014.

8. As set forth earlier, Zamil Offshore has no offices or employees in the United States. Any relevant and discoverable documents in this case from Zamil Offshore's files are located in Saudi Arabia and many are written in Arabic. Any Zamil Offshore witnesses are likely located in Saudi Arabia and many will not speak English. Indeed, it is likely that many have never traveled to the United States. Further, because the events described in AdvanFort's Complaint took place over a number of years stretching back to 2013, some of the witnesses in this case will likely be former employees of Zamil Offshore or the Saudi Ports Authority whom Zamil Offshore has no control over.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:
September 28, 2023

_____
Anoop Kurikkalakath

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>Alexandria Division</u>

| | |
|---|---|
| ADVANFORT COMPANY, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION NO. 1:23-cv-906 |
| ZAMIL OFFSHORE SERVICES COMPANY | ) |
| and SAUDI PORTS AUTHORITY, a foreign | ) |
| sovereign State, | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ........................................................................................... 2

ARGUMENT ..................................................................................................................... 5

   I.    Zamil Has Not Met Its Heavy Burden to Show Dismissal on *Forum Non Conveniens* Is Appropriate ....................................................................................... 5

     A.    Saudi Arabia Is Not an Available Forum.................................................... 6

     B.    Saudi Arabia Is Not an Adequate Forum For AdvanFort's Claims. .......... 7

       1.    The Judiciary Is Neither Fair, Independent, Nor Free From Corruption. ............................... 9

       2.    AdvanFort Cannot Receive a Fair Trial in Saudi Arabia and Would be Subject to Retribution. ................................................................................. 11

       3.    Zamil's Cited Cases Do Not Support *Forum Non Conveniens* Dismissal Here. ................... 14

     C.    The Public and Private Factors Do Not Favor Adjudication in Saudi Arabia. ..................... 16

       1.    Private Factors ............................................................................... 17

       2.    Public Factors ................................................................................ 18

   II.    This Court Has Personal Jurisdiction Over Zamil. ......................................... 20

     A.    Defendant Has Purposefully Availed Itself of the Privilege of Conducting Business in Virginia. ........................................................................... 21

     B.    AdvanFort's Claims Arise Out of and Are Related to Defendant's Contacts With Virginia. 27

     C.    Exercising Personal Jurisdiction Is Constitutionally Reasonable. ........... 28

CONCLUSION ................................................................................................................ 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Salamah Arabian Agencies Co. v. Reece*,
   673 F. Supp. 748 (M.D.N.C. 1987) ....................................................................15

*Alpha View Co. Ltd v. Atlas Copco AB*,
   205 F.3d 208 (5th Cir. 2000) ..............................................................................6

*American Dredging Co. v. Miller*,
   510 U.S. 443 (1994).............................................................................................17

*Arabian Teading & Chem. Indus. Co. Ltd. v. The B.F. Goodrich Co.*,
   823 F.2d 60 (4th Cir. 1987) ................................................................................19

*Azima v. RAK Inv. Auth.*,
   926 F.3d 870 (D.C. Cir. 2019)............................................................................15

*BAE Sys. Tech. Sol. & Servs. v. Republic of Korea's Def. Acquisition Program Admin.*,
   884 F.3d 463 (4th Cir. 2018) ..............................................................................5

*Bank Melli Iran v. Pahlavi*,
   58 F.3d 1406 (9th Cir. 1995) ..............................................................................12

*BP Chems. Ltd. v. Jiangsu Sopo Corp (Group) Ltd.*,
   No. 4:99CV323 CDP, 2004 U.S. Dist. LEXIS 27855 (E.D. Mo. Mar. 29, 2004) ...................................................................................................................12

*Bradley v. DentalPlans.com*,
   617 F. Supp. 3d 326 (D. Md. 2022) ....................................................................24

*Bridgeway Corp. v. Citibank*,
   201 F.3d 134 (2d Cir. 2000)................................................................................16

*Bristol-Myers Squibb v. Superior Court*,
   582 U.S. 255 (2017).......................................................................................27, 28

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985).................................................................................21, 22, 29

*Calder v. Jones*,
   465 U.S. 783 (1984).............................................................................................29

ii

*Canadian Overseas Ores Ltd. v. Compania De Acero Del Pacifico, S.A.*,
    528 F. Supp. 1337 (S.D.N.Y. 1982)................................................................13

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
    334 F.3d 390 (4th Cir. 2003) ......................................................................25

*Carter v. Trafalgar Tours, Ltd.*,
    704 F. Supp. 673 (W.D. Va. 1989) ...............................................................19

*CFA Inst. v. Inst. of Chartered Fin. Analysts of India*,
    551 F.3d 285 (4th Cir. 2009) ...............................................20, 21, 28, 29

*Chadwick v. Arabian Am. Oil Co.*,
    656 F. Supp. 857 (D. Del. 1987) ...................................................................19

*Chesapeake Bank v. Cullen*,
    No. 3:10cv247, 2010 U.S. Dist. LEXIS 100827 (E.D. Va. Sep. 21, 2010) ......................24, 26

*Combs v. Bakker*,
    886 F.2d 673 (4th Cir. 1989) ......................................................................20

*Conflict Kinetics, Inc. v. Goldfus*,
    577 F. Supp. 3d 459 (E.D. Va. 2021) ...........................................................16

*Consulting Engineers v. Geometric Limited*,
    561 F.3d 273 (4th Cir. 2009). ......................................................................27

*D&S Consulting, Inc. v. Kingdom of Saudi Arabia*,
    961 F.3d 1209 (D.C. Cir. 2020)...................................................................15

*DeSantis v. Hafner Creations, Inc.*,
    949 F. Supp. 419 (E.D. Va. 1996) ...............................................................24

*DiFederico v. Marriott Int'l, Inc.*,
    714 F.3d 796 (4th Cir. 2013) ........................................................ *passim*

*Dirtt Env't Sols Inc. v. Falkbuilt Ltd.*,
    65 F.4th 547 (10th Cir. 2023) ...............................................................6, 7

*In re Disaster at Riyadh Airport, Saudi Arabia, on August 19, 1980*,
    540 F. Supp. 1141 (D.D.C. 1982) ...............................................................15

*dmarcian, Inc. v. dmarcian Eur. BV*,
    60 F.4th 119 (4th Cir. 2022) .......................................................................8

*Doe v. Exxon Mobil Corp.*,
    393 F. Supp. 2d 20 (D.D.C. 2005) ...............................................................14

iii

*Dunlap v. Cottman Transmissions Sys.*,
   LLC, No. 2:11CV272, 2015 U.S. Dist. LEXIS 184224 (E.D. Va. Nov. 5,
   2015) ......................................................................................................... 29

*Ellicott Machinery Corp. v. John Holland Party, Ltd.*,
   995 F.2d 474 (4th Cir. 1993). ........................................................................ 27

*Emerson Radio Corp. v. Fok*,
   No. 2:20-cv-01618-WJM-MF, 2020 U.S. Dist. LEXIS 182339 (D.N.J. Oct. 1,
   2020) ......................................................................................................... 13

*Felland v. Clifton*,
   682 F.3d 665 (7th Cir. 2012) ........................................................................ 25

*FireClean LLC v. Tuohy*,
   No. 1:16-cv-294-JCC-MSN, 2016 U.S. Dist. LEXIS 109620 (E.D. Va. June
   14, 2016) .................................................................................................... 25

*Flatow v. Alavi Found.*,
   No. 99-2409, 2000 U.S. App. LEXIS 17753 (4th Cir. July 24, 2000) ................... 30

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
   141 S. Ct. 1017 (2021).............................................................................. 27, 28

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
   905 F.2d 438 (D.C.C.1990) .......................................................................... 30

*Forsythe v. Saudi Arabian Airlines Corp.*,
   885 F.2d 285 (5th Cir. 1989) ........................................................................ 15

*Galustian v. Peter*,
   591 F.3d 724 (4th Cir. 2010) .......................................................................... 6

*Goldfarb v. Channel One Russ.*,
   442 F. Supp. 3d 649 (S.D.N.Y. 2020)............................................................. 14

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947)................................................................................ 17, 19

*Jeha v Arabian Am. Oil*,
   936 F.2d 569 (5th Cir. 1991) ........................................................................ 15

*Jeha v. Arabian Am. Oil Co.*,
   751 F. Supp. 122 (S.D. Tex. 1990) ................................................................. 15

*Jiali Tang v. Synutra Int'l, Inc.*,
   656 F.3d 242 (4th Cir. 2011) ................................................................. 6, 8, 17

*Kamel v. Hill-Rom Co.,*
    108 F.3d 799 (7th Cir. 1997) ................................................................................15

*Khan v. Ranjha,*
    53 Va. Cir. 530 (Cir. Ct. 1999) ......................................................................25, 27

*Klumba.Ua. LLC v. klumba.com,*
    No. 1:15-cv-760, 2017 U.S. Dist. LEXIS 213772 (E.D. Va. Sep. 11, 2017) .........18

*Kontoulas v. A.H. Robins Co.,*
    745 F.2d 312 (4th Cir. 1984) ...................................................................................7

*Koster v. (American) Lumbermens Mut. Cas. Co.*
    330 U.S. 518 (1947) .......................................................................................6, 17

*Lee v. Walworth Valve Co.,*
    482 F.2d 297 (4th Cir. 1973) .........................................................................19, 29

*Lehman v. Humphrey Cayman, Ltd.,*
    713 F.2d 339 (8th Cir. 1983) .................................................................................19

*Levine v. Arabian Am. Oil Co.,*
    1985 U.S. Dist. LEXIS 13386 (S.D.N.Y. Nov. 27, 1985) ....................................19

*Lockwood Bros., Inc. v. Arnold Speditions GmbH,*
    453 F. Supp. 2d 928 (E.D. Va. 2006) ................................................................5, 18

*MacDermid, Inc. v. Deiter,*
    702 F.3d 725 (2d Cir. 2012) .................................................................................25

*MicroAire Surgical Instruments, LLC v. Arthrex, Inc.,*
    No. 3:09-cv-00078, 2010 U.S. Dist. LEXIS 70191 (W.D. Va. July 13, 2010) ..........15, 17, 19

*Millennium Inorganic Chemicals Ltd. v. Nat'l Union Fire Ins. Co.,*
    686 F. Supp. 2d 558 (D. Md. 2010) .......................................................................7

*Mulugeta v. Ademachew,*
    407 F. Supp. 3d 569 (E.D. Va. 2019) ...................................................................13

*Mylan Labs., Inc. v. Akzo, N.V.,*
    2 F.3d 56 (4th Cir. 1993) .......................................................................................20

*Nat'l Group for Commc'ns and Computers Ltd. v. Lucent Techs. Int'l Inc.,*
    331 F. Supp. 2d 290 (D.N.J. 2004) .......................................................................19

*Peninsula Cruise, Inc. v. New River Yacht Sales, Inc.,*
    257 Va. 315 (1999) ...............................................................................................26

J.A.144

*Petersen v. Boeing Co.*,
   108 F. Supp. 3d 726 (D. Ariz. 2015) ............................................9, 12

*Phoenix Canada Oil Co. v. Texaco, Inc.*,
   78 F.R.D. 445 (D. Del. 1978) ..................................................14

*Piper Aircraft Co. v. Reyno*,
   454 U.S. 235 (1981)............................................. *passim*

*Poly-Med, Inc. v. Novus Sci. Pte.*,
   No. 8:15-cv-01964-JMC, 2016 U.S. Dist. LEXIS 20815 (D.S.C. Feb. 22,
   2016) ..................................................................7, 16

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
   244 F. Supp. 2d 289 (S.D.N.Y. 2003)........................................12

*Rasoulzadeh v. Associated Press*,
   574 F. Supp. 854 (S.D.N.Y. 1983)..........................................12

*Reid-Walen v. Hansen*,
   933 F.2d 1390 & 1398 (8th Cir. 1991) .....................................13

*Rhodes v. ITT Sheraton Corp.*,
   9 Mass. L. Rep. 355 (Mass. Sup. Ct. 1999) ................................12

*Rustal Trading US, Inc. v. Makki*,
   17 F. App'x 331 (6th Cir. 2001) ............................................8

*SAS Inst., Inc. v. World Programming Ltd.*,
   468 F. App'x 264 (4th Cir. 2012) .......................................16, 18

*Shields v. Mi Ryung Constr. Co.*,
   508 F. Supp. 891 (S.D.N.Y. 1981)..........................................16

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
   549 U.S. 422 (2007)..........................................................6

*Sneha Media & Entm't, LLC v. Assoc. Broad. Co. P. Ltd.*,
   911 F.3d 192 (4th Cir 2018) ...............................................20

*Tire Eng'g & Distribution, Ltd. Liab. Co. v. Shandong Linglong Rubber Co.*,
   682 F.3d 292 (4th Cir. 2012) ......................................... *passim*

*UMG Recordings, Inc. v. Kurbanov*,
   963 F.3d 344 (4th Cir. 2020) ..........................................21, 25

J.A.145

*UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*,
    *No.* SA-04-CA-1008-WRF, 2008 U.S. Dist. LEXIS 62881 (W.D. Tex. July
    25, 2008) *aff'd in part, rev'd in part on other grounds*, 581 F.3d 210 (5th Cir.
    2009) ..................................................................................................................8, 12

*Universal Leather, LLC v. Koro AR, S.A.*,
    773 F.3d 553 (4th Cir. 2014) ...........................................................................2

*Vape Guys, Inc. v. Vape Guys Distribution*,
    Civil Action No. 3:19cv298, 2020 U.S. Dist. LEXIS 36117, (E.D. Va. Mar. 2,
    2020) .................................................................................................................23

*Wallace v. Yamaha Motors Corp., U.S.A.*,
    No. 19-2459, 2022 U.S. App. LEXIS 447 (4th Cir. Jan. 6, 2022)...................22, 28

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)..........................................................................................21

*Yacht Basin Provision Co. v. Bates*,
    610 F. Supp. 3d 800 (E.D.N.C. 2022)..............................................................24

**Statutes**

28 U.S.C. § 1330(b) ...................................................................................................30

28 U.S.C. §§ 1602 *et seq.*..........................................................................................30

**Other Authorities**

Fed. R. Civ. P. 12(b)(2).......................................................................................1, 20

Fed. R. Civ. P. 26(a)(2)(B) ......................................................................................10

U.S. Const., Amend. XIV. ........................................................................................20

## INTRODUCTION

This case is about the destruction of an American business's vessel at the hands of a Saudi Government entity (the Saudi Ports Authority) and a company controlled by a well-connected Saudi family. The relationship between the parties dates to 2013 when AdvanFort Company ("AdvanFort"), a Virginia company, contracted with Jeddah Shipyard, a joint enterprise of the Ports Authority and Zamil Offshore Services Company ("Zamil"), to perform routine maintenance and minor repairs on its vessel. But, rather than perform its services in a workmanlike manner, the shipyard caused the vessel to catch fire. The ensuing litigation in Saudi Arabia was marred by serial irregularities, including a settlement offer involving bribery, a witness who suddenly became too fearful to testify, an attempt to bribe and threaten another witness, and a court that abruptly refused to fulfill its promise to appoint an independent marine expert. AdvanFort's claims in the present action arise out of actions years later. In 2022, when AdvanFort was given access to the vessel, AdvanFort discovered it had been looted of all value. AdvanFort brings this action against Zamil and the Ports Authority on claims of conversion, breach of bailment (contract), breach of bailment (tort), negligence, and gross negligence.

Zamil moves to dismiss under *forum non conveniens* and Fed. R. Civ. P. 12(b)(2), arguing Saudi Arabia is the appropriate forum and that Zamil is not subject to this Court's personal jurisdiction. These arguments should be rejected. AdvanFort's choice of its home forum is entitled to heightened deference. Saudi Arabia is an inadequate and inappropriate forum. The notion that AdvanFort could safely and adequately pursue its claims in Saudi Arabia is delusional. Judges are purged and abused for ruling against government interests. The Saudi judiciary acts in a capricious, opaque, and discriminatory manner. Litigants who challenge the government are subjected to retribution, including imprisonment and other abuses. These are not the characteristics of a jurisdiction to which this Court should direct a properly filed case.

1

There is also personal jurisdiction. Zamil a global company that appears to employ individuals in the United States, and in Virginia specifically. Zamil actively solicits business in Virginia, both through its own direct advertisements and web-based efforts and via the Vienna, Virginia-based U.S.-Saudi Business Council. Zamil operates a website using Virginia-based servers. AdvanFort decided to engage Zamil for its repair work only after reviewing Zamil's Virginia-directed marketing efforts. Zamil and AdvanFort contracted for the repairs, which involved Zamil receiving funds from a Virginia bank. These facts establish jurisdiction.

## FACTUAL BACKGROUND

The following facts are taken from the facts as alleged in the complaint and attached declarations, drawing all reasonable inferences in favor of the party asserting jurisdiction.[1]

AdvanFort is a Virginia-based company that deploys security vessels to protect oil tankers and other vulnerable ships against piracy in some of the world's most volatile seas. Complaint, ECF No. 1 ("Compl.") ¶ 1. Zamil, a closed stock company organized under the laws of Saudi Arabia, operates an offshore and marine services company. Compl. ¶¶ 9, 50. Zamil jointly operates a shipyard in the Jeddah Islamic Port with the Saudi Ports Authority, an arm of the Saudi government ("Jeddah Shipyard"). Compl. ¶¶ 13, 30-31.

Zamil is an affiliate of Zamil Group Holding ("Zamil Group"), one of the largest company groups in Saudi Arabia that is owned and controlled by the Zamil Family, one of Saudi Arabia's richest and most powerful families. Compl. ¶ 10. The Zamil Family enjoys a privileged relationship with the Saudi Royal Family, and by extension, the Saudi Government. Declaration of Dr. Abdullah Alaoudh ("Alaoudh Decl.") ¶ 45. The Saudi Royal Family has assigned

---

[1] The Court may consider affidavits submitted by both parties, although it must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting that jurisdiction exists. *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 560 (4th Cir. 2014).

members of the Zamil family, including the Director of Zamil, to leadership positions in key

governing bodies, including the Shura Council, the Ministry of Industry and Mineral Resources,

and the Saudi Ports Authority. Alaoudh Decl. ¶¶ 46-49. Zamil partners with the Saudi

Government's restrictive and lucrative commercial operations, and Zamil family members serve

on the boards of numerous state-run commercial enterprises, including Saudi Arabia's sovereign

wealth fund (the Public Investment Fund), the Saudi Export Development Authority (a

governmental body tasked with developing Saudi Arabia's non-oil export industries), and Saudi

Global Ports LLC. Alaoudh Decl. ¶¶ 46-49.

Zamil solicits business from U.S. companies, including in Virginia. Zamil advertises its

marine services in publications such as *The Baltic Exchange*, which is distributed in the United

States, including Virginia. Compl. ¶ 50. Zamil regularly participates in United States conferences

for servicing companies that rely on the maritime industry to transport hydrocarbons. Compl. ¶¶

50-54. Zamil promotes its association with the U.S.-based classification society, the American

Bureau of Shipping, which is a recognized agent of the U.S. Government for certain

government-mandated marine inspections. Compl. ¶¶ 41-49. And, the Zamil Family participated

in the Saudi delegation that traveled to Virginia with Crown Prince Mohammed Bin Salman to

expand U.S. business in Saudi Arabia. Compl. ¶ 11. To facilitate these U.S. business

relationships, Zamil appears to employ individuals in the United States and Virginia specifically.

*See* Declaration of Peter Sullivan ("Sullivan Decl.") ¶¶ 3-4, Exs. B, C.

While AdvanFort's U.S.-based vessel *M/V Seaman Guard Virginia* was in the Red Sea, it

found itself in need of routine maintenance and repair. Compl. ¶ 39. AdvanFort had previously

seen Zamil's advertisements distributed in Virginia and was impressed by Zamil's U.S.

affiliations and certifications. Compl. ¶ 58-59. AdvanFort also viewed Zamil's website while in

J.A.149

USCA4 Appeal: 24-1007      Doc: 17      Filed: 03/27/2024      Pg: 155 of 389

Virginia. Declaration of Ahmed Farajallah ("Farajallah Decl.") ¶ 7. These Virginia-directed publications led AdvanFort to engage Zamil's services. Compl. ¶¶ 58-60. AdvanFort and Zamil communicated with each other from AdvanFort's Virginia offices and with AdvanFort's Virginia-based email to negotiate service of the *Seaman Guard Virginia*. Compl. ¶¶ 60-66. Zamil knew it was engaging with a Virginia-based company: AdvanFort's email block indicated as such. Compl. ¶ 61-62. Zamil communicated with AdvanFort in English. Farajallah Decl.¶ 2.

When Zamil began work on the vessel, a fire broke out while under its control, causing damage to the vessel. Compl. ¶¶ 75-85. Zamil refused to repair the damage that it had caused and instead threatened to undock the vessel less AdvanFort abandon claims against Zamil. Compl. ¶¶ 86, 98-100. AdvanFort sought redress against Zamil in the Saudi court system for the damage, but the Saudi proceedings were plagued by serious irregularities.  Compl. ¶¶ 108-23. One of AdvanFort's witnesses abruptly stopped returning their calls and refused to testify, indicating that he feared retribution for speaking out against the powerful Zamil Family. Compl. ¶¶ 118-19. Zamil threatened and attempted to bribe AdvanFort's captain to have him change his contemplated testimony. Compl. ¶¶ 112-16. The Court, in an abrupt about face, issued a judgment in Zamil's favor without appointing the independent marine expert it had previously stated was necessary to resolve the case's technical issues. Compl. ¶ 121. The resulting judgment was based exclusively on false, self-serving fire reports issued by Saudi government authorities, including the Saudi Ports Authority, which was in business with Zamil at the Jeddah Shipyard and had an interest in the dispute. Compl. ¶¶ 90, 111-23.

In 2022, Zamil wrote to AdvanFort in Virginia inviting it to reclaim the vessel. Compl. ¶ 124. When AdvanFort inspected the vessel, it learned that the vessel was stripped and looted of all value. Compl. ¶¶ 124-143. AdvanFort's claims in the present action are based on those acts.

## ARGUMENT

**I.  Zamil Has Not Met Its Heavy Burden to Show Dismissal on *Forum Non Conveniens* Is Appropriate**

The claims that AdvanFort alleges concern misconduct by the Saudi Government and other influential parties. It cannot fairly be litigated in Saudi Arabia where courts are controlled by an absolute monarchy – a power structure that tolerates human rights abuses, corruption, and discrimination. The doctrine of *forum non conveniens* is a discretionary one and requires not just a determination that another forum is available and adequate, but also that it is more convenient in light of the public and private interests involved. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 (1981). The issue does not require extensive deliberation: dismissal would shut AdvanFort out of court altogether. Suing in Saudi Arabia would require AdvanFort to put its representatives, witnesses, and attorneys at grave risk. A court in the U.S. should never tolerate such as prospect. And it is especially intolerable here, where a Virginia plaintiff sues at home and relies on evidence located in Virginia. In contrast, the complaints that Zamil makes concerning witnesses and documents are no different than those routinely managed by international litigants in the federal courts.

Dismissal is only appropriate on grounds of *forum non conveniens* where it is necessary to "prevent harassment of defendants." *Lockwood Bros., Inc. v. Arnold Speditions GmbH,* 453 F. Supp. 2d 928, 935 (E.D. Va. 2006); *see also Piper Aircraft,* 454 U.S. at 249 n.15, 241 ("[P]laintiff's choice of forum should rarely be disturbed."); *BAE Sys. Tech. Sol. & Servs. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 470–71 (4th Cir. 2018) (explaining the doctrine "allows a court to dismiss a case when the original venue is highly

inconvenient and an adequate alternative venue exists"). There is no harassment here; all that is requested is that Zamil defend its actions before a neutral U.S. court.

To succeed on a claim of *forum non conveniens,* the moving party bears the heavy burden to show an "alternative forum is: 1) available; 2) adequate; and 3) more convenient in light of the public and private interests involved." *Jiali Tang v. Synutra Int'l, Inc.*, 656 F.3d 242, 248 (4th Cir. 2011) (citing *Piper Aircraft*, 454 U.S. at 241). Each of these factors weighs in favor of keeping this case in Virginia and demonstrates Zamil would not be subject to "oppressiveness and vexation" by litigating here. *See Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947); *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007); *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 803 (4th Cir. 2013).

### A.    Saudi Arabia Is Not an Available Forum.

In considering the availability of an alternative forum, the court must find that the proposed forum is available to **all parties**. *See Galustian v. Peter*, 591 F.3d 724, 731 (4th Cir. 2010) (finding jurisdiction must be available to all defendants); *Alpha View Co. Ltd v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir. 2000) ("A foreign forum is available when the entire case and all parties can come within the jurisdiction of the forum.").

While AdvanFort's claims are asserted against two defendants, only Zamil has moved to dismiss.  The other defendant (the Saudi Ports Authority) has not yet appeared, let alone moved to dismiss on *forum non conveniens* grounds or consented to have the claims against it adjudicated on the merits in any particular court in Saudi Arabia. *Dirtt Env't Sols Inc. v. Falkbuilt Ltd.,* 65 F.4th 547, 549 (10th Cir. 2023) (reversing district court's dismissal based on *forum non conveniens* because it "clearly abuse[d] its discretion when…it elect[ed] to dismiss an action as to several defendants under a theory of *forum non conveniens* while simultaneously allowing the same action to proceed against other defendants."); *Poly-Med, Inc. v. Novus Sci.*

6

*Pte.*, No. 8:15-cv-01964-JMC, 2016 U.S. Dist. LEXIS 20815, *28-29 (D.S.C. Feb. 22, 2016)

(denying motion because not all defendants sought dismissal).

Even if the Ports Authority were to consent to AdvanFort's claims against it in Saudi

Arabia, there still would not be an alternative forum.[2] That is because while Zamil must

"indicate[] *what court* provides the alternative forum, . . .  it has only suggested the *country*."

*Kontoulas v. A.H. Robins Co.*, 745 F.2d 312, 316 (4th Cir. 1984); *Millennium Inorganic*

*Chemicals Ltd. v. Nat'l Union Fire Ins. Co.*, 686 F. Supp. 2d 558, 562 (D. Md. 2010) (noting this

"clear requirement").

There is good reason for this: AdvanFort's claims against Zamil and the Saudi Ports

Authority would have to be brought separately in Saudi Arabia. While Zamil argues that the

Saudi Board of Grievances is available for claims against the Ports Authority, Al-Hejailan Decl.

¶ 4.1.4, it presents no evidence that the Board of Grievances can also exercise jurisdiction over

claims against Zamil. That is because a suit by AdvanFort against Zamil would have to be

brought separately in the Saudi *Commercial Court*. Alaoudh Decl. ¶ 39. This precludes

dismissal.  As the Tenth Circuit has held, "*forum non conveniens* is not available as a tool to split

or bifurcate cases" because "[s]plitting cases . . . fundamentally contradicts the 'central purpose'

of *forum non conveniens* . . . it only increases the possibility of overlapping, piecemeal litigation

that is inherently inconvenient for both the parties and the courts." *Dirtt Env't Sols Inc.,* 65 F.4th

at 555.

    **B.**    **Saudi Arabia Is Not an Adequate Forum for AdvanFort's Claims.**

---

[2] In fact, the relevant Saudi court cannot hear claims that involve "acts of sovereignty," a
nebulous category of activity under which the Saudi court typically defers to the government's
self-serving characterization. Alaoudh Decl. ¶¶ 40-41.

Regardless, Zamil's argument that Saudi Arabia is an adequate forum for claims against an arm of the Saudi government and a well-connected family-owned company is blind to reality. Saudi Arabia is an absolutist monarchy where the Royal Family and allied families exert coercive control over the legal system. A "foreign forum is only 'adequate' if 'all parties can come within that forum's jurisdiction" and 'the parties will not be deprived of all remedies or treated unfairly.'" *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 136 (4th Cir. 2022) (quoting *Jiali Tang*, 656 F.3d at 249). That is simply not the case here, where there are "serious obstacles to conducting litigation in the alternative forum, such as a well-founded fear of persecution there," *Rustal Trading US, Inc. v. Makki*, 17 F. App'x 331, 335 (6th Cir. 2001), and the remedy in that forum is so illusory that it is no remedy at all. *Piper Aircraft*, 454 U.S. at 254.

The Saudi judiciary is controlled by the Saudi government, a defendant in this suit, and is marked by capriciousness, opacity, and discrimination. The U.S. Department of State regularly reports on its abuses, observing that the judiciary "has serious problems with . . . independence" and that the courts are "required to coordinate their decisions with executive authorities, with the king and crown prince as arbiters."[3] Judges who issue perceived anti-government decisions are met with retribution. Judges and lawyers have been arrested and tortured; the litigants making claims are sometimes arrested. As AdvanFort asserts claims accusing multiple elements of the Saudi government and a powerful family of misconduct, it is extremely unlikely that the courts of Saudi Arabia would adjudicate AdvanFort's claims in a fair and impartial manner.

---

[3] U.S. DEPARTMENT OF STATE, 2020 COUNTRY REPORT ON HUMAN RIGHTS PRACTICES: SAUDI ARABIA 16 (2020), https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/saudi-arabia/; U.S. DEPARTMENT OF STATE, 2022 COUNTRY REPORT ON HUMAN RIGHTS PRACTICES: SAUDI ARABIA 16 (2022), https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/; U.S. DEPARTMENT OF STATE, 2022 COUNTRY REPORT ON HUMAN RIGHTS PRACTICES: SAUDI ARABIA 13 (2021), https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/saudi-arabia/.

Moreover, individuals associated with AdvanFort, including its representatives, witnesses, and attorneys, would be at risk of detention and/or other forms of abuse if they were to travel to Saudi Arabia to participate in litigation there. This is the same government that orchestrated the brutal murder and dismemberment of *Washington Post* journalist Jamal Khashoggi.[4] The reality is that pursuing this litigation in Saudi Arabia is functionally impossible. *Petersen v. Boeing Co.*, 108 F. Supp. 3d 726, 729 (D. Ariz. 2015) (Saudi labor courts were not an adequate forum).

1.      **The Judiciary Is Neither Fair, Independent, Nor Free From Improper Influence.**

The Saudi judiciary is not independent. The King of Saudi Arabia is the head of the Saudi judicial system and maintains ultimate authority over the judiciary's organization and operations. Alaoudh Decl. ¶¶ 16-18. Saudi Arabia's Minister of Justice simultaneously serves as the President of the Supreme Judicial Council, the body that exercises supervisory authority over the country's judges. Alaoudh Decl. ¶ 17. Put simply, there is no separation of powers. Alaoudh Decl. ¶ 16.

Moreover, judges engage in their own *ijtihad* (interpretation) of the law without reference to or reliance on previous judicial decisions of their own or others. Alaoudh Decl. ¶ 31. Laws are applied inconsistently from court to court and judge to judge. Alaoudh Decl. ¶ 31. Procedural requirements are regularly ignored. Alaoudh Decl. ¶ 27. Decisions need not be published,[5] and judges frequently choose not to publish decisions. Alaoudh Decl. ¶ 31. In the words of the

---

[4] Julian E. Barnes & David Sanger, *Saudi Crown Prince Is Held Responsible for Khashoggi Killing in U.S. Report*, N.Y. TIMES (Jul. 17, 2021) https://www.nytimes.com/2021/02/26/us/politics/jamal-khashoggi-killing-cia-report.html.

[5] Indeed, neither AdvanFort nor its expert on Saudi law has been able to locate the cases Mr. Hussam Salah I. Al Hejailan discusses in his affidavit. He did not attach them and they are not publicly available. Alaoudh Decl. ¶ 31. *See* Fed. R. Civ. P. 26(a)(2)(B). Mr. Mr. Hussam Salah I. Al Hejailan's also neglected to disclose his compensation. *Id.*

Crown Prince, this system has "led to discrepancies in decisions . . . a lack of clarity in the
principles governing facts and practices . . . [and] prolonged litigation not based on legal texts"
resulting in legal "ambiguity."[6] Discrimination against women, non-Muslims and foreigners is
common, and is used as a basis for declaring testimony to be untrustworthy. Alaoudh Decl. ¶ 27.
Judges operate with total discretion and no accountability, so long as they "coordinate their
decisions with executive authorities."[7]

The government's control over the judiciary is brutally enforced. Alaoudh Decl. ¶ 19.
Last year, ten judges were publicly arrested at their courthouses and subsequently prosecuted for
issuing decisions perceived as unfavorable to the Saudi government. Alaoudh Decl. ¶ 19. In June
2023, the International Bar Association's Human Rights Institute observed that this is "part of a
broader, ongoing effort to dismantle the independence of the legal profession by intimidating,
hindering, harassing or improperly interfering with judges, lawyers and jurists."[8] Alaoudh Decl.
¶ 23. It further observed that this effort has "created a chilling effect across the judiciary and the
broader legal profession" in Saudi Arabia.[9]

Those that seek to challenge the government face harsh punishment. Alaoudh Decl. ¶¶
21-25. Earlier this year, Saudi authorities detained five relatives of a U.S. citizen under the
terrorism law after the U.S. citizen filed an action against the Saudi government in the U.S.

---

[6] The Embassy of the Kingdom of Saudi Arabia, *HRH Crown Prince Announces 4 New Laws to Reform the Kingdom's Judicial Institutions* https://www.saudiembassy.net/news/hrh-crown-prince-announces-4-new-laws-reform-kingdom%E2%80%99s-judicial-institutions (accessed Oct. 21, 2023).

[7] U.S. DEPARTMENT OF STATE, 2020 COUNTRY REPORT ON HUMAN RIGHTS PRACTICES: SAUDI ARABIA 16 (2020), https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/saudi-arabia/;

[8] *Public letter to His Majesty, King Salman bin Abdulaziz Al Saud of the Kingdom of Saudi Arabia*, INTERNATIONAL BAR ASSOCIATION HUMAN RIGHTS INSTITUTE (June 29, 2023), https://www.ibanet.org/Saudi-Arabia-IBAHRI-issues-letter-of-concern-over-former-judges-arrest.

[9] *Id.*

District Court for the Eastern District of Pennsylvania regarding a commercial dispute. Alaoudh Decl. ¶ 24. Unsurprisingly, attorneys are unwilling to challenge the government, fearing for their safety. Indeed, attorneys representing those adverse to the government face similar retribution. Alaoudh Decl. ¶ 21-22.

Influential families, like the Zamil Family, who maintain prominent government positions and enjoy close connections to the Saudi Royal Family, benefit from this system.[10] Alaoudh Decl. ¶¶ 42-50. Such families regularly use their connections with the government to receive preferential treatment and influence judicial rulings—abuses for which the Saudi judiciary is especially vulnerable given its lack of independence and the absence of procedural safeguards. Alaoudh Decl. ¶¶ 50-51.

> **2.      AdvanFort Cannot Receive a Fair Trial in Saudi Arabia and Would be Subject to Retribution.**

These problems with the Saudi Judiciary are particularly acute in this case. Not only does AdvanFort seek to challenge the Saudi government and a well-connected family, but this suit concerns allegations that would be viewed as particularly sensitive the Saudi Government. Alaoudh Decl. ¶ 12. Those allegations involve not just thievery, but the coordination with a private company on the creation of false reports and intimidation of witnesses. Given these circumstances, Saudi Arabia would be particularly vulnerable to the following issues, each of which preclude granting Zamil's motion:

*1.* Government interference is likely given the nature of AdvanFort's claims. Alaoudh Decl. ¶¶ 12, 35, 36. *BP Chems. Ltd. v. Jiangsu Sopo Corp (Group) Ltd*., No. 4:99CV323 CDP, 2004 U.S. Dist. LEXIS 27855, at *35-*36 (E.D. Mo. Mar. 29, 2004) ("[T]he likelihood of

---

[10] Notably, the same individual, Mr. Jamal Anani, represented both Zamil and the Ports Authority in AdvanFort's prior interactions with the parties. Compl. ¶¶ 111, 112.

governmental interference is high. [Defendant] is a powerful, state-owned enterprise with significant ties to the local Communist Party."); *Rasoulzadeh v. Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y. 1983) ("In the case at bar, I have no confidence whatsoever in the plaintiffs' ability to obtain justice at the hands of the courts administered by Iranian mullahs. On the contrary, I consider that if the plaintiffs returned to Iran to prosecute this claim, they would probably be shot.")

*2.* AdvanFort's witnesses would be discriminated against and harassed. Alaoudh Decl. ¶¶ 12, 21, 27, 34, 38; *Petersen*, 108 F. Supp. 3d at 729; *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia, No.* SA-04-CA-1008-WRF, 2008 U.S. Dist. LEXIS 62881, at *54-55 (W.D. Tex. July 25, 2008) *aff'd in part, rev'd in part on other grounds*, 581 F.3d 210 (5th Cir. 2009) (noting in Saudi Arabia there is a "genuine question as to whether all parties—non-Muslims—will be 'treated fairly,'" and declining to dismiss on *forum non conveniens*); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 336 (S.D.N.Y. 2003) (holding Sudan was inadequate forum based in part on greatly reduced rights of non-Muslim plaintiffs and "total lack of legal personality" and "diminished testimonial competence" for non-Muslim witnesses); *Rhodes v. ITT Sheraton Corp.*, 9 Mass. L. Rep. 355 (Mass. Sup. Ct. 1999) (recognizing that Saudi Arabia discriminates against certain groups).

*3.* Retaining counsel in Saudi Arabia willing to pursue those allegations would be extremely difficult, if not impossible. Alaoudh Decl. ¶ 11, 12, 21-22, 37; *cf. Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1413 (9th Cir. 1995) (refusing to enforce an Iranian judgment because the Iranian system did not comport with due process, and because the defendant, the sister of the former Shah of Iran, "could not expect fair treatment from the courts of Iran, could not personally appear before those courts, could not obtain proper legal representation in Iran, and

12

J.A.158

could not even obtain local witnesses on her behalf"). *Reid-Walen v. Hansen*, 933 F.2d 1390, 1393 n.2 & 1398 (8th Cir. 1991) (including as part of analysis of private interests the practical problems, financial and otherwise, encountered by plaintiffs).

*4.* The government defendant would be afforded essentially total immunity. Alaoudh Decl. ¶ 28, 33, 40–41; *Emerson Radio Corp. v. Fok,* No. 2:20-cv-01618-WJM-MF, 2020 U.S. Dist. LEXIS 182339, at *6 (D.N.J. Oct. 1, 2020) ("Given Defendant's total immunity from liability in Hong Kong, the Court finds Hong Kong would not be an appropriate alternative forum"); *Canadian Overseas Ores Ltd. v. Compania De Acero Del Pacifico, S.A.*, 528 F. Supp. 1337, 1342 (S.D.N.Y. 1982) (concluding that, where one party was a state owned corporation, "serious questions about the independence of the Chilean judiciary vis-a-vis the military junta currently in power" rendered Chile an inadequate forum).

*5.* The Zamil Family is likely to use its influence to interfere with the process. *See* Alaoudh Decl. ¶ 50–51; *Mulugeta v. Ademachew*, 407 F. Supp. 3d 569, 582 (E.D. Va. 2019) (declining to enforce or give preclusive effect to Ethiopian judgment obtained by one the country's wealthiest men where the court considered evidence that the judicial system was subject to influence).

*6.* If AdvanFort somehow obtained a judgment, it would have little hope to enforce it. Alaoudh Decl. ¶ 33 n.40.; *Piper Aircraft*, 454 U.S. at 254 ("Of course, if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all . . . [and] the district court may conclude that dismissal would not be in the interests of justice."); *Phoenix Canada Oil Co. v. Texaco, Inc.*, 78 F.R.D. 445, 454 (D. Del. 1978) ("[T]he record suggests that even if . . . plaintiff received a verdict in Ecuador, defendants perhaps could not be penalized effectively.").

Legal consequences are not the only bar to dismissal on this ground (though they are certainly enough). AdvanFort's executives personally fear for their safety as a result of the filing of this suit. Farajallah Decl. ¶ 8; Alaoudh Decl. ¶ 12. AdvanFort's witnesses and attorneys would face a legitimate risk of danger there, and AdvanFort is unwilling to subject its witnesses to those risks. Alaoudh Decl. ¶¶ 12; 21; Farajallah Decl. ¶ 8. These well-founded fears require denial of Zamil's motion. *See Goldfarb v. Channel One Russ.*, 442 F. Supp. 3d 649, 658-59 (S.D.N.Y. 2020) (collecting cases and declining to dismiss on *forum non conveniens* grounds because the party suing a state-controlled media company had submitted testimony on his credible fear that he would be imprisoned or physically harmed if he returned to Russia); *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 29 (D.D.C. 2005) (rejecting *forum non conveniens* argument because Indonesian plaintiffs alleged severe risk to safety and bias in Indonesian courts if claims were pursued in Indonesia, citing press reports of disappearances of other Indonesians investigating human rights abuses) (*reversed on other grounds* by *Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011)). These significant concerns with Saudi Arabia as a forum, considered in light of the reasons offered by Zamil, come nowhere close to justifying departure from the well-established rule that the plaintiff's choice of its home forum is entitled to strong deference.

### 3.    Zamil's Cited Cases Do Not Support *Forum Non Conveniens* Dismissal Here.

Zamil cites cases – none from the Eastern District of Virginia and mostly dating to the 1980s and 1990s – in which courts dismissed on *forum non conveniens* in favor of Saudi Arabia. However, much has changed in the ensuing years, and these three-to-four-decades-old cases have no bearing on the status of the Saudi judiciary today.

Several of the cases considered Saudi Arabia as a forum in light of the parties' agreement
to forum selection clauses.[11] The cases thus have no application here. As the D.C. Circuit has
explained, where there is a forum section clause the court "need not ask whether the location it
identifies is available, adequate, or best for the parties' private interests" because the parties
"have already told us that it meets these criteria" by "agreeing to litigate there." *Azima v. RAK
Inv. Auth.*, 926 F.3d 870, 875 (D.C. Cir. 2019). Others concern instances where the plaintiff,
unlike AdvanFort, was not suing its home forum, and therefore did not receive the heightened
deference of that choice.[12] *MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*, No. 3:09-cv-
00078, 2010 U.S. Dist. LEXIS 70191, at *15 (W.D. Va. July 13, 2010) (suing a defendant in
home forum is "presumed to be convenient"). Still others did not address challenges to the Saudi
court system.[13]

The only case Zamil cites that did not concern a forum selection clause or involve an
American national, *Shields v. Mi Ryung Constr. Co.*, 508 F. Supp. 891, 896 (S.D.N.Y. 1981), is

---

[11] *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 290–91 (5th Cir. 1989) (forum
selection clause selected Saudi Arabia as the applicable forum); *Al-Salamah Arabian Agencies
Co. v. Reece*, 673 F. Supp. 748, 749 (M.D.N.C. 1987) (arbitration clause selected Saudi Arabia
as the forum for arbitration); *D&S Consulting, Inc. v. Kingdom of Saudi Arabia*, 961 F.3d 1209,
1212 (D.C. Cir. 2020) (forum selection clause selecting the board of grievances).

[12] *See Kamel v. Hill-Rom Co.*, 108 F.3d 799, 803 (7th Cir. 1997) (Saudi plaintiff suing in U.S.
Courts); *Jeha v. Arabian Am. Oil Co.*, 751 F. Supp. 122, 126 (S.D. Tex. 1990), aff'd sub nom.
*Jeha v Arabian Am. Oil*, 936 F.2d 569 (5th Cir. 1991) (noting no connection between the parties
and the forum) *Ahmed v. Boeing Co.*, 720 F.2d 224, 225 (1st Cir. 1983) (relatives of pakistani
citizens suing in U.S. Courts); *In re Disaster at Riyadh Airport, Saudi Arabia, on August 19,
1980*, 540 F. Supp. 1141, 1146 (D.D.C. 1982) (noting that all American relatives had reached
settlement and considering only foreign representatives' claims).

[13] *Ahmed*, 720 F.2d at 226 (considering adequacy only insofar as it considered whether plaintiffs
had an adequate remedy in light of the fact that the defendant in that case had already paid a
"diah" or "blood money" which might preclude further suit); *In re Disaster at Riyadh Airport,
Saudi Arabia, on August 19, 1980*, 540 F. Supp. at 1145 (mutli-district litigation where
defendants agreed to submit to "either Saudi Arabia, the scene of the accident, *or each plaintiff's
domicile or in any other country having jurisdiction* of a plaintiff's cause of action pursuant to
Article 28 of the Warsaw Convention" and refusing to find *all* these forum inadequate)
(emphasis added).

15

over four decades old and is controverted by more recent cases addressing the issue. Moreover,

the decisions simply rejected the plaintiff's conclusory statements about the Saudi judiciary in

circumstances where, unlike here, the statements were unsupported by the record before the

court.

Zamil relies on the fact that AdvanFort previously litigated in Saudi Arabia in 2014 to try

to assure the Court that this prong is satisfied. Mem. of Support at 8–9. As threshold matter, this

initial choice should not used against AdvanFort because "suing where jurisdiction and venue

readily exist do not constitute assertions that the relevant courts are fair and impartial."

*Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141 (2d Cir. 2000); *see also SAS Inst., Inc. v. World*

*Programming Ltd.*, 468 F. App'x 264, 266 (4th Cir. 2012) (noting that the district court gave

"undue weight to the fact that the parties were engaged in parallel U.K. litigation" and reversing

the district court).[14] Moreover, any "amount of belief" AdvanFort had in 2014 that Saudi courts

were "capable of adjudicating" a dispute fairly was scuttled by the judiciary's actions in that suit

and Zamil's efforts to poison the process.

### C.    The Public and Private Factors Do Not Favor Adjudication in Saudi Arabia.

Since no adequate alternative forum for AdvanFort's claims exist, "the inquiry ends, and

the motion to dismiss [should be] denied." *Poly-Med, Inc.*, 2016 U.S. Dist. LEXIS 20815, at *30

n.13. But even if the Court were to continue the inquiry, the remaining factors point just as

decisively towards denying the motion. The next step requires the Court to consider whether "the

alternative forum is more convenient in light of the public and private interests involved."

*DiFederico*, 714 F.3d at 800. A plaintiff's home forum is "presumed to be convenient."

---

[14] Zamil cites *Conflict Kinetics, Inc. v. Goldfus*, 577 F. Supp. 3d 459, 463 (E.D. Va. 2021) to support its position, Mem. of Support at 8, but that case concerned a plaintiff who simultaneously filed suit in Israel and the United States based on the same technology. Here, AdvanFort relies exclusively on this Court to obtain relief.

*MicroAire Surgical Instruments*, 2010 U.S. Dist. LEXIS 70191, at *15. None of the private and public factors that courts consider when deciding whether the moving party has overcome that presumption supports dismissal. *Jiali Tang*, 656 F.3d at 249.

### 1.    Private Factors[15]

AdvanFort is a corporation headquartered in this district. Suit in its home forum is more convenient because its evidence and witnesses are located in the United States and this forum. Farajallah Decl. ¶¶ 3-6. Where, as here, there is a "real showing of convenience by a plaintiff who has sued in his home forum [it will] normally outweigh the inconvenience the defendant may have shown." *DiFederico*, 714 F.3d at 803 (quoting *Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. at 524). A plaintiff's showing "should be overridden only when the defendant establishes such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Id.* at 799. Such oppressiveness and vexations are not at play in this suit.

To the contrary, requiring AdvanFort to pursue its claims in Saudi Arabia would result in duplicative lawsuits as the claims against the Ports Authority and Zamil must be brought in different Saudi courts. The physical evidence located in Saudi Arabia is already documented, and not seriously in dispute: AdvanFort sent its marine expert to perform a thorough evaluation with video footage in September 2022.[16] Other documents regarding the vessel's value are located in the United States. The fact that there will be some burden on a party to translate documents and

---

[15] The private factors identified by the Supreme Court include "[1] the relative ease of access to sources of proof; [2] availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; [3] possibility of view of premises, if view would be appropriate to the action; and [4] all other practical problems that make trial of a case easy, expeditious and inexpensive." *American Dredging Co. v. Miller*, 510 U.S. 443, 448 (1994) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947)).
[16] Further, it is not clear that the vessel is still available. In June of this year counsel for Zamil informed AdvanFort of its intentions to remove and destroy the vessel.

bring witnesses to the United States does not require dismissal because "[l]itigation is always burdensome and expensive." *Klumba.Ua. LLC v. klumba.com*, No. 1:15-cv-760, 2017 U.S. Dist. LEXIS 213772, at *3 (E.D. Va. Sep. 11, 2017). Regardless, many of the important documents are already in English. Farajallah Decl ¶¶ 2; *see also* Compl. Ex. A (ECF 1-1). Zamil's "generalized assertions that the court cannot compel [Saudi] witnesses to give testimony" are insufficient as it fails to offer any evidence that any such witnesses would be "'unwilling' to cooperate with a trial in the United States." *DiFederico*, 714 F.3d at 807; *SAS Inst., Inc.*, 468 F. App'x at 266 (reviewing record and noting that the "barebones declaration observing that most of WPL's employees and documents are located in the U.K." is insufficient to carry a defendant's burden in seeking dismissal from a plaintiff's home forum"). What is left is that Zamil finds it more convenient to litigate in Saudi Arabia. This does not justify dismissal because it would "merely shift the balance of inconvenience in defendant's favor." *Lockwood Bros., Inc. v. Arnold Speditions GmbH*, 453 F. Supp. 2d at 936 (internal quotations omitted).

### 2.    Public Factors[17]

The public factors favor suit in the United States as well. While aspects of this controversy occurred in Saudi Arabia, other aspects occurred in the United States. AdvanFort negotiated the agreement here. It wired funds from its Virginia based bank account.  The vessel was required to return to the United States.  The damage to AdvanFort's U.S.-based vessel caused injury to a Virginia-based company. Virginia thus has an interest in protecting its

---

[17] The public factors include: "(1) [a]dministrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided at home; and (3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; (4) the avoidance of unnecessary problems in conflict of laws or in application of foreign law; (5) and the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft Co.*, 454 U.S. at 241 n. 6 (quoting *Gilbert*, 330 U.S. at 509).

J.A.164

citizen's rights. *Lee v. Walworth Valve Co.*, 482 F.2d 297, 299 (4th Cir. 1973); *MicroAire Surgical Instruments,*, 2010 U.S. Dist. LEXIS 70191, at *32 ("Although many of the facts underlying the dispute occurred in another country, the relation of the parties to the plaintiff's chosen forum undoubtedly bears on" the interest in hearing localized controversies at home). Nor will hearing this case unfairly burden a local jury since the plaintiff claiming injury is a resident of the community. *Carter v. Trafalgar Tours, Ltd.*, 704 F. Supp. 673, 679-80 (W.D. Va. 1989).

Regardless of whether Saudi or U.S. law applies, "'federal courts are quite capable of applying foreign law when required to do so,'" and reviewing and interpreting Saudi legal sources "is precisely the kind of work American judges perform on a daily basis." *DiFederico*, 714 F.3d at 807-08 (quoting *Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339, 345 (8th Cir. 1983)) (reversing the district court). Courts in the United States regularly apply foreign law, and Saudi law specifically.[18] Because Zamil concedes AdvanFort claims are cognizable and capable of redress under Saudi law, Mem. of Support at 8, there may well be few legal disputes that require application of Saudi law. Even so, the need to apply foreign law is never enough on its own to favor *forum non conveniens* dismissal. *See Piper Aircraft*, 454 U.S. at 260 n.29 (holding need to apply foreign law "alone is not sufficient to warrant dismissal"); *DiFederico*, 714 F.3d at 807-08 (district court erred by finding difficulty in applying Pakistani law favored dismissal).

---

[18] *See, e.g.*, *Arabian Teading & Chem. Indus. Co. Ltd. v. The B.F. Goodrich Co.*, 823 F.2d 60, 62–63 (4th Cir. 1987); *Nat'l Group for Commc'ns and Computers Ltd. v. Lucent Techs. Int'l Inc.*, 331 F. Supp. 2d 290, 293–301 (D.N.J. 2004); *Chadwick v. Arabian Am. Oil Co.*, 656 F. Supp. 857, 860-62 (D. Del. 1987); *see also Levine v. Arabian Am. Oil Co.*, 1985 U.S. Dist. LEXIS 13386, at *15–17 (S.D.N.Y. Nov. 27, 1985) (citing federal cases applying Saudi law).

## II. This Court Has Personal Jurisdiction Over Zamil.

Zamil's argument that the Court lacks personal jurisdiction fares no better.[19] Specific jurisdiction, the relevant inquiry here, requires that "the defendant purposely established minimum contacts in the forum state such that it should reasonably anticipate being haled into court there on a claim arising out of those contacts." *Sneha Media & Entm't, LLC v. Assoc. Broad. Co. P. Ltd.*, 911 F.3d 192, 198 (4th Cir 2018). A court may exercise specific jurisdiction over a defendant if (1) the defendant has purposefully availed himself of the privilege of conducting activities in Virginia, (2) the plaintiff's claims arise out of the defendant's contacts with Virginia, and (3) exercising jurisdiction would be constitutionally reasonable. *CFA Inst.*, 551 F.3d 285, 294 (4th Cir. 2009).

Based on the facts alleged in the Complaint and the additional facts put forth in the declarations included herewith, AdvanFort has established personal jurisdiction over Zamil under Virginia's long-arm statute and the Fourteenth Amendment of the U.S. Constitution. Zamil has purposefully availed itself of the privilege of conducting business in the United States in general, and in Virginia in particular. Because AdvanFort's claims arise directly out of Zamil's contacts with the United States and Virginia, and because exercising jurisdiction would be constitutionally reasonable, the Court should exercise personal jurisdiction over Zamil.

---

[19] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), a plaintiff bears the burden of establishing personal jurisdiction. *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir. 1989). If this Court chooses to forego an evidentiary hearing on the issue of personal jurisdiction, then AdvanFort need only make a *prima facie* case of personal jurisdiction. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993). The *prima facie* standard is a "tolerant" one, under which courts construe the allegations in the complaint and the available evidence in the light most favorable to the plaintiff. *See Combs*, 886 F.2d at 67–77.

20

**A.     Defendant Has Purposefully Availed Itself of the Privilege of Conducting Business in Virginia.**

A defendant purposefully avails itself of the privilege of conducting business in a forum when it deliberately engages in significant activities within the forum or "has created continuing obligations between himself and residents of the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77 (1985) (internal quotation marks omitted). The touchstone is whether a defendant has "fair warning that a particular activity may subject [him] to the jurisdiction of a foreign sovereign," *CFA Inst.*, 551 F.3d at 293 (quoting *Burger King*, 471 U.S. at 472), or whether his conduct is such that "he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

To approach this inquiry, the Fourth Circuit utilizes the following nonexclusive factors:

1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*UMG Recordings, Inc.*, 963 F.3d at 352. "Relevant to this analysis are the quality and nature of the defendant's connections, not merely the number of contacts between the defendant and the forum state." *Id.* (quoting *Tire Eng'g*, 682 F.3d at 301).

Applying these factors, personal jurisdiction over Zamil is satisfied. The first, third, fourth, seventh and eighth factors all demonstrate that Zamil has purposefully availed itself of this forum, and Zamil's out-of-forum conduct cannot divest this court of jurisdiction.

The *first factor*—whether the defendant maintained agents in the State—favors jurisdiction. While Zamil asserts in its motion and accompanying declaration that it has "no . . .

21

employees in the United States," Motion, at 2, 22; Kurikkalakath Decl., ¶¶ 3, 8, LinkedIn pages indicate that Zamil employs individuals in Virginia and elsewhere in the United States. Sullivan Decl. ¶ 3-4, Exs. B, C.[20]

Zamil's affiliates participate in the Vienna, Virginia-based U.S.-Saudi Business Counsel promoting Zamil. Compl. ¶¶ 55–57. Companies that solicit in-forum business and maintain infrastructure in the forum to facilitate that business are subject to this Court's jurisdiction. *See Tire Eng'g & Distribution, Ltd. Liab. Co. v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 304 (4th Cir. 2012).[21]

**The third factor**—whether the defendant reached into the forum to solicit or initiate business—is arguably the most important factor in this analysis because it evidences purposeful conduct on the part of the defendant to benefit from the privileges of conducting business in the forum. Courts have found specific jurisdiction over a defendant based on this factor when the defendant's solicitation of business within the state induces commercial relationships. *See, e.g.*, *Wallace v. Yamaha Motors Corp., U.S.A.*, No. 19-2459, 2022 U.S. App. LEXIS 447, at *7 (4th Cir. Jan. 6, 2022) (finding that "Yamaha purposefully availed itself of South Carolina's market by, among other activities, marketing, advertising, and providing extended service contracts for its products there"). This case is no different.

Zamil actively solicited Virginia businesses. Among other actions, it:

- Advertised its services in Virginia by paying for advertisements that appear in maritime magazines distributed in Virginia such as the *Maritime Executive*

---

[20] Determining the nature of their employment, along with any other employees based in the United States, is one of the subjects of the proposed discovery filed with this Opposition.

[21] Physical contacts alone are not the touchstone according to the Supreme Court: "So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State [it] ha[s] consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (citing cases).

       *Magazine*, *Seatrade Maritime News*, *TradeWinds*, and *Offshore Journal*, Compl.
       ¶¶ 50-52;

- Sought prestigious affiliation with the Vienna, Virginia-based U.S.-Saudi
  Business Council where it promoted Zamil,[22] Compl. ¶ 11, 55; and
- Sought, obtained, and publicized that it met U.S. standards promulgated by
  American Bureau of Shipping, Compl. ¶¶ 41-49;
- Regularly participated in American trade groups like the Offshore Technology
  Conference, Compl. ¶¶ 54-56.[23]

       Together, these acts demonstrate a sustained effort to reach into Virginia and solicit

business there, establishing the Court's jurisdiction. *Vape Guys, Inc. v. Vape Guys Distribution*,

Civil Action No. 3:19cv298, 2020 U.S. Dist. LEXIS 36117, at *22–23 (E.D. Va. Mar. 2, 2020).

(finding that an out-of-state resident's online and email attempts to solicit Virginia businesses

"readily support the Court's conclusion that Defendant has sufficient minimum contacts with

Virginia" because these contacts were directed at the forum).

       Zamil is wrong to argue, Mem in Supp. at 19-20, that these publications' national

distribution somehow diminishes their relevance. The two cases cited by Zamil contain no such

suggestion. *See Yacht Basin Provision Co. v. Bates*, 610 F. Supp. 3d 800, 815 (E.D.N.C. 2022)

(involving a trademark dispute between two similarly named restaurants, both outside the

jurisdiction); *DeSantis v. Hafner Creations, Inc*., 949 F. Supp. 419, 424 (E.D. Va. 1996)

(involving a trademark dispute where the only allegedly infringing transaction that occurred in

the forum state was conducted by a paralegal for the plaintiff's counsel).

---

[22] Zamil claims that its affiliates' involvement with the U.S.-Saudi Business Council are
irrelevant as they are separate corporate entities. Mem. of Support at 20-21. Zamil ignores
AdvanFort's allegation that Zamil Group promoted Zamil, Compl., ¶ 55, which distinguishes the
cases cited by Zamil and makes those activities relevant.
[23] In addition to advertising in the U.S., Zamil contracts with American businesses, including
Houston-based McDermott International, Inc. Compl. ¶ 56. Delaware-incorporated Seacor
Marine Holdings Inc.'s 2019 10-k disclosed that Zamil is one of Seacor's major customers,
accounting for millions of dollars of revenue per year. Sullivan Decl. ¶ 5, Ex. D.

In any event, Zamil's efforts to market to U.S. and Virginia businesses specifically proved fruitful. AdvanFort, after viewing Zamil's advertisements distributed in Virginia and examining its website from Virginia, engaged in a business relationship with Zamil. Compl. ¶¶ 11, 57–60.; Farajallah Decl. ¶ 7. And Zamil counts numerous other U.S.-based businesses among its clients. Compl. ¶¶ 11, 56–57; Sullivan Decl. ¶ 5, Ex. D; *Bradley v. DentalPlans.com*, 617 F. Supp. 3d 326, 335 (D. Md. 2022) (citing the fact that Cigna "cultivated its extensive customer base through 'long-term business activities' in Maryland" as a key factor in supporting specific jurisdiction).

*The fourth factor*—whether the defendant deliberately engaged in significant or long-term business activities in the forum—further favors jurisdiction. AdvanFort's contacts with Zamil include the parties' business discussions that began in 2013, when Zamil was attempting to repair the *Seaman Guard Virginia*, and more recent ones, when Zamil reached into Virginia to contact AdvanFort. At all relevant times, Zamil it knew it was transacting business with a Virginia entity. *Chesapeake Bank v. Cullen*, No. 3:10cv247, 2010 U.S. Dist. LEXIS 100827, at *13 (E.D. Va. Sep. 21, 2010) (finding jurisdiction because the defendants "knew [they] w[ere] transacting business with a bank in Virginia."). Virginia courts have similarly exercised jurisdiction over defendants where they "intentionally placed an advertisement in a newspaper they knew to circulate in Virginia, called the plaintiff in Virginia for the purpose of negotiating the sale of their business . . . faxed the plaintiff a document that changed the terms of their original agreement [and] one of the agreements between the parties was executed in Virginia." *Khan v. Ranjha*, 53 Va. Cir. 530, 534–35 (Cir. Ct. 1999).

Zamil's extensive business contacts with Virginia also include its website, zamiloffshore.com, which is available to residents of Virginia and hosted in Virginia. Compl.

¶ 48. To facilitate access in the United States, the website is available in English. In addition, Zamil utilizes a top-level domain (the .com domain) administered by Verisign, Inc., a Virginia company; and registered the domain names for the website with GoDaddy.com, a United States Domain-name registrar. Compl. ¶¶ 56-57; Sullivan Decl. ¶ 6, Ex. E. Not only does Zamil's website tout the Zamil's certification by the U.S. American Bureau of Shipping, Compl. ¶ 48, it includes a "Contact Us" page that invites visitors to enter information on a fillable form. Sullivan Decl. ¶ 8, Ex. G. The Fourth Circuit recognizes that having a website that engages citizens of the forum favors a finding that the defendant purposefully availed itself to the privileges of conducting business in Virginia. *See UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 353 (4th Cir. 2020). All these facts evidence an intentional website design that the information be viewed, accessed, and engaged with by residents of the forum, and support finding jurisdiction here. *Id.* at 349, 354 (foreign defendant "relied on U.S.-based servers," owned by a third-party, in Virginia); *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012); *Felland v. Clifton*, 682 F.3d 665, 676 n.3 (7th Cir. 2012).

The cases cited by Zamil predate *Kurbanov* and are inapposite because those courts found no personal jurisdiction when the websites were essentially the *only* contact the defendant had with the forum. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 398 (4th Cir. 2003) (only contacts with the forum was that the defendant's website was accessible from and hosted in the forum state); *FireClean LLC v. Tuohy*, No. 1:16-cv-294-JCC-MSN, 2016 U.S. Dist. LEXIS 109620, at *12 (E.D. Va. June 14, 2016) (only contacts with the forum were unrelated t-shirt sales and location of web servers). That is not the case here, where the servers where Zamil's website are hosted are just one of many contacts with Virginia.

*The seventh factor*—whether the relevant contracts required performance of duties in the forum—supports jurisdiction as well. Zamil requested that AdvanFort wire funds from its bank account, a bank account located in Virginia. Compl. ¶ 70-71. AdvanFort complied with the request, thus performing part of the contract in Virginia. *Id.*; *see Peninsula Cruise, Inc. v. New River Yacht Sales, Inc.*, 257 Va. 315, 321 (1999) (telephone communications with Virginia plaintiff and partial contract performance in Virginia supported finding jurisdiction).

Finally, *the eighth factor*—the nature, quality, and extent of the parties' communications about the business being transacted—favors jurisdiction. After successfully advertising to AdvanFort in Virginia, Zamil engaged in email and telephone communications with AdvanFort in Virginia, knowing it was engaged with a Virginia company. Compl. ¶¶ 59-62. By "substantially corresponding with an employee based in Virginia," Zamil "purposefully availed itself of the privilege of conducting activities in the forum state." *Tire Eng'g & Distribution, Ltd. Liab. Co. v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 303 (4th Cir. 2012). These contacts included numerous telephone calls and emails from AdvanFort's Virginia-based server and telephone lines located in Virginia. Compl. ¶ 60-62, 99-127. They encompassed the parties' business discussions in 2013, when Zamil was attempting to repair the *Seaman Guard Virginia*, and also more recently, when Zamil reached into Virginia to contact AdvanFort. Zamil knew it was engaging with a Virginia company, and nonetheless continued to solicit business, including soliciting and receiving funds from Virginia. *Chesapeake Bank v. Cullen*, No. 3:10cv247, 2010 U.S. Dist. LEXIS 100827, at *13 (E.D. Va. Sep. 21, 2010) (exercising personal jurisdiction over defendants because, since they sent emails to a bank in the forum, they "knew [they] w[ere] transacting business with a bank in Virginia"). Virginia courts have similarly exercised

26

jurisdiction over defendants in similar circumstances. *Khan v. Ranjha*, 53 Va. Cir. 530, 534 (Cir. Ct. 1999).

Zamil relies on two cases that are factually distinguishable. *Consulting Engineers v. Geometric Limited*, is not "on all fours," as Zamil contends. 561 F.3d 273 (4th Cir. 2009). Unlike here, the defendants in *Consulting Engineers* had no advertisements circulated in or targeted to the forum (factor #3), no website hosted in the forum (factor #4), no employees in the forum (factor #1), and did not have a contract that required payment from the forum (factor #7). Further, whereas parties' business relationship only lasted around three months, the relationship between Zamil and AdvanFort spanned years (factors #4 and 8). *Id.* at 275-76.

*Ellicott Machinery Corp. v. John Holland Party, Ltd.* is distinguishable as well. The defendant had no widespread advertisements circulated in or targeted to the forum (factor #3), no website hosted in the forum (factor #4), no employees in the forum (factor #1), and the parties' four-month business relationship only concerned the delivery and assembly of a piece of machinery (factors #4 and 8). 995 F.2d 474, 476–77 (4th Cir. 1993).

### B.    AdvanFort's Claims Arise Out of and Are Related to Defendant's Contacts With Virginia.

The second prong, whether the claims arise out of the activities directed at the forum, concerns to what extent Zamil's contacts with Virginia relate to the suit. *Consulting Eng'rs Corp.*, 561 F.3d at 278–79 (4th Cir. 2009). "The analysis here is generally not complicated." *Tire Eng'g,* 682 F.3d at 303. All that is needed is a "connection between the forum and the specific claims at issue." *Bristol-Myers Squibb v. Superior Court*, 582 U.S. 255, 265 (2017); *see also Ford Motor Co.*, 141 S. Ct. 1017, 1025 (2021) (claims "must arise out of *or relate to the* defendant's contacts with the forum") (emphasis added and internal quotation marks removed).

J.A.173

Here, the element is satisfied because the relationship arose in Virginia and Zamil caused damage in Virginia. The action arises from Zamil's in-forum conduct that caused its business relationship with AdvanFort: a Virginia company, from its headquarters in Virginia, saw Zamil's advertisements in publications distributed to Virginia and viewed Zamil's website from Virginia, and then engaged with Zamil from Virginia, via phone lines and servers based in Virginia, and via correspondence that indicated the company was based in Virginia, resulting in Zamil's solicitation of funds from Virginia. Compl. ¶¶ 58, 60–62, 68, 71; Farajallah Decl. ¶ 7.

The fact that the claims also concern subsequent activities by Zamil in Saudi Arabia is of no moment. Zamil's in-forum solicitation resulted in damage to a Virginia company in the forum. The Supreme Court "repeatedly emphasized" that factor in *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, where it found jurisdiction to arise from contacts with the forum because, in part, customers were injured in the state to which the defendant had marketed. *Wallace*, 2022 U.S. App. LEXIS 447, at *11. Put simply, "[w]hat is needed. . . is a connection between the forum and the specific claims at issue." *Bristol-Myers Squibb*, 582 U.S. at 265. Such a connection is present here because the relationship originated in Virginia and caused injury to a citizen of that state.

### C.    Exercising Personal Jurisdiction Is Constitutionally Reasonable.

The final inquiry in the due process analysis—whether exercising jurisdiction is constitutionally reasonable—is meant to ensure that litigation in the forum is not "so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." *CFA Inst.*, 551 F.3d at 296 (internal quotation marks omitted). When applying that standard, courts consider (1) the burden on the defendant, (2) the interests of the forum state, and (3) the plaintiff's interest in obtaining relief. *See id.* This prong is deferential to the Court's finding of minimum contacts and "likely will be met unless the defendant presents 'a compelling

case that the presence of some other considerations would render jurisdiction unreasonable.'"

*Dunlap v. Cottman Transmissions Sys.*, LLC, No. 2:11CV272, 2015 U.S. Dist. LEXIS 184224,

at *9 (E.D. Va. Nov. 5, 2015) (quoting *Burger King Corp.*, 471 U.S. at 477).

    The Fourth Circuit has repeatedly found that foreign defendants who are able to secure

counsel to represent their interests in the forum have a "litigation burden … no more substantial

than that encountered by other entities that choose to transact business in Virginia." *CFA Inst.*,

551 F.3d at 296; *see also Tire Eng'g,* 682 F.3d at 304–05. It is also reasonable for courts to

exercise jurisdiction over defendants when it is "reasonably foreseeable" to be subject to suit

there. Because Zamil solicited business in Virginia, which resulted in its transacting business

with a Virginia company, and it financially benefited from that transaction, it was reasonably

foreseeable that it would be haled into a court in Virginia. *See CFA Inst.,* 551 F.3d at 296

(holding that any "inequity of being haled into a foreign forum is mitigated if it was reasonably

foreseeable that the defendant could be subject to suit there" and finding that being haled into

Virginia court was foreseeable because defendant had "repeatedly reached into the

Commonwealth to transact business").

    With respect to the interest of the forum, Virginia has an interest in protecting its citizen's

rights. *Lee*, 482 F.2d at 299 (recognizing forum state's "paternal interest in the recovery by one

of its citizens of appropriate compensation, if there is a substantive cause of action"). AdvanFort

has a substantial interest in obtaining relief in Virginia because it suffered substantial harm in the

Commonwealth from Zamil's actions. *See Calder v. Jones*, 465 U.S. 783, 790 (1984) ("An

individual injured in California need not go to Florida to seek redress from persons who, though

remaining in Florida, knowingly cause the injury in California.").

29

Zamil is also subject to jurisdiction because it is an agent of the Ports Authority, by virtue of its agency relationship, such that Zamil's actions are attributable to the Ports Authority and thus subject to jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). *See* Comp. ¶ 16 (jurisdiction exists under the FSIA's commercial activity exception); 28 U.S.C. § 1330(b); *Foremost-McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 446 (D.C.C.1990). Zamil is an agent of the Ports Authority by virtue of its operation of the Jeddah Shipyard because the Ports Authority oversees, supervises, and retains the authority to control the commercial operation of Jeddah Shipyard and its ingress and egress. Compl., ¶ 38. Such control means that Zamil's actions may be attributed to the Ports Authority as its principal, such that jurisdiction may be found over Zamil as a sovereign's agent. 28 U.S.C. § 1330(b). *See also Flatow v. Alavi Found.*, No. 99-2409, 2000 U.S. App. LEXIS 17753, at *17 (4th Cir. July 24, 2000).

## <u>CONCLUSION</u>

For these reasons, AdvanFort respectfully requests that the Court deny Zamil's Motion to Dismiss. In the alternative, the Court should grant its Motion for Limited Discovery and to Stay Consideration of Zamil's Motion to Dismiss for the reasons set out therein.

Dated:  October 30, 2023

AdvanFort Company

By its Attorneys,

/s/ *Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
MCGUIRE WOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Clara Brillembourg *(pro hac vice)*

Foley Hoag LLP
1717 K Street N.W.
Washington D.C., 20006
Telephone: (202) 261-7334
Email: CBrillembourg@foleyhoag.com

Andrew Loewenstein *(pro hac vice)*
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-3015
E-mail: ALoewens@foleyhoag.com

Peter Sullivan *(pro hac vice)*
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 812-0310
E-mail: psullivan@foleyhoag.com

*Counsel for AdvanFort Company*

USCA4 Appeal: 24-1007   Doc: 17   Filed: 03/27/2024   Pg: 183 of 389

## <u>CERTIFICATE OF SERVICE</u>

`        I hereby certify that on October 30, 2023, a true and correct copy of the foregoing Memorandum of Law in Opposition to Defendant's Motion to Dismiss was served on all counsel of record via the Court's CM/ECF electronic filings system.


/s/ *Benjamin L. Hatch*
Benjamin L. Hatch



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| ADVANFORT COMPANY, ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NO. 1:23-CV-00906 |
| ) | |
| ZAMIL OFFSHORE SERVICES COMPANY ) | |
| and SAUDI PORTS AUTHORITY, a foreign ) | |
| sovereign State, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DECLARATION OF PETER A. SULLIVAN

1.      I am an attorney at the law firm of Foley Hoag LLP and am counsel to Plaintiff in

the above-captioned matter. I am familiar with the facts herein and make this declaration from

my personal knowledge.

2.      Attached hereto as Exhibit A is a true and accurate screenshot of the server host

report for the website Zamiloffshore.com captured on August 31, 2023.[1]

3.      Attached hereto as Exhibit B is a true and accurate copy of a LinkedIn Profile of

an individual identified as Adel Gad, Chief Engineer, Zamil Offshore Services Company ("Zamil

Offshore"), viewed and captured as of August 31, 2023, which states his location is "Richmond,

Virginia, United States."[2]

---

[1] https://check-host.net/ip-info?host=zamiloffshore.com&csrf_token=6f4c9e88c4a5b690f7fffbd0f99aa5934c2319c5
[2] https://www.linkedin.com/in/adel-gad-
3ab33b52?challengeId=AQFgcGUHXl_vVgAAAYpMsXCcdoXdjM7A1ta95tD-
9G0whmj8gNCwi4kZTu1a1UMghLsPC4LQTY8uHI2P8HYpj1-XTF6w17MTxA&submissionId=f75cb472-be88-
8017-abc7-
3512e42cec33&challengeSource=AgHbLSGgtAim_wAAAYpMsizKs0X_n0a3jsRcMpdBEX_D0F4xxLih-
H_1dHbG-UM&challengeType=AgE_VmlPdiKbgQAAAYpMsizMu0hifSAEGvrS-
WAgqGtUPKg4OFLwDvs&memberId=AgFTrPv_Ui9y8gAAAYpMsizP0etxGPWXw2P0CR1tZXapatc&recognize
Device=AgG4zAVYz-6UIgAAAYpMsizSHiJEZZUH_qosNVm3G4KXrBk7Qdv3

1

4.      Attached hereto as Exhibit C is a true and accurate copy of a LinkedIn profile of an individual identified as Kelly Ruth, Strategic Planning Specialist at Zamil Offshore, viewed and captured as of August 31, 2023, which states her location as "Washington, District of Columbia, United States."[3]

5.      Attached hereto as Exhibit D is a true and accurate copy of SEACOR Marine Holdings Inc.'s 2019 form 10-K filed with the United States Securities and Exchange Commission on March 4, 2020 showing on page 116 that Zamil Offshore engaged in business with SEACOR Marine Holdings Inc. accounting for $12.2 million or 6% of the Company's total consolidated operating revenues.[4]

6.      Attached hereto as Exhibit E is a true and accurate copy of GoDaddy registration search results for the website zamiloffshore.com as of September 7, 2023.[5]

7.      Attached hereto as Exhibit F is a true and accurate copy of Zamil Offshore's "Clients" webpage as of September 11, 2023.[6]

8.      Attached hereto as Exhibit G is a true and accurate copy of Zamil Offshore's "Contact us" webpage as of October 20, 2023.[7]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 28th day of October 2023.

Peter A. Sullivan, Esq.

---

[3] https://www.linkedin.com/in/kelly-ruth-4030b2208
[4] https://www.sec.gov/Archives/edgar/data/1690334/000156459020008689/smhi-10k_20191231.htm
[5] https://www.godaddy.com/whois/results.aspx?domainName=zamiloffshore.com
[6] http://www.zamiloffshore.com/page/Clients
[7] http://www.zamiloffshore.com/page/Contact_Us

# EXHIBIT A



IP: 67.185.23.49 Country: 🇺🇸 United States of America (Washington, Seattle) | Website protection



zamiloffshore.com

| Info | Ping | HTTP | TCP port | UDP port | DNS |

## IP and website location: zamiloffshore.com 🏴

### DB-IP (01.08.2023)

| IP address | **107.180.24.253** |
| --- | --- |
| Host name | 253.24.180.107.host.secureserver.net |
| IP range | 107.180.0.0-107.180.127.255 CIDR |
| ISP | GoDaddy.com, LLC |
| Organization | GoDaddy.com, LLC |
| Country | 🇺🇸 **United States of America** (US) |
| Region | Arizona |
| City | Tempe (South Tempe) |
| Time zone | America/Phoenix, GMT-0700 |
| Local time | 09:55:00 (MST) / 2023.08.31 |
| Postal Code | 85284 |



Leaflet | © OpenStreetMap contributors

Powered by DB-IP

### IPGeolocation.io (03.08.2023)

| IP address | **107.180.24.253** |
| --- | --- |
| Host name | 253.24.180.107.host.secureserver.net |
| IP range | 107.180.0.0-107.180.127.255 CIDR |
| ISP | GoDaddy.com, LLC |
| Organization | GoDaddy.com, LLC |
| Country | 🇺🇸 **United States** (US) |
| Region | Virginia |
| City | Ashburn |
| Time zone | America/New_York, GMT-0400 |
| Local time | 12:55:00 (EDT) / 2023.08.31 |
| Postal Code | 20147 |



Leaflet | © OpenStreetMap contributors

Powered by IPGeolocation.io

### IP2Location (03.08.2023)

| IP address | **107.180.24.253** |
| --- | --- |
| Host name | 253.24.180.107.host.secureserver.net |
| IP range | 107.180.0.0-107.180.135.255 CIDR |



J.A.182



| | |
|---|---|
| Organization | |
| Country | 🇺🇸 **United States of America** (US) |
| Region | Virginia |
| City | Ashburn |
| Time zone | -04:00 |
| Local time | 12:59:55 (-0400) / 2023.08.31 |
| Postal Code | 20146 |

Powered by IP2Location

## MaxMind GeoIP (16.08.2023)



| | |
|---|---|
| IP address | **107.180.24.253** |
| Host name | 253.24.180.107.host.secureserver.net |
| IP range | |
| ISP | |
| Organization | |
| Country | 🇺🇸 **United States** (US) |
| Region | Virginia |
| City | Ashburn |
| Time zone | America/New_York, GMT-0400 |
| Local time | 12:59:55 (EDT) / 2023.08.31 |
| Postal Code | 20149 |

Powered by MaxMind GeoIP

## IPInfo.io (23.08.2023)

Map is not available

| | |
|---|---|
| IP address | **107.180.24.253** |
| Host name | 253.24.180.107.host.secureserver.net |
| IP range | 107.180.0.0-107.180.95.255 CIDR |
| ISP | GoDaddy.com, LLC |
| Organization | GoDaddy.com, LLC |
| Country | 🇺🇸 **United States** (US) |
| Region | |
| City | |
| Time zone | |
| Local time | |
| Postal Code | |

Powered by IPInfo.io

**Whois:** Retrieve whois data

J.A.183



**Website Protection and Optimization**
Achieve better web performance and availability with us

**Activate**

DDOS-GUARD

**DDoS protected Web Hosting**

**Order**

IP info    Ping    HTTP    TCP port    UDP port    DNS

News    FAQ    API    Contacts

Copyright Check-Host.net © 2010-2023

# EXHIBIT B

USCA4 Appeal: 24-1007    Doc: 17    Filed: 03/27/2024    Pg: 191 of 389

8/31/23, iCase 1:23-CV-00306-LMB-IDD oeZammiloffshore on DinkedInEl Adel Approval 1oflCrwsore seongs & Zamiloffshore any ZeInkedIn







# Adel Gad

Chief Engineer at Zammiloffshore

Richmond, Virginia, United States

85 followers · 85 connections

See your mutual connections

**Join to view profile**

 **Zamil Offshore Services & Zamil O & M Company Ltd**

 AASTMT,Houston ,texas
Kongsburg Institute

## About

Aramco approval CE on DP2 vesseles

I work as a marine chief engineer. I have more than 22 years of experience as a marine chief engineer. I have an unlimited license .Operated the vessel during Diving ,ROV , 4 mooring point, seismic survey , towing, Anchor handling , Responsible for main engines, diesel generators, DP ,PMS ,pumps, winches, hydraulics, pneumatic instruments, automatic controls, air conditioning ,refrigeration , boiler operation and maintenance.

8/31/23, 1:55 PM    Case 1:23-cv-00906-UNA   Document 2-12   Filed 08/18/23   Page 2 of 10   PageID # 247
(9) Adel Gad | LinkedIn





Recently I work at Zamil offshore DP2 AHTSS , Also I worked

Halul Offshore DP1 DSV &ROV, Rwabi Swiber DP2 AHTSS ,TDW KSA as chief engineer on DP2
AHTSS. According to ARAMCO Approval.

---

# Experience



### Chief Engineer on DP2vesseles Aramco Approval
Zamil Offshore Services & Zamil O & M Company Ltd
Mar 2015 - Present · 8 years 6 months

KSA

.Chief Engineer on DP2 AHTSS &PSV Vessel.
Manage and direction of engineering and Technical work .
Oversight of operation and maintenance activities ,
Dedicated to keep " Ship client satisfied



### Chief Engineer Aramco approval
Rwabi Vallianz
Mar 2015 - Sep 2015 · 7 months

KSA

Chief Engineer on DP2 AHTSS &PSV ARamco approval
Manage and direction of engineering and Technical work .
Oversight of operation and maintenance activities ,
Dedicated to keep " Ship client satisfied



### Marine Chief Engineer with Aramco Approval on DP2 AHTSS
TDW.
Aug 2014 - Nov 2014 · 4 months

KSA

Planning and direction of engineering and technical work
Oversight of operation and maintenance activities
Responsible for main engines, diesel generators, DP ,PMS pumps, winches, hydraulics,

8/31/23, 1:52 PM Case 1:23-cv-00304-LMB-JFA Adel Gad LinkedIn Document 1-6 filed 03/09/23 Page 4 of 10 PageID# 248





Operated vessel during Diving ,ROV , 4 mooring point , towing, Anchor handling , seismic survey ,anti-pollution and survival tests.operate the AHTSS



### HalulOffshore
Halul Offshore Services Company

Aug 2008 - Jun 2014 · 5 years 11 months

Doha, Qatar

Chief Engineer on DP2 ROV & accommodation vessel, DSV and 4 mooring point DP1 vessel
Manage and direction of engineering and Technical work .
Oversight of operation and maintenance activities ,
Dedicated to keep " Ship client satisfied

### Marine Chief Engineer
HOS Co.Qatar

Nov 2008 - May 2014 · 5 years 7 months

Qatar

Doha-Qatar

### Maridieve & Oil services.
Alexandria

Feb 1992 - Feb 2006 · 14 years 1 month

Egypt -Alexandria

-Planning and direction of engineering and technical work- -Oversight of operation and maintenance activities
-Operated the vessel during the Towing & Anchor handling, Responsible for main engines, diesel generators, pumps, winches, hydraulics, pneumatic instruments, automatic controls, air conditioning and refrigeration and boiler operation and maintenance

### Marine Chief Engineer
Maradive and Oil Services

Jan 1992 - Jan 2006 · 14 years 1 month

Egypt-Alexandria

USCA4 Appeal: 24-1007   Doc: 17   Filed: 03/27/2024   Pg: 194 of 389

8/31/23, ... Case 1:23-CV-00506-... Engineer on Document Arab... Approved...for...offshore...servce... Document... 249...LinkedIn





Jan 1982 - Jan 1992 · 10 years 1 month

Egypt-Alexandria

Maintained parts Conducted complete overhaul of diesel engines (cylinder head, piston crown and skirt, cylinder liner, connecting rod, bearings, crank shaft, webs, and valves)
Checked gear reduction unit, condensers, air ejectors, evaporators, piping, gaskets, pumps, and heat exchangers, Bunche ring and fuel oil calculations .I started as 4th Engineer in 1981 until becoming chief engineer in 1990.

---

# Education

### AASTMT,Houston ,texas Kongsburg Institute
K-POS DP maintenance Course.

2010 - 2010

### AASTMT
Chief Engineer (Unlimited STCW 95 Regulation(III/2) · Naval Architecture and Marine Engineering

1987 - 1988

### AASTMT
Bachelor of Science In Marine Engineering · K-POS

1975 - 1980
References are available on request :
-STCW 95 Regulation (III/2) Certificate of Competency (Chief Engineer Unlimited) meeting legislative Requirements of the Flag, Issued From Egypt, Qatari unlimited Chief Engineer Endorsement ,Sea Services, STCW Courses and Certificates, K-POS maintenance courses and certificate.
US passport, Twic cart, US CG Combined and advanced Fire fighting, USCG first aid &CPR
-Certificates and license are recognized by the EU "European Parliament and of...

8/31/23, 1:46 PM Case 1:23-cv-00906-LMB-IDD Adel Gad | LinkedIn Document 1-2 Filed 12/13/23 Page 6 of 10 PageID# 250 Adel State Chief Engineer on Dry Cargo vessel at Approved Ancillary & offshore services & commercial & regulatory compliance LinkedIn





## Languages

**Arabic & English**
-

---

## Recommendations received

### jerry bert francisco

"Mr. Adel was my senior officer and i worked with him as second engineer.During those period of times we worked together i found him to be a competent,honest,a good leader and a good example with a good heart."

1 person has recommended Adel

**Join now to view**

---

## View Adel's full profile

See who you know in common

Get introduced

Contact Adel directly

**Join to view full profile**







**STEP UP TO THE PLATE AND ORDER**

Jack in the Box® is a registered trademark of Different Rules, LLC.
©2023 Different Rules, LLC.

## People also viewed

**marek alonczyk**
chief engineer Offshore ARAMCO, ADNOC
Gdansk Metropolitan Area

Connect

**Khaled Elbassyouny**
chief engineer marine with adnoc approvel
Abu Dhabi Emirate, United Arab Emirates

Connect

**Hendra Agustian**
Chief Engineer AHTS DP2 Aramco Approved
West Java, Indonesia

Connect

**Mamdouh Thabet**
Aramco Approved DP2 Chief Engineer
Egypt

Connect

**Igor Deli**
ARAMCO & ADNOC approved Chief Engineer. SP Jack-Up Barge.
Ukraine

Connect




Connect

**Oleksandr Shatunov**

Chief engineer ADNOC/ARAMCO approved, Liftboat

Ukraine

Connect

**Sergiy Melnyk**

Chief Engineer Cruise Expedition DSCV/ROV/OCV ARAMCO Approved

Chornomorsk

Connect

**amr Elgeneady**

Chief Engineer at Rawabi vallianz, Aramco Approved AHTS DP2

Alexandria

Connect

**Osama Eltahan**

Marine Chief Engineer(ADNOC Approved Ch. Engineer & Aramco Approved Ch. Engineer)

Abu Dhabi

Connect

Show more profiles

## Explore collaborative articles

We're unlocking community knowledge in a new way. Experts add insights directly into each article, started with the help of AI.

**Explore More**

# Others named **Adel Gad** in **United States**

J.A.192

8/31/23, 10:45 AM    Case 1:23-CV-00906 1 Engineer on Chief Gad Adel2 Approval LinkedInffshore Settings & Zamil & Privacy 1053 LinkedIn

                                                                    

Irvine, CA

**Adel Gad**

Owner, Gadco Restaurant, Bar and Nightclub Consulting

New York City Metropolitan Area

**Adel Gad**

Chief Engineer at Zamil offshore

Richmond, VA

**Adel Gad**

LVN & ADN - Student - Certified IV Therapy & Phlebotomist

Huntington Beach, CA

4 others named Adel Gad in United States are on LinkedIn

See others named **Adel Gad**

# Add new skills with these courses

### Learning Docker Compose

### CompTIA Network+ (N10-008) Cert Prep: 1 Understanding Networks

### Supply Chain and Operations Careers: Certification Tips and Tricks

See all courses

# Adel's public profile badge

Include this LinkedIn profile on other websites

**Adel Gad**

Chief Engineer at Zammiloffshore




AASTMT,Houston ,texas Kongsburg Institute

View profile

**View profile badges**

© 2023                                    About

Accessibility                             User Agreement

Privacy Policy                            Your California Privacy Choices

Cookie Policy                             Copyright Policy

Brand Policy                              Guest Controls

Community Guidelines                      Language

J.A.194

# EXHIBIT C







# Kelly Ruth

Strategic Planning Specialist at Zamil Offshore Services Company

Washington, District of Columbia, United States

**See your mutual connections**

**Join to view profile**

 **Zamil Offshore Services Company**

# Activity

USCA4 Appeal: 24-1007    Doc: 17    Filed: 03/27/2024    Pg: 202 of 389
Case 1:23-cv-00906-LMB-IDD    Document 17-5    Filed 03/27/24 Page 3 of 7 PageID# 257







**Photo**

Liked by Kelly Ruth

## Experience


**Strategic Planning Specialist**

Zamil Offshore Services Company

## View Kelly's full profile

⦿ See who you know in common

🖳 Get introduced

👥 Contact Kelly directly

**Join to view full profile**

J.A.197







Jack in the Box® is a registered trademark of Different Rules, LLC.
©2023 Different Rules, LLC.

## People also viewed



**Ruth Kelly**

Certified Financial Planner at Lamprell

Canada





**Pearl Silberon**

SEO | Lead Generation | Virtual Assistant

Philippines





**aurelio moreno**

Radio Operator Or Telecom Technician Network at Zamil Offshore Services & Zamil O & M Company Ltd

Saudi Arabia





**Sasindren Sundararaj**

Merchants navy at Zamil Offshore Services Company

Colombo





**Andrei Filyov**

Второй помощник капитана – Zamil Offshore Services Company

Russia



J.A.198





Syria

[ Connect ]



**Andika Mahardika**

oiler at Zamil Offshore Services Company

Saudi Arabia

[ Connect ]



**Azhan Jamal**

QC Welding Inspector Aramco Approved with CBT Pass & SAP No.

Tanajib

[ Connect ]



**Gamaleldin Nader**

Receivables / payables Accountant

Jeddah

[ Connect ]



**Bibin Mo**

Piping forman at Zamil Offshore Services Company

Dammam

[ Connect ]

[ Show more profiles ⌄ ]

---



## Explore collaborative articles

We're unlocking community knowledge in a new way. Experts add insights directly into each article, started with the help of AI.

[ **Explore More** ]







President/Senior Recruiter Reliable Recruiting

Dallas-Fort Worth Metroplex

**Kelly Ruth**

Enterprise Strategic Project Manager

Bedford, TX

**Kelly Ruth**

I want to INSPIRE you. Not influence you. I want women to use their voice. The one they ignore all too often.

Greater Harrisburg Area

**Kelly Ruth**

Second Grade Classroom Teacher

Oklahoma City, OK

**Kelly Ruth**

Owner at Bellacino's Pizza and Grinders

Stow, OH

42 others named Kelly Ruth in United States are on LinkedIn

See others named **Kelly Ruth**

# Kelly's public profile badge

Include this LinkedIn profile on other websites

**Kelly Ruth**

Strategic Planning Specialist at Zamil Offshore Services Company

Strategic Planning Specialist at Zamil Offshore Services Company

View profile

View profile badges

J.A.200

USCA4 Appeal: 24-1007    Doc: 17       Filed: 03/27/2024    Pg: 206 of 389
8/31/23, 11:03 AM    Case 1:23-cv-00906-LMB    Kelly Ruth Dorsett - Strategic Planning - Specialized Land/Offshore Service Company | LinkedIn    Document 45-3    Filed 09/01/23    Page 7 of 7    PageID# 261





| | |
|---|---|
| Accessibility | User Agreement |
| Privacy Policy | Your California Privacy Choices |
| Cookie Policy | Copyright Policy |
| Brand Policy | Guest Controls |
| Community Guidelines | Language |

# EXHIBIT D

# United States
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K
**ANNUAL REPORT**
**PURSUANT TO SECTIONS 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2019

OR

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from            to
Commission file number 1-37966

# SEACOR Marine Holdings Inc.
**(Exact name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| Delaware | 47-2564547 |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| 12121 Wickchester Lane, Suite 500, Houston, TX | 77079 |
| (Address of Principal Executive Office) | (Zip Code) |

Registrant's telephone number, including area code (346) 980-1700

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | SMHI | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

**None**
**(Title of Class)**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☐  Yes   ☒   No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐  Yes   ☒   No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒  Yes   ☐   No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒  Yes   ☐   No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer          ☐       Accelerated filer   ☒       Non-accelerated filer        ☐       Smaller reporting company          ☐       Emerging growth company          ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐  Yes   ☒   No

The aggregate market value of the voting stock of the registrant held by non-affiliates as of June 28, 2019 was approximately $325.6 million based on the closing price on the New York Stock Exchange on such date. The total number of shares of Common Stock outstanding as of February 28, 2020 was 21,881,489.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's definitive proxy statement for its 2020 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission (the "SEC") pursuant to Regulation 14A within 120 days after the end of the Registrant's last fiscal year is incorporated by reference into Part III of this Annual Report on Form 10-K.

*Latin America.* As of December 31, 2019, 34 vessels were located in this region, including four owned and 30 joint ventured. Of these joint-ventured vessels, (i) 16 are owned by Mantenimiento Express Maritimo, S.A.P.I. de C.V. ("MexMar"), a joint venture company that is 49% owned by SEACOR Marine International LLC ("SMI"), a wholly owned subsidiary of SEACOR Marine, and 51% owned by subsidiaries of Proyectos Globales de Energía y Servicios CME, S.A. de C.V. ("CME"), (ii) 13 are owned by MEXMAR Offshore International LLC ("MEXMAR Offshore"), a joint venture company that is 49% owned by SMI and 51% owned by a subsidiary of CME, and (iii) one is owned by the SEACOSCO joint venture. These vessels, consisting of a fleet of FSVs, supply, specialty and liftboat vessels, provide support for exploration and production activities in Mexico, Brazil and Guyana. From time to time, the Company's vessels also work in Trinidad and Tobago, and Colombia.

*Europe, primarily North Sea.* As of December 31, 2019, 43 vessels were located in this region primarily supporting the construction and maintenance of offshore wind turbines, including 37 owned and six joint ventured. On December 2, 2019, the Company completed the sale of its North Sea standby safety business, comprised of 18 emergency response and rescue vessels ("ERRVs") located in the North Sea providing standby safety and supply services.

### Seasonality

The demand for the Company's fleet can fluctuate with weather conditions because maintenance, construction and decommissioning activities are planned during times of the year with more favorable weather conditions. Seasonality is most pronounced for the liftboat fleet in the U.S. Gulf of Mexico, and Europe, offshore support vessels in the Middle East and West Africa, and crew transfer vessels in the North Sea, with peak demand normally occurring during the summer months. As a consequence of this seasonality, the Company typically schedules drydockings or other repair and maintenance activity during the winter months.

### Customers and Contractual Arrangements

The Company's principal customers are major integrated national and international oil companies, independent oil and natural gas exploration and production companies, as well as wind farm operators, and wind farm installation and maintenance companies. Consolidation of oil and natural gas companies through mergers and acquisitions over the past several years has reduced the Company's customer base. This, together with the depressed oil and gas price environment that began in 2014 has negatively affected exploration, field development and production activity as consolidated companies continue to focus on increasing efficiency and reducing costs and delay or abandon exploration activity and facilities with less promise.

During the year ended December 31, 2019, one customer, Seacor Marine Arabia LLC, a joint venture through which vessels are chartered to Zamil Offshore and Saudi Aramco, was responsible for 10% or more of the Company's consolidated operating revenues. The Company's ten largest customers accounted for approximately 52% of its operating revenues in 2019. The loss of one or more of these customers could have a material adverse effect on the Company's business, financial position, results of operations and cash flows.

The Company earns revenues primarily from the time charter and bareboat charter of vessels to customers based upon daily rates of hire. Therefore, vessel revenues are recognized on a daily basis throughout the contract period. Under a time charter, the Company provides a vessel to a customer and is responsible for all operating expenses, typically excluding fuel. Under a bareboat charter, the Company provides a vessel to a customer and the customer assumes responsibility for all operating expenses and all risk of operation. In the U.S. Gulf of Mexico, time charter durations and rates are typically established in the context of master service agreements that govern the terms and conditions of the charter.

Contract or charter durations may range from several days to several years. Longer duration charters are more common where equipment is not as readily available or specific equipment is required. In the Company's operating areas, charters vary in length from short-term to multi-year periods, many with cancellation clauses and no early termination penalty. As a result of options and frequent renewals, the stated duration of charters may have little correlation with the length of time the vessel is actually contracted to provide services to a particular customer.

### Competitive Conditions

The market for offshore marine services is highly fragmented and competitive depending upon the region of operation. The most important competitive factors are pricing, availability and specifications of equipment to fit customer requirements. Other important factors include service, reputation, flag preference, local marine operating and regulatory conditions, the ability to provide and maintain logistical support given the complexity of a project and the cost of moving equipment from one geographic region to another.

The Company has numerous competitors in each of the geographic regions in which it operates, ranging from international companies that operate in many regions to smaller local companies that typically concentrate their activities in one specific country or region.

J.A.204

The process of obtaining new charter agreements is highly competitive and generally involves an intensive screening and competitive bidding process, which, in certain cases, may extend for several months. The Company's existing and potential competitors may have significantly greater financial resources than the Company. In addition, competitors with greater resources may have larger fleets, or could operate larger fleets through consolidations, acquisitions, new buildings or pooling of their vessels with other companies, and, therefore, may be able to offer a more competitive service than the Company, including better charter rates. The Company expects competition from a number of experienced companies providing contracts to potential customers, including state-sponsored entities and major energy companies affiliated with the projects requiring offshore vessel services. As a result, the Company may be unable to expand its relationships with existing customers or to obtain new customers on a profitable basis, if at all. If the Company is unable to successfully compete, it could have a materially adverse effect on the Company's business, financial position, results of operations, cash flows and growth prospects.

*An oversupply of vessels or equipment that serve offshore oil and natural gas operations could have an adverse impact on the charter rates earned by the Company's vessels and equipment.*

The Company's industry is highly competitive, with oversupply of vessel capacity and intense price competition. Expansion of the supply of vessels and equipment that serve offshore oil and natural gas operations has increased competition in the markets in which the Company operates and affected prices charged by operators. Further, the refurbishment of disused or "mothballed" vessels, conversion of vessels from uses other than oil and natural gas exploration and production support and related activities or construction of new vessels and equipment could add vessel and equipment capacity to current worldwide levels. The current oversupply of vessels and equipment capacity in the offshore marine market could lower charter rates and result in lower operating revenues, which in turn could have a material adverse effect on the Company's business, financial position, results of operations, cash flows and growth prospects.

*As part of the Company's ongoing management of its fleet and personnel, the Company may need to improve its operations and financial systems and recruit additional staff and crew; if the Company cannot improve these systems or recruit suitable employees, the Company's business and results of operations may be adversely affected.*

The Company has and may continue to need to invest in upgrading its operating and financial systems. In addition, the Company may have to recruit additional well-qualified seafarers and shoreside administrative and management personnel. The Company may not be able to hire suitable employees. For example, the Company's vessels require technically skilled staff with specialized training. If the Company is unable to employ such technically skilled staff, they may not be able to adequately staff the Company's vessels. If the Company is unable to operate its financial and operations systems effectively or is unable to recruit suitable employees, the Company's results of operation and its ability to manage and expand its fleet may be adversely affected.

*The Company relies on several customers for a significant share of its revenues, the loss of any of which could adversely affect the Company's business and operating results.*

The Company derives a significant portion of its revenues from a limited number of oil and natural gas exploration, development and production companies. During the years ended December 31, 2019, 2018, and 2017, the Company's ten largest customers accounted for approximately 52%, 49%, and 58% of its operating revenues. During the year ended December 31, 2019, one customer, Seacor Marine Arabia LLC, a joint venture through which vessels are chartered to Zamil Offshore and Saudi Aramco, was responsible for 10% or more of the Company's operating revenues. In addition, one or more of the Company's joint ventures rely primarily on a single customer for their revenues. The portion of the Company's revenues or any of its joint ventures' revenues attributable to any single customer may change over time, depending on the level of activity by any such customer, the Company's ability to meet the customer's needs and other factors, many of which are beyond the Company's control. In addition, most of the Company's contracts with its oil and natural gas customers can be canceled on relatively short notice and do not commit its customers to acquire specific amounts of services or require the payment of significant liquidated damages upon cancellation. The loss of business from any of the Company's significant customers could have a material adverse effect on the Company's business, financial condition, liquidity and results of operations. Further, to the extent any of the Company's customers experience an extended period of operating difficulty, it may have a material adverse effect on the Company's business, financial position, results of operation, cash flows and growth prospects.

*Consolidation of the Company's customer base could adversely affect demand for its services and reduce its revenues.*

In recent years, oil and natural gas companies, energy companies, drilling contractors and other offshore service providers have undergone substantial consolidation and additional consolidation is possible, especially as the depressed oil price environment has caused many of these companies to restructure their operations and capital structure, including substantially reducing their debt levels. Consolidation results in fewer companies to charter or contract for the Company's services. Also, merger activity among both major and independent oil and natural gas companies affects exploration, development and production activity as the consolidated companies integrate operations to increase efficiency and reduce costs. Less promising exploration and development projects of a combined company may be dropped or delayed. Such activity may result in an exploration and development budget for a combined company that is lower than the total budget of both companies before consolidation, which could adversely affect demand for the Company's vessels thereby reducing its revenues.

15

J.A.205

*Other Transactions.* UMCGS-MEC, an entity managed by Mr. John Gellert, President, Chief Executive Officer and director of SEACOR Marine, purchased $1,000,000, or 50,000 shares, of Common Stock in the PIPE Issuance.

**18.    COMMITMENTS AND CONTINGENCIES**

As of December 31, 2019, the Company had capital commitments of $35.9 million for four PSVs, one CTV and other equipment, to be delivered in 2020. The Company has indefinitely deferred an additional $30.2 million of orders with respect to three FSVs.

In 2015, the Brazilian Federal Revenue Office issued a tax-deficiency notice to Seabulk Offshore do Brasil Ltda ("Seabulk Offshore do Brasil"), an indirectly wholly owned subsidiary of SEACOR Marine, with respect to certain profit participation contribution ("PIS") and social security financing contribution ("COFINS") requirements alleged to be due from Seabulk Offshore do Brasil ("Deficiency Notice"). In February 2015, Company deposited with the relevant Brazilian court an amount equal to USD $1.2 million and appealed the Deficiency Notice on the basis that such contributions were not applicable in the circumstances of a 70%/30% cost allocation structure. The case was remitted to the second instance and is currently awaiting trial. Recently, a local Brazilian law was enacted that supports the Company's position that such contribution requirements are not applicable, but it is uncertain whether such law will be taken into consideration with respect to administrative proceedings commenced prior to the enactment of the law. Accordingly, the success of Seabulk Offshore do Brasil in the administrative proceedings cannot be assured. The potential range of levies arising from the Deficiency Notice is R$12.8 million - R$17.5 million (USD $3.2 million – USD $4.3 million based on the exchange rate as of December 31, 2019).

In the normal course of its business, the Company becomes involved in various other litigation matters including, among other things, claims by third-parties for alleged property damages and personal injuries. Management has used estimates in determining the Company's potential exposure to these matters and has recorded reserves in its financial statements related thereto where appropriate. It is possible that a change in the Company's estimates of that exposure could occur, but the Company does not expect such changes in estimated costs could have a material adverse effect on the Company's business, financial condition, results of operations, cash flows and growth prospects.

The Company has $2.0 million available under its Windcat Workboats credit facilities.

**19.    MAJOR CUSTOMERS AND SEGMENT INFORMATION**

During the year ended December 31, 2019, Seacor Marine Arabia LLC was responsible for $30.8 million or 15% ($20.3 million or 10% from Zamil Offshore and $10.5 million or 5% from Saudi Aramco) of the Company's total consolidated operating revenues from continuing operations. During the year ended December 31, 2018, Seacor Marine Arabia LLC was responsible for $21.4 million or 10% ($12.2 million or 6% from Zamil Offshore and $9.2 million or 4% from Saudi Aramco) of the Company's total consolidated operating revenues from continuing operations. During the year ended December 31, 2017, Seacor Marine Arabia LLC was responsible for $16.0 million or 13% ($4.5 million or 4% from Zamil Offshore and $11.2 million or 9% from Saudi Aramco) of the Company's total consolidated operating revenues from continuing operations.

During the years ended December 31, 2019, 2018 and 2017, the ten largest customers of the Company accounted for approximately 44%, 49%, and 58%, respectively, of the Company's operating revenues from continuing operations. The loss of one or more of these customers could have a material adverse effect on the Company's results of operations and cash flows.

For the years ended December 31, 2019, 2018 and 2017, approximately 78%, 36%, and 82%, respectively, of the Company's operating revenues and $(12.8) million, $(3.0) million, and $2.0 million, respectively, of equity in (losses) earnings from 50% or less owned companies, net of tax, were derived from its continuing foreign operations.

The Company's offshore support vessels are highly mobile and regularly and routinely move between countries within a geographic region of the world. In addition, these vessels may be redeployed among the geographic regions, subject to flag restrictions, as changes in market conditions dictate. Because of this asset mobility, operating revenues and long-lived assets in any one country and capital expenditures for long-lived assets and gains or losses on asset dispositions and impairments in any one geographic region are not considered meaningful.

116

J.A.206

# EXHIBIT E

USCA4 Appeal: 24-1007     Doc: 17     Filed: 03/27/2024     Pg: 213 of 389

Case 1:23-cv-00906-LMB-IDD    Document 35-5   Filed 10/30/23   Page 2 of 9 PageID# 400

 GoDaddy        

# Search the WHOIS Database

| zamiloffshore.com | Search |
|---|---|

---

⊘ **zamiloffshore.com is taken**

We still might be able to get it for you. <u>See How</u>

Broker Service Fee

**$69.99** ⊙



[ Add to Cart ]

---

## WHOIS search results

Domain Name: zamiloffshore.com
Registry Domain ID:
1388111775_DOMAIN_COM-VRSN
Registrar WHOIS Server:
whois.godaddy.com
Registrar URL:
https://www.godaddy.com
Updated Date: 2022-11-19T00:50:10Z
Creation Date: 2008-01-26T08:57:47Z
Registrar Registration Expiration Date:
2026-01-26T08:57:47Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email:
abuse@godaddy.com
Registrar Abuse Contact Phone:
+1.4806242505
Domain Status:
clientTransferProhibited
https://icann.org/epp#clientTransferP
rohibited

## Find your Domain

| Find your perfect domain | |
|---|---|

💬 Contact Us

J.A.208

USCA4 Appeal: 24-1007    Doc: 17    Filed: 03/27/2024    Pg: 214 of 389
Case 1:23-cv-00906-LMB-IDD    Document 35-6    Filed 10/30/23    Page 3 of 9 PageID# 401

Domain Status:
clientUpdateProhibited
https://icann.org/epp#clientUpdatePr
ohibited
Domain Status: clientRenewProhibited
https://icann.org/epp#clientRenewPro
hibited
Domain Status: clientDeleteProhibited
https://icann.org/epp#clientDeletePro
hibited
Registry Registrant ID: Not Available
From Registry
Registrant Name: Registration Private
Registrant Organization: Domains By
Proxy, LLC
Registrant Street:
DomainsByProxy.com
Registrant Street: 2155 E Warner Rd
Registrant City: Tempe
Registrant State/Province: Arizona
Registrant Postal Code: 85284
Registrant Country: US
Registrant Phone: +1.4806242599
Registrant Phone Ext:
Registrant Fax: +1.4806242598
Registrant Fax Ext:
Registrant Email: Select Contact
Domain Holder link at
https://www.godaddy.com/whois/resul
ts.aspx?domain=zamiloffshore.com
Registry Admin ID: Not Available From
Registry
Admin Name: Registration Private
Admin Organization: Domains By
Proxy, LLC
Admin Street: DomainsByProxy.com
Admin Street: 2155 E Warner Rd
Admin City: Tempe
Admin State/Province: Arizona
Admin Postal Code: 85284



## Take a look at these alternate options

**zamil-offshore.com**
$0.01 ⓘ
~~$21.99~~
for the first year with a 2 year registration

**zamiloffshore.net**
$14.99 ⓘ
~~$22.99~~
for the first year with a 2 year registration

$3.99 ⓘ
~~$31.99~~
for the first year

**zamiloffshore.info**

J.A.209

USCA4 Appeal: 24-1007      Doc: 17      Filed: 03/27/2024      Pg: 215 of 389
Case 1:23-cv-00906-LMB-IDD   Document 35-5   Filed 10/30/23   Page 4 of 9 PageID# 402

Admin Country: US
Admin Phone: +1.4806242599
Admin Phone Ext:
Admin Fax: +1.4806242598
Admin Fax Ext:
Admin Email: Select Contact Domain
Holder link at
https://www.godaddy.com/whois/resul
ts.aspx?domain=zamiloffshore.com
Registry Tech ID: Not Available From
Registry
Tech Name: Registration Private
Tech Organization: Domains By Proxy,
LLC
Tech Street: DomainsByProxy.com
Tech Street: 2155 E Warner Rd
Tech City: Tempe
Tech State/Province: Arizona
Tech Postal Code: 85284
Tech Country: US
Tech Phone: +1.4806242599
Tech Phone Ext:
Tech Fax: +1.4806242598
Tech Fax Ext:
Tech Email: Select Contact Domain
Holder link at
https://www.godaddy.com/whois/resul
ts.aspx?domain=zamiloffshore.com
Name Server:
PDNS07.DOMAINCONTROL.COM
Name Server:
PDNS08.DOMAINCONTROL.COM
DNSSEC: signedDelegation
URL of the ICANN WHOIS Data
Problem Reporting System:
http://wdprs.internic.net/
>>> Last update of WHOIS database:
2023-09-07T18:10:18Z <<<
For more information on Whois status
codes, please visit

**zamiloffshor**    $9.99 
**e.org**    ~~$22.99~~
for the first year

**zamiloffs**    $0.01   ~~$39.99~~
**hore.co**    for the first year with a
2 year registration

J.A.210

USCA4 Appeal: 24-1007    Doc: 17    Filed: 03/27/2024    Pg: 216 of 389
Case 1:23-cv-00906-LMB-IDD    Document 35-5    Filed 10/30/23    Page 5 of 9 PageID# 403

https://icann.org/epp

TERMS OF USE: The data contained in
this registrar's Whois database, while
believed by the
registrar to be reliable, is provided "as
is" with no guarantee or warranties
regarding its
accuracy. This information is provided
for the sole purpose of assisting you in
obtaining
information about domain name
registration records. Any use of this
data for any other purpose
is expressly forbidden without the
prior written permission of this
registrar. By submitting
an inquiry, you agree to these terms
and limitations of warranty. In
particular, you agree not
to use this data to allow, enable, or
otherwise support the dissemination
or collection of this
data, in part or in its entirety, for any
purpose, such as transmission by e-
mail, telephone,
postal mail, facsimile or other means
of mass unsolicited, commercial
advertising or solicitations
of any kind, including spam. You
further agree not to use this data to
enable high volume, automated
or robotic electronic processes
designed to collect or compile this
data for any purpose, including
mining this data for your own personal
or commercial purposes. Failure to
comply with these terms
may result in termination of access to
the Whois database. These terms may
be subject to modification

J.A.211

9/7/23, 2:18 PM                                                    WHOIS Search Results

USCA4 Appeal: 24-1007    Doc: 17    Filed: 03/27/2024    Pg: 217 of 389
Case 1:23-cv-00906-LMB-IDD    Document 35-6    Filed 10/30/23    Page 6 of 9 PageID# 404

at any time without notice.

**See Underlying Registry Data**

**Contact Domain Holder**

**Report Invalid Whois**

Info displayed in public WHOIS is limited for privacy reasons. You can learn more about access to non-public domain contact information here.

# Get our newsletter, join the community:

Email Address

SIGN UP

We love taking your call.

guides                                    

About GoDaddy

About Us

Newsroom

Investor Relations

Careers

J.A.212

Corporate Responsibility

Trust Center

Legal

Help Center

Help Center

Community

Venture Forward: Microbusiness Data

GoDaddy Blog

Contact Us

Report Abuse

Resources

Webmail

WHOIS

GoDaddy Mobile App

ICANN Confirmation

Designers & Developers

Corporate Domains

Redeem Code

Product Catalog

Videos

Business Name Generator

Partner Programs

Affiliates

Reseller Programs

GoDaddy Pro

J.A.213

USCA4 Appeal: 24-1007     Doc: 17     Filed: 03/27/2024     Pg: 219 of 389

Case 1:23-cv-00906-LMB-IDD    Document 35-6   Filed 10/30/23   Page 8 of 9 PageID# 406

Account

My Products

Renewals & Billing

Create Account

Shopping

Buy a Domain

Websites

WordPress

Hosting

Web Security

Email & Office

Phone Numbers

United States - English ⌄     USD ⌄

Legal        Privacy Policy        Advertising Preferences        Cookies

Do not sell my personal information

Copyright © 1999 - 2023 GoDaddy Operating Company, LLC. All Rights Reserved.

Use of this Site is subject to express terms of use. By using this site, you signify that you agree to be bound by these Universal Terms of Service.

J.A.214

J.A.215

# EXHIBIT F



SEARCH

LOGIN (HTTP://WWW.ZAMILOFFSHORE.COM/PAGE/LOGIN)
CONTACT US (HTTP://WWW.ZAMILOFFSHORE.COM/PAGE/CONTACT_US)
CAREERS (HTTP://WWW.ZAMILOFFSHORE.COM/PAGE/CAREERS)

# CLIENTS









**SAUDI ARAMCO, SAUDI ARABIA.**

**KJO, KHAFJI JOINT OPERATIONS**

**MCDERMOTT**

**SAIPEM**









**SAUDI PORT AUTHORITY**

**SAUDI ROYAL NAVY**

**KUWAIT COAST GUARD AUTHORITY**

**ENSCO ARABIA CO.LTD.**









**NOR CRANE & WINCH**

**BGP ARABIA**

**JAN DE NUL SAUDI ARABIA CO.**

**KHALIFA A.ALGOSAIBI FISHERIES**



**TECHNIP**



**TRANSOCEAN**



**TIDE WATER MARINE INT\'L INC**



**NABORS SAUDI ARABIA CO. LTD.**



**ATCO MARINE**



**EMAS**



**SUBSEA 7**



**DYNAMIC INDUSTRIES**



**L&T HYDROCARBON ENGINEERING**



**TECHNIPFMC**



**ARO DRILLING**



**EDC**



**NOBLE**



**PRIDE**



**SEADRILL**

**SHELF DEILLING**



## ADES

---

 (http://www.zamiloffshore.com/)

**ABOUT US (HTTP://WWW.ZAMILOFFSHORE.COM/PAGE/ABOUT_US)**

Profile (http://www.zamiloffshore.com/page/About_us#profile)
Our History (http://www.zamiloffshore.com/page/About_us#history)
VISION & VALUES (http://www.zamiloffshore.com/page/About_us#mission)
Our Management (http://www.zamiloffshore.com/page/About_us#mteam)
Awards (http://www.zamiloffshore.com/page/About_us#awards)
**BUSINESS LINE (HTTP://WWW.ZAMILOFFSHORE.COM/)**

Zamil Marine (http://www.zamiloffshore.com/page/Zamil_Marine)
Zamil Shipyards (http://www.zamiloffshore.com/page/Zamil_Shipyards)
Construction (http://www.zamiloffshore.com/page/Zamil_Offshore_Construction)
**MEDIA CENTER (HTTP://WWW.ZAMILOFFSHORE.COM/PAGE/MEDIA_CENTER)**

Latest News (http://www.zamiloffshore.com/page/Media_Center#press-release)
Photo Gallery (http://www.zamiloffshore.com/page/Media_Center#photo_gallery)
Video Gallery (http://www.zamiloffshore.com/page/Media_Center#video_gallery)
Downloads (http://www.zamiloffshore.com/page/Media_Center#downloads)
**CONTACT US (HTTP://WWW.ZAMILOFFSHORE.COM/PAGE/CONTACT_US)**

Zamil Offshore Contacts (http://www.zamiloffshore.com/page/Contact_Us#contacts)
Locations (http://www.zamiloffshore.com/page/Contact_Us#googleMap)
Inquiry Form (http://www.zamiloffshore.com/page/Contact_Us#inquiry)

**Subscribe to our NewsLetter**   Enter your e-mail    SEND

**Get CONNECTED**

J.A.219

**f**
(https://www.facebook.com/zamiloffshore)
🐦 (https://twitter.com/zamiloffshore)
**in**
(https://www.linkedin.com/company/zamil-
offshore-services-company)



   

Zamil Offshore © 2023

Privacy Policy | (http://www.zamiloffshore.com/page/Privacy_Policy) Terms & Conditions
(http://www.zamiloffshore.com/page/Terms_Conditions)

J.A.220

# EXHIBIT G



AR

SEARCH

- Login
  - 
    - Email
    - Oracle
    - Taleo
    - Information Update
    - IT Support
- Contact Us
- Careers



- About us
- Business Line

  - ## 40 Years

    ### IN BUSINESS WITH CLASS LEADING SAFETY

    **and reliability across all operations test**

  - **Zamil Marine**



Established in 1977, Zamil Marine Services is one of the ...

  - **Shipyards**

J.A.222



Zamil shipyard started the shipbuilding business in 2002 by utilizing ...

- Zamil Offshore Construction



Zamil Offshore Construction is participating with EPC Contractors at becoming ...

- Clients
- Media Center

J.A.223



## Contact Us

**Locations**

**Contact Form**

**For Inquires please fill the form**

| Name* | Email  Address* | Message* | Submit |

**Contact Info**

- **Postal Address:**

  Postal Address: Zamil Offshore Services Company, P.O. Box 1922 Al-Bandaria, Al-Khobar 31952, Kingdom of Saudi Arabia.

- **Phone Contact:**

  +966 13 806 8500

- **Fax Contact:**

  +966 13 882 2032

- **General Contact:**

  contact@zamiloffshore.com

- **Zamil Marine:**

  marine@zamiloffshore.com

- **Zamil Offshore Construction:**

  epc@zamiloffshore.com

- **Zamil Shipyards:**

  shipyards@zamiloffshore.com

- **Career:**

J.A.224

Career@zamiloffshore.com



- About us
  - Profile
  - Our History
  - VISION & VALUES
  - Our Management
  - Awards

- Business Line
  - Zamil Marine
  - Zamil Shipyards
  - Construction

- Media Center
  - Latest News
  - Photo Gallery
  - Video Gallery
  - Downloads

- Contact Us
  - Zamil Offshore Contacts
  - Locations
  - Inquiry Form

**Subscribe to our NewsLetter**

Enter your e-mail    Send

**Get Connected**

-
-
-



**Certified**

-

1. 

2. 

3. 

4. 

Zamil Offshore © 2023

Privacy Policy | Terms & Conditions
×

J.A.225

**Send to friend**

Your Email *        Friend Email *        Submit

**Apply Job**

Name *        Email *        Mobile No *        Nationality *        Subject *
Choose File   No file chosen        Submit

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ADVANFORT COMPANY,        )
               Plaintiff,     )
                           )
     vs.                         )    CIVIL ACTION NO. 1:23-CV-00906
                           )
ZAMIL OFFSHORE SERVICES COMPANY   )
and SAUDI PORTS AUTHORITY, a foreign   )
sovereign State,                     )
             Defendants.     )
                           )

## DECLARATION OF AHMED FARAJALLAH

I, Ahmed Farajallah, hereby depose and state as follows:

1.     I am Vice President of AdvanFort Company ("AdvanFort"), where I have been

employed since 2010. I am familiar with the facts herein and make this declaration based on my

personal knowledge.

2.     AdvanFort and Zamil Offshore Services Company ("Zamil") communicated with

each other in English.

3.     AdvanFort stores its evidence in Virginia.

4.     To the best of my knowledge, the employees of AdvanFort who interacted with

Zamil reside in the United States or in countries other than Saudi Arabia.

5.     None of AdvanFort's employees resides in Saudi Arabia.

6.     Many potential witnesses in the case are located in the United States, and

specifically Virginia, or in countries other than Saudi Arabia.

7.     In 2013, I viewed the website Zamiloffshore.com in connection with AdvanFort's

prospective commercial relationship with Zamil.

1

J.A.227

8.      In light of the claims that AdvanFort has asserted in this action against Zamil and the Saudi Ports Authority, I would not travel to Saudi Arabia for fear for my physical safety. Nor, in light of the claims in this action, would AdvanFort ask anyone else to travel to Saudi Arabia, including witnesses who would otherwise testify on AdvanFort's behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 29th day of October 2023.

Ahmed Farajallah

J.A.228

AA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>Alexandria Division</u>

|  |  |
|---|---|
| ADVANFORT COMPANY, )<br>                    Plaintiff, )<br>                          )<br>        v.            )<br>                          )<br>ZAMIL OFFSHORE SERVICES COMPANY )<br>and SAUDI PORTS AUTHORITY, a foreign )<br>sovereign State, )<br>                    Defendants. )<br>                          ) | CIVIL ACTION NO. 1:23-CV-00906 |

### <u>DECLARATION OF ABDULLAH ALAOUDH</u>

1.      I, Dr. Abdullah Alaoudh, make this declaration based upon my personal

knowledge and I believe all such statements, and the information upon which they are based, to

be true and correct.

2.      I am a citizen of the Kingdom of Saudi Arabia, currently residing in the United

States.  I received a bachelor's degree in Islamic law from Qassim University, located in

Buraydah, Saudi Arabia.  I hold an LLM and an SJD from the University of Pittsburgh School of

Law, where my dissertation focused on the role of religious institutions in post-revolutionary

Arab countries and the transition to democracy.

3.      I am a legal scholar with a specialty in Saudi Arabia's legal system.  I am

currently employed as the Saudi Director at the Freedom Initiative, where my work concerns

human rights in Saudi Arabia.

4.      I previously served as Visiting Adjunct Professor at the Elliott School of

International Affairs at George Washington University; Sponsored University Associate and

Senior Fellow at the Alwaleed Center for Muslim-Christian Understanding at the Edmund A.

1

Walsh School of Foreign Service at Georgetown University; and Director of Research for the

Gulf Region at Democracy for the Arab World Now.  Before that, I was a Research Scholar in

Law and an Islamic Law and Civilization Research Fellow at Yale Law School.

5.       I have significant experience with the legal system in Saudi Arabia, having

studied and practiced law in Saudi Arabia for 21 years.  I have published articles pertaining to

the Saudi legal system and government, as well as articles about my father's detention in Saudi

Arabia for having expressed political views that were critical of government policy.[1]

6.       My CV is attached as Exhibit A to this declaration.

7.       I have no familial or business relationship or affiliation with any party to the

above-captioned matter.  I have not represented any of the parties in any capacity.

8.       I base my opinions on my own knowledge, education, training, and experience.

9.       My current billing rate is $500 per hour.  My compensation for this matter is not

contingent on the matter's outcome.

10.      I have been asked to provide my expert opinion on whether the courts of Saudi

Arabia would provide AdvanFort with a fair and impartial forum in which to litigate its claims

against Zamil Offshore Services Company ("Zamil") and the Saudi Ports Authority.

11.      For the reasons explained below, it is my expert opinion that the courts of Saudi

Arabia would not provide a fair and impartial forum.  There are serious problems with the

independence of the Saudi judiciary that make it extremely unlikely that the courts of Saudi

Arabia would adjudicate AdvanFort's claims against Zamil and the Saudi Ports Authority in a

fair and impartial matter.  The Saudi judiciary maintains a strong bias in favor of the Saudi

---

[1] *See*, *e.g.*, Abdullah Alaoudh, *Saudi Arabia is Slowly Killing my Father*, N.Y. Times (Dec. 30, 2020), https://www.nytimes.com/2020/12/30/opinion/saudi-arabia-political-prisoners.html?smid=url-share (Exhibit B).

government and influential families who are aligned with the Saudi Royal Family, such as the Zamil Family. Indeed, Saudi Arabia arrests judges and lawyers whose decisions and work are perceived as being adverse to the government's interests. The Saudi judiciary also acts in an opaque and inconsistent manner, and discriminates against foreign parties, as well as non-Muslims.

12.    The bias of the courts of Saudi Arbia would almost certainly be accentuated due to the nature of AdvanFort's claims, which allege malfeasance by government actors and irregularities in Saudi court proceedings, and thus raise matters that are particularly sensitive for the government of Saudi Arabia. Indeed, individuals associated with AdvanFort would be at risk of detention and/or other forms of abuse if they were to travel to Saudi Arabia to participate in litigation there. At the very least, Saudi government authorities would likely subject AdvanFort's representatives, witnesses, and lawyers to physical and cyber surveillance. For these reasons, it would be extremely difficult for AdvanFort to obtain counsel to represent it in prosecuting its claims.

13.    In forming my expert opinion, I have reviewed the following materials:

a) AdvanFort's Complaint, dated July 12, 2023;
b) Zamil Offshore Services Company's Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Complaint, dated September 29, 2023;
c) Expert Opinion of Hussam Salah I. Al Hejailan, dated September 29, 2023, and the exhibits attached thereto; and
d) The sources cited in this declaration and attached hereto as Exhibits A-WW.

14.    The following sections will address, in turn, (1) the control the Saudi Royal Family exerts over the judiciary, which is facilitated by the structure and procedures within the judiciary, and which is exemplified by the government's prosecution of judges, lawyers, and anyone else perceived as adverse to it; (2) the extreme difficulties of litigating this action in Saudi Arabia against the Saudi Ports Authority, because anyone associated with the lawsuit face

retribution, and because the Saudi Ports Authority would likely invoke the doctrine of "sovereign acts" to render the claims nonjusticiable; (3) powerful families in Saudi Arabia, including the Zamil Family, and their strong connection to the Saudi government including their ties to the Saudi Royal Family.

## I. THE LACK OF INDEPENDENCE OF SAUDI ARABIA'S JUDICIARY

15.    Saudi Arabia is an absolute monarchy, ruled by the House of Saud.  The Royal Family dominates virtually every aspect of the government of Saudi Arabia.  While King Salman bin Abdulaziz Al Saud retains the title of King, his son, Crown Prince Muhammed bin Salman, is Saudi Arabia's *de facto* ruler and rules in the King's name.

16.    Saudi Arabia's governance system is characterized by the absence of separation of powers.[2]  The Basic Law of Governance of the Kingdom of Saudi Arabia consolidates authority in the King, who has the power to enact and repeal laws, create and dismantle courts, and appoint and impeach judges.[3]  The King is the head of the legal system and possesses the authority to decide all final appeals.[4]  As Saudi Arabia's Embassy in the United States has stated: "At the top of the legal system is the King, who acts as the final court of appeal."[5]

---

[2] *Saudi Arabia Country Report 2022*, BERTELSMANN STIFTUNG 10-11 (2022) (Exhibit C).
[3] BASIC LAW OF GOVERNANCE art. 44, 50, 52 (1992) (Saudi Arabia) (Exhibit D); *see also* Esther van Eijk, *Sharia and national law in Saudi Arabia*, *in* SHARIA INCORPORATED 139, 156-57 (Jan Michiel Otto ed., 2010) (Exhibit E).
[4] BASIC LAW OF GOVERNANCE art. 44 (1992) (Saudi Arabia) (Exhibit D); *Legal and Judicial Structure*, THE EMBASSY OF THE KINGDOM OF SAUDI ARABIA https://www.saudiembassy.net/legal-and-judicial-structure-0 (last visited Oct. 19, 2023) (Exhibit F).
[5] *Legal and Judicial Structure*, THE EMBASSY OF THE KINGDOM OF SAUDI ARABIA https://www.saudiembassy.net/legal-and-judicial-structure-0 (last visited Oct. 19, 2023) (Exhibit F).

17.     The Saudi judiciary cannot be considered independent.  Indeed, Saudi Arabia's Minister of Justice simultaneously serves as the President of the Supreme Judicial Council.[6] That body exercises supervisory authority over the courts of Saudi Arabia, including the dismissal of judges.[7]

18.     The Saudi government closely monitors and enforces its power over the judiciary. The United States Department of State consistently reports that the Saudi judiciary is subject to influence and is "required to coordinate their decisions with government authorities, including the king and crown prince."[8]

19.     Judges in Saudi Arabia who make decisions that are perceived as being contrary to the interests of the government risk criminal prosecution.  The Saudi government is currently prosecuting 10 judges, including four judges of the High Court – the highest court in Saudi Arabia – for "high treason," on the basis that they issued judgments perceived as adverse to the Saudi government.[9]  To maximize the chilling effect on other judges, the judges were publicly

---

[6] *Dr. Walid bin Mohammed Al-Samaani, justice minister and president of the Supreme Judicial Council*, ARAB NEWS (Aug. 15, 2019), https://www.arabnews.com/node/1540611/saudi-arabia (Exhibit G).

[7] Esther van Eijk, *Sharia and national law in Saudi Arabia*, *in* SHARIA INCORPORATED 139, 148-49, 157 (Jan Michiel Otto ed., 2010) (Exhibit E).

[8] U.S. DEPARTMENT OF STATE, 2022 COUNTRY REPORT ON HUMAN RIGHTS PRACTICES: SAUDI ARABIA 16 (2022), https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/ (Exhibit H); U.S. DEPARTMENT OF STATE, 2021 COUNTRY REPORT ON HUMAN RIGHTS PRACTICES: SAUDI ARABIA 14 (2021), https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/saudi-arabia/ (Exhibit I); U.S. DEPARTMENT OF STATE, 2020 COUNTRY REPORT ON HUMAN RIGHTS PRACTICES: SAUDI ARABIA 16 (2020), https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/saudi-arabia/ (Exhibit J).

[9] *Public letter to His Majesty, King Salman bin Abdulaziz Al Saud of the Kingdom of Saudi Arabia*, INTERNATIONAL BAR ASSOCIATION HUMAN RIGHTS INSTITUTE (June 29, 2023), https://www.ibanet.org/Saudi-Arabia-IBAHRI-issues-letter-of-concern-over-former-judges-arrest (Exhibit K); *Saudi Arabia: Saudi Prosecutor Seeks Death Penalty against 10 Former Judges for 'High Treason'*, DEMOCRACY FOR THE ARAB WORLD NOW (Feb. 27, 2023),

5

arrested at their courthouses and face the death penalty.  The judges were held incommunicado without legal recourse and denied access to their families and lawyers for ten months during their pre-trial detention.[10] After arresting the judges, the Saudi government replaced them with loyalists, who have since reviewed the trials of political activists whose trials the arrested judges had overseen and dramatically increased their sentences.[11]

20.    Similarly, judges were included in the government's November 2017 mass arrest of nearly 400 Saudi Arabian princes, government ministers, and businessmen, who were detained and reportedly interrogated, tortured, and coerced into paying large sums of money or giving up other assets in exchange for their release.[12]  Many of the detainees were subjected to long-term arbitrary detention without charge, trial, or any clear legal process.[13]  The targets of the purge included numerous judges, including the head of the Supreme Court in Jeddah, Judge

---

https://dawnmena.org/saudi-arabia-saudi-prosecutor-seeks-death-penalty-against-10-former-judges-for-high-treason/ (Exhibit L).

[10] *Public letter to His Majesty, King Salman bin Abdulaziz Al Saud of the Kingdom of Saudi Arabia*, INTERNATIONAL BAR ASSOCIATION HUMAN RIGHTS INSTITUTE (June 29, 2023), https://www.ibanet.org/Saudi-Arabia-IBAHRI-issues-letter-of-concern-over-former-judges-arrest (Exhibit K).

[11] *Saudi Arabia: Saudi Prosecutor Seeks Death Penalty against 10 Former Judges for 'High Treason'*, DEMOCRACY FOR THE ARAB WORLD NOW (Feb. 27, 2023), https://dawnmena.org/saudi-arabia-saudi-prosecutor-seeks-death-penalty-against-10-former-judges-for-high-treason/ (Exhibit L).

[12] David D. Kirkpatrick, *Saudi End Purge That Began With Hundreds Locked in the Ritz-Carlton*, N.Y. TIMES (Jan. 31, 2019), https://www.nytimes.com/2019/01/31/world/middleeast/saudi-arabia-corruption-purge.html?smid=url-share (Exhibit M).

[13] *The High Cost of Change: Repression Under Saudi Crown Prince Tarnishes Reforms*, HUMAN RIGHTS WATCH 23-26 (Nov. 4, 2019), https://www.hrw.org/report/2019/11/04/high-cost-change/repression-under-saudi-crown-prince-tarnishes-reforms (Exhibit N).  The Saudi Royal Court confirmed in a statement in January 2019 that "more than SR400 billion (US$107 billion) were retrieved to the state treasury in the form of real estate, companies, cash, and other assets." *Id.* (citing *Statement by the Royal Court: Anti Corruption Committee Concludes Its Tasks*, THE EMBASSY OF THE KINGDOM OF SAUDI ARABIA (Jan. 30, 2019), https://www.spa.gov.sa/viewstory.php?lang=en&newsid=1880379 (Exhibit O)).

Rashed al-Shehri.[14]  Other detained judges included Judge Mohammad al-Dosari; Judge Omar

al-Haseen; Judge Bandar al-Tuwaijiri; Judge Abdullatif bin Abdulaziz Al-Abdallatif; and Judge

Turki bin Abdulaziz al-Sheikh.[15]

21.    Lawyers, witnesses, and/or or those who associate with them – including

members of their families – face retribution for supporting lawsuits against the Saudi

government or allied families.  For example, a prominent lawyer, Waleed Abulkhair, is currently

imprisoned for, among other reasons, representing parties considered adverse to the

government.[16]  Mr. Abulkhair received a three-month sentence from the General Court in 2013,

followed by a 15-year sentence from the Specialized Criminal Court in 2014.[17]

22.    As another example, prominent lawyer and Harvard Law School graduate Ibrahim

al-Mudaimeegh, is a Saudi citizen who previously served on the Saudi government's Experts

Commission, a body of legal experts tasked with drafting laws.[18]  In May 2018, government

security forces arrested Mr. al-Mudaimeegh in relation to his legal work representing detainees.

Although the government released Mr. al-Mudaimeegh from prison in December 2018, it has

kept him under strict supervision since that time and has banned him from practicing law.[19]

23.    In June 2023, the International Bar Association's Human Rights Institute

observed that Saudi Arabia's arrest of judges is "part of a broader, ongoing effort to dismantle

---

[14] *The High Cost of Change: Repression Under Saudi Crown Prince Tarnishes Reforms*, HUMAN
RIGHTS WATCH 23-26 (Nov. 4, 2019), https://www.hrw.org/report/2019/11/04/high-cost-
change/repression-under-saudi-crown-prince-tarnishes-reforms (Exhibit N).
[15] *Id.*
[16] For Waleed Abulkhair's case and his legal work, *see "You Will Regret Your Statements and
What You Did": Fearless Advocate for Justice*, DEMOCRACY FOR THE ARAB WORLD NOW (Oct.
1, 2020), https://dawnmena.org/waleed-abulkhair-charged-twice-no-justice/ (Exhibit P).
[17] *Id.*
[18] *Ibrahim al-Mudaimeegh*, ALQST, https://www.alqst.org/en/politicalprisoners/ibrahim-al-
mudaimeegh (last visited Oct. 21, 2023) (Exhibit Q).
[19] *Id*.

the independence of the legal profession by intimidating, hindering, harassing or improperly interfering with judges, lawyers and jurists."[20]  It further observed that this effort has "created a chilling effect across the judiciary and the broader legal profession" in Saudi Arabia.[21]

24.     Saudi Arabia's extremely broad criminal laws enable the government to prosecute individuals, including judges, who take actions that are perceived by the authorities as being adverse to the government's interests. The terrorism law imposes criminal penalties on "any person who, directly or indirectly, uses defamatory assertion against the King or the Crown Prince impinging on faith or integrity"[22] as well as "[a]ny act committed … to disturb public order, destabilize national security or State stability, [or] threaten national unity."[23]  Under the guise of enforcing this law, individuals have been arrested for criticizing the Royal Family, the Supreme Council of Religious Scholars, Saudi Arabia's international policies, and the government body regulating the entertainment industry.[24]  My father was arbitrarily detained

---

[20] *Public letter to His Majesty, King Salman bin Abdulaziz Al Saud of the Kingdom of Saudi Arabia*, INTERNATIONAL BAR ASSOCIATION HUMAN RIGHTS INSTITUTE (June 29, 2023), https://www.ibanet.org/Saudi-Arabia-IBAHRI-issues-letter-of-concern-over-former-judges-arrest (Exhibit K).

[21] *Id.*

[22] LAW ON COMBATTING CRIMES OF TERRORISM AND ITS FINANCING art. 30 (Saudi Arabia) (Exhibit R).

[23] *Id.* art. 1(3).

[24] U.S. DEPARTMENT OF STATE, 2022 COUNTRY REPORT ON INTERNATIONAL RELIGIOUS FREEDOM: SAUDI ARABIA 13, 14, 15 (2022), https://www.state.gov/wp-content/uploads/2023/05/441219-saudi-arabia-2022-international-religious-freedom-report.pdf (Exhibit S); *see also The High Cost of Change: Repression Under Saudi Crown Prince Tarnishes Reforms*, HUMAN RIGHTS WATCH (Nov. 4, 2019), https://www.hrw.org/report/2019/11/04/high-cost-change/repression-under-saudi-crown-prince-tarnishes-reforms (Exhibit N); *see also In the Shadow of Authoritarianism: Egyptian and Saudi Transnational Repression in the U.S.*, THE FREEDOM INITIATIVE (2023), https://thefreedomi.org/wp-content/uploads/2023/04/Transnational-Repression-Report-Single-Pages.pdf (Exhibit T).

under this law after tweeting his desire for reestablishing Saudi-Qatari relations.[25]   Earlier this year, the Saudi authorities retaliated against a U.S. citizen who had filed a commercial lawsuit against the Saudi government in Pennsylvania by arresting and prosecuting members of his family under the terrorism law.[26]

25.     The Anti-Cyber Crime Law is another law that the authorities utilize to punish those who take positions seen as adverse to the Saudi government.  Article 6 criminalizes "production, preparation, transmission, or storage of material impinging on public order, religious values, public morals, and privacy, through the information network or computers."[27] This law is frequently employed to prosecute peaceful activists and intellectuals.[28]

26.     In 2021, Saudi Arabia announced the adoption of several new laws as part of a larger campaign to improve its international image.  These included the Evidence Law, the Personal Status Law, the Civil Transactions Law, and the Penal Code for Discretionary Sentences.[29]   However, the new laws have not resulted in meaningful improvement in the human rights situation.  Since their adoption, Saudi Arabia has continued to aggressively enforce its criminal laws against perceived opposition without affording basic procedural rights.

---

[25] Salman al-Ouda, U.S. COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM (last visited Oct. 24, 2023), https://www.uscirf.gov/religious-prisoners-conscience/forb-victims-database/salman-al-ouda (Exhibit U); Abdullah Alaoudh, *Saudi Arabia is Slowly Killing my Father*, N.Y. TIMES (Dec. 30, 2020), https://www.nytimes.com/2020/12/30/opinion/saudi-arabia-political-prisoners.html?smid=url-share (Exhibit B).
[26] Aziz El Yaakoubi, *Saudi Arabia detains relatives of US citizen over lawsuit, rights groups say*, REUTERS (July 26, 2023), https://www.reuters.com/world/riyadh-detains-relatives-us-citizen-after-pennsylvania-lawsuit-rights-groups-say-2023-07-26/ (Exhibit V).
[27] ANTI-CYBER CRIME LAW art. 6 (Saudi Arabia) (Exhibit W).
[28] Abdullah Alaoudh, *Saudi Judiciary: From the Unpredictable Unwritten to Codified Authoritarianism*, ARAB L.Q. 536, 540 (Mar. 2022) (Exhibit X).
[29] Royal order on these four laws are found here: *HRH Crown Prince Announces 4 New Laws to Reform the Kingdom's Judicial Institutions*, THE EMBASSY OF THE KINGDOM OF SAUDI ARABIA (Feb. 8, 2021), https://www.saudiembassy.net/news/hrh-crown-prince-announces-4-new-laws-reform-kingdom%E2%80%99s-judicial-institutions (Exhibit Y).

J.A.237

27.     While procedural rights, such as the right to be heard and the right to a neutral arbiter, are found in Saudi law,[30] they are not consistently applied.  A witness's credibility is determined by their trustworthiness (*adalah*), which can take into account such factors as gender, "morality," and the religiosity of the witness.[31]  Although the Saudi Law of Evidence, enacted in December 2021, does not expressly preclude testimony by women and non-Muslims (which had previously been the case),[32] in practice, judges still frequently discount the testimony of women and non-Muslims, as well as foreigners and non-practicing Muslims, on the basis that these characteristics signal that the witness is not trustworthy and therefore that their testimony is unreliable.[33]  There is no mechanism to appeal a judge's determination of a witness's *adalah*.

28.     Courts in Saudi Arabia generally accept as true evidence prepared or submitted by governmental authorities.  There is no mechanism to challenge a government-issued report or statement that is presented as evidence in a Saudi court.  Even in cases where the government is not a party, judges often accept the conclusions of a government agency without questioning them, lest the judge be seen as challenging the government.

---

[30] BASIC LAW OF GOVERNANCE art. 47 (1992) (Saudi Arabia) (Exhibit D).

[31] Baha' ad-Deen al-Maqdisi, AL UDDAH SHARH AL UMDAH [INSTRUMENTS FOR INTERPRETING THE PILLARS OF FIQH] 688 (Exhibit Z).

[32] EVIDENCE LAW art. 70, 71 (Saudi Arabia) (Exhibit AA).

[33] *See* U.S. DEPARTMENT OF STATE, 2022 COUNTRY REPORT ON HUMAN RIGHTS PRACTICES: SAUDI ARABIA 19 (2022), https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/ (Exhibit H) (reporting that "Sharia, as interpreted by the government, is applied to all citizens and noncitizens, but in practice the law discriminates against women, noncitizens, nonpracticing Sunni Muslims, Shia Muslims, and persons of other religions. Sources reported judges sometimes completely disregarded or refused to hear testimony by Shia Muslims.").

29.     I understand from the Complaint that the Commercial Court, in its decision against AdvanFort,[34] uncritically accepted at face value reports prepared by the Director of Maritime Administration and the Border Guard and rejected the evidence provided by AdvanFort to counter these reports.[35]  This is consistent with my experience and knowledge of how Saudi courts operate, where judges accept such reports or evidence as conclusive findings of fact.

30.     There is no formal bar to *ex parte* communications in Saudi courts, and judges are subject to influence through such communications.  I am personally aware of multiple instances in which judges have been contacted by lawyers and requested that they provide favorable treatment based on familial connections and relationships.

31.     The Saudi judicial system lacks transparency and predictability and the outcome of court proceedings is often subject to influence by powerful actors.  A judge is allowed to use independent interpretation (*ijtihad*) to decide each case.[36]  There is no requirement that the judiciary publish judgments, and judges choose frequently to not publish their opinions.  A judge may therefore disregard previous judgments, either his own or those of other judges.[37]  The same facts often result in different outcomes from court to court, and even judge to judge.  It is also difficult to find previous judgments unless they are included in a compilations published by the government.  A lawyer often needs to personally know the parties, lawyers, or judges involved in the case to obtain a copy of a judgment.  Indeed, none of the three Saudi court cases that is

---

[34] It appears the Commercial Court in these cases was located within the Board of Grievances, as the Board of Grievances addresses is listed. Though same in location, the two venues are legally district.
[35] Complaint, ¶122.
[36] Esther van Eijk, *Sharia and national law in Saudi Arabia*, *in* SHARIA INCORPORATED 139, 161 (Jan Michiel Otto ed., 2010) (Exhibit E).
[37] *Id*.

mentioned in the declaration of Hussam Salah I. Al Hejailan is publicly available.  I was therefore not able to review them in preparing my declaration.

32.     The Saudi government has recognized the serious problems with the Saudi judiciary.  In 2021, it noted the need to create laws to "preserve rights, bolster the principles of justice, enforce transparency, [and] protect human rights" in the Saudi judicial system.[38]  The Crown Prince himself acknowledged "discrepancies in decisions and a lack of clarity in the principles governing facts and practices" in Saudi judicial institutions, and that "the absence of a clear legal framework for the private and business sectors has led to ambiguity with respect to obligations."[39]

33.     Occasionally, the Saudi government permits cases against it to succeed and allows the court to award nominal judgments.[40]  Those judgments are then publicized to generate positive public relations for the government.  This appears to be the case in regard to at least one of the cases mentioned by Mr. Al Hejailan, which concerned damage allegedly caused to a

---

[38] *HRH Crown Prince Announces 4 New Laws to Reform the Kingdom's Judicial Institutions*, THE EMBASSY OF THE KINGDOM OF SAUDI ARABIA (Feb. 8, 2021), https://www.saudiembassy.net/news/hrh-crown-prince-announces-4-new-laws-reform-kingdom%E2%80%99s-judicial-institutions (Exhibit Y).

[39] *Id.* In addition, while judges can require a party to disclose "[i]f the law allows" such disclosure, EVIDENCE LAW art. 34(1)(a) (Saudia Arabia) (Exhibit AA), this vague language is often abused, especially when a party wants to control the evidentiary process.

[40] Even when a plaintiff is permitted to win the rare case against a government entity, judgments are frequently not complied with and rarely enforced.  I have personal experience trying unsuccessfully to enforce such a judgment.  In 2014, the Ministry of Education terminated my scholarship because of political activities in the United States.  In February 2017, during a brief interval in which the Saudi government was more tolerant, I won a judgment against the Ministry in the amount of approximately US$46,000 for its wrongful termination of my scholarship. However, that window quickly closed and there is virtually no way to enforce the judgment through the Saudi courts in circumstances where the government refuses to pay the judgment voluntarily.

vehicle by a pothole, for which the court awarded the plaintiff approximately US$400. The judgement was then the subject of extensive reporting in the Saudi media.[41]

## II. LITIGATION IN SAUDI ARABIA AGAINST THE SAUDI PORTS AUTHORITY

34.    Due to the issues described above – including the risk of arrest faced by judges, lawyers, and witnesses perceived as adverse to the government; serious procedural problems in Saudi courts that favor government parties and allow powerful actors to influence judicial outcomes; and the judiciary's structure designed to facilitate government control – Saudi Arabia would not provide a fair and impartial forum for AdvanFort to litigate its claims against an arm of the Saudi government like the Saudi Ports Authority.

35.    A judge assigned to the case would fear arrest, losing their jobs, and being referred for investigation if their ruling did not favor the government.  This would be a particular concern in regard to the claims that AdvanFort asserts in light of the sensitivity of the Saudi government to allegations of misconduct by governmental officials.  The fact that AdvanFort first raised such matters in a lawsuit in the United States would be met with particular disfavor.

36.    The risk of retribution is particularly acute in light of the fact that AdvanFort's claims implicate the actions of the Saudi Border Guard, which is one of the government's security services.  The Border Guard is known for its brutality.  Human Rights Watch, for example, has reported on its use of explosive weapons to shoot people at close range, sometimes even asking victims in which limb of their bodies they preferred to be shot.[42]

---

[41] Ayman Badahman, *Judiciary requires Jeddah Municipality to pay citizen 1,600 riyals*, AL ARABIYA (Apr. 14, 2014) (Exhibit BB).
[42] *See They Fired on Us Like Rain*, HUMAN RIGHTS WATCH (Aug. 21, 2023), https://www.hrw.org/report/2023/08/21/they-fired-us-rain/saudi-arabian-mass-killings-ethiopian-migrants-yemen-saudi (Exhibit CC).

37.    It would be extremely difficult, if not impossible, for AdvanFort to retain counsel in Saudi Arabia to represent it in a lawsuit against the Saudi Ports Authority that involves the issues of governmental misconduct that are raised by AdvanFort's claims.  And, if counsel in Saudi Arabia were to be retained, there is a significant risk that counsel would not be willing to press those issues with the same vigor as could be done in the United States.

38.    There is also a significant risk that AdvanFort's representatives, lawyers, and witnesses would be subject to physical and cyber surveillance, including the hacking of their computers and phones. The Saudi government openly operates extensive surveillance systems, using spyware to monitor and censor emails, text messages, and phone calls.[43]

39.    The Board of Grievances (*Diwan al-Madhalim*) has exclusive jurisdiction over administrative cases and lawsuits filed against government bodies.[44]  Thus, if litigated in Saudi Arabia, AdvanFort's claims against the Saudi Ports Authority would have to be litigated before the Board of Grievances.  However, the Board of Grievances' jurisdiction does not extend to commercial cases brought against non-government parties.  Consequently, since AdvanFort's claims concern conversion, breach of bailment, negligence, and gross negligence, those claims against Zamil would have to be litigated before a different court: the Commercial Court.[45]  There is no forum in Saudi Arabia where AdvanFort could bring its claims against both Defendants.

---

[43] *Freedom on the Net: Saudi Arabia*, FREEDOM HOUSE (2023), https://freedomhouse.org/country/saudi-arabia/freedom-net/2023 (Exhibit DD).
[44] On the Board of Grievances, its historical and classical background, and jurisdiction*, see* Frank E. Vogel, ISLAMIC LAW AND THE LEGAL SYSTEM: STUDIES OF SAUDI ARABIA 288 (2000) (Exhibit EE); Ayoub M.A. Al-Jarbou, JUDICIAL REVIEW OF ADMINISTRATIVE ACTIONS UNDER THE SAUDI LAW 7-9 (2011) (Exhibit FF); Hossein Esmaeili, *On a Slow Boat Towards the Rule of Law: The Nature of Law in the Saudi Arabia Legal System*, 26 ARIZ. J. INT'L & COMP. L. 1, 32 (2009) (Exhibit GG).
[45] Before the creation of the Commercial Courts in 2007, the Board of Grievances was authorized to adjudicate commercial disputes. Since 2007, the Commercial Courts have been the

40.    In regard to lawsuits against Saudi government authorities before the Board of Grievances, Hussam Salah Al Hejailan stated in his declaration that Saudi law does not provide for sovereign immunity.  However, Article 14 of the Law of Board of Grievances provides that "Courts of the Board of Grievances may not review cases related to sovereign acts."[46]  Acts of sovereignty include not only formal acts and decrees by government entities but also *other miscellaneous issues* that eschew categorization beyond being typically presented as acts of sovereignty by the body defending its actions before the court.[47] Courts typically defer to the government's characterization of an act as being sovereign.

41.    The broad, undefined catch-all category of "other miscellaneous issues" allows the Board of Grievances to shield government bodies from accountability and judicial oversight. The Saudi government has increasingly utilized the acts of sovereignty doctrine since the Crown Prince came to power.[48]  The Saudi Ports Authority could invoke the acts of sovereignty doctrine in a lawsuit brought against it in the Board of Grievances to render AdvanFort's claims nonjusticiable.

---

only courts with jurisdiction over commercial disputes between private parties. Previously, the Commercial Courts were physically housed in the Board of Grievances, though they operate completely separately.

[46] LAW OF THE BOARD OF GRIEVANCES art. 14 (2007) (Saudi Arabia) (Exhibit HH); *see* Ayoub M. Al-Jarbou, *Nazariyyat a'Mal Alsiyadah*, in ITTIHAD AL-JAM'AT AL-'ARABIYYAH 10 (2008) (Exhibit II).

[47] *See* Ayoub M. Al-Jarbou, *Nazariyyat a'Mal Alsiyadah*, in ITTIHAD AL-JAM'AT AL-'ARABIYYAH (2008) (Exhibit II).

[48] For example, since the Crown Prince came to power, the Council of Ministers modified Article 14 of the Law of Board of Grievances to broaden the acts of sovereignty doctrine in May 2020, extending immunity to the acts of the Public Prosecution Council.

## III. LITIGATION IN SAUDI ARABIA AGAINST ZAMIL

42.       There are a small number of prominent families in Saudi Arabia that enjoy

significant influence in the country.  The Zamil Family, which is ranked 23rd by *Forbes* on its list

of the Top 100 Arab Family Business, is one of the most influential families in Saudi Arabia.[49]

43.       Because of the Zamil Family's influence and connections to the government, the

same issues that impact AdvanFort's ability to fairly litigate its claims against the Saudi Ports

Authority also apply to its ability to litigate claims against Zamil.

44.       The Zamil Group Holding, an affiliate of Zamil (a defendant in this action),[50] is

one of Saudi Arabia's largest private enterprises,[51] spanning manufacturing, building materials,

real estate, trade, and petrochemical industries.[52]  The Zamil Group is owned and controlled by

the Zamil Family.[53]

45.       The Zamil Family has an extremely close relationship to the Saudi Royal Family,

and by extension, the Saudi government.  These ties significantly benefit the Zamil Family.

Zamil family members have been appointed to numerous government positions touching nearly

every aspect of Saudi life.  These positions and affiliations afford them broad power and

influence.

---

[49] *Top 100 Arab Family Businesses: 23. Zamil Group*, FORBES MIDDLE EAST (last visited Oct. 30, 2023) (Exhibit JJ).
[50] Complaint, ¶10.
[51] *The Al Zamil Family*, ARABIAN BUSINESS, https://www.arabianbusiness.com/lists/rich-list-290689-htmlitemid290995 (last visited Oct. 24, 2023) (Exhibit KK).
[52] *Strength Through Diversity: About the Group*, ZAMIL GROUP, https://zamil.com/index.php/strength-through-diversity/?lang=en (last visited Oct. 24, 2023) (Exhibit LL).
[53] Complaint, ¶10.

46.     To cite but a few examples, the President of Zamil Group Holding is Osama al-Zamil.[54]  He was appointed by the King and the Crown Prince to be the Deputy Minister of Industry and Mineral Resources,[55] making him one of the Ministry's most powerful individuals. He was also appointed to the Saudi Authority for Intellectual Property.[56]

47.     Abdul Rahman Al-Zamil, the Chairman of Zamil Group and Zamil Group Holding Company, is a member of the Board of Directors of the Saudi Ports Authority,[57] that is, Zamil's co-defendant in this action and the government agency that supervises all ports in Saudi Arabia, including the Jeddah Islamic Port where the acts that form the basis for AdvanFort's claims occurred.  He is also a member of the Shura Council, a consultative assembly whose members are appointed by the King and charged with advising him on issues important to Saudi Arabia, proposing and interpreting laws, and examining annual reports referred to it by ministries and governmental agencies.[58]

48.     Abdullah Al-Zamil, the Director of Zamil – one of the defendants in this action – is the Chairman of the Board of Saudi Global Ports LLC,[59] a joint-venture company of which the Saudi government's Public Investment Fund is a party.[60]  He has also been appointed a member

---

[54] *Osama bin Abdul Aziz Al-Zamil, Saudi Arabia's deputy minister of industry and mineral resources*, ARAB NEWS (Mar. 16, 2023), https://arab.news/p6sbg (Exhibit MM).
[55] *Id.*
[56] *King Salman appoints new board to help SAIP become regional IP hub*, ARAB NEWS (Jan. 27, 2022), https://arab.news/ps4bg (Exhibit NN).
[57] *Abdul-Rahman Bin Abdullah Al-Zamil*, THE SHURA COUNCIL, https://www.shura.gov.sa/wps/wcm/connect/ShuraEn/internet/CVold/Abdul-Rahman%20Bin%20Abdullah%20Al-Zamil (last visited Oct. 24, 2023) (Exhibit OO).
[58] *Id*.
[59] *Board Members*, SAUDI GLOBAL PORTS CO., https://saudiglobalports.com.sa/board_of_directors (last visited Oct. 24, 2023) (Exhibit PP).
[60] *History and Milestone*, SAUDI GLOBAL PORTS CO., https://saudiglobalports.com.sa/HistoryandMilestone (last visited Oct. 24, 2023) (Exhibit QQ).

of the Eastern Province Council,[61] which is a government entity that reports to and advises the

Minister of Interior and other Saudi government agencies.[62]  He also served as a member of the

Executive Board of the Saudi Export Development Authority,[63] a governmental body tasked with

developing Saudi Arabia's non-oil export industries.[64]

49.    Adib Al-Zamil, the CEO of Zamil Group, sits on the board of Sanabil,[65] an

investment subsidy of Saudi Arabia's sovereign wealth fund, the Public Investment Fund.[66]

50.    These positions held by members of the Zamil Family reflect the Family's close

ties to the Royal Family and especially the Crown Prince.  Powerful families like the Zamil

Family often obtain governmental influence and documents, obstruct testimony through witness

intimidation, and influence judicial rulings through connections and leverage.

51.    I understand from the Complaint that one of AdvanFort's witnesses, Mr.

Fedorenko, was offered a bribe and threatened by Zamil's representatives to testify in a way that

was favorable to Zamil.[67]  I also understand that another of AdvanFort's witnesses indicated that

he would not testify because he feared retribution for testifying against the interests of the Zamil

Family.[68]  I further understand that Zamil offered to settle the dispute in exchange for both

---

[61] *Eng. Abdullah Mohammed Al Zamil*, GIB Capital, https://www.gibcapital.com/bod/mr-abdullah-mohammed-al-zamil/ (last visited Oct. 29, 2023) (Exhibit RR).

[62] *Provincial System*, THE EMBASSY OF THE KINGDOM OF SAUDI ARABIA, https://www.saudiembassy.net/provincial-system (last visited Oct. 24, 2023) (Exhibit SS).

[63] *Abdullah M. Al Zamil*, ARABIAN BUSINESS https://www.arabianbusiness.com/lists/cw-power-100-408918-htmlitemid408986 (last visited Oct. 24, 2023) (Exhibit TT).

[64] *Overview*, SAUDI EXPORT DEVELOPMENT AUTHORITY https://www.saudiexports.sa/en/about/Pages/overview.aspx (last visited Oct. 24, 2023) (Exhibit UU).

[65] *Our board of directors*, SANABIL, https://www.sanabil.com/en/who-we-are/our-boardofdirectory (last visited Oct. 26, 2023) (Exhibit VV).

[66] *Who We Are – Chairman Letter*, SANABIL, https://www.sanabil.com/en/chairman-letter (last visited Oct. 30, 2023) (Exhibit WW).

[67] Complaint, ¶115-16.

[68] *Id.* ¶119.

AdvanFort's admission that the fire was an "Act of God" and agreement to pay relevant Saudi government authorities to revise the fire report, all in an attempt to recoup insurance proceeds from Zamil's insurer.[69]  These types of tactics are often used by powerful parties in Saudi Arabia to influence the outcome of cases.  Seeking recourse with a Saudi court is not a viable option when members of the government or other influential actors engage in such tactics.

**IV. CONCLUSION**

52.    In conclusion, because of the serious problems with the Saudi judiciary and its strong bias in favor of the Saudi government and influential families who are aligned with the Saudi Royal Family, AdvanFort would not receive a fair and impartial process in Saudi Arabia. The bias of Saudi courts would almost certainly be made worse due to the nature of AdvanFort's claims, which raise matters that are particularly sensitive for the government of Saudi Arabia. AdvanFort's representatives, witnesses, and lawyers would likely be subject to physical and cyber surveillance, and possibly detention and prosecution if they were to travel to Saudi Arabia. It is accordingly my expert opinion that the courts of Saudi Arabia would not provide a fair and impartial forum.

---

[69] *Id.* ¶108-09.

J.A.247

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 30th day of October 2023.

_____
Abdullah Alaoudh

# EXHIBIT H

# SAUDI ARABIA 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

The Kingdom of Saudi Arabia is a monarchy ruled by King Salman bin Abdulaziz Al Saud who is head of state.  Crown Prince Mohammed bin Salman Al Saud is prime minister and head of government.  The 1992 Basic Law provides for the system of governance, rights of citizens, and powers and duties of the government, and it provides that the Quran and Sunna (the traditions of the Prophet Muhammad) serve as the country's constitution.  It specifies that the rulers of the country shall be male descendants of the founder, King Abdulaziz (Ibn Saud).

The State Security Presidency, National Guard, and Ministries of Defense and Interior, all which report to the king, are responsible for law enforcement and maintenance of order.  The State Security Presidency includes the General Directorate of Investigation (*mabahith*), Special Security Forces, and Special Emergency Forces; police are under the Ministry of Interior.  Civilian authorities generally maintained effective control over the security forces.  There were credible reports that members of the security forces committed numerous abuses.

Significant human rights issues included credible reports of:  unlawful or arbitrary killings, including extrajudicial killings; enforced disappearances; torture and cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening prison conditions; arbitrary arrest and detention; political prisoners or detainees; transnational repression against individuals in another country; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; punishment of family members for alleged offenses by a relative; serious abuses in a conflict, including related to civilian casualties and damage to civilian infrastructure as a result of airstrikes in Yemen; serious restrictions on freedom of expression and media, including unjustified arrests or prosecutions against journalists and others, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental organizations and civil society organizations; particularly severe restrictions of religious freedom;

Country Reports on Human Rights Practices for 2022
United States Department of State • Bureau of Democracy, Human Rights and Labor

J.A.250

and harassed during her detention, including being subjected to interrogations after being given medications that exhausted her.

## e. Denial of Fair Public Trial

The law provides that judges are independent and not subject to any authority other than the provisions of sharia and the laws in force, but the judiciary reportedly was subject to influence, particularly in the case of legal decisions rendered by specialized judicial bodies like the SCC, which rarely acquitted suspects. The SCC and the Public Prosecutor's Office were not independent entities, as they reportedly were required to coordinate their decisions with government authorities, including the king and crown prince. Human rights activists claimed that SCC judges received implicit instructions to issue harsh sentences against human rights activists, reformers, journalists, and dissidents not engaged in violent activities. Activists also reported that judicial and prosecutorial authorities ignored due process-related complaints, including lack of access by lawyers to their clients at critical stages of the judicial process, particularly during the pretrial investigation phase.

Defendants and the prosecution can appeal convictions, acquittals, and sentences. The law requires a five-judge appellate court to affirm a death sentence, which a five-judge panel of the Supreme Court must then unanimously affirm. Appellate courts may recommend changes to a sentence, including increasing the severity of a lesser sentence (up to the death penalty), if the trial court convicted the defendant of a crime for which capital punishment is permitted. There were cases during 2022 when a prosecution appeal resulted in longer sentences than originally imposed, including cases involving Mohammed al-Rabea, Salma al-Shehab, and others.

Defendants possess the right to seek commutation of a death sentence for some crimes and may receive a royal pardon under specific circumstances (see section 1.d.). In some prescribed qisas cases, the families of the deceased may accept compensation from the family of the person convicted in an unlawful death, sparing the convicted from execution.

On March 14, UN High Commissioner for Human Rights Michelle Bachelet said

that the trials of some of the 81 individuals executed on March 12 did not meet fair trial and due process guarantees (see section 1.a.).

**Trial Procedures**

The judicial system traditionally lacked published case law on criminal matters, a uniform criminal code, the presumption of innocence, or a doctrine of stare decisis that binds judges to follow legal precedent.  In February 2021 the crown prince announced forthcoming legal reforms to the personal status law, civil transactions law, evidence law, and discretionary sentencing, stating a goal of increasing predictability and transparency in the legal system and expanding protections for women (see section 6, Women).  On December 28, 2021, the Council of Ministers enacted the evidence law.  The personal status law received final approval on March 8 and the civil transactions law was also approved in March.  While assessments of the effects of reforms are still preliminary, the evidence law has clarified the types of admissible evidence and created uniform application of evidence rules in all courts.  It also prohibited judges from discounting evidence given by women and non-Muslims.  The Personal Status law has improved trial procedures for women, giving them additional rights in family cases.  There are still reports of uneven application of the rights granted in the Personal Status law in some cases.  The Saudi Ministry of Justice Judicial Training Center holds training sessions on the legal reforms for judges.

In the absence of a formalized penal code that details all criminal offenses and punishments, judges in the courts determine many of these penalties through individualized interpretations of sharia, which varied according to the judge and the circumstances of the case.  Because judges have considerable discretion in decision making, rulings and sentences diverged widely from case to case.

Several laws provide sentencing requirements for crimes, including terrorism, cybercrimes, trafficking in persons, and domestic abuse.

The Justice Ministry continued a project started in 2007 to distribute model judicial decisions with the goal of ensuring more uniformity of legal application, and the ministry published judicial decisions on its website.  The law states that defendants should be treated equally in accordance with sharia.  The Council of Senior

Scholars, or the *ulema*, an autonomous advisory body, issues *fatwas* (religious opinions) that guide how judges are supposed to interpret sharia.  In 2016 the Ministry of Justice issued a compilation of previous decisions that judges could reference in rulings and sentences.

Appeals courts cannot independently reverse lower-court judgments of innocence or guilt; they are limited to affirming judgments, modifying sentences, or returning them to a lower court for modification.  Even when appeals judges did not affirm judgments, in some cases they remanded the judgment to the original trial judge, sometimes making it difficult for parties to receive a ruling that differed from the original judgment, given judges' hesitation to admit error.  While judges may base their decisions on any of the four Sunni schools of jurisprudence, all of which were represented in the Council of Senior Scholars, the Hanbali School predominated and formed the basis for the country's law and legal interpretations of sharia.  Shia citizens in the Eastern Province, where most Saudi Shia reside, use their legal traditions with Shia judges to adjudicate family law and inheritance cases between Shia parties in their own court system, although either party can decide to adjudicate a case in state courts, which apply Sunni legal traditions.

While the law states that court hearings shall be public, courts regularly were closed at the judge's discretion.  According to the Ministry of Justice, authorities may close a trial depending on the sensitivity of the case to national security, the reputation of the defendant, or the safety of witnesses.  HRC representatives sometimes attended SCC trials.  Foreign diplomats regularly requested to attend non-consular trials of political prisoners and other high-profile detainees, but the Ministry of Foreign Affairs consistently refused to approve their attendance to court proceedings at the SCC, as well as at trials related to state security or human rights issues.  Diplomatic personnel were generally allowed to attend consular proceedings for their own citizens.  Some family members of prisoners complained that neither they nor the legal representatives of the accused were permitted access to trials or notified of the status of trial proceedings.  In several cases, family members were given only 24 hours' notice before a trial hearing.

By law authorities must offer defendants a lawyer at government expense.  In 2017 the Ministry of Justice stated that defendants "enjoy all judicial guarantees they are entitled to, including the right to seek the assistance of lawyers of their choosing to

defend them, while the ministry pays the lawyer's fees when the accused is not able to settle them." Activists alleged that many political prisoners were not able or allowed to retain an attorney or consult with their attorneys during critical stages of the investigatory and trial proceedings. Detained human rights activists often indicated they did not trust the courts to appoint unbiased lawyers who would vigorously defend them. The law provides defendants the right to be present at trial and to consult with an attorney during the trial. The counterterrorism law, however, authorizes the attorney general to limit the right of a defendant accused of so-called terrorism charges to access legal representation while under investigation, "whenever the interests of the investigation so require." Defendants have no right to discovery, nor can defendants view their own case file or the minutes from their interrogation. Defendants have the right to call and cross-examine witnesses, but activists reported that SCC judges regularly restricted this right in "the interests of the case." The law provides that a prosecutor-appointed investigator may question the witnesses called by the defendant during the investigation phase before the initiation of a trial. The investigator also may elicit testimony from additional witnesses. Authorities are prohibited from subjecting a defendant to coercive measures or compelling the taking of an oath, but there were regular credible reports of confessions elicited through torture and other mistreatment. The court must inform convicted persons of their right to appeal rulings.

The law does not provide for a right against self-incrimination.

The law provides that "the court should seek the assistance of interpreters," but it does not obligate the court to do so from the moment the defendant is charged, nor does the law specify that the state will bear the costs of such services; in practice free interpretation services often were provided.

Sharia, as interpreted by the government, is applied to all citizens and noncitizens, but in practice the law discriminates against women, noncitizens, nonpracticing Sunni Muslims, Shia Muslims, and persons of other religions. Sources reported judges sometimes completely disregarded or refused to hear testimony by Shia Muslims.

# EXHIBIT I

# SAUDI ARABIA 2021 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

The Kingdom of Saudi Arabia is a monarchy ruled by King Salman bin Abdulaziz Al Saud, who is both head of state and head of government. The 1992 Basic Law sets out the system of governance, rights of citizens, and powers and duties of the government, and it provides that the Quran and Sunna (the traditions of the Prophet Muhammad) serve as the country's constitution. It specifies that the rulers of the country shall be male descendants of the founder, King Abdulaziz (Ibn Saud).

The State Security Presidency, National Guard, and Ministries of Defense and Interior, all of which report to the king, are responsible for law enforcement and maintenance of order. The State Security Presidency includes the General Directorate of Investigation (mabahith), Special Security Forces, and Special Emergency Forces; police are under the Ministry of Interior. Civilian authorities generally maintained effective control over the security forces. There were credible reports that members of the security forces committed some abuses.

Significant human rights issues included credible reports of: executions for nonviolent offenses; forced disappearances; torture and cases of cruel, inhuman, or degrading treatment of prisoners and detainees by government agents; harsh and life-threatening prison conditions; arbitrary arrest and detention; political prisoners or detainees; harassment and intimidation against Saudi dissidents living abroad; arbitrary or unlawful interference with privacy; collective punishment of family members for offenses allegedly committed by an individual; serious abuses in a conflict, including civilian casualties and damage to civilian infrastructure as a result of airstrikes in Yemen; serious restrictions on free expression and media, including unjustified arrests or prosecutions against journalists and others, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental organizations and civil society organizations; severe restrictions of religious freedom; restrictions on freedom of movement; inability of citizens to choose their government peacefully through free and fair elections; serious and unreasonable

Country Reports on Human Rights Practices for 2021
United States Department of State • Bureau of Democracy, Human Rights and Labor

J.A.256

**Detainee's Ability to Challenge Lawfulness of Detention before a Court:**  By law detainees are not entitled to challenge the lawfulness of their detention before a court.  In the case of wrongful detention, the law of criminal procedure, as well as provisions of the counterterrorism law, provide for the right to compensation if detainees are found to have been held unlawfully.

# e. Denial of Fair Public Trial

The law provides that judges are independent and not subject to any authority other than the provisions of sharia and the laws in force.  Although public allegations of interference with judicial independence were rare, the judiciary reportedly was subject to influence, particularly in the case of legal decisions rendered by specialized judicial bodies, such as the Specialized Criminal Court, which rarely acquitted suspects.  The Specialized Criminal Court and the Public Prosecutor's Office were not independent entities, as they reportedly were required to coordinate their decisions with executive authorities, including the king and crown prince.  Human rights activists claimed that the court's judges received implicit instructions to issue harsh sentences against human rights activists, reformers, journalists, and dissidents not engaged in violent activities.  Activists also reported that judicial and prosecutorial authorities ignored due process-related complaints, including lack of access by lawyers to their clients at critical stages of the judicial process, particularly during the pretrial investigation phase.

On March 8, local media reported that the Supreme Court eliminated the use of oaths (*al-qisama*) as evidence in murder or manslaughter cases.  Under Islamic law, the victim's family is allowed to take up to 50 oaths to officially confirm that the suspect was guilty if there was no direct evidence or if eyewitness testimony was invalid under Islamic law, as in the case of child witnesses.

Defendants are able to appeal their sentences.  The law requires a five-judge appellate court to affirm a death sentence, which a five-judge panel of the Supreme Court must then unanimously affirm.  Appellate courts may recommend changes to a sentence, including increasing the severity of a lesser sentence (up to the death penalty), if the trial court convicted the defendant of a crime for which capital punishment is permitted.

Defendants possess the right to seek commutation of a death sentence for some crimes and may receive a royal pardon under specific circumstances (see section 1.d.).  In some prescribed cases (qisas), the families of the deceased may accept compensation from the family of the person convicted in an unlawful death, sparing the convicted from execution.

On August 3, Amnesty International assessed that trials before the Specialized Criminal Court were "intrinsically unfair, with defendants subjected to flawed procedures that violate both Saudi and international laws."  Amnesty accused authorities of using the court to crack down on freedom of expression through the prosecution, sentencing, and resentencing processes, as well as bans on public speaking, human rights work, use of social media, and travel.  Among others, Amnesty cited the trial and conviction of activist Israa al-Ghomgham, who was sentenced to eight years in prison and an eight-year travel ban in February for charges related to her peaceful activism and participation in antigovernment protests.

On August 16, the court of appeals increased the sentence of activist Khalid al-Omair from seven to nine years without explanation, according to ALQST.

**Trial Procedures**

In the judicial system, there traditionally was no published case law on criminal matters, no uniform criminal code, no presumption of innocence, and no doctrine of stare decisis that binds judges to follow legal precedent.  In February the crown prince announced forthcoming legal reforms that would impact the personal status law, civil transactions law, evidence law, and discretionary sentencing, aiming to increase predictability and transparency in the legal system and expand protections for women (see section 6, Women).  On December 28, the Council of Ministers enacted the evidence law.

In the absence of a formalized penal code that details all criminal offenses and punishments, judges in the courts determine many of these penalties through their interpretations of sharia, which varied according to the judge and the circumstances of the case.  Because judges have considerable discretion in decision making, rulings and sentences diverged widely from case to case.

# EXHIBIT J

# SAUDI ARABIA 2020 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

The Kingdom of Saudi Arabia is a monarchy ruled by King Salman bin Abdulaziz Al Saud, who is both head of state and head of government. The 1992 Basic Law sets out the system of governance, rights of citizens, and powers and duties of the government, and it provides that the Quran and Sunna (the traditions of the Prophet Muhammad) serve as the country's constitution. It specifies that the rulers of the country shall be male descendants of the founder, King Abdulaziz (Ibn Saud). In 2015 the country held its most recent municipal elections on a nonparty basis for two-thirds of the 3,159 seats in the 284 municipal councils around the country. Independent polling station observers did not identify significant irregularities with the elections.

The State Security Presidency, National Guard, and Ministries of Defense and Interior, all of which report to the king, are responsible for law enforcement and maintenance of order. The State Security Presidency includes the General Directorate of Investigation (Mabahith), Special Security Forces, and Special Emergency Forces; police are under the Ministry of Interior. Civilian authorities generally maintained effective control over the security forces. Members of the security forces committed some abuses.

Saudi Arabia continued air operations in Yemen throughout the year as leader of a coalition formed to counter the 2014 Houthi takeover of Yemeni government institutions and facilities. Houthi militants conducted missile, rocket, drone, and artillery attacks aimed at Saudi territory on an almost weekly basis. Saudi-led coalition airstrikes in Yemen reportedly resulted in civilian casualties and damage to infrastructure on multiple occasions. In June the UN secretary-general noted a "sustained, significant decrease in killing and maiming due to air strikes" and delisted the Saudi-led coalition from the list of parties responsible for grave violations against children in armed conflict. The Joint Incident Assessment Team, an independent investigative body, reviewed allegations of civilian casualties against the Saudi-led coalition in Yemen and referred incidents for potential action.

Country Reports on Human Rights Practices for 2020
United States Department of State • Bureau of Democracy, Human Rights and Labor

J.A.260

## SAUDI ARABIA

hold a defendant for up to 90 days in detention without access to family members or legal counsel (and the SCC may extend such restrictions beyond this period). Security and some other types of prisoners sometimes remained in prolonged solitary detention before family members or associates received information of their whereabouts, particularly for detainees in Mabahith-run facilities.

On September 6, HRW stated authorities denied some prominent detainees, including former crown prince Mohammed bin Nayef and Muslim scholar Salman al-Odah, contact with their family members and lawyers for months. After almost three months in incommunicado detention, according to HRW, family members of women's rights activist Loujain al-Hathloul said authorities allowed her parents to visit on August 31, following her six-day hunger strike; she started another hunger strike October 26 in protest of prison conditions (see section 1.e., Political Prisoners and Detainees).

**Detainee's Ability to Challenge Lawfulness of Detention before a Court:** Under the law detainees are not entitled to challenge the lawfulness of their detention before a court. In the case of wrongful detention, the law of criminal procedure, as well as provisions of the counterterrorism law, provide for the right to compensation if detainees are found to have been held unlawfully.

## e. Denial of Fair Public Trial

The law provides that judges are independent and not subject to any authority other than the provisions of sharia and the laws in force. Nevertheless, the judiciary, the PPO, and the SSP were not independent entities, as they were required to coordinate their decisions with executive authorities, with the king and crown prince as arbiters. Although public allegations of interference with judicial independence were rare, the judiciary reportedly was subject to influence, particularly in the case of legal decisions rendered by specialized judicial bodies, such as the SCC, which rarely acquitted suspects. Human rights activists reported that SCC judges received implicit instructions to issue harsh sentences against human rights activists, reformers, journalists, and dissidents not engaged in violent activities. Activists also reported that judicial and prosecutorial authorities ignored due process-related complaints, including lack of access by lawyers to their clients

**SAUDI ARABIA**

at critical stages of the judicial process, particularly during the pretrial investigation phase.

Women's ability to practice law was limited; there were no women on the High Court or Supreme Judicial Council and no female judges or public prosecutors.  On June 17, the Shoura rejected a proposal to study appointing women as judges in personal status courts.  In August 2019, however, the PPO announced the appointment of 50 women as public prosecution investigators, marking the first time that women had held this position.  On June 4, the PPO appointed an additional 53 women as public prosecution investigators.

Defendants are able to appeal their sentences.  The law requires a five-judge appellate court to affirm a death sentence, which a five-judge panel of the Supreme Court must unanimously affirm.  Appellate courts may recommend changes to a sentence, including increasing the severity of a lesser sentence (up to the death penalty), if the trial court convicted the defendant of a crime for which capital punishment is permitted.

Defendants possess the right under the law to seek commutation of a death sentence for some crimes and may receive a royal pardon under specific circumstances (see section 1.d.).  In some prescribed cases (*qisas*), the families of the deceased may accept compensation from the family of the person convicted in an unlawful death, sparing the convicted from execution.

On February 6, Amnesty International reported that authorities were using the SCC "to systematically silence dissent."  Amnesty accused the SCC of using overly broad counterterror and anticybercrime laws in unfair trials to hand down prison sentences of up to 30 years as well as the death penalty to human rights defenders, writers, economists, journalists, religious clerics, reformists, and political activists, particularly from the Shia minority.  Amnesty asserted that "every stage of the SCC's judicial process is tainted with human rights abuses, from the denial of access to a lawyer, to incommunicado detention, to convictions based solely on so-called 'confessions' extracted through torture."

On April 17, HRW reported 68 Palestinians and Jordanians on trial before the SCC on the charge of links with an unnamed "terrorist organization" were subjected to a

# EXHIBIT K



Human Rights
Institute

His Majesty King Salman bin Abdulaziz Al Saud
King of the Kingdom of Saudi Arabia
Al Yamamah Palace
Riyadh 12911
Saudi Arabia

29 June 2023

**Public letter to His Majesty, King Salman bin Abdulaziz Al Saud of the Kingdom of Saudi Arabia, from the International Bar Association's Human Rights Institute**

Your Majesty,

1.  We are writing to you on behalf of the International Bar Association's Human Rights Institute (IBAHRI) to express our concern over reports that ten former judges of the Kingdom of Saudi Arabia have been charged with 'high treason', which carries a potential death sentence.

2.  The International Bar Association, established in 1947, is the world's leading organisation of international legal practitioners, bar associations and law societies, created with the aim to protect and promote the rule of law worldwide. It has a membership of more than 80,000 individual lawyers, and 190 bar associations and law societies that represent millions of lawyers from 160 countries. The IBAHRI, an autonomous and substantively independent entity, works with the global legal community to promote and protect human rights and the independence of the legal profession worldwide. The IBAHRI opposes the death penalty in all circumstances.

3.  We note reports that the Specialised Criminal Court (SCC) in Riyadh has charged six former judges of the SCC and four former judges of the High Court of the Kingdom of Saudi Arabia with 'high treason'. Reportedly, the judges were publicly arrested at the courts at which they worked in April 2022 and the first hearing in their case took place in secret on 16 February 2023.

4.  The IBAHRI recalls that Saudi Arabia is bound by, inter alia, the provisions of the Arab Charter on Human Rights (Arab Charter)[i] and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[ii] Despite not ratifying the International Covenant on Civil and Political Rights (ICCPR),[iii] Saudi Arabia has reaffirmed its provisions, as well as the Universal Declaration of Human Rights (UDHR),[iv] as a State Party to the Arab Charter.[v]

5.  We respectfully remind Your Majesty that, in line with the above obligations and responsibilities, Saudi Arabia must respect international and regional human rights law, standards and norms:

   *I.  Independence of the Judiciary*

6.  The charges of 'high treason' against the judges appear to stem from allegations of 'leniency' reportedly shown by the accused while discharging their judicial duties. For example, the State Security Circuit of the Public Prosecution Office reportedly charged the SCC judges after they signed confessions that they had been too 'lenient' in State security cases that they presided over at the SCC. The court documents in the judges' case allegedly cite these confessions as evidence for the charges and include, as examples of 'leniency', sentences that the judges handed down in

---

cases involving the prosecution of human rights defenders, women's rights activists and peaceful dissidents.

7. Under Article 12 of the Arab Charter, State Parties are bound to guarantee the independence of the judiciary and to protect judges from interference, pressure, and threats. In the same vein, the UN Basic Principles on the Independence of the Judiciary note that the judiciary shall 'decide matters before them impartially, on the basis of facts and in accordance with the law, without any restrictions, improper influences, inducements, pressures, threats or interferences, direct or indirect, from any quarter or for any reason'.[vi] Article 46 of the Basic Law of Governance of the Kingdom of Saudi Arabia provides for the independence of the judiciary and states that the 'decisions of judges shall not be subject to any authority other than the authority of the Islamic Sharia'.[vii] Furthermore, Article 1 of the Law of the Judiciary of the Kingdom of Saudi Arabia reiterates the independence of judges and expressly forbids interference with the judiciary.[viii]

8. Subjecting judges to prosecution and the threat of execution based on the content of their legal judgments is in contravention of the above law, standards and norms on judicial independence. Judges must be permitted to fulfil their duties free from interference and the threat of sanction. The IBAHRI calls on Saudi Arabia to ensure that the independence of the judiciary and the rule of law are guaranteed in all circumstances.

9. Furthermore, Principle 4 of the UN Basic Principles on the Independence of the Judiciary emphasise that judicial verdicts must not be subject to revision. This is particularly germane as it has been reported that judgments previously rendered by the accused are being revised and altered after the fact, in violation of this principle.

10. The IBAHRI expresses concern that the arrest of the judges forms part of a broader, ongoing effort to dismantle the independence of the legal profession by intimidating, hindering, harassing or improperly interfering with judges, lawyers and jurists. In recent years, judges and lawyers have reportedly been arrested, including on alleged corruption charges and for criticising the justice system on Twitter, creating a chilling effect across the judiciary and the broader legal profession.

11. Furthermore, the IBAHRI understands that strict directives ban judges from participating in mainstream media and using social media. The IBAHRI respectfully recalls Principle 8 of the UN Basic Principles on the Independence of the Judiciary, which holds that judges are entitled to, inter alia, freedom of expression provided that 'in exercising such rights, judges shall always conduct themselves in such a manner as to preserve the dignity of their office and the impartiality and independence of the judiciary'. A blanket-ban on judges expressing themselves freely would be contrary to this principle.

   II.  *The Right to Liberty and Security*

12. The IBAHRI understands that the ten judges were arrested on 11 April 2022 and were held in incommunicado pre-trial detention for ten months, without access to their families or a lawyer. We respectfully remind Your Majesty that no one shall be subjected to arbitrary arrest or detention,[ix] and that anyone arrested or detained on a criminal charge shall be brought promptly before a judge – within 48 hours, except in absolutely exceptional circumstances[x] – and shall be entitled to trial within a reasonable time or to release.[xi]

13. The UN Working Group on Arbitrary Detention (WGAD) has held that arbitrary deprivation of liberty constitutes a *jus cogens* norm and regards cases of deprivation of liberty as arbitrary under customary international law in cases where, inter alia, it is clearly impossible to invoke any legal basis justifying the deprivation of liberty (Category I); and the total or partial non-observance of international norms relating to the right to a fair trial established in the UDHR and in relevant international instruments is of such gravity as to give the deprivation of liberty an arbitrary character (Category III).[xii]

14. We respectfully recall that the right to challenge the lawfulness of one's detention without undue delay is a peremptory norm of international law.[xiii] In relation to arbitrary detention under Category I, the UN WGAD has held that incommunicado detention precludes the ability to challenge that detention and places the person outside the protection of the law, in violation of Articles 6 and 8, UDHR.[xiv]

15. We also respectfully remind Your Majesty of the 2022 UN WGAD opinion on Saudi Arabia, which emphasises that 'pre-trial detention must be the exception rather than the rule'.[xv] It must be 'based on an individualised judicial determination that it is reasonable and necessary to prevent flight, interference with evidence, or the recurrence of crime, and must be accompanied by consideration of whether alternatives, such as bail, would render detention unnecessary'.[xvi]

16. Furthermore, legal representation is a core facet of the rights to liberty and security of person and to a fair trial and should be available at all stages of criminal proceedings.[xvii] In relation to arbitrary detention under Category III, the UN WGAD has held that the absence of legal counsel from the outset of detention and during incommunicado detention violates the right to legal assistance as part of the right to fair trial and due process under Articles 10 and 11(1), UDHR.[xviii] In relation to Category III, we respectfully further refer Your Majesty to Section IV below.

### III. Prohibition of Torture and Ill-Treatment

17. The prohibition of torture is a peremptory norm of international law.[xix] We respectfully remind Your Majesty of a 2022 UN WGAD Opinion to Saudi Arabia, which highlights that prolonged incommunicado detention is conducive to torture and ill-treatment and can itself constitute such treatment.[xx] In this regard, we respectfully emphasise that the right to access to a lawyer of one's choice at all stages of detention and proceedings is an integral safeguard against torture and ill-treatment, particularly in the early stages of detention.[xxi] This is particularly so considering the reported 'confessions', discussed further in Section IV below.

18. We also respectfully remind Your Majesty that Saudi Arabia, as a State Party to the CAT, has an obligation to undertake a prompt, independent, impartial and effective *ex officio* investigation where there are reasonable grounds to believe that torture and ill-treatment has been committed.[xxii]

### IV. The Right to a Fair Trial and Due Process

19. The IBAHRI understands that the first hearing of the judges' trial was conducted in secret. Under Article 13(2) of the Arab Charter, trials shall be public, except in 'exceptional cases that may be warranted by the interests of justice in a society that respects human freedoms and rights'.[xxiii] The IBAHRI submits that there are no such circumstances in the reported facts of the case to warrant conducting the trial behind closed doors. Public hearings ensure the transparency of proceedings, thereby providing 'an important safeguard for the interest of the individual and of society at large'.[xxiv] Where former members of the judiciary are themselves on trial and face the death penalty, this is particularly important in order to ensure respect for the independence of the judiciary and the rule of law.

20. The IBAHRI also understands that the ten judges were denied their right to legal representation during their initial hearing. The IBAHRI respectfully recalls that the right to legal representation of one's own choosing is guaranteed by, inter alia, Articles 16(3) – (4) of the Arab Charter.[xxv] This is a fundamental pillar of the right to a fair trial as an accused person cannot mount an adequate defence if they are not afforded legal representation.

21. The IBAHRI further understands that no credible evidence was produced at the first hearing to corroborate the charges against the judges. Rather, the only evidence reportedly adduced in support of the charges against the SCC judges were confessions allegedly signed by the accused. After such an unreasonably long pre-trial detention period, without access to, inter alia, legal

representation, the IBAHRI is concerned that these 'confessions' may be tainted by coercion. Under, inter alia, Article 16(6), Arab Charter,[xxvi] a defendant must not be 'compelled to testify against himself or to confess guilt'. Furthermore, under Article 15, CAT and customary international law, State parties shall ensure that any statement that is established to have been made as a result of torture or ill-treatment shall not be invoked as evidence in any proceedings.[xxvii]

22. Additionally, other charges against the judges reportedly include 'complacency toward state security criminals'. It is unclear whether this is a cognisable offence under national law. Vague or overly broad laws are vulnerable to abuse or arbitrary application. The principles of legal certainty, *nulla poena sine lege* and the prohibition of the retroactive application of criminal law are well-established in law, notably Article 15, Arab Charter, Article 11, UDHR, and Article 38, Basic Law of Governance.[xxviii] We call on Your Majesty to ensure that criminal laws that are not sufficiently precise and/or with retroactive application are not enacted or applied.

   *V.  The Right to Life*

23. The IBAHRI understands that prosecutors are seeking the discretionary death penalty in the judges' case. We respectfully remind Your Majesty that the right to life requires 'the highest level of protection'.[xxix] Article 5, Arab Charter, affirms the non-derogable right to life of all people and holds that no person shall be arbitrarily deprived of their life. The prohibition against arbitrary deprivation of life is a peremptory norm.[xxx] The UN Safeguards Guaranteeing the Protection of the Rights of Those Facing the Death Penalty stipulate that capital punishment may only be carried out after a legal process that provides all possible safeguards to ensure a fair trial.[xxxi] The IBAHRI respectfully emphasises that violations of fair trial guarantees in proceedings resulting in the imposition of the death penalty render the sentence arbitrary and in violation of the right to life.[xxxii]

24. Furthermore, under international law, where the death penalty is still practiced, it may only be imposed for 'the most serious crimes'.[xxxiii] Various UN human rights charter- and treaty-based mechanisms have consistently held that this term must be read restrictively, relating only to crimes of extreme gravity involving intentional killing.[xxxiv] Activities that do not result directly and intentionally in death, such as those of a political nature (including treason, 'crimes against the State' and 'disloyalty'), cannot serve as the basis for the death penalty.[xxxv] Additionally, the death penalty cannot be imposed based on vaguely defined criminal provisions that depend on subjective or discretionary considerations, the application of which is not reasonably foreseeable.[xxxvi]

25. The IBAHRI stresses that to subject the judges to the death penalty for alleged crimes that do not meet the threshold of 'the most serious' and/or for vaguely defined crimes after a secret trial lacking fair trial guarantees and due process would constitute a grave violation of a *jus cogens* norm*,* namely the obligation to protect the right to life, amounting to a serious repudiation of customary international law by the Kingdom of Saudi Arabia.

26. To conclude, we respectfully call on the Saudi Arabian authorities to ensure that judges can carry out their legitimate professional activities without fear of intimidation, harassment, or interference; to cease the use of incommunicado detention and to immediately and unconditionally release all those who have been arbitrarily arrested and detained; to ensure the right to a fair trial and due process; to review the scope of the death penalty without delay to ensure that its imposition and implementation are strictly limited to the confines of international law, including the non-applicability to so-called political activities as set out above, and to repeal the use of the death penalty for such offences accordingly.

27. In light of the worldwide abolitionist trend,[xxxvii] the IBAHRI also urges Saudi Arabia reconsider the application of the death penalty in general and to introduce an immediate moratorium on its use with a view to abolition. The IBAHRI further recommends Saudi Arabia to ratify both the ICCPR and its Second Optional Protocol.

28. We would be grateful to receive your assurances that you have received our letter and that our concerns will be addressed as a matter of urgency.

Yours sincerely,

**Anne Ramberg Dr Jur hc**
**Co-Chair, IBAHRI and Immediate Past Secretary General of the Swedish Bar Association**

**Mark Stephens CBE**
**Co-Chair, IBAHRI**

---

i Arab Charter on Human Rights (Arab Charter) (22 May 2004) (ratified by Saudi Arabia in 2008).
ii Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (10 December 1984) 1465 UNTS 85 (ratified by Saudi Arabia in 1997, with reservations to Articles 20 and 30(1)).
iii International Covenant on Civil and Political Rights (ICCPR) (4 April 1968) 999 UNTS 170.
iv Universal Declaration of Human Rights (UDHR) (10 December 1948) 27 A (III).
v Arab Charter (2004) [PP 5].
vi Seventh UN Congress on the Prevention of Crime and the Treatment of Offenders, Basic Principles on the Independence of the Judiciary (6 September 1985), Principle 2.
vii Basic Law of Governance (1 March 1992) Royal Decree No. A/90, Article 46.
viii Law of the Judiciary (23 July 1975) Royal Decree No. M/64, Article 1.
ix Article 14(1), Arab Charter; Article 9(1), ICCPR; Articles 3 and 9, UDHR.
x UN Human Rights Council, Opinion No. 84/2022 adopted by the Working Group on Arbitrary Detention concerning Abdelrhman Mohammed Farhanah (Saudi Arabia) (10 March 2023) UN Doc A/HRC/WGAD/2022/84 [81].
xi Article 14(5), Arab Charter; Articles 9(3) and 14(3)(c), ICCPR; Article 11(1), UDHR.
xii UN Human Rights Council, Report of the Working Group on Arbitrary Detention (24 December 2012) UN Doc A/HRC/22/44 [38(a) and (c), 75].
xiii UN Human Rights Council, Report of the Working Group on Arbitrary Detention (10 October 2019) UN Doc A/HRC/WGAD/2019/56 [80].
xiv See, eg, UN Human Rights Council, Opinion No. 84/2022 adopted by the Working Group on Arbitrary Detention concerning Abdelrhman Mohammed Farhanah (Saudi Arabia) (10 March 2023) UN Doc A/HRC/WGAD/2022/84 [87 – 88].
xv Ibid. [82].
xvi Ibid. [82].
xvii Ibid. [93, 95].
xviii See, eg, UN Human Rights Council, Opinion No. 72/2021 adopted by the Working Group on Arbitrary Detention concerning Abdullah al-Howaiti (Saudi Arabia) (28 January 2022) UN Doc A/HRC/WGAD/2021/72 [87 – 88].
xix See, eg, Article 8, Arab Charter; Articles 7 and 10, ICCPR; Article 5, UDHR; Articles 1, 2 and 16, CAT; International Law Commission, Draft conclusions on identification and legal consequences of peremptory norms of general international law (jus cogens) (2022), Annex. Available at: <https://legal.un.org/ilc/texts/1_14.shtml>.
xx UN Human Rights Council, Opinion No. 84/2022 adopted by the Working Group on Arbitrary Detention concerning Abdelrhman Mohammed Farhanah (Saudi Arabia) (10 March 2023) UN Doc A/HRC/WGAD/2022/84 [87].
xxi Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Study on the phenomena of torture, cruel, inhuman or degrading treatment or punishment in the world, including an assessment of conditions of detention (5 February 2010) A/HRC/13/39/Add.5 [102 – 103]; UN Human Rights Council, Report of the Working Group on Arbitrary Detention (24 December 2012) UN Doc A/HRC/22/44 [84].
xxii Articles 12 and 16, CAT.
xxiii See also: Article 10, UDHR; Article 14(1), ICCPR ('…The press and the public may be excluded from all or part of a trial for reasons of morals, public order (ordre public) or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice…').

xxiv UN Human Rights Committee, General Comment No. 32: Article 14: Right to equality before courts and tribunals and to a fair trial (23 August 2007) UN Doc CCPR/C/GC/32 [28]. See also: United Nations High Commissioner for Human Rights, 'Capital punishment and the implementation of the safeguards guaranteeing protection of the rights of those facing the death penalty' (16 July 2015) A/HRC/30/18 [49 – 50].

xxv See also, Article 14(3)(d), ICCPR; Article 11(2), UDHR.

xxvi See also, Article 14(3)(g), ICCPR.

xxvii UN Human Rights Council, Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Juan E. Méndez (10 April 2014) UN Doc A/HRC/25/60 [17, 22].

xxviii See also, Article 15(1), ICCPR.

xxix UN General Assembly, Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions, Christof Heyns (9 August 2012) UN Doc A/67/275 [117].

xxx UN Human Rights Committee, General Comment No. 36: Article 6: Right to Life (3 September 2019) UN Doc CCPR/C/GC/36 [68].

xxxi Economic and Social Council, Resolution 1984/50: Safeguards guaranteeing protection of the rights of those facing the death penalty (25 May 1984) UN Doc E/RES/1984/50, Safeguard 5.

xxxii UN Human Rights Committee, General Comment No. 36: Article 6: Right to Life (3 September 2019) UN Doc CCPR/C/GC/36 [41].

xxxiii Article 6, Arab Charter; Article 6(2), ICCPR; Economic and Social Council, Resolution 1984/50: Safeguards guaranteeing protection of the rights of those facing the death penalty (25 May 1984) UN Doc E/RES/1984/50, Safeguard 1 ('In countries which have not abolished the death penalty, capital punishment may be imposed only for the most serious crimes, it being understood that their scope should not go beyond intentional crimes with lethal or other extremely grave consequences').

xxxiv See, eg, UN General Assembly, Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions, Christof Heyns (9 August 2012) UN Doc A/67/275 [34 – 67] ('The first of the safeguards guaranteeing protection of the rights of those facing the death penalty should be understood to mean: "In countries which have not abolished the death penalty, capital punishment may be imposed only for intentional killing, but it may not be mandatory in such cases."' [67]).

xxxv See, eg, UN Human Rights Council, Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions, Philip Alston (29 January 2007) UN Doc A/HRC/4/20 [39 – 53]; UN Human Rights Committee, General Comment No. 36: Article 6: Right to Life (3 September 2019) UN Doc CCPR/C/GC/36 [35]; UN Commission on Human Rights. *Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions* (25 January 2000) UN Doc E/CN.4/2000/3 [70]. See also: UN Human Rights Council, Question of the death penalty: Report of the Secretary-General (26 July 2022) UN Doc A/HRC/51/7 [64].

xxxvi UN Human Rights Committee, General Comment No. 36: Article 6: Right to Life (3 September 2019) UN Doc CCPR/C/GC/36 [38].

xxxvii The UN General Assembly, by overwhelmingly majorities, has called upon States that still maintain the death penalty to establish a moratorium on executions with a view to abolishing the death penalty in nine separate Resolutions going back to 2007 and most recently in Resolution 77/222 of 15 December 2022: UN General Assembly, '77/222. Moratorium on the use of the death penalty' (6 January 2023) UN Doc. A/RES/77/222.

# EXHIBIT Y

The Embassy of the Kingdom of

# Saudi Arabia

Washington, DC

(/)

# News

# HRH Crown Prince Announces 4 New Laws to Reform the Kingdom's Judicial Institutions

📅 **February 08, 2021**

HRH Crown Prince Mohammed bin Salman announced that the Kingdom has taken serious steps towards developing its legislative environment during the past few years, including adopting new laws and reforming existing ones. These laws are meant to preserve rights, bolster the principles of justice, enforce transparency, protect human rights and achieve comprehensive and sustainable development, in a manner to reinforce the Kingdom's global competitiveness based on objective and clearly identified procedural and institutional references.

HRH the Crown Prince emphasized that the Personal Status Law draft, which is being finalized, is one of four draft laws being prepared by the relevant entities. He clarified that these draft laws will then be submitted to the Council of Ministers and its bodies for review and consideration, in accordance with the legislative process and in preparation for submission to the Shura Council, pursuant to its law. These laws will then be promulgated pursuant to the legislative laws.

HRH the Crown Prince stated that the Personal Status Law, the Civil Transactions Law, the Penal Code for Discretionary Sentences, and the Law of Evidence will represent a new wave of reforms that will contribute to the ability to predict court decisions, increase the level of integrity and efficiency of judicial institutions, and increase the reliability of procedures and oversight mechanisms as cornerstones in achieving the principles of justice, clarifying the lines of accountability and ensuring the consistency of legal references in a manner that limits discrepancies in courts decisions.

HRH the Crown Prince noted that "The absence of applicable legislations has led to discrepancies in decisions and a lack of clarity in the principles governing facts and practices. This resulted in prolonged litigation not based on legal texts. In addition, the absence of a clear legal framework for the private and business sectors has led to ambiguity with respect to obligations. HRH added, "this was painful for many individuals and families, especially women, permitting some to evade their responsibilities. This will not take place after these laws are promulgated pursuant to legislative laws and procedures."

HRH also noted that a draft known as "the Code of Judicial Decisions" was crafted a few years ago, but was revealed to be insufficient in terms of meeting society's needs and expectations after careful review. Therefore, it was decided to draft the aforementioned laws within the scope of the current legal and judicial international practices and standards, yet adhering to Sharia principles and taking into consideration the Kingdom's commitments under international conventions and treaties. HRH noted the ongoing development process of the Kingdom's judicial system, adding that these laws will be announced consecutively this year.

HRH The Crown Prince expressed his gratitude to the Custodian of the Two Holy Mosques King Salman bin Abdulaziz Al Saud for his guidance and keenness to secure the rights of the citizens and residents of the Kingdom of Saudi Arabia and to safeguard their interests.



## Contact

**The Embassy of The Kingdom of Saudi Arabia**
601 New Hampshire Avenue, NW
Washington, DC 20037

**Regular Business Hours** (/consular-travel-services)
Monday - Friday 9:00am–5:00pm

## Connect with Us

TWITTER (HTTPS://TWITTER.COM/SAUDIEMBASSYUSA)

YOUTUBE (HTTPS://YOUTUBE.COM/CHANNEL/UC1187FINWW_CWBBMEWFSYAW)

## Contact Number

Main Number: **(202) 342-3800**
Consulate/Visa Section: **(202) 944-3126**
Health Mission: **(202) 866-0767**
Commercial Office: **(202) 337-4088**
Cultural Mission: **(703) 573-7226**
Emergency Contact Numbers (/emergency-contacts)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>Alexandria Division</u>

<table>
<tr><td>

ADVANFORT COMPANY,

                     Plaintiff,

    v.

ZAMIL OFFSHORE SERVICES COMPANY
and SAUDI PORTS AUTHORITY, a foreign
sovereign State,

                  Defendants.
</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td><td>

CIVIL ACTION NO. 1:23-cv-906
</td></tr>
</table>

### PLAINTIFF'S MOTION FOR LIMITED DISCOVERY ON PERSONAL JURISDICTION AND FORUM NON CONVENIENS AND TO STAY MOTION TO DISMISS OF DEFENDANT ZAMIL OFFSHORE SERVICES COMPANY

Plaintiff AdvanFort Company ("AdvanFort"), by and through undersigned counsel, hereby submits and files this Motion for Limited Discovery on Personal Jurisdiction and *Forum Non Conveniens* and to Stay Motion to Dismiss of Defendant Zamil Offshore Services Company ("Zamil"). For the reasons stated in AdvanFort's accompanying memorandum, AdvanFort respectfully requests that the Court grant the motion for limited discovery pursuant to Fed. R. Civ. P. 26(b)(1) and (d)(1), stay its consideration of Zamil's motion to dismiss (ECF No. 24), and grant any further relief as this Court deems necessary and warranted. A proposed order is attached hereto as **Exhibit A**.

Counsel for AdvanFort conferred by telephone and email with opposing counsel, pursuant to LCvR 37(E), regarding the relief requested herein. Zamil does not agree to the relief requested in this motion.

J.A.273

Dated:  October 30, 2023

AdvanFort Company

By its Attorneys,

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
MCGUIRE WOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Clara Brillembourg *(pro hac vice)*
Foley Hoag LLP
1717 K Street N.W.
Washington D.C., 020006
Telephone: (202) 261-7334
Email: CBrillembourg@foleyhoag.com

Andrew Loewenstein *(pro hac vice)*
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-3015
E-mail: ALoewens@foleyhoag.com

Peter Sullivan *(pro hac vice)*
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 010019
Telephone: (212) 812-0310
E-mail: psullivan@foleyhoag.com

*Counsel for AdvanFort Company*

2

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2023, a true and correct copy of the foregoing Plaintiff's Motion for Limited Discovery on Personal Jurisdiction and *Forum Non Conveniens* and to Stay Motion to Dismiss of Zamil Offshore Services Company was served on all counsel of record via the Court's CM/ECF electronic filings system.

/s/ Benjamin L. Hatch
Benjamin L. Hatch (VSB No. 70116)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>Alexandria Division</u>

|  |  |
|---|---|
| ADVANFORT COMPANY, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ZAMIL OFFSHORE SERVICES COMPANY | ) |
| and SAUDI PORTS AUTHORITY, a foreign | ) |
| sovereign State, | ) |
| Defendants. | ) |

CIVIL ACTION NO. 1:23-cv-906

## **[PROPOSED] ORDER**

Upon consideration of Plaintiff's Motion for Limited Discovery on Personal Jurisdiction and *Forum Non Conveniens* and to Stay Motion to Dismiss of Zamil Offshore Services Company and the accompanying memorandum filed therewith, it is hereby **ORDERED** that Plaintiff AdvanFort's Motion for Limited Discovery and to Stay Motion to Dismiss of Zamil Offshore Services Company is **GRANTED**.

**FURTHER**, it is hereby **ORDERED** that Plaintiff AdvanFort may promulgate discovery on the following:

*Personal Jurisdiction*

a)   Zamil employees or contractors who have worked from or in the United States from 2013 to present;

b)   The marketing, advertisement, or promotion of Zamil's services through print, web-based, television, or other media distributed in or accessible from Virginia;

c)   The participation of Zamil and/or affiliated entities or individuals in the U.S.-Saudi Business Council, including the promotion of Zamil's services through such participation;

d)      The participation of Zamil and/or affiliated entities or individuals in industry events or trade shows in the United States, including the promotion of Zamil's services through such participation; and

e)      Engagement data collected from visitors to Zamil's website, including instances where United States or Virginia residents have filled out the "Contact Us" page on Zamil's website from 2013 to present.

*Forum Non Conveniens*

a)      Deposition of Mr. Hussam Salah I. Al Hejailan;

b)      Communications between Zamil and/or anyone acting on its behalf or for its benefit and any actual or contemplated witnesses of AdvanFort in the parties' litigation in Saudi Arabia;

c)      *Ex parte* communications between Zamil and/or anyone acting on its behalf or for its benefit and any judge or other personnel employed by the courts of Saudi Arabia regarding the parties' litigation in Saudi Arabia;

d)      The identities and locations of individuals with knowledge relevant to AdvanFort's claims and any defenses that Zamil may present;

e)      The languages spoken by any such individuals; and

f)      The language used in documents relevant to AdvanFort's claims and any defenses that Zamil may present.

It is further **ORDERED** that this Court will stay its consideration of Zamil's Motion to

Dismiss (ECF No. 24) until such time as the parties have completed discovery.

ENTERED: _____/_____/_____


_____
JUDGE

J.A.277

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>Alexandria Division</u>

|  |  |
|---|---|
| ADVANFORT COMPANY,<br><br>      Plaintiff,<br><br>  v.<br><br>ZAMIL OFFSHORE SERVICES COMPANY<br>and SAUDI PORTS AUTHORITY, a foreign<br>sovereign State,<br><br>      Defendants. | CIVIL ACTION NO. 1:23-cv-906 |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR LIMITED**
**DISCOVERY ON PERSONAL JURISDICTION AND *FORUM NON CONVENIENS* AND**
<u>**TO STAY MOTION TO DISMISS OF ZAMIL OFFSHORE SERVICES COMPANY**</u>

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................1

   A. Zamil's Factual Assertions Regarding Personal Jurisdiction Justify Discovery. ...................3

      1.   *Zamil's Employees in the Forum* ....................................................................3

      2.   *Zamil's Efforts to Solicit Business in Virginia* ..................................................4

      3.   *Zamil's Website Maintained in Virginia* ..........................................................5

   B. Zamil's Factual Assertions Regarding *Forum Non Conveniens* Justify Discovery................5

      1.   *The Alleged Adequacy of Saudi Arabia as a Forum* ......................................6

      2.   The *Location and Language of Witnesses and Evidence*................................8

   C. Staying Consideration of the Motion to Dismiss Is Appropriate During Discovery. ..............9

CONCLUSION....................................................................................................................9

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Base Metal Trading S.A. v. Russian Aluminum,*
  00 Civ. 9627 (JGK)(FM), 2002 U.S. Dist. LEXIS 8516 (S.D.N.Y. May 13,
  2002) ................................................................................................................2

*In re Bridgestone/Firestone, Inc., ATX, ATX II, & Wilderness Tires Prods. Liab.*
  *Litig.,*
  131 F. Supp. 2d 1027 (S.D. Ind. 2001) ......................................................2, 7

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985)..........................................................................................3

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,*
  334 F.3d 390 (4th Cir. 2003) ............................................................................2

*Carijano v. Occidental Petroleum Corp.,*
  643 F.3d 1216 (9th Cir. 2011) ..........................................................................5

*Dunham v. Hotelera Canco S.A. de C.V.,*
  933 F. Supp. 543 (E.D. Va. 1996) ....................................................................2

*Gibbs v. Plain Green LLC,*
  331 F. Supp. 3d 518 (E.D. Va. 2018) ...............................................................2

*P1 Grp., Inc. v. RipKurrent, LLC,*
  No. 3:23-CV-00196-RJC-SCR, 2023 U.S. Dist. LEXIS 161608 (W.D.N.C.
  Sep. 12, 2023) ...................................................................................................1

*Jiali Tang v. Synutra Int'l, Inc.,*
  656 F.3d 242 (4th Cir. 2011) ........................................................................5, 8

*Lee Sch. Lofts, L.L.C. v. Amtax Holdings 106 LLC,*
  Civil Action No. 3:08cv427, 2008 U.S. Dist. LEXIS 87572 (E.D. Va. Oct. 29,
  2008) .................................................................................................................9

*Mamo v. BP P.L.C.,*
  No. 1:05cv1323 (JCC), 2006 U.S. Dist. LEXIS 12876 (E.D. Va. Mar. 7, 2006).....................9

*Masaitis v. Marriott Int'l, Inc.,*
  No. GLS-18-3388, 2020 U.S. Dist. LEXIS 242765 (D. Md. Dec. 28, 2020)...........................2

J.A.280

*McLaughlin v. McPhail*,
    707 F.2d 800 (4th Cir. 1983) ................................................................1

*Mylan Labs, Inc. v. Akzo, N.V.*,
    2 F.3d 56 (4th. Cir. 1993) ...................................................................1

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
    No. 02 Civ. 1499 (LTS)(KNF), 2003 U.S. Dist. LEXIS 4276 (S.D.N.Y. Mar.
    21, 2003) .........................................................................................2

*Rustal Trading US, Inc. v. Makki*,
    17 F. App'x 331 (6th Cir. 2001) ..........................................................6

*Sneha Media & Entm't, LLC v. Associated Broad. Co. P Ltd.*,
    911 F.3d 192 (4th Cir. 2018) ..............................................................3

*T & S Brass & Bronze Works, Inc. v. Greenfield World Trade, Inc.*,
    Civ. No. 6:08-1987-HFF, 2009 U.S. Dist. LEXIS 153727 (D.S.C. Mar. 12,
    2009) ..............................................................................................2

*UMG Recordings, Inc. v. Kurbanov*,
    963 F.3d 344 (4th Cir. 2020) ...........................................................3, 5

*Von Spee v. Von Spee*,
    No. 3:05 CV 1488 (JBA), 2007 U.S. Dist. LEXIS 110362 (D. Conn. Mar. 27,
    2007) ..............................................................................................2

## Other Authorities

Fed. R. Civ. P. 26(b)(1), (d)(1) ................................................................1

U.S. DEPARTMENT OF STATE, 2022 COUNTRY REPORT ON HUMAN RIGHTS
    PRACTICES: SAUDI ARABIA 16 (2022).......................................................6

## INTRODUCTION

Plaintiff AdvanFort Company ("AdvanFort"), by and through undersigned counsel, hereby submits this Memorandum in Support of Its Motion for Limited Discovery on Personal Jurisdiction and *Forum Non Conveniens* and to Stay Motion to Dismiss of Zamil Offshore Services Company ("Zamil").

Zamil's motion to dismiss asserts two putative grounds for dismissal: *forum non conveniens* and personal jurisdiction. *See* Zamil's Memorandum in Support of its Motion to Dismiss (ECF No. 24) ("Mem. in Supp.").  In that motion, Zamil makes sweeping factual assertions that seek to minimize its contacts with this forum and create a misleading impression regarding the alleged fairness of Saudi Arabia as an alternate forum for adjudicating AdvanFort's claims.  AdvanFort's Opposition, filed simultaneously herewith, explains why the Court should deny the motion to dismiss.  If, however, there is any doubt as to whether that motion should be denied, AdvanFort respectfully requests that the Court stay its consideration to allow limited discovery targeted to the factual issues raised therein.

## ARGUMENT

Limited discovery is appropriate in light of the unsubstantiated assertions that provide the basis for Zamil's motion to dismiss on personal jurisdiction and *forum non conveniens* grounds.  When a defendant raises a personal jurisdiction defense, the rules allow for limited discovery over the jurisdictional issue.  *Mylan Labs, Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993) (citing *McLaughlin v. McPhail*, 707 F.2d 800, 806–07 (4th Cir. 1983)); Fed. R. Civ. P. 26(b)(1), (d)(1).  "Numerous district courts within the Fourth Circuit have permitted jurisdictional discovery where disputes exist in the record or where further exploration of jurisdictional facts is warranted."  *P1 Grp., Inc. v. RipKurrent, LLC*, No. 3:23-CV-00196-RJC-SCR, 2023 U.S. Dist. LEXIS 161608, at

*2 (W.D.N.C. Sep. 12, 2023) (quoting *T & S Brass & Bronze Works, Inc. v. Greenfield World Trade, Inc*., Civ. No. 6:08-1987-HFF, 2009 U.S. Dist. LEXIS 153727, at *2 (D.S.C. Mar. 12, 2009)). "Jurisdictional discovery can be appropriate when a plaintiff files a motion [for discovery] containing 'specific and substantive' allegations regarding a court's jurisdiction." *Gibbs v. Plain Green LLC*, 331 F. Supp. 3d 518, 529 (E.D. Va. 2018). In deciding whether such discovery is appropriate, courts also consider whether there is any "indication of fraud or intentional misconduct" in the defendant's representations or affidavits made as part of its motion to dismiss. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc*., 334 F.3d 390, 403 (4th Cir. 2003).

Discovery is likewise warranted when it could assist a court in adjudicating a motion that asserts *forum non conveniens* as a basis for dismissal. *See, e.g.*, *Von Spee v. Von Spee,* No. 3:05 CV 1488 (JBA), 2007 U.S. Dist. LEXIS 110362, at *9–13 (D. Conn. Mar. 27, 2007) (collecting cases); *Masaitis v. Marriott Int'l, Inc.,* No. GLS-18-3388, 2020 U.S. Dist. LEXIS 242765, at *6 (D. Md. Dec. 28, 2020); *Dunham v. Hotelera Canco S.A. de C.V.,* 933 F. Supp. 543, 546 (E.D. Va. 1996). The need for such discovery follows from the fact that *forum non conveniens* is an inherently "fact-based inquiry." *In re Bridgestone/Firestone, Inc., ATX, ATX II, & Wilderness Tires Prods. Liab. Litig*., 131 F. Supp. 2d 1027, 1029 (S.D. Ind. 2001). It therefore "behooves courts to permit discovery on facts relevant to forum non conveniens motions." *Id*. at 1029–30. Further, where a *forum non conveniens* motion includes a declaration by an expert on the law of the proposed alternate forum, courts often permit the deposition of the expert on their qualifications and opinions. *See, e.g.*, *id.* at 1031; *Norex Petroleum Ltd. v. Access Indus., Inc*., No. 02 Civ. 1499 (LTS)(KNF), 2003 U.S. Dist. LEXIS 4276 (S.D.N.Y. Mar. 21, 2003); *Base Metal Trading S.A. v. Russian Aluminum*, 00 Civ. 9627 (JGK)(FM), 2002 U.S. Dist. LEXIS 8516, at *10 (S.D.N.Y. May 13, 2002).

Limited discovery is appropriate here because Zamil's motion to dismiss relies on factual assertions that are misleading, overbroad, or otherwise unsubstantiated. Thus, unless the Court dismisses the motion to dismiss straightaway for the reasons set out in AdvanFort's Opposition, the Court should stay consideration of the motion to permit discovery on the narrow topics described below.

**A. Zamil's Factual Assertions Regarding Personal Jurisdiction Justify Discovery.**

With respect to personal jurisdiction, limited discovery would assist the Court to probe the veracity of apparent misstatements and bare assertions made by Zamil regarding its contacts with Virginia.[1]

### 1. *Zamil's Employees in the Forum*

Zamil asserts in its motion to dismiss and accompanying declaration that Zamil has "no U.S.-based employees." Mem. in Supp. at 2, 22; Kurikkalakath Decl. (ECF No. 24-6) ¶ 3. However, AdvanFort has found information that appears to contradict these assertions. Multiple

---

[1] A defendant purposefully avails itself of the privilege of conducting business in a forum when it deliberately engages in significant activities within the forum or "has created continuing obligations between himself and residents of the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77 (1985) (internal quotation marks omitted). The Fourth Circuit utilizes the following nonexclusive factors to determine whether the standard has been satisfied:

> 1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020) (quoting *Sneha Media & Entm't, LLC v. Associated Broad. Co. P*, 911 F.3d 192, 198–99 (4th Cir. 2018)).

LinkedIn pages indicate that Zamil has several U.S.-based employees, including at least one in Virginia. *See* Sullivan Decl., Exs. B–C, ¶¶ 3–4.

Zamil may employ additional U.S.-based individuals. Further, it is unclear from the LinkedIn pages what duties its employees perform in the United States generally—and Virginia specifically—including whether they solicit business or otherwise promote Zamil in the forum. These are factual matters that lie at the core of Zamil's argument concerning personal jurisdiction. Accordingly, AdvanFort respectfully requests that the Court permit discovery regarding:

(a) Zamil employees or contractors who have worked from or in the United States from 2013 to present.

2. *Zamil's Efforts to Solicit Business in Virginia*

Zamil's motion to dismiss attempts to downplay the solicitation of business in the United States, including in Virginia. Mem. in Supp. at 19–20. For instance, Zamil argues that such efforts are somehow "irrelevant" and/or otherwise "random, fortuitous, [and] attenuated contact" with the forum. Mem. in Supp. at 17, 19–20. However, Zamil significantly understates its extensive contacts with Virginia for the purpose of soliciting business from Virginia companies. As set out in the Complaint, Zamil advertised in numerous maritime publications that are distributed in Virginia. Compl. ¶ 52. In addition, affiliated entities and individuals promoted Zamil in Virginia. Compl. ¶¶ 41–55.

There are therefore disputed questions of fact relating to Zamil's business development activities in Virginia that are relevant to the motion to dismiss. AdvanFort thus respectfully requests that the Court permit discovery regarding:

(b) The marketing, advertisement, or promotion of Zamil's services through print, web-based, television, or other media distributed in or accessible from Virginia.

(c) The participation of Zamil and/or affiliated entities or individuals in the U.S.-Saudi Business Council, including the promotion of Zamil's services through such participation.

(d) The participation of Zamil and/or affiliated entities or individuals in industry events or trade shows in the United States, including the promotion of Zamil's services through such participation.

3. *Zamil's Website Maintained in Virginia*

Zamil likewise tries to downplay the importance of its website, zamiloffshore.com, in regard to its contacts with AdvanFort and Virginia, even though the website is published in English and is accessible to Virginia residents. Compl. ¶ 48. Zamil argues that the website is irrelevant because it was not "directed specifically at Virginia," Mem. in Supp. at 20. However, Zamil disregards the fact that the Fourth Circuit has found personal jurisdiction where a defendant's website is "interactive" and "collect[s] certain personal information from visitors" including the visitor's IP address and country-of-origin. *UMG Recordings*, 963 F.3d at 353. In that connection, Zamil's website includes a "Contact Us" page through which users can enter information and submit it to Zamil. Sullivan Decl. ¶ 8, Ex. G.

Jurisdictional discovery is accordingly needed to determine the level of Zamil's contacts with the United States and Virginia through its website. AdvanFort therefore respectfully requests that the Court permit discovery regarding:

(e) Engagement data collected from visitors to Zamil's website, including instances where United States or Virginia residents have filled out the "Contact Us" page on Zamil's website from 2013 to present.

**B. Zamil's Factual Assertions Regarding *Forum Non Conveniens* Justify Discovery.**

To prevail on its *forum non conveniens* argument, Zamil must establish that Saudi Arabia is an adequate forum in which to litigate AdvanFort's claims. *Jiali Tang v. Synutra Int'l, Inc.,* 656 F.3d 242, 248 (4th Cir. 2011). Zamil cannot do so if proceedings in Saudi Arabia might be infected with discrimination, corruption, or some other unfairness. *Carijano v. Occidental Petroleum Corp.,* 643 F.3d 1216, 1226 (9th Cir. 2011). Nor are the courts of Saudi Arabia adequate if there

5

might be "serious obstacles to conducting litigation" there, such as a "well-founded fear of persecution." *Rustal Trading US, Inc. v. Makki*, 17 F. App'x 331, 335 (6th Cir. 2001).

1. *The Alleged Adequacy of Saudi Arabia as a Forum*

For the reasons set out in AdvanFort's opposition, the Saudi courts are plainly inadequate for litigating AdvanFort's claims against an arm of the government of Saudi Arabia and a company controlled by an influential family with close ties to the Saudi Royal Family. This is especially the case in light of the fact that the claims concern misconduct by multiple parts of the Saudi government. Not only would AdvanFort face a complete lack of independence in the judiciary, its representatives, witnesses, and attorneys would face a grave risk of harm if forced to litigate there.

Nonetheless, Zamil argues that the courts of Saudi Arabia are somehow an adequate forum. In making that argument, Zamil relies principally on: (1) bald assurances by its expert on Saudi law that the courts of Saudi Arabia are independent; and (2) AdvanFort's prior litigation in Saudi Arabia.

With respect the alleged independence of Saudi courts, Zamil relies on a declaration by Hussam Salah I. Al Hejailan, who contends that "[a]s for the Judicial System in Saudi Arabia, it must be noted that it is independent and autonomous from any other authority." Al Hejailan Decl. at 5. Mr. Al Hejailan makes that claim in the face of the directly contrary view of the United States Department of State, which concluded in its most recent review of conditions in Saudi Arabia that there are "serious problems with the independence of the judiciary" and that courts are "required to coordinate their decisions with executive authorities, with the king and crown prince as arbiters."[2] Mr. Al Hejailan also makes various additional assertions regarding Saudi Arabia's

---

[2] U.S. DEPARTMENT OF STATE, 2022 COUNTRY REPORT ON HUMAN RIGHTS PRACTICES: SAUDI ARABIA 16 (2022), https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/saudi-arabia/.

J.A.287

courts and laws that are refuted in the expert report of Dr. Abdullah Alaoudh, included with AdvanFort's opposition to the motion to dismiss.

Inasmuch as the Court might be inclined to give any credence to the views expressed by Mr. Al Hajailan (it should not), AdvanFort respectfully requests that the Court permit it to depose him. *See, e.g.*, *In re Bridgestone/Firestone*, 131 F. Supp. 2d at 1031 (permitting deposition of expert in connection with motion to dismiss for *forum non conveniens* in regard to the qualifications of the expert and the basis for conclusions on foreign law); *Norex Petrol.*, 2003 U.S. Dist. LEXIS 4276, at *7 (same).

With respect to Zamil's reliance on AdvanFort's prior litigation in Saudi Arabia, Zamil disregards all of the facts recounted in the Complaint detailing how that process was marred by serious irregularities. These include: a witness who was offered a bribe and threatened in order to induce him not to testify; another witness who suddenly became too fearful to testify; a settlement offer that required bribery; and a court that abruptly rendered a judgement against AdvanFort without appointing an independent marine expert despite having previously committed to doing so. Compl. ¶¶ 109, 112, 115–16, 119, 121.

Moreover, as explained in the expert declaration of Dr. Alaoudh, *ex parte* communications between parties and judges are not prohibited under Saudi law and routinely occur, including for purposes of leveraging personal connections and exerting influence. Alaoudh Decl. ¶ 30.

Accordingly, AdvanFort respectfully requests that the Court permit it to:

(a) Take the deposition of Mr. Al Hejailan.

AdvanFort also respectfully requests that the Court permit discovery in regard to:

(b) Communications between Zamil and/or anyone acting on its behalf or for its benefit and any actual or contemplated witnesses of AdvanFort in the parties' litigation in Saudi Arabia; and

(c) *Ex parte* communications between Zamil and/or anyone acting on its behalf or for its benefit and any judge or other personnel employed by the courts of Saudi Arabia regarding the parties' litigation in Saudi Arabia.

2. *The Location and Language of Witnesses and Evidence*

In attempting to argue that the "private factors" relevant to the *forum non conveniens* inquiry weigh in favor of dismissal, *Jiali Tang,* 656 F.3d at 248, Zamil makes the conclusory and unsupported factual assertion that certain unnamed witnesses are located in Saudi Arabia. Mem. in Supp. at 11. However, Zamil conspicuously fails to identify any such witness. Nor does Zamil disclose where they are found. Without knowing who these witnesses are and where they may be located, it is not possible to determine whether their testimony would be available for a U.S. proceeding, including by way of trial deposition through the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, or similar treaty.

Zamil likewise makes broad, unsupported factual assertions that "many" relevant documents are in Arabic and that "many" relevant employees do not speak English. Kurikkalakath Decl. ¶ 8. Zamil makes these assertions despite the facts that, *inter alia*, Zamil advertises its services in English in the United States and communicated with AdvanFort in English. *See* Farajallah Decl. ¶ 2. *See also, e.g.*, Compl. ¶¶ 70, 76, 80, Ex. A.

Nonetheless, if the Court is inclined to consider that additional evidence on these issues to be helpful, AdvanFort respectfully requests it be permitted to conduct discovery in regard to:

(d) The identities and locations of individuals with knowledge relevant to AdvanFort's claims and any defenses that Zamil may present.

(e) The languages spoken by any such individuals; and

(f) The language used in documents relevant to AdvanFort's claims and any defenses that Zamil may present.

***

8

In sum, the limited discovery that AdvanFort seeks is narrowly targeted to matters of fact that Zamil raised in its motion to dismiss.  Further, Zamil's apparent misstatements regarding whether it has employees in the United States are troubling and require discovery to determine the scope and nature of Zamil's contacts with Virginia.

## C. Staying Consideration of the Motion to Dismiss Is Appropriate During Discovery.

Where a court finds jurisdictional or *forum non conveniens* discovery is appropriate, it typically stays consideration of the underlying motion to dismiss until such discovery is completed. *See, e.g.*, *Lee Sch. Lofts, L.L.C. v. Amtax Holdings 106 LLC*, Civil Action No. 3:08cv427, 2008 U.S. Dist. LEXIS 87572, at *11 (E.D. Va. Oct. 29, 2008); *Mamo v. BP P.L.C.*, No. 1:05cv1323 (JCC), 2006 U.S. Dist. LEXIS 12876, at *1 (E.D. Va. Mar. 7, 2006) (deferring decision on motion to dismiss until completion of jurisdictional discovery).  Accordingly, unless the Court denies the motion to dismiss without discovery, it should, in addition to granting the present motion for limited discovery, simultaneously stay consideration of the motion to dismiss until discovery is completed.

## CONCLUSION

For the foregoing reasons, AdvanFort respectfully requests an Order (1) staying its consideration of Zamil's motion to dismiss pending discovery on the issues identified in this memorandum, and (2) ordering that AdvanFort may commence with discovery on those issues.

9

Dated:  October 30, 2023

AdvanFort Company

By its Attorneys,

/s/ Benjamin L. Hatch
Benjamin L. Hatch (VSB No. 70116)
MCGUIRE WOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Clara Brillembourg *(pro hac vice)*
Foley Hoag LLP
1717 K Street N.W.
Washington D.C., 020006
Telephone: (202) 261-7334
Email: CBrillembourg@foleyhoag.com

Andrew Loewenstein *(pro hac vice)*
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-3015
E-mail: ALoewens@foleyhoag.com

Peter Sullivan *(pro hac vice)*
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 010019
Telephone: (212) 812-0310
E-mail: psullivan@foleyhoag.com

*Counsel for AdvanFort Company*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2023, a true and correct copy of the foregoing Memorandum in Support of Plaintiff's Motion for Limited Discovery and to Stay Motion to Dismiss of Zamil Offshore Services Company was served on all counsel of record via the Court's CM/ECF electronic filing system.

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| ADVANFORT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-906 |
| | ) | |
| ZAMIL OFFSHORE SERVICES | ) | |
| COMPANY and SAUDI PORTS | ) | |
| AUTHORITY, a foreign sovereign | ) | |
| State, | ) | |
| | ) | |
| Defendants. | ) | |

**ZAMIL OFFSHORE SERVICES COMPANY'S REPLY**
**IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT ....................................................................................................................... 2

I.    This Court Lacks Personal Jurisdiction Over Zamil Offshore. ............................... 2

      A.    The Vast Majority of AdvanFort's Jurisdictional Allegations Have
            Nothing to Do With AdvanFort's Claims. ................................................... 2

      B.    Zamil Offshore Did Not Purposefully Avail Itself of the Privilege of
            Doing Business in Virginia. .......................................................................... 4

      C.    The Exercise of Jurisdiction Would be Constitutionally Unreasonable. ..... 11

      D.    AdvanFort's New "Agency" Theory of Jurisdiction Is Incorrect. .............. 12

II.   This Case Should be Dismissed Based on *Forum Non Conveniens*. ..................... 12

      A.    Saudi Courts are Available. ......................................................................... 12

      B.    Saudi Courts are Adequate. ......................................................................... 14

      C.    The Private Interest Factors Favor Saudi Arabia. ....................................... 18

      D.    The Public Interest Factors Favor Saudi Arabia. ........................................ 19

CONCLUSION ................................................................................................................. 20

i

## TABLE OF AUTHORITIES

Page

### CASES

*Alayan v. Permanent Mission of Saudi Arabia to the United Nations*, 2021 WL 1964078 (S.D.N.Y. May 17, 2021) .................................................................. 15, 16, 17

*Azima v. RAK Inv. Auth.*, 926 F.3d 870 (D.C. Cir. 2019) .......................................... 17

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390 (4th Cir. 2003) ........................................................................................................... 8

*CDM Smith Inc. v. Atasi*, 594 F. Supp. 3d 246 (D. Mass. 2022) ........................... 16, 17

*Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*, 569 F.3d 189 (4th Cir. 2009) ............................................................................... 15

*Conflict Kinetics, Inc. v. Goldfus*, 577 F. Supp. 3d 459 (E.D. Va. 2021) .................... 19

*Conopco, Inc. v. Rebel Smuggling*, 2021 WL 5909831 (E.D. Va. Dec. 14, 2021) ............................................................................................................... 7, 11

*Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273 (4th Cir. 2009) .................... *passim*

*D & S Consulting, Inc. v. Kingdom of Saudi Arabia*, 322 F. Supp. 3d 45 (D.D.C. 2018), *aff'd*, 961 F.3d 1209 (D.C. Cir. 2020) .......................................... 17

*Dirtt Env't Sols Inc. v. Falkbuilt Ltd.*, 65 F.4th 547 (10th Cir. 2023) ................... 13, 14

*Ellicott Machinery Corp. v. John Holland Party Ltd.*, 995 F.2d 474 (4th Cir. 1993) ................................................................................................. *passim*

*Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124 (4th Cir. 2020) ................................... 3, 7

*Fireclean LLC v. Tuohy*, 2016 WL 4414845 (E.D. Va. June 14, 2016) ....................... 8

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990) ............................................................................................... 12

*Foster Made, LLC v. Foster*, 2018 WL 4693810 (E.D. Va. Sept. 28, 2018) ................ 7

*Grizzard v. LG Chem Ltd.*, 641 F. Supp. 3d 282 (E.D. Va. 2022) .............................. 8

*In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp. 1141 (D.D.C. 1982) ........................................................................... 20

*Lane v. Gray Transp., Inc.*, 2021 WL 4392667 (N.D. W. Va. Sept. 24, 2021) ............. 4

Page

*Mattiaccio v. Cantu Apiaries of Fla., LLC*, 2022 WL 1597826 (E.D. Va. May 19, 2022) ........................................................................................................ 9, 11

*Petersen v. Boeing Co.*, 108 F. Supp. 3d 726 (D. Ariz. 2015) ............................... 16, 17

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) .................................... 12, 15, 19, 20

*Poly-Med, Inc. v. Novus Sci. Pte. LTD*, 2016 WL 695625 (D.S.C. Feb. 22, 2016) ........................................................................................................... 13, 14

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175 (4th Cir. 2013) ........................................................................ 3

*Saudi v. Northrop Grumman Corp.*, 427 F.3d 271 (4th Cir. 2005) ............................... 3

*Tang v. Synutra Int'l, Inc.*, 656 F.3d 242 (4th Cir. 2011) .......................... 12, 14, 18, 19

*Tire Engineering & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292 (4th Cir. 2012) ...................................................................... 6, 11

*UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344 (4th Cir. 2020) .............................. 7

*Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553 (4th Cir. 2014) ....................... 8

*Vape Guys, Inc. v. Vape Guys Distrib., Inc.,* 2020 WL 1016443 (E.D. Va. Mar. 2, 2020) ............................................................................................ 9

*Wallace v. Yamaha Motors Corp.,* 2022 WL 61430 (4th Cir. Jan. 6, 2022) ............. 8, 9

*Weisner v. FLIR Sys., Inc.*, 2019 WL 4962594 (E.D.N.C. Oct. 7, 2019) .................... 10

*Yacht Basin Provision Co. v. Bates*, 610 F. Supp. 3d 800 (E.D.N.C. 2022) ............. 3, 6

## OTHER AUTHORITIES

28 U.S.C. § 1330 ................................................................................................ 12

AdvanFort's Opposition further demonstrates that this case—in which the entire dispute is over alleged damage to a ship docked in a Saudi Arabian shipyard—should not proceed in this Court.  AdvanFort distorts the record, alleges new facts not found in the Complaint, misreads or ignores applicable case law, and attempts to draw this Court into a political fray.  However, it cannot escape the conclusion that, under controlling Fourth Circuit precedent, this Court should dismiss this case for lack of personal jurisdiction, *forum non conveniens*, or both.

*First*, AdvanFort does not come close to showing that this Court has personal jurisdiction over Zamil Offshore.  AdvanFort does not—and cannot—distinguish Fourth Circuit precedent holding that where, as here, the dispute involves a one-off contract with a foreign company for services performed in a foreign country, a handful of calls and emails do not establish personal jurisdiction.  Thus, Zamil Offshore's alleged contacts with Virginia are insufficient as a matter of law, and its claims should be dismissed on this basis.

*Second*, AdvanFort's *forum non conveniens* arguments are equally unavailing.  AdvanFort concedes its claims may be brought under Saudi Arabian law, and it fails to offer any serious argument to rebut the conclusion that the private and public interest factors in this Saudi Arabia-centered dispute weigh heavily in favor of the Saudi forum.  Instead, AdvanFort erroneously argues that Saudi Arabia is not "available" because AdvanFort would have to bring its claims against Zamil Offshore and the Ports Authority in two separate Saudi courts.  But Saudi law does not preclude it from bringing a claim against the Ports Authority and Zamil Offshore in the same Saudi court.  And even if it were required to bring separate suits in Saudi Arabia, AdvanFort does not cite any case law to support the proposition that this is an inconvenience that precludes a *forum non conveniens* dismissal.

AdvanFort then spends the bulk of its brief arguing that the entire Saudi Arabian judicial system and government are corrupt.  But AdvanFort's allegations about the Saudi legal system are nothing new, and they have been repeatedly rejected by U.S. courts—including as recently as May 2021.  In attempting to turn its misdirected Complaint into a referendum on the Saudi legal system, AdvanFort asks this Court to be the first federal court in the United States to declare the entire

Saudi civil judicial system inadequate. This Court should decline that invitation and reject AdvanFort's arguments.

## ARGUMENT

### I.    This Court Lacks Personal Jurisdiction Over Zamil Offshore.

The basic legal framework is not in dispute. AdvanFort makes no argument that this Court has general jurisdiction over Zamil Offshore. Instead, it argues there is specific jurisdiction, which requires AdvanFort to show that (1) Zamil Offshore purposefully availed itself of the privilege of conducting activities in Virginia; (2) AdvanFort's claims arise out of those activities directed at Virginia; and (3) the exercise of personal jurisdiction would be constitutionally reasonable. *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 133 (4th Cir. 2023); Dkt. No. 34 (Opp.) at 20. AdvanFort's Opposition confirms that *none* of these factors are met here.

### A.    The Vast Majority of AdvanFort's Jurisdictional Allegations Have Nothing to Do With AdvanFort's Claims.

AdvanFort attempts to confuse the jurisdictional analysis by relying on alleged activities that have no nexus with its claims. However, such allegations are irrelevant under the second prong of the specific jurisdiction inquiry. As AdvanFort acknowledges, specific jurisdiction requires that "the defendant purposely established minimum contacts in the forum state such that it should reasonably anticipate being haled into court there on a claim *arising out of those contacts*." Opp. at 20 (emphasis added) (quoting *Sneha Media & Ent., LLC v. Associated Broad Co. P.*, 911 F.3d 192, 198 (4th Cir. 2018)); *see also dmarcian, Inc.* 60 F.4th at 133 (requiring that "claims arise out of those activities directed at the State") (citation omitted).

The *only* facts alleged in the Complaint with any connection to this case are (i) AdvanFort's allegation that it "learned of Zamil Offshore by seeing Zamil Offshore's advertisement in *The Baltic Exchange* and reading about the company in the *Maritime Executive Magazine*," Compl. ¶ 58, and (ii) its communications with AdvanFort about the work on the *Seaman Guard Virginia*, Dkt. No. 1 (Compl.) ¶¶ 60, 63-64, 67-69, 75-77, 99-101, 103-04, 107-08, 110, 124-126.

Yet AdvanFort relies on other allegations that have no nexus to its claims:

- It alleges that Zamil Offshore advertised in other publications, Opp. at 22-23 (citing Compl. ¶¶ 50-52), but does not allege that AdvanFort ever saw or read any of these other advertisements.

- It alleges that Zamil Offshore's affiliate "[s]ought prestigious affiliation with the Vienna, Virginia-based U.S.-Saudi Business Council where it promoted Zamil," Opp. at 23 (citing Compl. ¶¶ 11, 55). But it does not allege that AdvanFort attended any meeting of this organization or relied in any way on this alleged "promotion."

- It alleges that Zamil Offshore "regularly participated in American trade groups like the Offshore Technology Conference," in Houston, Texas. Opp. at 23 (citing Compl. ¶¶ 54-56). But it does not allege that anyone at AdvanFort attended this conference.

Those allegations are irrelevant to the jurisdictional question. *See Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005) (refusing to consider foreign shipyard's unrelated activities that did not have "anything to do with" the plaintiff's claims); *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 139 (4th Cir. 2020) (Marriott's "not insignificant" business activity in forum state was "not relevant" to specific jurisdiction inquiry because it was unrelated to claims); *Yacht Basin Provision Co. v. Bates*, 610 F. Supp. 3d 800, 820 (E.D.N.C. 2022) (defendants' unrelated activities in forum were "not related to plaintiff's claims and thus cannot serve as a basis for specific jurisdiction").

Realizing the inadequacy of its Complaint, AdvanFort attempts to buttress it with two new allegations in its declarations and Opposition brief: (i) that Zamil Offshore has two employees in the United States, relying on unverified, suspicious LinkedIn profiles as evidence, *see* Dkt. Nos. 35-2, 35-3 (Sullivan Decl. Exs. B-C); Opp. at 22; and (ii) that AdvanFort viewed Zamil Offshore's website before contracting with it in 2013, *see* Dkt. No. 36 (Farajallah Decl.) ¶ 7. As a threshold matter, this Court should not entertain AdvanFort's new allegations that were not alleged in its Complaint. "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). But even if the Court considers AdvanFort's new allegations, they do not affect the outcome.

*First*, there is no allegation that the two alleged employees from the LinkedIn profiles had anything to do with AdvanFort's claims. AdvanFort makes no allegation that either of the employees had any contact whatsoever with AdvanFort or were involved in any way with AdvanFort's claims. Thus, they are irrelevant to the jurisdictional analysis. *See Lane v. Gray Transp., Inc.*, 2021 WL 4392667, at *5 (N.D. W. Va. Sept. 24, 2021) (two employees of defendant living in forum state but with no connection to the allegations insufficient to confer specific jurisdiction).

Moreover, AdvanFort's LinkedIn employee allegations are contradicted by sworn testimony in the record. As Mr. Kurikkalakath affirmed in his declaration, Zamil Offshore has no offices or employees in the United States, and it has never repaired a ship in the United States. Dkt. No. 24-6 (Kurikkalakath Decl.) ¶¶ 3-4. Zamil Offshore has no records of employing anyone by the names of "Adel Gad" or "Kelly Ruth" anywhere. Kurikkalakath Suppl. Decl. ¶ 3. In addition, the profiles are highly questionable and nonsensical. The public profile of "Kelly Ruth" shows no LinkedIn followers, no posts, and no history—just a single "liked" photo. *See* Sullivan Decl. Ex. C. And "Adel Gad" purports to be a "Chief Engineer" at Zamil Offshore who both lists his current location as "KSA" in the "Experience" section of his profile and "Richmond, Virginia, United States" at the top of the page. Sullivan Decl., Ex. B. AdvanFort offers no explanation of how he could possibly be employing his skills as an engineer from the other side of the world, given Zamil Offshore has no offices in the United States and operates a shipyard in Saudi Arabia. Kurikkalakath Decl. ¶¶ 3-4. Thus, although the Court need not resolve this factual issue to decide this motion, AdvanFort's employee allegations are baseless.

*Second*, Zamil Offshore's website is insufficient to establish personal jurisdiction. Although it alleges a connection with Plaintiff's claims, for the reasons described in the next section, it does not satisfy the purposeful availment standard under Fourth Circuit precedent.

**B.     Zamil Offshore Did Not Purposefully Avail Itself of the Privilege of Doing Business in Virginia.**

The purposeful availment prong considers the following nonexclusive list of factors:

(1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*dmarcian*, 60 F.4th at 133 (citation omitted). AdvanFort argues that it meets the first, third, fourth, seventh, and eighth factors, but its arguments are erroneous and contrary to Fourth Circuit precedent.

As an initial matter, two Fourth Circuit decisions, *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273 (4th Cir. 2009) and *Ellicott Machinery Corp. v. John Holland Party Ltd.*, 995 F.2d 474 (4th Cir. 1993) are dispositive of the jurisdictional inquiry here. As the Fourth Circuit explained, when applying these "factors distilled from the case law," courts "look to the quality and nature of the contacts in evaluating whether they meet the minimum contacts requirement." *Consulting Eng'rs*, 561 F.3d at 279. Both of those cases involved claims, as here, against foreign defendants arising out of short-term, one-off service contracts performed abroad. And in both cases, the Fourth Circuit found contacts similar to—and *more* extensive than those alleged by AdvanFort—to be insufficient to support a finding of purposeful availment. AdvanFort's Opposition dedicates a mere six sentences in its thirty-page brief to attempting to distinguish those two directly-on-point cases. Opp. at 27. AdvanFort's brevity is telling. As explained below, AdvanFort cannot distinguish them.

*First factor—whether Zamil Offshore maintained offices or agents in Virginia.* AdvanFort relies on allegations that are unrelated to its claims: (i) alleged Zamil employees on LinkedIn and (ii) claims its affiliate "promoted" Zamil Offshore at the U.S-Saudi Business Counsel. As explained above, however, there is no allegation that either of these activities had any nexus to this case; thus, they cannot establish specific jurisdiction.

AdvanFort cites *Tire Engineering & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 304 (4th Cir. 2012) (per curiam) for the proposition that soliciting business in Virginia can bring a defendant within the ambit of Virginia's courts, Opp. at 22, but it only further undermines its argument. The court concluded that the plaintiff's claims "arise out of [defendant's] contacts directed at Virginia," including that the defendant "had an office and employee in the forum state, its representatives traveled to the forum state, and a critical part of the activity of which the plaintiffs complain—conspiring to infringe its intellectual property rights—took place in the forum state." *Tire Eng'g & Distrib.*, 682 F.3d at 304. There are no such allegations here.

*Third factor—whether Zamil Offshore reached into Virginia to solicit or initiate business.* AdvanFort once again relies primarily on alleged solicitations that are irrelevant because they have no connection with its claims. *See supra*, at 3-4. The only alleged solicitations that have any connection to this case are that "AdvanFort, after viewing Zamil's advertisements distributed in Virginia and examining its website from Virginia, engaged in a business relationship with Zamil." Opp. at 24. However, under Fourth Circuit law, these activities are not sufficient to confer personal jurisdiction.

AdvanFort's allegations fail because there is no evidence that Zamil Offshore specifically targeted Virginia with its advertisements or website. AdvanFort does not dispute that Zamil's advertisements were in national publications. As the court recognized in *Yacht Basin Provision Co. v. Bates*, this fact is significant because there is no evidence that "that defendants expressly aimed their tortious conduct at [the forum state] such that [the forum state] can be said to be the focal point of the tortious activity." 610 F. Supp. 3d at 819. AdvanFort's only attempt to distinguish *Yacht Basin* is that both parties "were outside the jurisdiction," but that is incorrect. The plaintiff, like AdvanFort, was from the forum state, North Carolina. *Id.* at 804.

Likewise, AdvanFort's newfound allegation that it relied on Zamil Offshore's website fails for the same reason: there is no allegation or evidence that Zamil's website was targeted at Virginia

any more than any other state. As the Fourth Circuit has recognized, this type of general website is not sufficient to show that a defendant has purposely availed itself of the forum state:

> While Marriott obviously uses its website to engage in commercial transactions, the website does not target South Carolina residents for commercial transactions any more than it targets any other state. Instead of targeting any particular state, the website makes itself available to anyone who seeks it out, regardless of where they live. In our view, the mere fact that the website is accessible in a given state does not mean that Marriott is targeting its activities at that state.

*Fidrych*, 952 F.3d at 141.

AdvanFort describes Zamil Offshore's website as "intentional[ly] . . . design[ed]" to "engag[e]" Virginia's citizens because it had a "Contact Us" page with a fillable form. Opp. at 25. But Courts in this jurisdiction have already rejected the notion that a "fillable" form on a website evinces purposeful availment to the privileges of doing business in Virginia. *Foster Made, LLC v. Foster*, 2018 WL 4693810, at *7 (E.D. Va. Sept. 28, 2018) ("The mere existence of the online [fillable] form cannot . . . suffice to establish jurisdiction."); *Fidrych*, 952 F.3d at 141-42 (interactive website not sufficient because there is no "continuing, back-and-forth relationship between [defendant] and the website user" online).

AdvanFort also cites its allegations that Zamil Offshore has a website hosted in Virginia and domain names registered with Verisign, Inc. and GoDaddy.com, and claims that *UMG Recordings* changed the legal landscape and silently abrogated the cases cited by Zamil Offshore that found these types of contacts with a forum to be "de minimis." Opp. at 25; Dkt. No. 24 (Mot. to Dismiss) at 20, 24. But *UMG Recordings* did no such thing. The Fourth Circuit's finding of personal jurisdiction over the foreign operator of a music piracy website in *UMG Recordings* grew out of its finding that the website operator collected user IP addresses, countries of origin, and other user data from Virginians for the express purpose of selling "advertising [on its website]. . . *targeted to visitors in Virginia*." *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 354 (4th Cir. 2020). Courts in this district have already recognized as much and distinguished *UMG Recordings* on precisely that basis. *See Conopco, Inc. v. Rebel Smuggling*, 2021 WL 5909831, at *4 (E.D. Va. Dec. 14, 2021) (explaining that "one of the primary factors indicating that the defendant

purposefully availed himself [in *UMG Recordings*] was that he targeted his advertising to Virginia residents"). So too here. There is no allegation that Zamil Offshore's website sold or contained advertisements individually targeted at Virginians, and, accordingly, the cases cited by Zamil Offshore in its Motion to Dismiss apply with full force. The website, domain, and server do not establish purposeful availment. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 399 (4th Cir. 2003); *Grizzard v. LG Chem Ltd.*, 641 F. Supp. 3d 282, 290 (E.D. Va. 2022); *Fireclean LLC v. Tuohy*, 2016 WL 4414845, at *6 (E.D. Va. June 14, 2016).

Moreover, AdvanFort also attempts to distinguish *Consulting Engineers* and *Ellicott Machinery* by arguing there were no allegations in those two cases that the defendants advertised in the relevant jurisdictions. Opp. at 27. But AdvanFort completely misses the point, and in the process underscores why its allegations are insufficient. In both *Consulting Engineers* and *Ellicott Machinery*, the defendants reached out directly to the plaintiffs in their home jurisdiction to initiate the business relationship. *See Consulting Eng'rs*, 561 F.3d at 280 (defendant affirmatively reached out to the Virginia plaintiff and initiated the business relationship); *Ellicott Mach.*, 995 F.2d at 476, 478 (defendant "purposefully initiated the business relationship between the parties" by faxing a request to bid on the project to the plaintiff's Baltimore headquarters). Here, by contrast, AdvanFort reached out to Zamil Offshore to initiate the relationship. Compl. ¶ 63. In the Fourth Circuit, a defendant's decision to "initiate contact" is afforded special weight in the purposeful availment inquiry, and can "significantly impact[] the outcome of a personal jurisdiction analysis." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 562 (4th Cir. 2014). If reaching out directly to the plaintiff in the forum to initiate the business relationship was not enough to tip the balance in *Consulting Engineers* or *Ellicott Machinery*, then Zamil Offshore's passive print advertising and website makes this a *stronger case* for dismissal than *Consulting Engineers* or *Ellicott Machinery* —not a weaker one.

Finally, AdvanFort relies on cases that are plainly inapposite because they involve contacts with the forum that are far more extensive than Zamil Offshore's contacts here. For example, it relies on *Wallace v. Yamaha Motors Corp.,* 2022 WL 61430, at *5 n.6 (4th Cir. Jan. 6, 2022)*,* an

unpublished opinion in which it was *undisputed* that "Yamaha purposefully availed itself of South Carolina's market by, among other activities, marketing, advertising, and providing extended service contracts for its products there; permitting authorized Yamaha dealerships to operate there; sponsoring product demonstrations there; and maintaining a membership in the Chamber of Commerce there." *Id.* at *3. Zamil Offshore's contacts with Virginia do not come close to those facts. *See also Vape Guys, Inc. v. Vape Guys Distrib., Inc.,* 2020 WL 1016443, at *8 (E.D. Va. Mar. 2, 2020) (defendant sent emails to specific customers in Virginia and conducted interactive purchases through its website).

     *Fourth factor—whether Zamil Offshore deliberately engaged in significant or long-term business activities in Virginia.* There is no evidence that Zamil Offshore engaged in any activities that satisfy this factor. AdvanFort's only evidence is "the parties' business discussions that began in 2013, when Zamil was attempting to repair the *Seaman Guard Virginia,* and more recent ones, when Zamil reached into Virginia to contact AdvanFort." Opp. at 24. AdvanFort claims this case is distinguishable from *Consulting Engineers* and *Ellicott Machinery* because those cases involved business relationships that "only lasted" three or four months, while "the relationship between Zamil and AdvanFort spanned years." Opp. at 27. That assertion does not pass the straight-face test. As AdvanFort alleged in the Complaint, AdvanFort contracted with Zamil Offshore to perform "routine maintenance and minor repairs" on the *Seaman Guard Virginia* in October 2013. Compl. ¶ 74; Opp. at 3. No further services were contemplated. The only reason Zamil Offshore's and AdvanFort's communications have "spanned years," Opp. at 27, is because AdvanFort abandoned its ship in Zamil Offshore's shipyard a decade ago and Zamil Offshore has had to repeatedly contact AdvanFort to ask it to come get it. AdvanFort's motivation for mischaracterizing the facts here is obvious: "While a single contract may be enough to satisfy the minimum contacts test showing that defendants purposefully availed themselves of the forum state, the contract must show a continuous, ongoing contractual relationship[,]" as opposed to a short-term, one-off contract for services performed abroad. *See Mattiaccio v. Cantu Apiaries of Fla., LLC,* 2022 WL 1597826, at *4, *6 (E.D. Va. May 19, 2022) (finding that *Ellicott Machinery*'s

"lens prevents th[e] Court from extending personal jurisdiction over" foreign defendant because contract with Virginia plaintiff was negotiated remotely, short-term, and performed abroad).

*Seventh Factor—whether the relevant contracts required performance of duties in Virginia.*  The only argument AdvanFort can muster is that it paid Zamil Offshore from its Virginia bank account, but that does not satisfy this factor.  Zamil Offshore wanted to be paid for its repair work.  Zamil Offshore did not demand—and the Complaint does not allege—that Zamil Offshore "requested" *that payment come from a Virginia-based bank*.  It was of no importance to Zamil Offshore where AdvanFort's bank was located.  The fact that AdvanFort happened to use a Virginia-based bank is not evidence that Zamil Offshore purposefully availed itself of the Virginia forum; it is merely a consequence of AvanFort's residence in Virginia.  *See Weisner v. FLIR Sys., Inc.*, 2019 WL 4962594, at *4 (E.D.N.C. Oct. 7, 2019) (wire transfer from defendant in Saudi Arabia to plaintiff's bank in North Carolina fell "well short" of establishing that Saudi company sought to avail itself of the privilege of doing business in North Carolina, and was instead a function of plaintiff's residence in North Carolina that had "little, if anything, to do with the relationship between the parties").

AdvanFort claims this case is distinguishable from *Consulting Engineers* because it "did not have a contract that required payment from the forum."  Opp. at 25.  But neither does this case.  In any event, the point cuts against AdvanFort: even if its newfound (and incorrect) allegation that Zamil Offshore required payment from Virginia is credited, it concedes in its Opposition that the plaintiff in *Ellicott Machinery* was required to pay the foreign defendant from Maryland—and the Fourth Circuit still found no purposeful availment.  *See* Opp. at 27.

*Eighth Factor-the nature, quality, and extent of the parties' communications about the business being transacted.*  AdvanFort repeats the same erroneous arguments, but once again fails to recognize that the Fourth Circuit has held in *Consulting Engineers* and *Ellicott Machinery* that even more substantial contacts are not of a sufficient "nature, quality and extent" to confer jurisdiction.  AdvanFort's failure to find any basis upon which to distinguish this case from *Consulting Engineers* and *Ellicott Machinery* is unsurprising, since the Fourth Circuit has

repeatedly found "purposeful availment [to be] lacking in cases in which the locus of the parties' interaction was overwhelmingly abroad." *Tire Eng'g & Distrib.*, 682 F.3d at 302; *Ellicott Mach.*, 995 F.2d at 480. This is such a case.

## C. The Exercise of Jurisdiction Would be Constitutionally Unreasonable.

The third prong, whether the exercise of jurisdiction would be constitutionally reasonable, considers the interests of the forum state, the burden on the defendant, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies. *Ellicott Mach.*, 995 F.2d at 479.[1]

The State of Virginia's interest in this case is minimal. This is a decade-old case about repairs performed on a ship in Saudi Arabia that remains in a shipyard in Saudi Arabia.[2] AdvanFort does not contest that Saudi law will apply. *See* Opp. at 19. And while Virginia may have a general interest in providing a forum for its citizens to seek redress for injuries in Virginia, "a cause of action outside the forum involving one contract between a Virginia resident and entirely foreign defendants does not indicate a strong state interest." *Mattiaccio*, 2022 WL 1597826, at *7. AdvanFort also conspicuously neglects to address the Fourth Circuit's observation that a state's "interest in adjudicating [an] action insofar as it seeks to ensure the economic health of its citizens and the fair resolution of their disputes . . . . diminishes . . . as [the state's] citizens seek their fortune away from home"—like AdvanFort did. *Ellicott Mach.*, 995 F.2d at 479.

For the reasons described in Zamil Offshore's Motion to Dismiss, the burden on Zamil Offshore to litigate this fact-based dispute on the other side of the world is great, and when weighed against Virginia's minimal interests and the international comity concerns expressed in *Ellicott*

---

[1] Because AdvanFort cannot satisfy the first two specific jurisdiction prongs, this Court need not reach the third prong. *See Consulting Eng'rs*, 561 F.3d at 279; *Conopco, Inc.*, 2021 WL 5909831, at *5.

[2] AdvanFort questions whether the ship has been scrapped. Opp. at n.16. It has not been scrapped, and remains in the Jeddah shipyard. Kurikkalakath Suppl. Decl. ¶ 8.

*Machinery*, *id.* at 480, exercising personal jurisdiction in this matter would be constitutionally unreasonable.

### D. AdvanFort's New "Agency" Theory of Jurisdiction Is Incorrect.

AdvanFort adds a new theory of jurisdiction not alleged in the Complaint: that this Court has jurisdiction over Zamil Offshore under 28 U.S.C. § 1330(b) because it is an agent of the Ports Authority. Opp. at 30. This allegation is frivolous. Zamil Offshore is not an agent of the Ports Authority; it has operated the Jeddah shipyard for the past ten years pursuant to a written lease agreement with the Ports Authority. Kurikkalakath Suppl. Decl. ¶ 6. Moreover, the presumption of the juridical separateness of entities applies to jurisdictional issues, and AdvanFort's unadorned "[i]n the alternative, upon information and belief" allegation that Zamil Offshore is an agent of the Ports Authority, Compl. ¶ 38, comes nowhere close to satisfying its burden under the "rigorous attribution standard required by FSIA." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 440, 446-48 (D.C. Cir. 1990) (noting that even "[m]ajority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA").

## II. This Case Should be Dismissed Based on *Forum Non Conveniens*.

A case should be dismissal on the basis of *forum non conveniens* when an alternative forum is (i) available; (ii) adequate; and (iii) more convenient in light of the public and private interests involved. *dmarcian*, 60 F.4th at 136 (citing *Tang v. Synutra Int'l, Inc.*, 656 F.3d 242, 248 (4th Cir. 2011)). Nothing in AdvanFort's Opposition alters the analysis; this is a textbook case for *forum non conveniens* dismissal.

### A. Saudi Courts are Available.

"Availability will ordinarily be satisfied when the defendant is amenable to process in the other jurisdiction." *Tang*, 656 F.3d at 249 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981)). Here, there is no dispute that Zamil Offshore is amenable to process in Saudi Arabia,

as it was in 2014. Kurikkalakath Decl. ¶ 7. AdvanFort's arguments about why the Saudi courts are not available should be easily rejected.

*First*, AdvanFort contends that Saudi Arabia is not an available forum because the Ports Authority has not yet moved for dismissal on the basis of *forum non conveniens*, Opp. at 6, but that is simply a matter of timing. The Ports Authority has not yet appeared in this matter because it was not served until recently on September 25, 2023. Dkt. No. 33. A plaintiff cannot stymie a motion to dismiss for *forum non conveniens* by delaying service on one defendant and then arguing that dismissal is precluded because the recently-served defendant has not yet appeared in the action. Further, AdvanFort cites cases in which domestic defendants declined to join their foreign co-defendants' *forum non conveniens* motions because they did not want to litigate in a foreign country. *Dirtt Env't Sols Inc. v. Falkbuilt Ltd.*, 65 F.4th 547, 549 (10th Cir. 2023); *Poly-Med, Inc. v. Novus Sci. Pte. LTD*, 2016 WL 695625, at *9 (D.S.C. Feb. 22, 2016). However, it is highly unlikely that the Saudi Ports Authority will oppose moving this case back to Saudi Arabia when their response is due.

*Second,* AdvanFort argues that the Saudi courts are unavailable because AdvanFort would have to bring its claims against Zamil Offshore and the Ports Authority in two different Saudi Courts: the Commercial Court and the Board of Grievances.[3] Opp. at 7.

As an initial matter, it is incorrect that AdvanFort necessarily would have to bring their claims in two Saudi courts. As explained by Mr. Hussam Salah I. Al Hejailan in his supplemental declaration, the Board of Grievances has the discretion to hear both claims against the Ports Authority and Zamil Offshore. *See* Al Hejailan Suppl. Decl. ¶ 3.1.1.

Moreover, even if AdvanFort were required to bring separate suits in separate Saudi courts, that is not a basis to deny this motion. AdvanFort does not cite any legal authority for the proposition that AdvanFort's claims must be heard by a single Saudi court. Rather, AdvanFort

---

[3] In Saudi Arabia, the Board of Grievances has recently come to be known as the "Administrative Court." Al Hejailan Suppl. Decl. ¶ 3.1.1.

cites cases in which courts have denied *forum non conveniens* motions when it would split claims against domestic defendants from foreign defendants, forcing plaintiffs to litigate in two different countries. In *DIRTT Environmental Solutions., Inc. v. Falkbuilt Ltd.*, there were three domestic defendants and three Canadian defendants. 65 F.4th at 551. The three domestic defendants "refused to join" the Canadian defendants' *forum non conveniens* motion because they did not want to leave their home country to defend the suit in Canada. *Id.* The Tenth Circuit held it would be improper for the district court to use *forum non conveniens* to "split" the case—sending half of the defendants off to litigate in Canada while keeping the domestic defendants in Utah—because it would result in "piecemeal" litigation in two different countries that would be inconvenient for all involved. *Id.* at 554-55. Likewise, in *Poly-Med, Inc. v. Novus Scientific Pte. LTD*, the Swedish defendant and the Singaporean defendant filed a *forum non conveniens* motion to move the case to Sweden, but the domestic defendant declined to join. 2016 WL 695625, at *9. In denying the *forum non conveniens* motion, the district court declined to force a San Diego-based defendant who did not want to litigate in Sweden to litigate in Sweden. *Id.*

Those case do not apply here, where both Zamil Offshore and the Ports Authority are Saudi entities. The convenience factors are far different. At worst, AdvanFort would be required to bring parallel suits against the Ports Authority in the Board of Grievances and Zamil Offshore in the Saudi Commercial Court, which as AdvanFort's expert acknowledged, are both located nearby in Jeddah. Dkt. No. 37 (Alaoudh Decl.) ¶ 29 n.34. AdvanFort does not cite *any* case that has denied a *forum non conveniens* motion under these circumstances.

## B. Saudi Courts are Adequate.

"A foreign forum is adequate when (1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." *Tang*, 656 F.3d at 249 (citation omitted).

As to the first factor, AdvanFort concedes that Saudi courts have jurisdiction over both Zamil Offshore and the Ports Authority.  Opp. at 7.

On the second, a forum is inadequate when it does not permit litigation of the subject matter in dispute, *Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*, 569 F.3d 189, 205 (4th Cir. 2009), or, in "rare circumstances," when the remedy offered by the other forum is "clearly unsatisfactory."  *Piper Aircraft Co.*, 454 U.S. at 254 n.22.  AdvanFort does not contest that it may bring a claim concerning the subject matter in dispute in Saudi courts and that Saudi law offers an adequate remedy for its claims.  AdvanFort's legal expert, Mr. Alaoudh, does not offer any rebuttal to Mr. Al Hejailan's opinions on those issues.  Dkt. No. 24-1 (Al Hejailan Decl.) ¶¶ 4.1.2, 4.1.3.

Instead, AdvanFort recycles well-worn arguments that the Saudi judicial system, as a whole, is incapable of adjudicating disputes fairly.  Opp. at 7-16.  Its primary argument is that Saudi courts are "controlled by the Saudi government . . . and [are] marked by capriciousness, opacity, and discrimination."  Opp. at 8.  It relies on the declaration of its legal expert—a vocal public critic of the Saudi government—and miscellaneous news reporting in support its contention that "it is extremely unlikely that the courts of Saudi Arabia would adjudicate AdvanFort's claims in a fair and impartial manner."  *Id.*

But none of AdvanFort's claims about the Saudi government and the Saudi legal system are new, and courts in the United States have been rejecting these same arguments for years.  *See* Mot. to Dismiss at 9-10 (collecting cases finding Saudi Arabia to be an adequate forum). AdvanFort seeks to dismiss these cases because they are "three-to-four-decades-old [and] have no bearing on the status of the judiciary today."  Opp. at 14-15.  That critique is plainly wrong. AdvanFort's brief conspicuously fails to mention *Alayan v. Permanent Mission of Saudi Arabia to the United Nations*, 2021 WL 1964078 (S.D.N.Y. May 17, 2021)—decided in 2021—in which the plaintiffs argued the Saudi legal system was inadequate and "cite[d] allegations of human rights scandals, the detention of women's rights activists, and the murder of a Saudi Journalist[,]" as well as allegations that its process server "was turned away under the threat of arrest" and "was in fear

of his life." *Id.* at *2. The court acknowledged the process server's safety concerns, but still found the plaintiffs' "arguments unavailing," explaining that they "rest mostly on general biases and dangers within Saudi Arabia[,]" and cited other cases in which U.S. courts had found Saudi Arabia to be an adequate forum. *Id.* at *2-3. Even more recently, plaintiffs cited the same State Department "Human Rights Practices" Reports that AdvanFort cites, but the court was unpersuaded. *See CDM Smith Inc. v. Atasi*, 594 F. Supp. 3d 246, 256-57 (D. Mass. 2022) (finding Saudi Labor Court to be impartial and explaining that State Department Human Rights Reports are inapposite because they are focused on the Saudi criminal justice system, not the civil courts).

AdvanFort contends that Zamil Offshore's case law has been "controverted by more recent cases addressing the issue," Opp. at 16, but cites no cases. That is because the only case in AdvanFort's entire brief that found any court in Saudi Arabia to be inadequate is *Petersen v. Boeing Co.*, 108 F. Supp. 3d 726 (D. Ariz. 2015). *Petersen*'s finding of inadequacy is inapposite, however, because it was limited by its own terms "to the Saudi Labor Courts, specifically, as opposed to Saudi courts more generally." *Id.* at 731. Moreover, even that narrow holding has been controverted by more recent cases. *See CDM Smith Inc.*, 594 F. Supp. 3d at 257, 263 (declining to follow *Petersen* and finding Saudi Labor Courts to be impartial).

AdvanFort argues that some of the cases Zamil Offshore cited should be ignored because they involved a foreign plaintiff, and a foreign plaintiff's choice of forum is owed less deference. Opp. at 15. That distinction is not on point. Whether a plaintiff is suing in its home forum affects the weight given to that plaintiff's choice of forum in the overall *forum non conveniens* balancing test, but it has no effect on the court's determination of whether a foreign forum is adequate. Indeed, in the very case cited by AdvanFort, *MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*, the court did not even discuss the level of deference owed to the plaintiff's choice of forum *until after it had already determined that Germany was an adequate forum*. 2010 WL 2757351, at *4-5 (W.D. Va. July 13, 2010).

AdvanFort also attempts to disregard cases that involved a forum selection clause as "hav[ing] no application here," Opp. at 15, but AdvanFort's argument is self-defeating, as the only

case AdvanFort cites that found any court in Saudi Arabia to be inadequate, *Petersen v. Boeing Co.*, *was a case involving the enforcement of a forum selection clause*.  108 F. Supp. 3d at 731 (forum selection clause selected Saudi Labor Courts).  As the D.C. Circuit recognized, the law is still evolving in this area, and "most"—but not all—courts do not discuss adequacy when a forum selection clause exists.  *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 875 n.2 (D.C. Cir. 2019).  But that is no reason to ignore the relevant analysis from the courts that (like *Petersen*) still do.  *See, e.g.*, *Alayan*, 2021 WL 1964078, at *2-3 (performing adequacy analysis and citing *forum non conveniens* cases after the plaintiff argued that enforcement of the forum selection clause would be "unjust"); *CDM Smith Inc.*, 594 F. Supp. 3d at 263 (same).  In addition, at least one court has felt compelled to opine on the adequacy of one of the very Saudi courts at issue, even if not strictly necessary.  *See D & S Consulting, Inc. v. Kingdom of Saudi Arabia*, 322 F. Supp. 3d 45, 51 n.4 (D.D.C. 2018), *aff'd*, 961 F.3d 1209 (D.C. Cir. 2020) ("The Court notes that if it could reach the issue, the Court would find that the Board [of Grievances] would meet the adequacy standard. Saudi Arabia is an adequate alternative forum . . . .").

AdvanFort has *no answer* to the inconvenient fact that Zamil Offshore did not completely prevail in its first case with AdvanFort in the Saudi courts.  The Saudi court denied Zamil Offshore 70% of the relief it sought in this prior suit.  Al Hejailan Decl. Ex. B, at 4; Mot. to Dismiss at 9.  This directly contradicts AdvanFort's claim that it will not get a fair trial in Saudi Arabia.

Finally, AdvanFort does not refute the core principle that "[c]ourts must be cautious before finding incompetence or corruption by other nation's judicial systems."  *Alayan*, 2021 WL 1964078, at *2.  In arguing that this Court should find both the Saudi Board of Grievances and the Commercial Court to be inadequate fora, it asks this Court to be the first court in the United States to make such a finding.  The Court should reject that argument and follow the long line of cases that have rejected AdvanFort's arguments.

C.    The Private Interest Factors Favor Saudi Arabia.

The private interest factors include: (i) the relative ease of access to sources of proof, (ii) the availability of compulsory process to obtain the testimony of unwilling witnesses, (iii) the cost of obtaining testimony from willing witnesses, (iv) the possibility of viewing the premises, and (v) "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Tang*, 656 F.3d at 249 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). AdvanFort's arguments that these factors weigh in favor of proceeding with this case in Virginia rather than Saudi Arabia are plainly wrong.

AdvanFort's claim that the physical evidence is "not seriously in dispute," Opp. at 17, could not be further from the truth, as a key issue in this case will be determining what damage occurred to the *Seaman Guard Virginia*, when that damage occurred, and what caused it. That will require evaluation of physical evidence in Jeddah, such as the ship and the security features of the shipyard, as well as testimony from witnesses in Jeddah. AdvanFort cites its own expert's report on the condition of the vessel, Opp. at 17, but those opinions are subject to dispute.

AdvanFort's claim that its "witnesses are located in the United States and this forum," Opp. at 17, is also misguided. AdvanFort claims that unspecified "potential witnesses in this case are located in the United States, and specifically Virginia," Farajallah Decl. ¶ 6, but does not identify a single witness or type of witness. It also claims that "employees who interacted with Zamil reside in the United States or in countries other than Saudi Arabia," Farajallah Decl. ¶ 4, but offers no further explanation of who those witnesses would be and what testimony they would offer. This is significant because AdvanFort's claims are based on events that occurred in Saudi Arabia years after all of AdvanFort's employees left the Jeddah shipyard. Compl. ¶¶ 132-135. Thus, it is not clear what local witnesses AdvanFort is referring to and what role they would have in the case. Accordingly, its nebulous arguments as to the convenience of its witnesses should be given no weight.

Relatedly, AdvanFort's claims that Zamil Offshore failed to adequately identify the employees who may testify is also wrong. Mr. Kurikkalakath's declaration identifies exactly who

may need to be compelled to testify about what happened to the *Seaman Guard Virginia* during the ten years AdvanFort abandoned it: former Zamil Offshore and Ports Authority employees who worked at the Jeddah shipyard from 2013-2022 whom the defendants no longer control. Kurikkalakath Decl. ¶ 8. These witnesses weigh in favor of proceeding with this case in Saudi Arabia.

AdvanFort's remaining arguments are similarly unpersuasive. For the reasons already discussed, should it have to litigate in two Saudi courts, it would not impose a significant extra burden on AdvanFort. *Supra*, at 14. And the fact that "many of the important documents are already in English," Opp. at 18, alters the litigation burden equation little when other documents will be in Arabic, and the majority of relevant witnesses do not speak English and would need to be flown halfway around the world to testify. Thus, there is no serious dispute that it would be far more convenient for the parties in this case to proceed in Saudi Arabia rather than Virginia.

### D. The Public Interest Factors Favor Saudi Arabia.

The public's interests in a *forum non conveniens* motion include:

> [1] the administrative difficulties flowing from court congestion; [2] the local interest in having localized controversies decided at home; [3] the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; [4] the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and [5] the unfairness of burdening citizens in an unrelated forum with jury duty.

*Tang*, 656 F.3d at 249 (quoting *Piper Aircraft Co.*, 454 U.S. at 241 n.6). AdvanFort articulates Virginia's generalized interests in "protecting its citizen's rights" and adjudicating disputes involving injuries felt in Virginia. Opp. at 18-19. But those generic arguments ignore the nature of this suit. It completely fails to address precedent explaining that there is "little local interest" in this district in a case involving an alleged tort arising from performance of a contract overseas, like this one. *Conflict Kinetics, Inc. v. Goldfus*, 577 F. Supp. 3d 459, 465 (E.D. Va. 2021); *Ellicott Mach.*, 995 F.2d at 479. AdvanFort also does not deny that this court will be burdened with applying Saudi law, which (although not dispositive) "point[s] towards dismissal," *Piper Aircraft*

*Co.*, 454 U.S. at 251, 260, or that jury duty will be "imposed upon the people" for a case in which the "controversy's contacts with the United States pale in comparison to the controversy's foreign contacts." *In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp. 1141, 1152 (D.D.C. 1982).

At bottom, "the central focus of the *forum non conveniens* inquiry is convenience[.]" *Piper Aircraft Co.*, 454 U.S. at 249. Here, every element of the inquiry shows that Saudi Arabia is a more convenient forum than the United States. This Court should dismiss the Complaint on the basis of *forum non conveniens*.

## CONCLUSION

For the foregoing reasons, AdvanFort's Complaint should be dismissed.

Dated: November 10, 2023

Respectfully submitted,

*/s/ Amy McKinlay*
Richmond T. Moore (*pro hac vice*)
John S. Williams (*pro hac vice*)
Amy B. McKinlay (VSB No. 89394)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC  20024
Telephone: (202) 434-5000
Fax: (202) 434-5029
amckinlay@wc.com

*Counsel for Defendant Zamil Offshore Services Company*

USCA4 Appeal: 24-1007    Doc: 17    Filed: 03/27/2024    Pg: 323 of 389

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of November, 2023, I will electronically file the foregoing with the clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Benjamin L. Hatch
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510-1655
Telephone: (757) 640-3947
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Clara E. Brillembourg
Foley Hoag LLP
1717 K Street N.W.
Washington D.C., 20006
Telephone: (202) 223-1200
E-mail: CBrillembourg@foleyhoag.com

Andrew B. Loewenstein
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
E-mail: ALoewens@foleyhoag.com

Peter A. Sullivan
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 812-0400
E-mail: psullivan@foleyhoag.com

/s/ Amy McKinlay

Amy B. McKinlay (VSB No. 89394)
WILLIAMS & CONNOLLY LLP

# Supplemental Declaration of Anoop Kurikkalakath

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | |
|---|---|
| ADVANFORT COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:23-cv-906 |
| | ) |
| ZAMIL OFFSHORE SERVICES | ) |
| COMPANY and SAUDI PORTS | ) |
| AUTHORITY, a foreign sovereign | ) |
| State, | ) |
| | ) |
| Defendants. | ) |

### SUPPLEMENTAL DECLARATION OF ANOOP KURIKKALAKATH

I, Anoop Kurikkalakath, Senior Legal Counsel at Zamil Offshore Services Company ("Zamil

Offshore"), assert the following:

1. I have personal knowledge of the facts set forth in this Declaration.

2. I am Senior Legal Counsel at Zamil Offshore. In my role, I have authority to make

    legally binding decisions on behalf of Zamil Offshore for purposes of this litigation, or

    speak for those who do.

### A. Zamil Offshore's Employees

3. Zamil Offshore has no records of ever employing anyone by the names of "Adel Gad"

    or "Kelly Ruth" anywhere, including the United States.



4. No Zamil Offshore employee has ever visited Virginia or AdvanFort's office in Virginia to carry out official company business. The contract between Zamil Offshore and AdvanFort was negotiated from the Kingdom of Saudi Arabia.

5. Zamil Offshore does not have any business of commercial agents in the United States.

## B. Relationship with Port Authority

6. Zamil Offshore has been the sole operator of the Jeddah shipyard since 2013 when the shipyard was leased by Zamil Offshore. The shipyard operated by Zamil Offshore is not jointly operated by Zamil Offshore and the Saudi Ports Authority. The lease deed for the shipyard was for 10 years and expired in June 2023. Another lease deed was executed for an extension until December 2023.

7. Zamil Offshore is not the agent of the Saudi Ports Authority and there is no agency relationship. The relationship between Zamil Offshore and the Saudi Ports Authority is that of a lessor and lessee.

## C. Status of the Property at Issue

8. The vessel at issue in this suit remains in the Jeddah shipyard. It has not been scrapped.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:
November 10, 2023

_____

Anoop Kurikkalakath

# Supplemental Declaration of Hussam Salah I. Al Hejailan

Case 1:23-cv-00906-LMB-IDD   Document 41-2   Filed 11/10/23   Page 2 of 7 PageID# 1154

# The Law Firm of Salah Al-Hejailan since 1968 (L.L.C.)
## In association with ⊕ Freshfields Bruckhaus Deringer

H e a d  O f f i c e  -  R i y a d h
P.O. Box 1454, Riyadh 11431 CR 1010328482
Tel.: 011-4792200  Fax: 011-4791717
Email: Lfshriyadh@hejailanlaw.com
Website: www.hejailanlaw.com
K i n g d o m  o f  S a u d i  A r a b i a

Our ref.: LFSH/Zamil

Date: 9 November 2023

Dear Sirs

**Civil Action No. 1:23-cv-906**
**AdvanFort Company vs. Zamil Offshore Services Co. and Saudi Ports Authority**

| | |
|---|---|
| **Expert Opinion of:** | Hussam Salah I. Al Hejailan |
| **Specialist field:** | Administrative and Commercial Litigation under Saudi Law |
| **On behalf of the Defendant:** | Zamil Offshore Services Co. (the Defendant) |
| **Prepared for:** | United States District Court for the Eastern District of Virginia |
| **Subject Matter:** | Supplemental Opinion Regarding Certain Issues Raised by Mr. Abdullah Alaoudh |

1    **Instructions**

I have been instructed by Williams & Connolly, LLP, counsel for Zamil Offshore Services Co., to provide a supplemental expert opinion (the "**Opinion**") addressing three additional issues raised by Mr. Abdullah Alaoudh in his declaration in support of AdvanFort Company's Opposition to Zamil Offshore's Motion to Dismiss.

2    **The issues to be addressed**

This Supplemental Opinion will address the following legal issues:

2.1.1    Whether a single court in Saudi Arabia has jurisdiction to adjudicate AdvanFort's claims against both Zamil Offshore and the Ports Authority.

2.1.2    Whether AdvanFort's claims against the Ports Authority are barred by Article 14 of the Law of Board of Grievances.

2.1.3    Whether the Saudi legal system allows a party to challenge the accuracy of a government-issued report or statement presented as evidence in court.

**JEDDAH:** P.O. Box 15141  Jeddah 21444  Tel.: 012-6985888   Fax: 012-6821277   Email: Lfshjeddah@hejailanlaw.com
**KHOBAR:** P.O. Box 405  Khobar 31952  Tel.: 013-8687266  Fax: 013-8687255  Email: Lfshalkhobar@hejailanlaw.com
(The Law Firm of Salah Al-Hejailan L.L.C. has replaced The Law Firm of Salah Al-Hejailan)

J.A.322

*The Law Firm of Salah Al-Hejailan* since 1968 (L.L.C.)

In association with **Freshfields Bruckhaus Deringer**

3       **My opinion**

3.1.1       **Whether a single court in Saudi Arabia has jurisdiction to adjudicate AdvanFort's claims against both Zamil Offshore and the Ports Authority.**

Under Saudi Arabian law, the jurisdiction of a court will depend, among other things, on the subject and the nature of the dispute and/or the defendant.

Under the Saudi Board of Grievances Law (Administrative Law) - Saudi Arabia Cabinet Decision No. 303/1428 approved by the Saudi Arabia Royal Decree No. M78/1428 (the **"Saudi Board of Grievances Law"**), Administrative Courts (which were, until recently, referred to as the Board of Grievances) have jurisdiction over all disputes (including matters of tort and disciplinary cases) involving the Saudi Arabian government and its sub-divisions as well as their administrative decisions and over all cases related to contracts to which the government and its agencies are a party (article 13[1] of the Saudi Board of Grievance Law).

However, the Saudi Board of Grievances Law, in order to ensure access to the same forum for all relevant parties, and therefore fair treatment, allows a claimant that has submitted a lawsuit before the Administrative Court to request that the Administrative Court involve another party in the case provided that the conditions required by the relevant law are met. If the requirements are met, a third party can be joined in a case in the Administrative Court.

Moreover, Saudi law gives relief for any third party to submit a request to join an existing claim provided that they demonstrate interest in the proceedings.

More specifically, please note the following:

(1)   Under Article 11, Paragraph 1, subparagraph (B) of the Law of Procedure before the Board of Grievances, - Saudi Arabia Cabinet Decision No. [13/1435] - approved by the Saudi Royal Decree No. M/3 – dated November 25, 2013 - the judge may require the litigants to submit supplemental briefs

---

[1] *"Administrative courts shall have jurisdiction to adjudicate the following:*
*a- Cases relating to rights provided for in civil service, military service and retirement laws for employees of the Government and independent juristic entities or their heirs and their other beneficiaries.*
*b- Cases for cancellation of final administrative decisions issued by persons concerned when the appeal is based on grounds of lack of jurisdiction, defect in form or cause, violation of laws and regulations, error in application or interpretation thereof, abuse of power, including disciplinary decisions and decisions issued by quasi-judicial committees and disciplinary boards as well as decisions issued by public benefit associations – and the like – relating to their activities. The administrative authority's refusal or denial to make a decision required to be made by it in accordance with the laws and regulations shall be deemed an administrative decision.*
*c- Tort cases initiated by the persons concerned against the administrative authority's decisions or actions.*
*d- Cases related to contracts to which the administrative authority is party.*
*e- Disciplinary cases filed by the competent authority."*

2

*The Law Firm of Salah Al-Hejailan* since 1968 (L.L.C.)

In association with 🖤 Freshfields Bruckhaus Deringer

and documents, summon concerned parties for questioning on facts requiring verification, allow and permit the intervention of any eligible litigants, and other actions deemed necessary for the preparation of the case.

In light of the above, the analysis made by the Saudi expert for AdvantFort, Mr. Abdullah Alaoudh (reference is to paragraph 39 of his expert opinion), is not entirely accurate since AdvantFort's claim against both the Ports Authority and Zamil may be litigated before the same court. As mentioned above, the subject and nature of the dispute will also determine the jurisdiction of the court, and whether all parties can be joined into one claim in the Administrative Court (pursuant Article 11 of the Law of Procedure).

3.1.2    **Whether AdvantFort's claims against the Ports Authority are barred by Article 14 of the Law of Board of Grievances.**

I reconfirm my previous expert opinion dated September 29, 2023 (paragraph 4.1.4) that the Ports Authority has no sovereign immunity.

The reference to article 14 of the Saudi Board of Grievances Law made by the Saudi expert of AdvantFort, Mr. Abdullah Alaoudh (reference is to paragraph 40 of his expert opinion), is incorrect and misleading.

Article 14 relates to the principle of state sovereignty which the Ports Authority does not benefit from.

Article 14 states that *"Courts of the Board of Grievances may not hear cases related to sovereign acts, nor objections to judgments rendered by courts – not subject to this Law – within their jurisdiction, or to decisions issued by the Supreme Judicial Council and the Administrative Judicial Council as well as the Public Prosecution Council".*

The acts of the Ports Authority are administrative acts not sovereign acts within the meaning, and for the purpose of Article 14. A sovereign act shall be considered an order issued by the government of the Kingdom of Saudi Arabia related to its sovereignty or its relations with other countries, or decisions that aim at maintaining peace, social security and public health. In the Kingdom of Saudi Arabia, a sovereign order is a royal order issued by His Majesty the King.

Therefore, a distinction shall be made between a sovereign act and an administrative act – like the one that can be issued by the Ports Authority – which may be challenged and appealed according to the administrative law before an administrative court.

3.1.3    **Whether the Saudi legal system allows a party to challenge the accuracy of a government-issued report or statement presented as evidence in court.**

The Saudi legal system allows a party to challenge the accuracy of a government-issued report or statement presented as evidence in court.

3

J.A.324

*The Law Firm of Salah Al-Hejailan* since 1968 (L.L.C.)

In association with Freshfields Bruckhaus Deringer

This principle is stated in article 13, paragraph (b) of the Saudi Board of Grievance Law whereby an administrative court has jurisdiction over "*Cases for cancellation of final administrative decisions issued by persons concerned when the appeal is based on grounds of lack of jurisdiction, defect in form or cause, violation of laws and regulations, error in application or interpretation thereof, abuse of power, including disciplinary decisions and decisions issued by quasi-judicial committees and disciplinary boards as well as decisions issued by public benefit associations – and the like – relating to their activities. The administrative authority's refusal or denial to make a decision required to be made by it in accordance with the laws and regulations shall be deemed an administrative decision.*"

Therefore, any decisions issued by administrative authorities may be challenged if they are violating the statutory conditions stipulated in the law (e.g., lack of jurisdiction, defect in form or cause, violation of laws and regulations, error in application or interpretation thereof, abuse of power).

It is also worth noting that any claimant, whether the case is filed before a commercial or an administrative court, always benefits from the guarantee of appellate review, which, similar to other countries, is one of the most important guarantees of justice. Moreover, please note that rulings issued by the appellate courts cannot violate the principles of the Supreme Court.

In this respect, please note that:

(1)  Under Article 88, paragraph 1.1.2, of the Commercial Courts Law:

> "*The commercial circuit at the Supreme Court shall examine the objections against the judgments and decisions issued by the appellate circuits in the court, if the subject-matter of the objection against the judgment is one of the following:*
> (i)    *Violation of Islamic Sharia's principles or laws, or for a mistake in their application or interpretation, or for a breach of a judicial principle issued by the Supreme Court.*
> (ii)   ...*"

(2)  Under Article 11, paragraph A 2 of the Saudi Board of Grievances Law, "*the High Administrative Court shall have jurisdiction to hear objections to judgments issued by administrative courts of appeal if the grounds of appeal are any of the following:*
> (i)    *Violation of provisions of Sharia or laws not inconsistent therewith or an error in application or interpretation thereof, including violation of a precedent established in a judgment rendered by the High Administrative Court.*
> (ii)   ...*"

4        Miscellaneous

My billing rate for this matter is USD 600.

4

J.A.325



## *The Law Firm of Salah Al-Hejailan* since 1968 (L.L.C.)

**In association with** Freshfields Bruckhaus Deringer

---

5       **Statement of truth**

I confirm that I have made clear which facts and matters referred to in this expert opinion are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer. I declare under penalty of perjury under the laws of the United States of America that the foregoing truly and correctly reflects my opinions and conclusions regarding the questions posed before me within the scope of this report.

Signed

The Law Firm of Salah Al-Hejailan LLC
in association with
Freshfields Bruckhaus Deringer LLP

*The Law Firm of Salah Al-Hejailan* since 1968 (L.L.C.)

In association with 🅦 **Freshfields Bruckhaus Deringer**

---

**Appendix 1**
**Curriculum Vitae**

### HUSSAM AL-HEJAILAN
**Nationality:** Saudi

Hussam Salah Al Hejailan is working in the Riyadh office of LFSH as managing partner and head of the firm's litigation section. In that capacity, he has acquired excellent expertise in the field of litigation management, experience and pre-eminent knowledge. Based on this experience in different kind of legal areas including but not limited to employment law, corporate, finance and governmental issues, he advises the international section of LFSH in its work of contract drafting and legal consultancy services. Hussam also works in the field of state legislative and regulatory legal matters as well as law firm coordination and management. He has also international commercial transaction experience, with an emphasis on corporate and project finance, international joint ventures and distribution agreements and other commercial law issues. He has over the years, worked on the following:

1. He was head of the LFSH legal team that advised the Saudi Arabian General Investment Authority, Economic Cities Agency for two years on the regulatory framework for Economic Cities in the Kingdom of Saudi Arabia;
2. assisted in a study related to Saudi Arabian economic and business development conducted by the International Monetary Fund;
3. worked on several high commercial and governmental litigation matters; and
4. attended several conferences in relation to arbitration, insurance, office management, family companies and investment forums.

**Publications:**

Hussam is also author of a number of publications:

- Examination of the Subject Matter relating to Commercial Agencies and the Legal Problems Likely to Arise Therefrom (2000)
- Saudi Arabia (2000-2001)
- Responsibility of Board Members and the Directors of Joint Stock Companies (March 2003)
- Anti-Money Laundering Law Sets Standards for Commercial and Financial Transactions (2004)
- The requirements for Future Contracts of Foreign Companies with Government Authorities in the Kingdom
- Amendments to the Law of Legal Practice and Reinforcing the Judicial System
- The Law of Judicial Costs and Free Litigation
- The New Law of Evidence and Paradigm Shift in the Judicial Field
- An article on cyber security
- A study on the new Saudi Law of Arbitration
- A study on profit and non-profit companies
- A study on the new Saudi Bankruptcy Law
- An article on the one-man company
- An Essay on the Future of the Foreign Companies' Contracting with Government Agencies of the Kingdom

**PRACTICES / INDUSTRIES**

Corporate and Litigation

**AREAS OF FOCUS**

Litigation
Corporate

**EDUCATION**

LL.B. Law, King Saud University, Riyadh (1996)

Georgetown University Law Centre, Foundation of American Law and Legal Education (1997)

Master of Law (LL.M), University of Virginia School of Law (1999)

**MEMBERSHIPS**

Managing Director, The Law Firm of Salah Al Hejailan LLC

Member of the International Court of Arbitration (2021)

Deputy Chairman, ICC Saudi Arabia (2017)

Member in the Lawyers Committee at the Chamber of Commerce & Industry, two terms (2005-2012)

Board member, Aon Saudi Arabia

Board member, Arla Foods

**BAR ADMISSIONS**

Admitted to legal practice by the Ministry of Commerce & Industry, Riyadh Saudi Arabia (1995)

Admitted to legal practice after the promulgation of the new regulation concerning legal practice as approved by the Ministry of Justice, Riyadh, Saudi Arabia (2003)

Admitted to Who's Who International Society (2003)

Member of the Saudi Bar Association under membership no. 91669

**COURT ADMISSIONS**

Saudi Arabia

**LANGUAGES**

Arabic
English

6

J.A.327

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| ADVANFORT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-906 |
| | ) | |
| ZAMIL OFFSHORE SERVICES | ) | |
| COMPANY and SAUDI PORTS | ) | |
| AUTHORITY, a foreign sovereign | ) | |
| State, | ) | |
| | ) | |
| Defendants. | ) | |

---

**ZAMIL OFFSHORE SERVICES COMPANY'S OPPOSITION TO
PLAINTIFF'S MOTION FOR LIMITED DISCOVERY ON
PERSONAL JURISDICTION AND *FORUM NON CONVENIENS*
AND TO STAY MOTION TO DISMISS**

Zamil Offshore's motion to dismiss does not depend on any disputed issues of fact. Rather, as explained in Zamil Offshore's briefing on its motion to dismiss, even if the factual allegations in AdvanFort's complaint and supporting declarations were true, this case should be dismissed *as a matter of law* based on lack of personal jurisdiction and *forum non conveniens*. AdvanFort's request for discovery is a desperate attempt to search for evidence to oppose Zamil Offshore's motion—without any factual or legal basis. The Court, however, has the factual information it needs to resolve the legal questions in the motion to dismiss, based on controlling Fourth Circuit law, and allowing discovery would only further waste the parties' time and resources in a case that should never have been filed here and belongs, if anywhere, in Saudi Arabia. Thus, the Court should deny AdvanFort's request for discovery and grant Zamil Offshore's motion to dismiss.

**ARGUMENT**

A.     **AdvanFort's Requested Discovery Would Not Change the Personal Jurisdiction Analysis.**

Plaintiff has the burden of alleging facts that, if true, would establish personal jurisdiction. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  If the defendant challenges jurisdiction, the court may resolve personal jurisdiction on the basis of "affidavits and other written materials in the absence of an evidentiary hearing."  *TomTom, Inc. v. AOT Sys. GmbH*, 893 F. Supp. 2d 785, 787 (E.D. Va. 2012) (citation omitted).  A court should not allow jurisdictional discovery if the "additional information" sought would not "alter [the] analysis of personal jurisdiction."  *Carefirst*, 334 F.3d at 403; *see also Durden v. United States*, 736 F.3d 296, 307 (4th Cir. 2013) (finding that plaintiff failed to establish additional information that might be uncovered and even if the court granted her discovery requests, her theories of liability would still fall short).  None of AdvanFort's discovery requests would alter the Court's jurisdictional analysis.

1.     **Zamil Offshore's Employees.**

AdvanFort has submitted the LinkedIn profiles of two individuals that contain references to being employed by Zamil Offshore.  As an initial matter, Zamil Offshore has never employed these individuals.  Dkt. 24-6 (Kurikkalakath Decl.) ¶ 8; Kurikkalakath Suppl. Decl. ¶ 3.  Indeed, even a cursory examination of the profiles reveals serious questions about their veracity.  For example, one profile has no followers, no posts, no other experience, and no activity except for a single "like" of a picture.  Dkt. No. 35-3 (Sullivan Decl. Ex. C).  The other is an engineer who purportedly lives in Richmond, Virginia, yet AdvanFort offers no explanation for why a Saudi Arabian shipyard would employ an engineer in Richmond or what relevant functions he could possibly perform from there. Dkt. No. 35-2 (Sullivan Decl. Ex. B).

2

J.A.329

In any event, even if Zamil Offshore had employed these individuals, that fact is legally irrelevant to the question of personal jurisdiction here because AdvanFort does not allege these employees *had any connection with this case*. Specific jurisdiction requires that "plaintiff's claims arise out of those activities directed at the State." *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 133 (4th Cir. 2023). AdvanFort does not allege or present any evidence that these two individuals had any communications with AdvanFort or engaged in any acts that could give rise to personal jurisdiction. Thus, Zamil Offshore's allegation of their employment cannot show personal jurisdiction because it does not have "anything to do with" AdvanFort's claims. *See Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005); *Fidrych v. Marriott Int'l, Inc.,* 952 F.3d 124, 139 (4th Cir. 2020) (unrelated forum contacts "not relevant"); *Yacht Basin Provision Co. v. Bates*, 610 F. Supp. 3d 800, 820 (E.D.N.C. 2022) (same); *see also Lane v. Gray Transportation, Inc.*, 2021 WL 4392667, at *5 (N.D. W. Va. Sept. 24, 2021) (two employees of defendant living in forum state but with no connection to the allegations insufficient to confer specific jurisdiction). Thus, even accepting AdvanFort's far-fetched allegation that Zamil Offshore employed these two individuals, that would not change the personal jurisdiction analysis, and no discovery is warranted.[1]

## 2. Zamil Offshore's Solicitation of Business in Virginia.

AdvanFort seeks sweeping discovery on Zamil Offshore's alleged "solicitation of business in the United States, including Virginia." Mem. at 4. Again, however, the Court already has before it the relevant facts on this issue. AdvanFort alleges that it reached out to Zamil Offshore after

---

[1] AdvanFort does not argue that its request for jurisdictional discovery is based on any "indication of fraud or intentional misconduct" by Zamil Offshore. *See Carefirst*, 334 F.3d at 403. It states that Zamil Offshore's factual assertions are "misleading," Dkt. 39 (Mem.) at 3, but does not offer any evidence to support that. Nor could it, because the only potentially "misleading" evidence is AdvanFort's claim that Zamil Offshore employed individuals in Virginia.

seeing an advertisement in a trade publication. Dkt. 1 (Compl.) ¶¶ 58-59; Dkt. 34 (Opp.) at 3. There is no factual dispute that Zamil Offshore advertised in this maritime publication; instead, the parties dispute the legal significance of this fact. *See* Dkt. No. 24 (Zamil Offshore MTD) at 19-21 (explaining this solicitation is not sufficient to establish jurisdiction); Opp. at 22-23. Thus, there is no factual dispute that warrants discovery.

Again, AdvanFort's requested discovery is not warranted because it seeks information that has no connection with this case. AdvanFort seeks discovery on other alleged solicitations, including "marketing, advertisement, promotion" in Virginia, participation in the U.S.-Saudi Business Council, and participation at "industry events or trade shows." Mem. at 4-5. Notably, however, AdvanFort does not allege *any* nexus between these alleged activities and AdvanFort or the events at issue here. AdvanFort would know—without discovery—if it saw or relied on any of these other alleged solicitations, and it makes no such allegation. Moreover, AdvanFort speculates there may be other Zamil Offshore "business development activities" in Virginia, Mem. at 9, "but offers no facts to support this suggestion," making its request "akin to a fishing expedition." *Beyond Sys., Inc. v. Kennedy W. Univ.*, 2006 WL 1554847, at *10 (D. Md. May 31, 2006). Thus, Zamil Offshore's claim for solicitations that do not have "anything to do" with this case are irrelevant to the specific jurisdiction analysis and are not a valid basis for discovery. *Saudi*, 427 F.3d at 276.

### 3. Zamil Offshore's Website.

The same analysis applies to Zamil Offshore's website. AdvanFort requests discovery on Zamil Offshore's data collection from visitors to its website since 2013 because the website has a "Contact Us" feature. As Zamil Offshore has explained, however, this feature is not sufficient to confer personal jurisdiction, absent some other facts showing that Zamil Offshore specifically targeted and had further interactions with AdvanFort in Virginia. *Foster Made, LLC v. Foster*,

4

2018 WL 4693810, at *7 (E.D. Va. Sept. 28, 2018) ("The mere existence of the online [fillable] form cannot . . . suffice to establish jurisdiction."); *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 141 (4th Cir. 2020); Reply at 6-8. Plaintiff makes no such allegation here. Thus, AdvanFort's argument once again goes to the legal adequacy of its pleadings, not a factual dispute.

**B.    The Court Has Sufficient Information to Assess *Forum Non Conveniens*.**

Courts should resolve motions to dismiss on the basis of *forum non conveniens* before discovery "so that the parties will not waste resources on discovery and trial preparation in a forum that will later decline to exercise jurisdiction over the case." *Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 614 (3d Cir. 1991). As such, courts may decide motions to dismiss for *forum non conveniens* based on affidavits presented by the parties, without allowing limited discovery. *See id.*; *Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988); *see also Moskovits v. Moskovits*, 150 F. App'x 101, 102-03 (2d Cir. 2005). This is in part because "requiring extensive investigation would defeat the purpose of [the] motion" for *forum non conveniens*. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 258 (1981). Courts only require "enough information to enable [them] to balance the parties' interests," *id.* at 258-59, not "extensive investigation" or a "detailed development of the entire case," *Lony*, 935 F.2d at 614. Here, the record contains ample information for the Court to assess the *forum non conveniens* inquiry without any discovery.

**1.    Adequacy of Saudi Arabia as a Forum.**

AdvanFort seeks extensive discovery on the adequacy of Saudi Arabian courts. Again, however, the dispute between the parties concerns the legal significance of the parties' factual allegations, not disputed issues of fact that require discovery.

*First*, there is no valid basis for AdvanFort's request to take the deposition of Zamil Offshore's legal expert, Mr. Al Hejailan. Both parties have provided affidavits from Saudi legal experts detailing certain features of Saudi Arabian legal system. AdvanFort's expert, Mr. Alaoudh,

does not dispute Mr. Al Hejailan's testimony that AdvanFort's claims can be pursued in the Saudi courts under Saudi law. Instead, Mr. Alaoudh launches a broad attack on the entire Saudi legal system. The Court need not resolve whether Mr. Alaoudh's allegations are accurate because they are not sufficient, as a matter of law, to conclude that the Saudi courts are inadequate. Mr. Alaoudh's allegations are exactly the same types of allegations that courts in the United States have considered and rejected as a basis to conclude that Saudi courts are inadequate for purposes of *forum non conveniens*. Reply at 14-17. Thus, the *forum non conveniens* motion does not depend on a "battle of the experts" over the general merits of the Saudi legal system. There is no reason to order a deposition of Mr. Al Hejailan.

*Second*, AdvanFort has not provided any valid basis for conducting discovery into the parties' prior litigation in Saudi Arabia regarding the 2013 fire. AdvanFort seeks (i) communications between Zamil Offshore and any of AdvanFort's potential witnesses in the prior litigation; and (ii) any *ex parte* communications between Zamil Offshore and any judge or Saudi court personnel regarding the parties' litigation in Saudi Arabia. But by AdvanFort's own telling, it is undisputed that AdvanFort's claims in this lawsuit are not a re-do of the litigation over fault for the 2013 fire; instead, AdvanFort acknowledges that its "claims in the present action arise out of actions years later." Opp. at 1. The only relevant facts concerning the prior litigation are undisputed—i.e., that AdvanFort elected to bring the lawsuit in the Saudi courts, and Zamil Offshore did not completely prevail in that case. Compl. ¶¶ 105-106, 121. Moreover, AdvanFort's vague allegations of witness intimidation and attempted bribery are based entirely on allegations from the complaint and are unsupported bv any affidavits or other evidence. Mem. at 7. Thus, the Court does not need discovery on that previous litigation to decide Zamil Offshore's *forum non conveniens* motion, and it should reject AdvanFort's attempt to re-litigate that case here.

2.      **Location of Witnesses and Evidence.**

AdvanFort's proposed discovery on the location and language of the potential witnesses and evidence in this case is also not necessary to decide Zamil Offshore's motion.  AdvanFort argues that Zamil Offshore has not identified the names of specific witnesses, but there is no requirement that a party must produce a complete witness or exhibit list before a court can grant a *forum non conveniens* motion.  AdvanFort's claims arise out of the allegation that Zamil Offshore neglected to maintain a ship in a Saudi Arabian shipyard and caused the ship to suffer damage.  It cannot seriously be disputed that the employees of the shipyard in Saudi Arabia will be relevant witnesses and that many of the documents will be in Arabic.  Moreover, AdvanFort has not identified any specific witnesses in Virginia.  Thus, the Court need not order discovery on these facts in order to decide that the private interests in this case weigh heavily in favor of Saudi Arabia rather than Virginia.

C.      **The Court Should Not Stay Consideration of the Motion to Dismiss.**

Because there is no valid basis to allow the discovery sought by AdvanFort, the Court should decide Zamil Offshore's motion to dismiss based on the record before the Court without delay and deny AdvanFort's request for a stay.

**CONCLUSION**

For the foregoing reasons, Zamil Offshore respectfully requests that the Court deny AdvanFort's motion for jurisdictional and *forum non conveniens* discovery and stay of its consideration of the motion to dismiss.

7

Dated: November 10, 2023

Respectfully submitted,

  */s/ Amy McKinlay*

Richmond T. Moore (*pro hac vice*)
John S. Williams (*pro hac vice*)
Amy B. McKinlay (VSB No. 89394)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC  20024
(202) 434-5000
amckinlay@wc.com

*Counsel for Defendant Zamil Offshore Services Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10 day of November, 2023, I will electronically file the foregoing with the clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Benjamin L. Hatch
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510-1655
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Clara Brillembourg
Foley Hoag LLP
1717 K Street N.W.
Washington D.C., 020006
Telephone: (202) 261-7334
E-mail: CBrillembourg@foleyhoag.com

Andrew Loewenstein
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone: (614) 832-3015
E-mail: ALoewens@foleyhoag.com

Peter Sullivan
Foley Hoag LLP
1301 Avenue of the Americans
New York, NY 010019
Telephone: (212) 812-0310
E-mail: psullivan@foleyhoag.com

*/s/ Amy McKinlay*
Amy B. McKinlay (VSB No. 89394)
WILLIAMS & CONNOLLY LLP

9

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>Alexandria Division</u>

|  |  |  |
|---|---|---|
| ADVANFORT COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:23-cv-906 |
| | ) | |
| ZAMIL OFFSHORE SERVICES COMPANY | ) | |
| and SAUDI PORTS AUTHORITY, a foreign | ) | |
| sovereign State, | ) | |
| Defendants. | ) | |
| | ) | |

## <u>PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR LIMITED DISCOVERY ON PERSONAL JURISDICTION AND *FORUM NON CONVENIENS* AND TO STAY MOTION TO DISMISS OF ZAMIL OFFSHORE SERVICES COMPANY</u>

AdvanFort Company ("AdvanFort") has demonstrated facts sufficient to establish personal jurisdiction over Zamil Offshore Services Company ("Zamil"). Among other things, Zamil engaged in purposeful efforts to market its services in Virginia both through Virginia-directed advertisements and via associations and accreditations with organizations in Virginia. AdvanFort, in Virginia, relied on those Virginia-based marketing efforts in deciding to enter into business with Zamil. Zamil does not deny that these activities took place in Virginia, leaving them undisputed for purposes of the motion to dismiss. AdvanFort has also demonstrated facts sufficient to find that the courts of Saudi Arabia are unavailable and inadequate for litigating claims against Zamil and its co-defendant, the Saudi Ports Authority – an arm of the Saudi government – especially in light of the government malfeasance that lies at the heart of this action. Zamil does not engage in any meaningful way on the relevant facts pertaining to

1

J.A.337

personal jurisdiction or *forum non conveniens*. The undisputed facts thus justify denying Zamil's motion to dismiss outright without further factual development.

Nothing in Zamil's opposition undermines the conclusion that if the Court considers additional factual development to be useful, it should allow limited discovery on the factual issues that relate to personal jurisdiction and *forum non conveniens*. If the Court chooses to decide this motion without an evidentiary hearing, the Court must "draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan Labs, Inc. v. Akzo, N.V.*, 2 F.3d 16, 60 (4th Cir. 1993).

Zamil does not argue that AdvanFort's proposed discovery would be unduly burdensome or otherwise trespass on merits discovery. Nor does Zamil disagree that the requested discovery is targeted at issues of fact raised in Zamil's motion to dismiss. Instead, Zamil's primary arguments for resisting discovery are to deny the existence of disputed issues of fact and to try to narrow the range of facts that are relevant to personal jurisdiction. Zamil's approach is incorrect because: (1) there are issues of disputed fact, as demonstrated by Zamil's continued attempts, even in its reply supporting its motion to dismiss, to advance unsupported factual assertions as the basis for dismissal; and (2) under *Ford Motor Co. v. Montana Eighth Judicial District Court*, the scope of the facts relevant to personal jurisdiction is much broader than Zamil admits.

## ARGUMENT

### I.     *The Limited Discovery Is Relevant and Important to the Personal Jurisdiction Analysis.*

The limited discovery that AdvanFort seeks in connection with personal jurisdiction is confined to issues of fact raised in Zamil's motion to dismiss that are relevant to the Court's analysis. Courts routinely permit such jurisdictional discovery where "further exploration of jurisdictional facts is warranted." *P1 Grp., Inc. v. RipKurrent, LLC*, No. 3:23-CV-00196-RJC-

2

SCR, 2023 U.S. Dist. LEXIS 161608, at *2 (W.D.N.C. Sep. 12, 2023) (quoting *T & S Brass &*
*Bronze Works, Inc. v. Greenfield World Trade, Inc*., Civ. No. 6:08-1987-HFF, 2009 U.S. Dist.
LEXIS 153727, at *2 (D.S.C. Mar. 12, 2009)).

### A.  Zamil Applies an Improper Standard Against Which to Weigh Contacts with the Forum.

Notwithstanding the fact that Zamil itself made a range of unsubstantiated factual
assertions in its motion to dismiss – including its contention that Zamil has no "offices,
employees, or ongoing business activities in Virginia," Mot. to Dismiss, dkt. 24, at 22 – Zamil
now tries to argue that those very same factual assertions are somehow irrelevant.  Specifically,
Zamil argues that a plaintiff's claims must "arise out of those activities [by the defendant]
directed at the State."  Zamil's Opposition to Motion for Limited Discovery ("Opp."), dkt. 42, at
3 (quoting *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 133 (4th Cir. 2023)).  In so
arguing, Zamil attempts to restrict the Court to considering only Zamil's contacts with the forum
that directly led to AdvanFort's claims.  *Id.*, at 3-5.  However, this cannot be squared with the
Supreme Court's recent decision in *Ford Motor Co. v. Montana Eighth Judicial District Court*, a
case that that AdvanFort has highlighted, AdvanFort's Opp. to Mot. to Dismiss, dkt. 34, at 27-28,
but which Zamil conspicuously fails to address.  Zamil's reticence is unsurprising.  The Supreme
Court held that for establishing personal jurisdiction an action may "arise out of ***or relate to*** the
defendant's contacts with the forum."  141 S. Ct. 1017, 1026 (2021) (emphasis added).  The
Supreme Court explained: "The first half of that standard asks about causation; but the back half,
after the 'or,' contemplates that some relationships will support jurisdiction without a causal
showing."  *Id*.

Courts applying *Ford* do not require the type of tight, causation-like link to establish
relevant forum contacts that Zamil seeks to impose here.  As the Tenth Circuit has explained,

*Ford* "made clear that a causal connection is not required" to establish personal jurisdiction. *Hood v. Am. Auto Care, Ltd. Liab. Co.*, 21 F.4th 1216, 1224 (10th Cir. 2021). *See, also, e.g.*, *Atchley v. Astrazeneca UK Ltd.,* 22 F.4th 204, 210, 237-38 (D.C. Cir. 2022) (reversing, under *Ford*, the district court's dismissal for lack of personal jurisdiction due to its "unduly restrictive" analysis, which failed to give sufficient weight to defendants' in-forum activities that relate to plaintiff's injury).[1]

### B. Discovery Concerning Zamil's Agents in Virginia.

AdvanFort seeks discovery on the resources that Zamil deploys in Virginia. In support of showing that Zamil, in fact, deploys such resources in the forum, AdvanFort presented evidence that individuals describe themselves as having a work relationship with Zamil. AdvanFort included with its opposition to the motion to dismiss screenshots of LinkedIn pages for two individuals who describe themselves as being based in the United States and employed by Zamil, including an individual who lists his location as Richmond, Virginia. Sullivan Decl., dkt. 35, ¶¶ 2-3, Exhibits B-C, dkts. 35-2, 35-3.

Despite this evidence, Zamil denies having U.S.-based "employees." Opp., dkt. 42, at 2. There thus appears to be a disputed issue of fact for which discovery is appropriate. *See P1 Grp.,* 2023 U.S. Dist. LEXIS 161608, at *2. In any event, under Fourth Circuit precedent, the relevant jurisdictional inquiry is not whether a defendant has "employees" in the forum but rather "whether the defendant maintained offices ***or agents*** in the State." *UMG Recordings, Inc. v.*

---

[1] Zamil is not helped by citing *dmarcian*, a case that concerned the arising-out-of prong of specific personal jurisdiction, unlike *Ford*, which proceeded on the relating-to prong. *Compare dmarcian*, 60 F.4th at 134-35 (stating standard as "whether the plaintiffs' claims arise out of" the in-state activities and applying it as such) *with Ford*, 141 S. Ct. at 1028 (analyzing relating-to prong in absence of strict causal relationship necessary for arising-out-of). There was no need to reach any relating-to arguments in *dmarcian* because the Fourth Circuit held that the claims arose out of the in-state activities. *Id*. at 135 (finding "dInc's claims thus arose out of activities dBV directed at North Carolina").

*Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020) (emphasis added) (quoting *Sneha Media & Entm't, LLC v. Associated Broad. Co. P*, 911 F.3d 192, 198-99 (4th Cir. 2018)). Zamil's carefully worded response goes no further than denying having "employees" here. Zamil thus sidesteps the relevant jurisdictional question, namely whether it maintains "agents" in the forum. Discovery is therefore appropriate to determine if Zamil maintains any form of relationship with the individuals identified by AdvanFort (or any others), and what duties they may carry out, to determine whether they qualify as agents for purposes of the jurisdictional analysis. Such information can only be obtained through discovery.[2]

Zamil's broad assertion that to be relevant to the jurisdictional analysis its in-forum employees must have had "communications with AdvanFort" or that their actions otherwise gave rise to AdvanFort's claims is incorrect. Opp., dkt. 42, at 3. The presence of a defendant's agent in the forum can support personal jurisdiction because it indicates the defendant intended to "exploit[] a State's Market." *Ford Motor Co.*, 141 S. Ct. at 1027; *see also Espin v. Citibank, N.A.*, No. 5:22-CV-383-BO-RN, 2023 U.S. Dist. LEXIS 176241, at *12 (E.D.N.C. Sep. 29, 2023) (evidence that the defendant had employees in the forum showed that it sought to "exploit" the market under the *Ford* standard); *Fridinger v. Stonegate Wealth Mgmt.*, LLC, No. 1:10CV906, 2013 U.S. Dist. LEXIS 109686, at *21 (M.D.N.C. Aug. 5, 2013) (finding the fact that defendant maintained two representatives in the forum unrelated to the plaintiff's claims relevant to support a finding of jurisdiction). Indeed, in the principal case that Zamil relies upon, *Lane v. Gray Transportation*, the court considered two unrelated employees in the forum as relevant to the jurisdictional analysis (although ultimately concluding there were overall

---

[2] Zamil is accordingly not helped by arguing that AdvanFort has not explained the responsibilities of the Virginia-based engineer who identifies himself as an employee of Zamil. Opp., dkt. 42, at 2. AdvanFort cannot know the nuances of how Zamil's business operates, including the duties of its employees, contractors, or agents, without discovery.

insufficient contacts with the forum).  *Lane v. Gray Transp., Inc.*, No. 2:20-CV-40, 2021 U.S.

Dist. LEXIS 183677, at *13-14 (N.D. W. Va. Sep. 24, 2021) (including "two employees who

reside in West Virginia" among relevant "forum-related activities").

### C. Discovery Concerning Zamil's Advertising, Affiliations, and Certifications.

Discovery concerning Zamil's marketing efforts and other affiliations and certifications

in the forum is likewise justified.  Zamil does not dispute that it engaged in at least some such

activities in the forum, including that it advertised its services in maritime trade magazines

circulated in Virginia.  Opp., dkt. 42, at 4; Compl., dkt. 1, ¶ 58.  Nor does Zamil contest that

AdvanFort saw Zamil's advertising while in Virgina, or that Zamil's "affiliations and

certifications" enticed AdvanFort to pursue a commercial relationship with Zamil and that

AdvanFort relied on those associations.  Compl., dkt. 1, ¶ 59.  Zamil also does not contest that

the head of the powerful Zamil family traveled to Virginia and participated in the U.S.-Saudi

Business Council, whose purpose is to promote affiliated companies, including Zamil.  *Id.* ¶¶ 11,

55.  The facts thus establish that Zamil's contacts with the forum, including its participation in

industry events and trade shows, and Zamil's other advertisements in Virginia, support personal

jurisdiction.  *See Ford*, 141 S. Ct. at 1026.  Inasmuch as Zamil contests whether its activities in

Virginia are of sufficient quality, breadth, or depth to support jurisdiction, discovery into those

matters is appropriate as directly related to whether Zamil purposefully availed itself of soliciting

and doing business in the forum.  *Id.* at 1028.

Zamil's website represents another effort by Zamil to reach into Virginia to solicit

business.  Zamil does not dispute that AdvanFort viewed Zamil's website before entering into its

commercial relationship with Zamil or that Zamil's website is hosted on servers in Virginia.

Opp., dkt. 42, at 4-5; AdvanFort's Opposition to Motion to Dismiss, dkt. 34, at 24-25.  Nor does

Zamil contest that its website collects data from users, including through a "Contact Us" form.

Instead, Zamil argues that these facts are insufficient to confer personal jurisdiction "absent some other facts showing that Zamil Offshore specifically targeted and had further interactions with AdvanFort in Virginia."  Opp., dkt. 42, at 4.  But that is the exact type of information AdvanFort seeks to discover: including whether Zamil collected user data from AdvanFort (and others in Virginia), which Zamil used in furtherance of business development efforts with respect to AdvanFort or others in Virginia.  And such discovery is particularly warranted since Zamil plainly collected user data as it required users to provide contact information.  The manner in which Zamil employed such data to further business generation in the forum is thus squarely relevant to whether Zamil intentionally sought Virginia's business and reasonably anticipated being haled into court in Virginia.  *ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002).[3]

## II.    *The Limited Discovery Is Relevant and Important to the Forum Non Conveniens Analysis.*

Zamil comes nowhere close to overcoming its burden of displacing AdvanFort's choice to pursue this action in its home forum.  *BAE Sys. Tech. Sol. & Servs. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 471 (4th Cir. 2018).  Neither Zamil nor its expert, Hussam Salah I. Al-Hejailan, denies any of the facts that AdvanFort has presented concerning the unavailability and inadequacy of Saudi courts, including that:

- the judiciary is controlled by executive authorities;

- laws are applied inconsistently;

- procedural requirements are regularly ignored;

---

[3] For the same reason, Zamil derives no assistance by arguing there are no "allegations that Zamil Offshore's website sold or contained advertisements individually targeted at Virginia." Zamil's Reply to Motion to Dismiss, dkt. 41, at 6.  This is information that can only be obtained through discovery.

7

J.A.343

- discrimination against women, non-Muslims, and foreigners is common;

- judges who issue perceived anti-government decisions are arrested;

- litigants and counsel who challenge the government are subject to physical and cyber-surveillance and face harsh punishment; and

- influential families such as the Zamil family receive preferential treatment.

*See* AdvanFort's Opp. to Mot. to Dismiss, dkt. 34, at 8-14; Opp., dkt. 42, at 5.[4]

In light of these uncontested facts, dismissal is plainly inappropriate. *Shi v. New Mighty United States Tr.*, 918 F.3d 944, 948 (D.C. Cir. 2019) (the court "draws all reasonable inferences in favor of the nonmoving party"); *Halcyon Syndicate Ltd., LLC v. Graham Beck Enters. (PTY)*, 2020 U.S. Dist. LEXIS 127500, *56 (N.D. Cal. July 20, 2020) ("[W]hen considering whether dismissal is appropriate under the doctrine of *forum non conveniens* the Court may look beyond the facts alleged in the complaint but must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party").

Zamil provides no compelling reason for why discovery should not be allowed if the Court were to consider additional information to be helpful. Zamil does not dispute that *forum non conveniens* is an inherently "fact-based inquiry" or that courts routinely allow discovery where the doctrine is invoked as a ground for dismissal. *In re Bridgestone/Firestone, Inc., ATX, ATX II, & Wilderness Tires Prods. Liab. Litig.*, 131 F. Supp. 2d 1027, 1029 (S.D. Ind. 2001).

---

[4] Zamil attempts to discredit Mr. Alaoudh by casting him as a "public critic of the Saudi government" and denigrating the sources he cites as "miscellaneous news reporting." But Zamil has no answer to the fact that those sources include the U.S. Department of State, which reported in 2022 that the courts of Saudi Arabia are "required to coordinate their decisions with executive authorities," and the International Bar Association, which reported in June 2023 that the Saudi government is engaged in an "ongoing effort to dismantle the independence of the legal profession by intimidating, hindering, harassing or improperly interfering with judges, lawyers and jurists." AdvanFort's Opp. to Mot. to Dismiss, dkt. 34, at 8-10.

8

Indeed, the principal case relied upon by Zamil, *Lony v. E.I. Du Pont de Nemours*, **permitted** discovery in such circumstances. 935 F.2d 604, 614 (3d Cir. 1991) (recognizing that the Supreme Court decision in *Piper Aircraft Co. v. Reyno* "contemplated … discovery before the disposition of a *forum non conveniens* motion"). Each of the discovery topics suggested by AdvanFort pertain to discrete issues of fact raised in Zamil's *forum non conveniens* motion.

### A. Expert Deposition of Zamil's Expert Would Aid the Court in Evaluating the Availability and Adequacy of Saudi Arabia as a Forum.

As a threshold matter, AdvanFort has shown that Saudi Arabia is not an available forum because it would be required to pursue separate actions against Zamil and the Saudi Ports Authority in different Saudi courts: the Commercial Court and the Board of Grievances, respectively. This also renders Saudi Arabia inadequate as a forum because having to litigate in multiple Saudi courts is not conducive to the efficient resolution of the parties' dispute and imposes an unnecessary and avoidable burden. *See Dirtt Env't Sols Inc. v. Falkbuilt Ltd.*, 65 F.4th 547, 555 (10th Cir. 2023) ("*forum non conveniens* is not available as a tool to split or bifurcate cases" because "[s]plitting cases . . . fundamentally contradicts the 'central purpose' of forum non conveniens . . . it only increases the possibility of overlapping, piecemeal litigation that is inherently inconvenient for both the parties and the courts"); *American Dredging Co. v. Miller*, 510 U.S. 443, 448 (1994) (considering all "practical problems that make trial of a case easy, expeditious and inexpensive").

Zamil does not dispute that parallel actions must be commenced in Saudi Arabia. Instead, it argues that the Board of Grievances has discretion to consolidate the actions. *Compare* Alaoudh Decl., dkt. no. 37-1, ¶ 28, 33, 39, 40-41; *with* Al Hejailan Suppl. Decl., dkt. no. 41-2, ¶ 3.1.1-3. A deposition of Mr. Al Hejailan would enable the record to be developed

J.A.345

regarding whether the Board of Grievances, in fact, has the authority to consolidate the actions as well as the likelihood that it might do so in the circumstances presented here.

More broadly, Mr. Al Hejailan, without providing any support or engaging with any of the evidence presented by AdvanFort, makes generalized assertions that AdvanFort would be treated fairly if the litigation were to proceed in Saudi Arabia. *See generally* Al Hejailan Suppl. Decl., dkt. no. 41-2, ¶¶ 3.1.1-3. If the Court is inclined to give any credence whatsoever to those views, AdvanFort should be permitted to test them by deposition. *See, e.g.*, *In re Bridgestone/Firestone*, 131 F. Supp. 2d at 1031 (ordering deposition of foreign law expert who made "sweeping conclusions" in connection with *forum non conveniens* motion).

### B. Discovery Regarding the Prior Litigation in Saudi Arabia.

Zamil invokes AdvanFort's prior litigation in Saudi Arabia in support of its argument that the courts of Saudi Arabia are adequate. *See* Zamil's Mem. in Supp. of its Motion to Dismiss, dkt. no. 24, at 8-9; Zamil's Reply to Motion to Dismiss, dkt. 41, at 17. Limited discovery regarding the irregularities in that prior litigation is therefore appropriate. Indeed, Zamil does not dispute that *ex parte* communications with Saudi courts routinely occur, Alaoudh Decl., dkt. 37, ¶ 30, or deny that it engaged in such *ex parte* communications. Nor does Zamil dispute any of the facts recounted in the Complaint regarding the litany of improprieties to which AdvanFort was subjected in the prior Saudi litigation, including attempts to bribe and intimidate witnesses.[5] Accordingly, discovery regarding communications related to that suit, including *ex parte* communications with court officials, should prove fruitful and shed light on how and why the Saudi courts were and continue to be inadequate.

---

[5] Zamil also does not attempt to deny or diminish AdvanFort's fear that individuals associated with AdvanFort, including its representatives, witnesses, and attorneys, would be at risk of detention and other forms of abuse if they were to travel to Saudi Arabia to participate in litigation there again. *See* AdvanFort's Opp. to Mot. to Dismiss, dkt. 34, at 9, 14.

### C.  Discovery Regarding the Location and Language of Witnesses and Evidence

Finally, AdvanFort seeks targeted discovery on the private and public interest factors relevant to *forum non conveniens*.  Zamil makes conclusory and unsupported factual assertions about unidentified witnesses purportedly located in Saudi Arabia.  Zamil's Mem. in Support of its Mot. to Dismiss, dkt. No. 24, at 11.  Zamil also makes equally unsupported assertions that relevant documents are in Arabic.  In response, AdvanFort has presented evidence that documents are in English and witnesses are in the United States.  Farajallah Decl., dkt. no. 36, ¶¶ 3-6.

Again, there is reason to believe discovery would promote resolution of these issues. Zamil does not dispute that the parties communicated primarily in English or that many important documents are already in English.  Reply for Mot. to Dismiss, dkt. 41, at 19. Farajallah Decl. dkt. no. 36, ¶¶ 3-6.  Instead, Zamil argues that unidentified relevant witnesses are (1) necessarily located in Saudi Arabia and (2) do not speak English.  Discovery would determine where relevant witnesses are located and what language they speak, as well as whether and to what extent relevant documents are in English.

### CONCLUSION

For the foregoing reasons, AdvanFort respectfully requests an Order (1) staying its consideration of Zamil's motion to dismiss pending discovery on the issues identified in this memorandum, and (2) ordering that AdvanFort may commence with discovery on those issues.

Dated:  November 16, 2023

AdvanFort Company

By its Attorneys,

11

/s/ *Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Clara Brillembourg *(pro hac vice)*
Foley Hoag LLP
1717 K Street N.W.
Washington D.C., 020006
Telephone: (202) 261-7334
Email: Cbrillembourg@foleyhoag.com

Andrew Loewenstein *(pro hac vice)*
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone : (617) 832-3015
E-mail : Aloewens@foleyhoag.com

Peter A. Sullivan *(pro hac vice)*
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 010019
Telephone: (212) 812-0310
E-mail: psullivan@foleyhoag.com

*Counsel for AdvanFort Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2023, a true and correct copy of the foregoing

Reply in Support of Plaintiff's Motion for Limited Discovery and to Stay Motion to Dismiss of

Zamil Offshore Services Company was served on all counsel of record via the Court's CM/ECF

electronic filings system.

/s/ *Benjamin L. Hatch*
Benjamin L. Hatch

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>Alexandria Division</u>

|  |  |
|---|---|
| ADVANFORT COMPANY,<br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>ZAMIL OFFSHORE SERVICES COMPANY<br>and SAUDI PORTS AUTHORITY, a foreign<br>sovereign State,<br>　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)　CIVIL ACTION NO. 1:23-cv-906<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**REQUEST FOR ENTRY OF DEFAULT AGAINST
DEFENDANT SAUDI PORTS AUTHORITY**

Plaintiff AdvanFort Company ("AdvanFort"), by and through its undersigned counsel,

requests that the Clerk enter default against defendant Saudi Ports Authority ("Ports Authority")

pursuant to Federal Rule of Civil Procedure 55(a) and 28 U.S.C. § 1608(d). In support of this

request, AdvanFort states as follows.

1.　　　AdvanFort commenced this action on July 12, 2023 by filing a complaint

("Complaint") naming the Ports Authority and Zamil Offshore Services Company ("Zamil") as

defendants. ECF No. 1.

2.　　　AdvanFort filed proposed summonses for both defendants on the same day. ECF

Nos. 2, 3. The Court issued summonses for both defendants on July 13, 2023. ECF No. 8.

3.　　　The Ports Authority is a foreign sovereign State. AdvanFort is therefore required

to serve the Ports Authority pursuant to 28 U.S.C. § 1608(a). *See* 28 U.S.C. § 1608(a) (detailing

how service "shall be made upon a foreign state"); Fed. R. Civ. P. 4(j)(1) ("A foreign state . . .

must be served in accordance with 28 U.S.C. § 1608.").

4.      The Foreign Sovereign Immunities Act ("FSIA") "describes four methods of serving process on a foreign state, listed in hierarchical order." *Kumar v. Republic of Sudan*, 880 F.3d 144, 153 (4th Cir. 2018).  The first, which requires a "special arrangement for service between the plaintiff and the foreign state," 28 U.S.C. § 1608(a)(1), does not apply because there is no special arrangement between AdvanFort and the Ports Authority.  Nor does the second method, which requires "an applicable international convention on service of judicial documents." 28 U.S.C. § 1608(a)(2).  According to the U.S. Department of State, the United States is party to only two multilateral treaties on service of process: the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters and the Inter-American Convention on Letters Rogatory and Additional Protocol.[1]  The Kingdom of Saudi Arabia is not a signatory to either treaty.[2]

5.      Consequently, AdvanFort served the Ports Authority under 28 U.S.C. § 1608(a)(3). Section 1608(a)(3) requires service to be made by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of court to the head of the ministry of foreign affairs of the foreign state concerned."  28 U.S.C. § 1608(a)(3).

6.      On September 11, 2023, AdvanFort filed an affidavit requesting that the Clerk of Court dispatch for mailing by DHL a service package containing the summons, complaint, and notice of suit to the head of Saudi Arabia's Ministry of Foreign Affairs ("Ministry").  ECF No. 14;

---

[1] *See Foreign Sovereign Immunities Act:  How do I effect service on a foreign state or political subdivision?*, U.S. Dep't. of State, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Service-of-Process/Foreign-Sovereign-Immunities-Act.html (last updated June 1, 2023).

[2] *See Status Table*, Hague Conf. on Priv. Int'l L., https://www.hcch.net/en/instruments/conventions/status-table/print/?cid=17 (last updated June 23, 2023); O.A.S.T.S. No. 43 (Inter-American Convention on Letters Rogatory and Additional Protocol).

Affidavit of Benjamin Hatch ("Hatch Aff."), ¶ 2.  The service package was dispatched by the Clerk of Court to the Ministry on September 19, 2023.  *See* ECF No. 33; Hatch Aff., ¶ 4.

7.      On September 25, 2023, the service package was delivered to the Ministry, where it was accepted and signed for.  ECF No. 33-2; Hatch Aff., ¶ 5.

8.      On October 20, 2023, AdvanFort filed a return of service, including as exhibits the shipping label for the service package, the signed delivery receipt, and the tracking history of the service package as provided by DHL.  ECF No. 33, 33-1, 33-2, 33-3; Hatch Aff., ¶ 6.

9.      Service under 28 U.S.C. § 1608(a)(3) is deemed made "as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed."  28 U.S.C. § 1608(c)(2).  Service on the Ports Authority thus was made as of September 25, 2023, when the service package was signed for at the Ministry.  *See Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1059 (2019) (explaining that "service is deemed to have occurred on the date shown on a document signed by the person who received it from the carrier").

10.     The Ports Authority was required to answer or otherwise respond to AdvanFort's complaint within 60 days after service was made, *i.e.*, by November 24, 2023.  28 U.S.C. § 1608(d).  *See also Rux v. Republic of Sudan*, 2005 U.S. Dist. LEXIS 36575, at *7 (E.D. Va. Aug. 26, 2005) (entering default after foreign sovereign had not appeared "as of more than 60 days after service of process").

11.     The Ports Authority did not respond to the Complaint by November 24, 2023, and has not responded to date.

12.     AdvanFort therefore requests that the Clerk enter default against the Ports Authority in this action.

J.A.352

Dated:  November 30, 2023

AdvanFort Company

By its Attorneys,

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Clara Brillembourg *(pro hac vice)*
Foley Hoag LLP
1717 K Street N.W.
Washington D.C., 020006
Telephone: (202) 261-7334
Email: Cbrillembourg@foleyhoag.com

Andrew Loewenstein *(pro hac vice)*
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone : (617) 832-3015
E-mail : Aloewens@foleyhoag.com

Peter A. Sullivan *(pro hac vice)*
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 010019
Telephone: (212) 812-0310
E-mail: psullivan@foleyhoag.com

*Counsel for AdvanFort Company*

4

J.A.353

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>Alexandria Division</u>

<table>
<tr><td>

ADVANFORT COMPANY,<br>
      Plaintiff,<br><br>
 v.<br><br>
ZAMIL OFFSHORE SERVICES COMPANY<br>
and SAUDI PORTS AUTHORITY, a foreign<br>
sovereign State,<br>
      Defendants.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

CIVIL ACTION NO. 1:23-cv-906

</td></tr>
</table>

## <u>AFFIDAVIT OF BENJAMIN HATCH</u>

1. I am counsel to Plaintiff AdvanFort Company ("AdvanFort") in this action.

2. On September 11, 2023, I filed, on behalf of AdvanFort, an affidavit requesting that the Clerk of Court dispatch for mailing by DHL a service package containing the summons, complaint, and notice of suit to the head of Saudi Arabia's Ministry of Foreign Affairs ("Ministry"), as required for service under 28 U.S.C. § 12608(a)(3).  ECF No. 14.

3. On September 14, 2023, I caused a service package containing the above-referenced documents to be delivered to the Court.

4. On September 19, 2023, counsel for AdvanFort was informed that the Clerk had that day dispatched the service package to the head of the Ministry of Foreign Affairs via DHL.

5. On September 26, 2023, counsel for AdvanFort received notice from DHL that the service package had arrived at the Ministry and had been signed for the day before, September 25, 2023.  DHL provided a signed receipt and the tracking history for the service package.  *See* ECF Nos. 33-2, 33-3.

6.     On October 20, 2023, I filed, on behalf of AdvanFort, a return of service, to which was attached a copy of the DHL shipping label for the service package, the signed receipt, and the DHL tracking history.  ECF Nos. 33, 33-1, 33-2, 33-3.

I declare under penalty of perjury under the laws of the United States that the foregoing facts are true and correct.

Dated: November 30, 2023

/s/ *Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

AdvanFort Company                             )
                                              )
v.                          Plaintiff         )
                                              )        CIVIL ACTION NO.  1:23-cv-00906-LMB-IDD
Zamil Offshore Services Company, et al        )
                                              )
                            Defendants        )

## ENTRY OF DEFAULT

In accordance with plaintiff's request to enter default and affidavit of, Benjamin Lucas Hatch  counsel of record for Planitiff, the Clerk of this Court does hereby enter the default of Saudi Ports Authority for failure to plead or otherwise defend as provided by the Federal Rules of Civil Procedure.

The entry of default is in accordance with Rule 55(a) Federal Rules of Civil Procedure.

FERNANDO GALINDO
CLERK OF COURT

BY:     /s/
S. Williams, DEPUTY CLERK

DATED:  12/1/2023

J.A.356

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3       --------------------------x
         ADVANFORT COMPANY,           :     Civil Action No.:
 4                                    :     1:23-cv-906
                      Plaintiff,      :
 5            versus                  :     Friday, December 1, 2023
                                      :     Alexandria, Virginia
 6       ZAMIL OFFSHORE SERVICES      :
         COMPANY, et al.,             :     Pages 1-6
 7                    Defendants.     :
         --------------------------x
 8

 9            The above-entitled motions hearing was heard before
         the Honorable Leonie M. Brinkema, United States District
10       Judge.  This proceeding commenced at 10:06 a.m.

11                        A P P E A R A N C E S:

12       FOR THE PLAINTIFF:    BENJAMIN HATCH, ESQUIRE
                               MCGUIREWOODS LLP
13                             101 W Main Street
                               Suite 9000
14                             Norfolk, Virginia  23510
                               (757) 640-3947
15
                               PETER SULLIVAN, ESQUIRE
16                             FOLEY HOAG LLP
                               1301 Avenue of the Americas
17                             25th Floor
                               New York, New York  10019
18                             (212) 812-0399

19                             ANDREW LOEWENSTEIN, ESQUIRE
                               ROSEANNA LORING, ESQUIRE
20                             FOLEY HOAG LLP
                               155 Seaport Boulevard
21                             Boston, Massachusetts  02210
                               (617) 832-1000
22
         FOR THE DEFENDANTS:   RICHMOND MOORE, ESQUIRE
23                             AMY MCKINLAY, ESQUIRE
                               WILLIAMS & CONNOLLY LLP
24                             680 Maine Avenue, SW
                               Washington, D.C.  20024
25                             (202) 434-5029
```

1

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

J.A.357

```
1    COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
                            Official Court Reporter
2                           United States District Court
                            401 Courthouse Square
3                           Alexandria, Virginia  22314
                            (571) 298-1649
4                           S.AustinReporting@gmail.com

5         COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                              2
```

```
 1                    P R O C E E D I N G S
 2            THE DEPUTY CLERK:  The Court calls AvanFort
 3   Company versus Zamil Offshore Services Company, et al., Case
 4   Number 1:23-cv-906.
 5            May I have appearances, please, first for the
 6   plaintiff.
 7            THE COURT:  Mr. Hatch, you're doing double duty
 8   today.
 9            MR. HATCH:  Good morning again, Your Honor.
10   Ben Hatch on behalf of AvanFort Company.  Also with me
11   today, Your Honor, Mr. Peter Sullivan, Mr. Andrew
12   Loewenstein, and Ms. Rosie Loring from the Foley Hoag firm.
13            THE COURT:  Good morning.
14            MR. MOORE:  Good morning, Your Honor.  Rich Moore
15   from Williams & Connolly on behalf of the defendant, Zamil
16   Offshore, and I have with me Amy McKinlay from our firm.
17            THE COURT:  All right.  This matter comes before
18   the Court on the defendant, Zamil Offshore's, motion to
19   dismiss the complaint for lack of personal jurisdiction and
20   also on the grounds of forum non conveniens.  And then there
21   was also a motion by the plaintiff to stay so that they
22   could obtain some discovery on these issues.
23            Mr. Hatch, I'm going to deny the motion to stay
24   because I'm satisfied that the record is more than complete
25   to enable the Court to resolve the motions.  And I've looked
```

                                                              3

```
 1   very carefully at what you all have presented.  As you know
 2   with a forum non conveniens motion, the Court needs to look
 3   at several factors.  First of all, the availability of the
 4   foreign forum; secondly, whether that forum would provide an
 5   adequate forum for the plaintiff's case; and then to look at
 6   factors of conveniens in terms of both the public and
 7   private interests.  And when you look at this particular
 8   case, I am satisfied, frankly, that the defendant has made
 9   out a proper claim that this would be an appropriate case to
10   dismiss for forum non conveniens.
11           First of all, all of the critical facts in this
12   case and events occur in Saudi Arabia.  And there is, within
13   Saudi Arabia, a court system.  In fact, as the record shows,
14   the plaintiff actually used that court system to bring one
15   lawsuit against one of the defendants already.  And although
16   the plaintiff did not prevail, I do note that the defendant
17   also did not get the full amount that it was seeking.  It
18   was seeking well over $100,000, and I think it got a $40,000
19   judgment and then some unspecified birthing fees, but it
20   does not look as though the Saudi court was giving away the
21   store, so to speak.
22           I know the plaintiff has argued that the Saudi
23   courts are not adequate, that they are corrupt, but the case
24   law does not support that type of allegation, which is
25   primarily anecdotal, and some of the cases actually are
```

4

1    focusing more on their criminal courts than their civil

2    courts.  While I certainly can appreciate why a plaintiff

3    would not want to be having to litigate in the Saudi courts,

4    especially because one of the defendants is a government

5    entity, nevertheless, I don't think that's sufficient to

6    find that that would not be an adequate forum for the

7    litigation.  Nor do I find the issue about whether you might

8    have to appear in two different tribunals because of the

9    nature of the two different defendants a dispositive issue.

10           Some of the cases that you cited involve

11   situations where forum non conveniens was denied where the

12   plaintiff would have to sue in two different countries.

13   That's not the case here.  You know, you might have to be in

14   different tribunals, but it would all be in Saudi Arabia.

15           And the last factor, the conveniens.  I mean, the

16   far majority of all the key witnesses would be in the Saudi

17   Arabia area, which creates all sorts of interesting problems

18   in terms of process.  There's a real problem in terms of the

19   law that would apply, because, under Virginia law, the place

20   where the last act that causes the tort occurs is where --

21   you use that jurisdiction's law, which means I would be

22   using Saudi Arabian or Islamic law, and the same thing with

23   the breach of contract claim.  The Court looks at where the

24   contract was to be performed, which, in this case, was Saudi

25   Arabia.

                                                              5

```
1              And, frankly, other than the fact that the
2    plaintiff is a Virginia entity, there really is no interest
3    of the Virginia -- of Virginia in this litigation.  And
4    because the contract in this entire business relationship
5    between the Virginia company occurs in a foreign country,
6    there's a little bit less deference that's even given to the
7    plaintiff's choice of forum.
8              So, for all those reasons -- and I'm going to
9    spell them out in a little more detail in an opinion --
10   we're going to grant the defendants' motion to dismiss for
11   forum non conveniens.  I'm not going to bother addressing
12   the personal jurisdiction issue; I don't need to.
13             I recognize that the other defendant has not
14   entered an appearance, and, therefore, technically is in
15   default.  But the forum non conveniens analysis would apply
16   equally to that defendant.  So I'm going to dismiss this
17   case.
18             And obviously, Counsel, you know, you can take an
19   appeal from this decision or just go back to Saudi Arabia.
20   Thank you.
21             (Proceedings adjourned at 10:11 a.m.)
22             ----------------------------------
     I certify that the foregoing is a true and accurate
23   transcription of my stenographic notes.

24   _____

25                         Stephanie M. Austin, RPR, CRR
                                                              6
```

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ADVANFORT COMPANY,                    )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )        1:23-cv-906 (LMB/IDD)
                                      )
ZAMIL OFFSHORE SERVICES COMPANY       )
    and SAUDI PORTS AUTHORITY,        )
                                      )
        Defendants.                   )

<u>MEMORANDUM OPINION</u>

Before the Court is defendant Zamil Offshore Services Company's ("Zamil") Motion to

Dismiss plaintiff AdvanFort's ("AdvanFort") Complaint based on <u>forum non conveniens</u> and

lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) ("Motion to Dismiss"). [Dkt. No.

23].[1]  More specifically, Zamil, a Saudi company that operates a local shipyard in Jeddah, Saudi

Arabia, argues that the Court should dismiss the Complaint based on <u>forum non conveniens</u>

because the Saudi courts, which are already familiar with the facts that underlie this dispute, are

available, adequate, and more convenient in light of the public and private interests involved,

including that all the relevant events occurred in Saudi Arabia and all the relevant evidence and

witnesses (other than AdvanFort) are in Saudi Arabia.  [Dkt. No. 24] at 2.  Zamil also argues that

the Court should dismiss the Complaint for lack of personal jurisdiction because Zamil, who has

---

[1] Defendant Saudi Ports Authority was properly served pursuant to 28 U.S.C. § 1608(a)(3) by
mailing documents to the Minister of Foreign Affairs at the address of the Saudi Ministry of
Foreign Affairs in Riyadh, Saudi Arabia.  <u>See</u> [Dkt. No. 33].  It has not yet filed a responsive
pleading.  Pursuant to § 1608(d), because it was served on September 25, 2023, defendant Saudi
Arabia Ports Authority should have filed a responsive pleading by Monday, November 27, 2023.

no United States offices or employees and has never repaired a ship in the United States, did not purposefully avail itself of the privilege of doing business in the Commonwealth of Virginia. Id.

AdvanFort opposes Zamil's Motion to Dismiss, arguing that the choice of its home forum is entitled to heightened deference, and Saudi Arabia is an inadequate and inappropriate forum. [Dkt. No. 34] at 9-10. AdvanFort also argues that the Court has personal jurisdiction over Zamil because it is "a global company that appears to employ individuals in the United States, and in Virginia specifically" and because Zamil has purposefully availed itself of the privilege of conducting business in Virginia. Id. at 34-35. For the reasons that follow, Zamil's Motion to Dismiss will be GRANTED.[2]

## I. BACKGROUND

### A. Factual Allegations

According to the Complaint, in May 2012, AdvanFort, a Virginia-based company that deploys armed security vessels to protect oil tankers and other vulnerable ships against piracy, chartered a former British Navy vessel, the Seaman Guard Virginia, for a period of 36 months. [Dkt. No. 1] at ¶ 23. In that same year, AdvanFort directed the Seaman Guard Virginia to depart the Port of Baltimore for the Red Sea. Id. at ¶ 28. Upon arrival in the Red Sea, the vessel

---

[2] To the extent the Court "has any doubt as to whether [Zamil's] Motion should be denied," AdvanFort has filed a Motion for Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss of Zamil ("Motion for Limited Discovery") [Dkt. No. 38], requesting "that the Court stay its consideration to allow limited discovery targeted to the factual issues raised therein." [Dkt. No. 39] at 5. Zamil opposes the Motion, arguing that "the Court [] has the factual information it needs to resolve the legal questions in the motion to dismiss, based on controlling Fourth Circuit law, and allowing discovery would only further waste the parties' time and resources." [Dkt. No. 42]. Because the Court finds that this Complaint must be dismissed for forum non conveniens, AdvanFort's Motion for Limited Discovery will be denied.

2

performed anti-piracy services pursuant to contracts that AdvanFort entered into with commercial fleets.  Id.

In 2013, defendant the Saudi Ports Authority, which owns the Jeddah Islamic Port, entered into an agreement to partner with defendant Zamil to jointly and commercially operate a shipyard at the Jeddah Islamic Port for a period of ten years (hereinafter, "Jeddah Shipyard").  Id. at ¶¶ 30-31.  That same year, the Seaman Guard Virginia needed routine maintenance and minor repairs.  After seeing Zamil's advertisement in a magazine called The Baltic Exchange and reading about the company in The Maritime Executive Magazine, AdvanFort sought the services of Jeddah Shipyard.  Id. at ¶¶ 39, 58.

On September 23, 2013, Jeddah Shipyard provided AdvanFort a quote, which included the corporate logos of both defendants, offering to perform basic maintenance services, including: hull cleaning; hull inspection; anchor and chain inspection and cleaning; seawater valves overhauling; and pipes and steel renewal for $46,550.00 and stated that the "[t]ime frame for [the] above defined works [would be] 12 days in normal stable conditions."  Id. at ¶ 70.  AdvanFort accepted the quote and wired $20,000.00 to Zamil from its Virginia bank account.  Id. at ¶ 72.

On October 19, 2013, AdvanFort delivered the vessel to Jeddah Shipyard's dry dock in good condition.  At the time of delivery, the vessel required only routine maintenance and minor repairs, id. at ¶ 74; however, at some point in October 2013, Jeddah Shipyard proposed that electrical work be performed on the vessel.  On October 21, 2013, AdvanFort approved the proposal.  Id. at ¶ 77.

J.A.365

On October 27, 2013, a fire broke out on the vessel below deck.[3]  Id. at ¶ 79.  Hours after

the fire, the Saudi government issued a report concluding that the fire was caused by an electrical

short circuit in the living room.[4]  Id. at ¶ 87.  On December 15, 2013, the Director of Saudi

Arabia's Maritime Administration released a report that attributed the cause of the fire to

AdvanFort and the vessel's electrical system.[5]  Id. at ¶ 89.

According to the Complaint, on October 28, 2013, the day after the fire, AdvanFort

received notice that Jeddah Shipyard intended to undock the vessel mid-repair, which would

leave it vulnerable to water damage.  Id. at ¶ 99.  When AdvanFort wrote to Jeddah Shipyard

demanding that it not undock the vessel, Jeddah Shipyard responded by requesting that

AdvanFort sign a statement of responsibility for the fire, which AdvanFort refused to do.  Id.

Jeddah Shipyard then ceased performing any work on the vessel.  Id. at ¶ 100.

On December 26, 2013, AdvanFort wrote to Zamil seeking prompt repair of the vessel's

fire-related damage.  Id. at ¶ 103.  On January 25, 2014, Zamil wrote to AdvanFort "denying

---

[3] AdvanFort spends much of its Complaint explaining how it believes that Zamil was negligent in its handling of electrical work and "because of the failures by Jeddah Shipyard to check for and remove combustible material prior to performing hot work, the work taking place on the deck ignited combustible materials underneath the deck."  Id. at ¶ 84.  Because AdvanFort already litigated and lost this issue in a Saudi court, this portion of the Complaint is not directly at issue in this action.

[4] AdvanFort disagrees with the Saudi government's report because it "did not consider the root cause of the supposed electrical short circuit, nor did it consider that the supposed short circuit could have been caused by the hot work that Jeddah Shipyard had been conducting on the vessel that day."  Id. at ¶ 88.

[5] AdvanFort also challenges the Maritime Administration's report because it "contained supposed findings that were demonstrably false," including that "the hot work on the port side (the same side as the fire) had been completed before the fire occurred on October 27, 2013, and that the hot work on the day of the fire was on the opposite side of the fire (the starboard side), even though governmental investigators possessed the hot work permit, which expressly stated that the hot work occurred on the forward port side of the vessel."  Id. at ¶ 89.  This, according to the Complaint, evinces that Jeddah Shipyard "influenced both reports by improper means."  Id. at ¶ 90.

responsibility for the fire; accusing AdvanFort of causing the delay in the regular maintenance and scheduled repair by falsely claiming that AdvanFort had neglected to furnish spare parts; and, most egregiously, demanding payment from AdvanFort for purported damage suffered by Jeddah Shipyard as a result of the fire that Jeddah Shipyard had itself caused." Id. at ¶ 104. As a result, on April 14, 2014, AdvanFort commenced a civil action against Zamil in Saudi Arabia in the Third Commercial Circuit of the Jeddah Board of Grievances seeking $825,986.00 per month for damages caused by the fire. [Dkt. No. 1] at ¶ 105. Zamil filed a countersuit, which according to AdvanFort, "falsely claimed that the fire was somehow AdvanFort's fault and falsely asserted that any delay in repairing the vessel was attributable to AdvanFort's own supposed delay in furnishing spare parts." Id. at ¶ 106. Zamil sought $147,523.00 in berthing fees and $717,800.00 in repair costs.[6] Id. The Complaint alleges that, throughout the Saudi litigation, Zamil "sought to taint the legal process," by among other things, pressuring the captain of the Seaman Guard Virginia, Yurii Fedorenko, to change his testimony and making one of AdvanFort's witnesses fearful to testify "against the interests of the powerful Zamil family." Id. at ¶¶ 112, 119. At a hearing that took place on June 16, 2014, the Saudi court stated that it would appoint a marine expert in light of technical issues raised by the action; however, the Saudi court subsequently reversed course. Id. at ¶ 121. Instead, in April 2017, the Saudi court,

---

[6] According to the Complaint, on December 8, 2014, Zamil Offshore, through its legal representative, offered to settle the dispute by wiring 10 million Saudi Royals (approximately US $2.7 million) to AdvanFort. Under the terms of the offer, however, AdvanFort had to: (a) agree that the fire was an "Act of God" and (b) "pay the guys" to have the Saudi Government's report revised to change the cause of the fire, on the basis of which Zamil Offshore would make a claim to its insurer. Id. at ¶ 108. AdvanFort understood the putative settlement offer to mean that Zamil would arrange a bribe to the relevant Saudi authorities, who, in exchange for payment, would amend their report regarding the cause of the fire. Id. at ¶ 109. AdvanFort refused the offer. Id. at ¶ 110.

without appointing a marine expert, issued a judgment dismissing AdvanFort's claims and awarding Zamil $40,000.00 in damages and unspecified berthing fees. Id.

On June 29, 2022, Zamil, through counsel, informed AdvanFort that "unless AdvanFort contacted Mr. Allastair Bisset," Zamil's General Manager, "regarding its plans to remove the Seaman Guard Virginia within 90 days of that letter, Zamil Offshore itself would take 'appropriate steps' to remove the Seaman Guard Virginia including disposing of the vessel. Id. at ¶ 124.

On September 4, 2022, AdvanFort's marine expert inspected the vessel and discovered that it "had been stripped bare and rendered inoperable." Id. at ¶ 127. According to the Complaint, the inspection revealed that Jeddah Shipyard had undertaken no meaningful efforts to preserve or protect the vessel or associated equipment. Id. at ¶ 132. Jeddah Shipyard employees informed the marine expert that the vessel had been removed from the water due to fears that it would sink and become a hazard to local navigation. Id. The inspection also revealed that the vessel "was stripped of all items of value," including among other things, engines, a speed boat, TVs, air conditioners, a washing machine, steering equipment, and anchors. Id. at ¶ 133. The Complaint concludes that Jeddah Shipyard wrongly, and without right, assumed ownership of the engines, along with all the other stripped parts, materials, and instruments. Id. at ¶ 139.

**B. Procedural History**

Recognizing that res judicata prohibits it from relitigating the cause of the 2013 fire, AdvanFort filed a five-count civil action in this Court against both Zamil and the Saudi Ports Authority, alleging that it has been "denied use" of the vessel since the fire because of the

deterioration of the boat's condition.[7]  More specifically, the five-count Complaint alleges

conversion (Count I), because Jeddah Shipyard lacked any right to assume authority over or to

convert the <u>Seaman Guard Virginia</u>, its materials, instruments, engines, and parts, <u>id.</u> at ¶ 145;

breach of a bailment – tort (Count II), because while under Jeddah Shipyard's control, the vessel

was destroyed and rendered useless and valueless which was proximately caused by the

negligence of Jeddah Shipyard, <u>id.</u> at ¶ 153; breach of a bailment – contract (Count III), because

Jeddah Shipyard failed to redeliver the vessel as required by the parties' contract and, instead,

only allowed AdvanFort to access the vessel when it had been stripped of all value, <u>id.</u> at ¶ 157;

negligence (Count IV), because Jeddah Shipyard breached its duty to maintain the vessel in a

workman-like manner consistent with industry standards when it stored the vessel without

protection from the elements or security from theft, <u>id.</u> at ¶ 161; and gross negligence (Count V),

because Jeddah Shipyard showed an utter disregard to caution amounting to a complete neglect

of the <u>Seaman Guard Virginia</u>'s safety by exposing it to the elements for extended periods of

time and leaving it unprotected from theft, <u>id.</u> at ¶ 167.  AdvanFort seeks an award of actual,

compensatory, and consequential damages, including lost profits, and punitive damages; an order

that Zamil disgorge all money and profits wrongfully obtained; and an award of attorney's fees

and costs.  <u>Id.</u> at 34-35.

    On July 21, 2023, Zamil waived service [Dkt. No. 13], and on September 29, 2023, it

filed the instant Motion to Dismiss [Dkt. No. 23], pursuant to the doctrine of <u>forum non

conveniens</u> and under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction,

---

[7] Notably, neither party explains why the vessel remained in the Jeddah Shipyard until 2023, especially given that the Saudi civil action terminated in 2017.

to which AdvanFort has filed an opposition. [Dkt. No. 34]. Zamil has filed a reply to the opposition, [Dkt. No. 41], and oral argument has been held.

## II. DISCUSSION

District courts have discretion whether to first address objections to personal and subject matter jurisdiction, or to first consider dismissal for forum non conveniens. Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 432 (2007). Because this action will be dismissed based on forum non conveniens, Zamil's Fed. R. Civ. P. 12(b)(2) argument need not and, therefore, will not be addressed.

### A. Standard of Review

A forum non conveniens dismissal "den[ies] audience to a case on the merits," and "is a determination that the merits should be adjudicated elsewhere." Sinochem, 549 U.S. at 432 (2007). A civil action should be dismissed on the basis of forum non conveniens when an alternative forum is (i) available; (ii) adequate; and (iii) more convenient in light of the public and private interests involved. dmarcian, Inc. v. dmarcian Eur. BV, 60 F.4th 119, 136 (4th Cir. 2023). The forum non conveniens doctrine is ultimately "concerned with convenience, not simply the locus of alleged wrongful conduct." Jiali Tang v. Synutra Int'l., Inc., 656 F.3d 242, 252 (4th Cir. 2011).

### B. Analysis

#### 1. Availability

For a case to be dismissed based on forum non conveniens, an alternate forum must be available to all defendants. Galustian v. Peter, 591 F.3d 724, 731 (4th Cir. 2010). Zamil argues that, as a Saudi company, it is subject to suit in Saudi Arabia, and AdvanFort cannot claim otherwise because previously "it initiated litigation against Zamil Offshore in Saudi Arabia." [Dkt. No. 24]. Although it does not contest that Saudi courts would have jurisdiction over both

8

defendants, AdvanFort argues that Saudi Arabia is nevertheless an unavailable forum because defendant Saudi Ports Authority has not yet appeared in this action and because AdvanFort's claims against defendants would have to be brought separately in Saudi Arabia—suit against Zamil would have to be brought in the Saudi Commercial Court and suit against the Saudi Ports Authority would have to be brought before the Saudi Board of Grievances.  [Dkt. No. 34] at 15.

Neither of AdvanFort's arguments preclude the Court from finding that Saudi courts are available to hear this civil action.  Merely because the Saudi Ports Authority has not yet appeared in this action does not prevent the Court from dismissing this action based on forum non conveniens.  Moreover, although the parties' Saudi Arabian attorneys dispute whether AdvanFort would have to sue each defendant in a different Saudi tribunal, compare [Dkt. No. 41-2] at ¶ 3.1.1, with [Dkt. No. 37] at ¶ 39, AdvanFort does not cite any legal authority for the proposition that a foreign country is not a convenient forum if a party's claims must be heard by different tribunals in that country.  Instead, it cites inapposite cases in which courts have denied motions to dismiss for forum non conveniens when dismissing the actions would split claims against domestic defendants from foreign defendants, thereby forcing plaintiffs to litigate in two different countries.  See [Dkt. No. 34] at 15 (citing DIRTT Environmental Solutions, Inc. v. Falkbuilt Ltd., 65 F.4th 547, 551 (10th Cir. 2023)).  Unlike in DIRTT, because dismissing this action would not force AdvanFort to litigate in two different counties and because together the Board of Grievances and the Commercial Court have jurisdiction to hear AdvanFort's claims against defendants, the Saudi courts provide an available forum to resolve AdvanFort's claims against both defendants.

2. Adequacy

A foreign forum "is adequate when (1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." Tang, 656 F.3d at 249 (citation omitted). Zamil argues that the Saudi courts are adequate because all parties can come within the Saudi courts' jurisdiction, as evinced by AdvanFort's past civil action against Zamil in Saudi Arabia, and AdvanFort will not be deprived of remedies in Saudi Arabia because it will be able to pursue claims that Zamil "breached a duty of care owed under the terms of a contract, or in the absence of a specific contract, under Islamic tort law." [Dkt. No. 24] at 13. Zamil also claims that AdvanFort has not established that it will be treated unfairly by the Saudi courts because it merely provides "anecdotal evidence of corruption and delay" which this district has found to be "an insufficient basis for concluding that a foreign court is an inadequate forum." Conflict Kinetics, Inc. v. Goldfus, 577 F. Supp. 3d 459, 464-65 (E.D. Va. 2021). AdvanFort does not challenge Zamil's claim that all parties can come within the Saudi courts' jurisdiction[8] and that AdvanFort would have a legal avenue to pursue its claims against defendants; rather, it claims that because "[t]he Saudi judiciary is controlled by the Saudi government, a defendant in this suit, and is marked by capriciousness, opacity, and discrimination," and because the United States Department of Treasury "regularly reports on [the Saudi judiciary's] abuses, observing that the judiciary 'has serious problems with . . .

---

[8] Although the Saudi Ports Authority has not yet appeared in this matter, it also is a Saudi Arabian entity within the jurisdiction of the Saudi courts, and it is not entitled to sovereign immunity. See [Dkt. No. 24-1] at ¶ 4.1.4 ("Under Saudi law, there is no sovereign immunity granted to ministers, government employees, commercial public or private entities, or citizens.").

10

independence,'" it is "extremely unlikely that the courts of Saudi Arabia would adjudicate AdvanFort's claims in a fair and impartial manner." [Dkt. No. 34] at 8.

AdvanFort's argument that the Saudi judicial system, as a whole, is corrupt and thus incapable of adjudicating disputes fairly misaligns with the results of the parties' past litigation. In the parties' 2013 litigation in Saudi Arabia, although the court dismissed AdvanFort's claims, it awarded Zamil only $40,000.00 in repair fees—less than one-third of the $147,523.00 Zamil sought. Also, a court's administrative decision to change course and not "appoint a marine expert in light of the technical issues raised by th[is] case," [Dkt. No. 1] at ¶ 121, alone does not indicate that a court would "deprive[] [AdvanFort] of all remedies or treat [ ] [it] unfairly." Tang, 656 F.3d at 249.

Moreover, American courts have routinely found that Saudi courts are adequate fora and have dismissed cases on the basis of forum non conveniens. See, e.g., Kamel v. Hill-Rom Co., 108 F.3d 799, 803 (7th Cir. 1997) (affirming trial court's dismissal on the basis of forum non conveniens, including its finding that Saudi Arabia was an adequate forum); Forsythe v. Saudi Arabian Airlines Corp., 885 F.2d 285, 290-91 (5th Cir. 1989) (same); Ahmed v. Boeing Co., 720 F.2d 224, 226 (1st Cir. 1983) (Breyer, J.) (same).

Courts have also "uniformly held that anecdotal evidence of corruption and delay provides an insufficient basis for concluding that a foreign court is an inadequate forum." Conflict Kinetics, 577 F. Supp. 3d at 464-65.[9]  For example, in Alayan v. Permanent Mission of Saudi Arabia to the United Nations, 2021 WL 1964078 (S.D.N.Y. May 17, 2021), the plaintiffs

---

[9] This calculus does not change when the claim being brought is against a government-controlled entity, such as the Saudi Ports Authority. See, e.g., Forsythe, 885 F.2d at 290-91 (affirming finding that Saudi Arabia was an adequate forum even though defendant was a corporation wholly owned by the Saudi government).

J.A.373

argued that the Saudi legal system was inadequate and "cite[d] allegations of human rights

scandals, the detention of women's rights activists, and the murder of a Saudi Journalist[,]" as

well as allegations that its process server "was turned away under the threat of arrest" and "was

in fear of his life." Id. at *2.  The court found the plaintiff's "arguments unavailing," explaining

that they "rest mostly on general biases and danger within Saudi Arabia[,]" and cited other cases

in which United States courts had found Saudi Arabia to be an adequate forum. Id. at *2-3.

Even more recently, in CDM Smith Inc. v. Atasi, the plaintiffs cited the same State Department

"Human Rights Practices" reports that AdvanFort cites in its opposition to argue that the Saudi

Labor Court was not an adequate forum, but the court in CDM Smith was unpersuaded. See 594

F. Supp. 3d 246, 256-57 (D. Mass. 2022) (finding Saudi Labor Court to be impartial and

explaining that State Department Human Rights Reports are inapposite because they are focused

on the Saudi criminal justice system, not the civil courts).  Ultimately, "[c]ourts must be cautious

before finding incompetence or corruption by other nation's judicial systems," Alayan, 2021 WL

1964078, at *2, and the type of generalized claims of corruption pressed by AdvanFort have

been repeatedly held to be insufficient to establish inadequacy of a foreign sovereign's courts.

For these reasons, AdvanFort fails to support its argument that the Saudi Board of Grievances

and the Commercial Court are inadequate fora.

     3. Public and Private Interests

          i. Private Interest Factors

     The factors pertaining to the private interests of litigants include (i) the relative ease of

access to sources of proof, (ii) the availability of compulsory process to obtain the testimony of

unwilling witnesses, (iii) the cost of obtaining testimony from willing witnesses, (iv) the

possibility of viewing the premises, and (v) "all other practical problems that make trial of a case

easy, expeditious and inexpensive." Tang, 656 F.3d at 249.  Generally, if there is a "real

showing of convenience by a plaintiff who has sued in his home forum [it will] normally

outweigh the inconvenience the defendant may have shown;" however, this principle is

inapplicable where "the plaintiff is a corporation doing business abroad."  DiFederico v. Marriott

Int'l Inc., 714 F.3d 796, 804, 807 (4th Cir. 2013).

AdvanFort elected to do business with Zamil in Saudi Arabia, and therefore, it "should

expect to litigate in foreign courts."  As a result, the Court will "partially discount[]

[AdvanFort's] United States Citizenship." Id.  Moreover, the private interest factors "plainly

favor [the] foreign forum" and "favor dismissal on forum non conveniens grounds." In re

Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980, 540 F. Supp. 1141, 1147 (D.D.C.

1982); Conflict Kinetics, 577 F. Supp. 3d at 465.  First, "the majority of the actionable conduct

alleged in the complaint occurred in [Saudi Arabia], not the United States." Conflict Kinetics,

577 F. Supp. 3d at 465.  Because the relevant conduct occurred in Saudi Arabia and because

AdvanFort was not in Saudi Arabia when the alleged damage to the vessel took place, the parties

will need to rely on physical and testimonial evidence located in Saudi Arabia, including Jeddah

Shipyard employees, AdvanFort's marine expert, and physical evidence such as the vessel which

remains in Saudi Arabia.[10]  [Dkt. No. 1] at ¶ 137; see In re Disaster at Riyadh Airport, 540 F.

Supp. at 1147 (finding that evidence in Saudi Arabia regarding alleged negligent maintenance of

aircraft at Riyadh airport was "more important to the proceedings").

---

[10] AdvanFort's claim that its "witnesses are located in the United States and this forum," [Dkt.
No. 34] at 17, is lacking in support. AdvanFort states that unspecified "potential witnesses in this
case are located in the United States, and specifically Virginia," [Dkt. No. 36] at ¶ 6, but it does
not identify a single witness.  It also claims that "employees who interacted with Zamil reside in
the United States or in countries other than Saudi Arabia," id. at ¶ 4, but offers no further
explanation of who those witnesses would be and what testimony they would offer.

Finally, regarding the availability of both willing and unwilling witnesses, "[s]ignificant costs would be involved in transporting and accommodating [the] willing witnesses . . . from Saudi Arabia" because "more witnesses will have to travel farther distances if trial is held in the United States." In re Disaster at Riyadh Airport, 540 F. Supp. at 1148-49.  Notably, given that this dispute involves events spread over ten years at a Saudi Arabian shipyard—including allegations that Zamil "allow[ed] the vessel to be looted" by third parties, [Dkt. No. 1] at ¶ 153— it is reasonable to expect that litigation of the case will involve third-party witnesses who are not under either party's control.  See Piper Aircraft Co. v. Reyno, 454 U.S. 235, at 258-59 (1981) (noting a lack of need to identify particular witnesses who are not available, especially if they are difficult to identify without "extensive investigation").  This Court would lack authority to compel the attendance at trial of any unwilling Saudi witnesses—a factor that favors the Saudi forum.  See Tang, 656 F.3d at 252; In re Disaster at Riyadh Airport, 540 F. Supp. at 1148 ("[A] United States forum would likely be unable to require the attendance of those foreign witnesses having knowledge of either plaintiffs' damages.").

ii. Public Interest Factors

Public interest factors in a forum non conveniens inquiry include: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies decided at home; (3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; (4) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty." Tang, 656 F.3d at 249.  All of these factors weigh in favor of litigation in Saudi Arabia, and not in Virginia.

14

First, the Commonwealth of Virginia's interests in this case are minimal. Because this action is about a vessel in Saudi Arabia that was allegedly damaged by a Saudi company, with Saudi employees, in a Saudi shipyard in Saudi Arabia, both the Board of Grievances and Commercial Court "seemingly would have a significant interest in hearing a dispute about a contract performed in Saudi Arabia." D & S Consulting, Inc. v. Kingdom of Saudi Arabia, 961 F.3d 1209, 1214 (D.C. Cir. 2020). On the other hand, there is "little local interest" in a case involving an alleged tort arising from performance of a contract overseas. Conflict Kinetics, 577 F. Supp. 3d at 465. In situations where the "controversy's contacts with the United States pale in comparison to the controversy's foreign contacts," "jury duty ought not to be imposed upon the people of the United States nor should United States courts be clogged." In re Disaster at Riyadh Airport, 540 F. Supp. at 1152.

Moreover, forum non conveniens is appropriate in this action given that this Court would be tasked with applying Saudi law. A federal court sitting in Virginia and exercising diversity jurisdiction applies Virginia's choice-of-law rules, and under Virginia's lex loci delicti rule for tort claims, the federal court must apply the law of the place where "the last event necessary to make an actor liable for an alleged tort takes place." DiFederico, 714 F.3d at 807. For contract claims, questions arising from the performance of a contract are governed by the law of the place of performance. Equitable Tr. Co. v. Bratwursthaus Mgmt. Corp., 514 F.2d 565, 547 (4th Cir. 1975). Under both rules, the place of performance and the place where the last alleged tortuous act took place is Jeddah, Saudi Arabia, and as such, this Court would be forced to apply Saudi law. Piper Aircraft Co., 454 U.S. at 260 (explaining that "the need to apply foreign law point[s] towards dismissal").

III. CONCLUSION

For the reasons stated above, the Court will dismiss the Complaint on the basis of <u>forum non conveniens</u> by an Order to be issued with this Memorandum Opinion.

Entered this 1st day of December, 2023.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ADVANFORT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:23-cv-906 (LMB/IDD) |
| | ) | |
| ZAMIL OFFSHORE SERVICES COMPANY | ) | |
| and SAUDI PORTS AUTHORITY, | ) | |
| | ) | |
| Defendants. | | |

ORDER

For the reasons stated in open court, and as explained in the accompanying Memorandum

Opinion, defendant Zamil Offshore Services Company's ("defendant") Motion to Dismiss [Dkt.

No. 23] is GRANTED and plaintiff AdvanFort Company's ("plaintiff") Motion for Limited

Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay the Motion to

Dismiss [Dkt. No. 38] is DENIED. Accordingly, it is hereby

ORDERED that plaintiff's Complaint [Dkt. No. 1] be and is DISMISSED WITHOUT

PREJUDICE.

The Clerk is directed to enter judgment in favor of defendants under Fed. R. Civ. P. 58;

forward copies of this Order to counsel of record; and close this civil action.

Entered this 1st day of December, 2023.

Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| Advanfort Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23cv906-LMB-IDD |
| | ) | |
| Zamil Offshore Services Company and | ) | |
| Saudi Ports Authority, | ) | |
| | ) | |
| Defendants. | ) | |

**JUDGMENT**

Pursuant to the order of this Court entered on December 1ˢᵗ, 2023 and in accordance with

Federal Rules of Civil Procedure 58, JUDGMENT is hereby entered in favor of the Defendants',

Zamil Offshore Services Company and Saudi Ports Authority and against the Plaintiff,

Advanfort Company.

FERNANDO GALINDO, CLERK OF COURT

By:_____/s/_____
Paulina A. Miller
Deputy Clerk

Dated: December 1, 2023
Alexandria, Virginia

J.A.380

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>Alexandria Division</u>

| | |
|---|---|
| ADVANFORT COMPANY, )<br>                              Plaintiff, )<br>                                          )<br>      v.                              )<br>                                          )<br> ZAMIL OFFSHORE SERVICES COMPANY )<br> and SAUDI PORTS AUTHORITY, a foreign )<br> sovereign State, )<br>                              Defendants. )<br>                                          )<br>                                          ) | CIVIL ACTION NO. 1:23-cv-906 |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Plaintiff AdvanFort Company ("AdvanFort") appeals to the

United States Court of Appeals for the Fourth Circuit the final Judgment entered in this action on

December 1, 2023 [Dkt. 51], as well as all prior Orders of the District Court incorporated into

that Judgment [Dkt. 48–50].

Dated:  December 26, 2023

AdvanFort Company

By its Attorneys,

<u>/s/ *Benjamin L. Hatch*</u>
Benjamin L. Hatch (VSB No. 70116)
McGuireWoods LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Clara Brillembourg *(pro hac vice)*
Foley Hoag LLP
1717 K Street N.W.
Washington D.C., 020006
Telephone: (202) 261-7334

Email: Cbrillembourg@foleyhoag.com

Andrew Loewenstein *(pro hac vice)*
Roseanna K. Loring *(pro hac vice)*
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
Telephone : (617) 832-3015
E-mail : Aloewens@foleyhoag.com

Peter A. Sullivan *(pro hac vice)*
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 010019
Telephone: (212) 812-0310
E-mail: psullivan@foleyhoag.com

*Counsel for AdvanFort Company*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 26, 2023, a true and correct copy of the foregoing

Notice of Appeal was served on all counsel of record via the Court's CM/ECF electronic filings

system.

/s/ *Benjamin L. Hatch*
Benjamin L. Hatch

# CERTIFICATE OF SERVICE

I, Peter A. Sullivan, a member of the Bar of this Court, hereby certify that on March 27, 2024, I caused the foregoing Joint Appendix to be filed with the Clerk of the United States Court of Appeals for the Fourth Circuit. I certify that service on all case participants will be accomplished through the Court's CM/ECF system or, for case participants not registered for service through the CM/ECF system, by third-party commercial carrier to the address(es) listed in the docketing statement.

Dated: March 27, 2024                 */s/  Peter A. Sullivan*
                                      *Attorney for AdvanFort Company*